# Exhibit C

Dena R. Hixon, M.D.

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF TENNESSEE

- - - - - - - - - - - - - - - - x

KATRINA DAWN COPLEY                    :

            Plaintiff               :

v.                                     : Civil Action No.:

BAYER HEALTHCARE                       : 3:14-CV-00406

PHARMACEUTICALS, INC.                  :

            Defendant.              :

- - - - - - - - - - - - - - - - x

                        Friday, April 29, 2016

                        Washington, D.C.


VIDEOTAPED DEPOSITION OF:

            DENA R. HIXON, M.D.

    a witness in the above-entitled cause, called

for examination by counsel for the Defendant,

pursuant to notice and to agreement of counsel as to

time and place, at the offices of Covington &

Burling LLP, One CityCenter, 850 Tenth Street, N.W.,

Washington, D.C. 20001, commencing at 9:13 a.m.,

before Samara J. Zink, a Notary Public

in and for the District of Columbia, when were

present on behalf of the respective parties:

Dena R. Hixon, M.D.

Page 2

1      A P P E A R A N C E S
2
3      ON BEHALF OF THE PLAINTIFF:
4          LAWRENCE L. JONES, II, ESQUIRE
5          CHRISTINA NATALE, ESQUIRE
6          JONES WARD PLC
7          312 South 4th Street
8          6th Floor
9          Louisville, Kentucky  40202
10         (502) 882-6000
11         larry@jonesward.com
12         christina@jonesward.com
13
14     ON BEHALF OF THE DEFENDANT:
15         MICHAEL X. IMBROSCIO, ESQUIRE
16         KATHLEEN E. PALEY, ESQUIRE
17         COVINGTON & BURLING LLP
18         850 10th Street, N.W.
19         Washington, D.C.  20001
20         (202) 662-5694
21         mimbroscio@cov.com
22         kpaley@cov.com
23
24     ALSO PRESENT:
25         Larry Newman, videographer

Page 3

1
2              C O N T E N T S
3      EXAMINATION OF DENA R. HIXON, M.D.       PAGE
4      BY MR. JONES                  5
5
6              E X H I B I T S
7          (Attached to transcript)
8      HIXON DEPOSITION EXHIBITS            PAGE
9      Exhibit 1   Notice of Video Deposition of    7
              Dena Hixon, M.D.
10
       Exhibit 2   Supplemental List of Materials   70
11               Reviewed
12     Exhibit 3   Expert Statement of         70
              Dena R. Hixon, M.D.
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1              P R O C E E D I N G S
2          THE VIDEOGRAPHER:  We are now on the
3      record.  My name is Larry Newman.  I am a
4      videographer for Golkow Technologies.  Today's date
5      is Friday, April 29th, 2016.  The time is 9:13 a.m.
6      This video deposition is being held in Washington,
7      D.C. in the matter of Katrina Dawn Copley versus
8      Bayer Healthcare, et al., and this is in the United
9      States District Court for the Middle Division of
10     Tennessee, Nashville Division.  Our deponent is
11     Dena Hixon.
12         Would our counsel please identify
13     themselves.
14         MR. JONES:  Larry Jones for the
15     Plaintiffs.
16         MS. NATALE:  Christina Natale for the
17     Plaintiffs.
18         MR. IMBROSCIO:  Michael Imbroscio for
19     Bayer.
20         MS. PALEY:  Kathleen Paley for Bayer.
21         THE VIDEOGRAPHER:  Our court reporter
22     today is Samara Zink and will now swear in the
23     witness.
24     Whereupon,
25         DENA R. HIXON, M.D.

Page 5

1      a Witness, called for examination by counsel for
2      the Plaintiffs, having first been duly sworn, was
3      examined and testified as follows:
4          EXAMINATION BY COUNSEL FOR PLAINTIFFS
5      BY MR. JONES:
6      Q.  Good morning.  I'm Larry Jones.
7      A.  Good morning.
8      Q.  Will you please state your full name for
9      the record.
10     A.  Dena R. Hixon.
11         MR. IMBROSCIO:  And, Larry, before you
12     begin, I just want to make a note.  We've also
13     cross-noticed this deposition in the other cases
14     where Dr. Hixon has issued a report, the cases that
15     are in discovery, and we'll have those attached to
16     the end of the deposition as well.  I know you're
17     not probably accepting them or whatever the case may
18     be, but I want to just note for the record that
19     we've cross-noticed this in the other cases.
20         MR. JONES:  Yeah.  And when you say "the
21     other cases" -- I know I saw some -- are they the
22     ones that Dr. Hixon has --
23         MR. IMBROSCIO:  Yes.
24         MR. JONES:  -- issued a report in?
25         MR. IMBROSCIO:  Correct.  Yes.

2  (Pages 2 to 5)

Dena R. Hixon, M.D.

Page 6

1          MR. JONES:  Okay.  Fair enough.
2     BY MR. JONES:
3          Q.  And as I said, Dr. Hixon, you are a
4     medical doctor, correct?
5          A.  Yes, I am.
6          Q.  Okay.  And you issued a report in this
7     litigation and several other -- or this case and
8     several others, as counsel has noted, correct?
9          A.  The others -- it was one single report for
10    the other cases.
11         Q.  Okay.  Do you know which cases you've
12    issued a report for?
13         A.  So I have issued the one report for this
14    case, and the other cases were the cases related to
15    uterine perforations with Mirena.
16         Q.  Okay.  Let me -- let me clarify.  There --
17    your report -- let's talk about this particular
18    case --
19         A.  Okay.
20         Q.  -- the Copley case.
21             You've issued -- you've submitted a
22    37-page report --
23         A.  Correct.
24         Q.  -- correct?
25             Okay.  And have you -- are you aware that

Page 7

1     you have submitted the same 37-page report in other
2     cases involving benign intracranial hypertension?
3          A.  I -- I am not specifically aware, but that
4     seems correct based on our background discussions.
5          Q.  Okay.  And do you know the names of any of
6     my clients that you've issued reports in their
7     particular cases?
8          A.  No, I do not.
9          Q.  Okay.  I note in your report, you say that
10    you were paid -- you were compensated at a rate of
11    $600 per hour for reviewing materials and creating
12    this report; is that correct?
13         A.  That's correct.
14         Q.  Okay.  And do you have an additional rate
15    that you receive for testifying?
16         A.  No.  I charge the same rate for
17    everything.
18         Q.  Okay.  Doctor, I'm going to hand you what
19    we're going to mark as Deposition Exhibit 1.
20             (Exhibit 1 was marked for identification
21             and is attached to the transcript.)
22             THE WITNESS:  Thank you.
23    BY MR. JONES:
24         Q.  This is a Notice of Video Deposition of
25    Dena Hixon, M.D.  Have I represented the document

Page 8

1     that's been handed to you correctly?
2          A.  Yes.
3          Q.  Okay.  And have you seen this before?
4          A.  Yes.
5          Q.  Okay.  And you'll note beginning back on
6     page 4 that there's several document requests where
7     it says "Documents to Be Produced."  Do you see
8     that?
9          A.  That's correct.
10         Q.  Okay.  And did you review each of these
11    20 requests?
12         A.  Yes, I did.
13         Q.  Okay.  And what did you -- did you gather
14    any documents pursuant to these 20 requests?
15         A.  I did.
16         Q.  Okay.  And what did you do to look for the
17    documents that have been requested in these 20
18    items?
19         A.  I went through the list and I noted, for
20    instance, that the curriculum vitae had already been
21    presented to the attorneys.  I went through my
22    archived documents to find presentations and talks,
23    and I provided to the attorneys the ones that I
24    found.
25         Q.  Okay.

Page 9

1          MR. IMBROSCIO:  And, Larry, we have a set
2     of stuff -- I probably should have done this before
3     and I forgot -- in response.  We're happy to hand it
4     over and have her walk you through it, whatever the
5     case may be.
6          MR. JONES:  Yeah, if you could just hand
7     it over.  Just if you could give it to Christina and
8     she'll start looking through things.
9          MS. PALEY:  This is a copy of
10    presentations.  Here are the IIH invoices.
11         MR. JONES:  Can I see the IIH invoice?
12         THE WITNESS:  To finish my answer, I
13    also --
14    BY MR. JONES:
15         Q.  Yes, ma'am.
16         A.  -- looked at the rest of the -- the
17    requests and found that a number of them were not
18    applicable.  I -- I didn't have anything to respond
19    to them.  And everything that I had I provided to
20    the attorneys.
21         Q.  Thank you.
22             Okay.  Doctor -- excuse me -- among the
23    materials that have just been handed across the
24    table, I see two invoices from Pharmaceutical
25    Life -- Lifecycle Consulting, LLC.  What is

3 (Pages 6 to 9)

Dena R. Hixon, M.D.

Page 10

1    Pharmaceutical Lifecycle Consulting, LLC?
2         A.  I work as a single-member LLC, and my
3    business is called Pharmaceutical Lifecycle --
4         Q.  Okay.
5         A.  -- Consulting, LLC.
6         Q.  Okay.  And on the two invoices, I see a
7    billing for February 2016 and March 2016.  Did you
8    do any work on this case before February 2016?
9         A.  No, I did not.
10        Q.  And the February 2016 invoice notes that
11   you spent 24 hours, 40 minutes for a grand total of
12   $14,800.  Does that sound correct?
13        A.  Yes, it does.
14        Q.  And the March invoice notes that you spent
15   32 hours and 30 minutes: Mirena litigation document
16   review, discussions with attorneys, and drafting
17   report.  Does that sound correct?
18        A.  Yes, it does.
19        Q.  I'm going to try my math skills here.
20            So is it fair to say that between February
21   and March of 2016, you were paid $34,300 for -- from
22   Bayer for your work involved with this case?
23        A.  That's correct.
24        Q.  And did you do any work on this case in
25   April 2016?

Page 11

1         A.  Yes, I did.  And I haven't added up my
2    hours worked in April at this point.
3         Q.  Okay.  Approximately how many hours would
4    you think that would be?
5         A.  I'm not sure.  My best guess would be
6    around 40 hours.
7         Q.  Around 40 hours.
8            So 40 hours times $600 an hour would be
9    approximately another $24,000?
10        A.  That sounds right.
11        Q.  And you're getting paid for your -- you're
12   getting paid for your time to appear here today for
13   your deposition, correct?
14        A.  That's correct.
15        Q.  And that's at $600 an hour as well?
16        A.  That's correct.
17        Q.  So by my calculations, we would be at
18   approximately $54,300 before your testimony here
19   today.  Does that sound like it is about correct?
20        A.  That sounds like it's in the ballpark.
21        Q.  Okay.  And you mentioned that you were
22   a -- I think you said the sole member of
23   Pharmaceutical Lifestyle Consulting, LLC?
24        A.  Lifecycle Consulting.  Yes.
25        Q.  What did I say?

Page 12

1         A.  You said --
2         Q.  Lifestyle?
3         A.  -- lifestyle.
4         Q.  Sorry.
5         A.  That's okay.
6         Q.  So you don't have any partners in that?
7         A.  No, I do not.
8         Q.  Okay.  And when did you form
9    Pharmaceutical Lifecycle Consulting, LLC?
10        A.  I believe it was actually formed in
11   December of 2011.  I didn't start doing any work
12   until 2012.
13        Q.  And other than litigation consulting, have
14   you ever done any work for Bayer Healthcare
15   Pharmaceuticals?
16        A.  I don't believe so.  Nothing comes to mind
17   that I've done for Bayer.
18        Q.  And you are also -- you've also been
19   designated as an expert witness and have done work
20   in the Mirena migration perforation MDL, correct?
21        A.  That's correct.
22        Q.  And approximately how much money have you
23   been paid for your work in the migration perforation
24   MDL?
25        A.  As best I recall, somewhere between 150-

Page 13

1    and $200,000.
2         Q.  And was that all in 2015, or does that --
3    have you done work in 2016 that you would bill for?
4         A.  That was 2014 and '15.
5         Q.  Okay.  Now, in preparing your report to be
6    submitted in this litigation, did you use any
7    portions of the report that you submitted in the
8    migration perforation MDL?
9         A.  I -- I used some of the same information,
10   yes.
11        Q.  Okay.  My question is a little different.
12            Did you use -- did you, for instance, copy
13   things out of the MDL report and paste them into the
14   report for this case?
15        A.  I think there were some general sections
16   that I did copy into this report.  I didn't do so
17   without reviewing them to be sure that they were
18   appropriate as they were written.
19        Q.  Right.  It makes sense.  I'm not attacking
20   you on it.  There's no sense in recreating the
21   wheel.
22        A.  Right.
23        Q.  I'm just trying to figure out what you
24   spent on this particular case.
25            Also in your report you list lots

4 (Pages 10 to 13)

Dena R. Hixon, M.D.

Page 14

1  of different -- it's -- your report is footnoted;
2  is that correct?
3      A.  That's correct.
4      Q.  Okay.  And let's see how many footnotes
5  you go to.
6          I'm counting 235 footnotes to this report.
7  Does that sound about correct?
8      A.  I think that's probably accurate.
9      Q.  Okay.  And when we say "footnote," that
10 means you're citing to a particular document for
11 support for the proposition that you've put in your
12 report?
13     A.  That's correct.
14     Q.  Okay.  And --
15     A.  It's also for providing additional
16 information if needed.  So --
17     Q.  Okay.  And explain that to me.
18     A.  -- it doesn't necessarily mean that that's
19 where all of my information comes from because I'm
20 acquiring that background not only from other
21 documents but also based on my experience and
22 knowledge.
23     Q.  Okay.  Well, let me ask you this.  Are all
24 the opinions that you are intending to give at the
25 trial in this case contained within the body of your

Page 15

1  37-page report?
2      A.  Yes, they are.
3      Q.  And back to the footnotes.  It looks like
4  it contains a potpourri of materials we'll call
5  it.  It looks like some FDA guidances; is that
6  correct?
7      A.  Correct.
8      Q.  Statutory citations; is that correct?
9      A.  That's correct.
10     Q.  Medical journal articles?
11     A.  That's correct.
12     Q.  Bayer internal documents?
13     A.  That's correct.
14     Q.  FDA regulations?
15     A.  Correct.
16     Q.  And did you review all of these materials
17 prior to preparing your report?
18     A.  Prior to and during the preparation of the
19 report.  Some of them I put into the report as I
20 went along and others were reviewed before I started
21 the writing process.
22     Q.  Fair enough.
23         I guess my question is more at the time
24 that you signed your signature on this report, is it
25 fair to say that you had reviewed all of the

Page 16

1  documents listed in these footnotes?
2      A.  Yes.
3      Q.  Okay.  And then also we received a list of
4  materials that you reviewed but perhaps didn't rely
5  on.  Is that fair to say?
6      A.  That's correct.
7      Q.  Okay.  And those -- when we -- when I say
8  "not relied on," I mean they're not specifically
9  cited in your report?
10     A.  That's correct.
11     Q.  Okay.  And that -- those materials are --
12 are kind of the same types of materials, internal
13 documents, medical journal articles, et cetera,
14 correct?
15     A.  That's correct.  And I must say that it
16 includes some of the deposition transcripts related
17 to this case.  And some of those transcripts I did
18 not review in detail.
19     Q.  Okay.  Well, let's talk about just what's
20 in your -- in your report here.
21     A.  Okay.
22     Q.  In the 235 footnotes, did you review all
23 of the documents that you cited in detail?
24         MR. IMBROSCIO:  Object to the -- object to
25 the form.

Page 17

1          MR. JONES:  That's fine.
2  BY MR. JONES:
3      Q.  Do you understand what I mean?
4      A.  I understand what you mean.  And I -- I
5  reviewed those.  I -- I certainly didn't commit them
6  to memory, and I -- I did more than skim them.  So I
7  would say that I thoroughly reviewed them.
8      Q.  Well, let me ask the question a different
9  way.
10         Each of the documents cited in your 235
11 footnotes, did you review those documents from cover
12 to cover?
13     A.  I believe there may have been some
14 information in those that I -- I didn't read, like
15 some of the references and -- and footnotes and so
16 forth, but I at least went through them from cover
17 to cover.
18     Q.  Putting aside the footnotes that may have
19 been in the individual documents that are contained
20 in your footnotes to your report, did you review
21 each document?  Did you read every word on each
22 document?
23     A.  No, I did not read every word on each
24 document.  I reviewed them the same way I would have
25 reviewed them in preparing reviews when I worked at

Dena R. Hixon, M.D.

Page 18

```
 1    FDA.
 2         Q.  Okay.  And when you worked at FDA, did
 3    that include not reviewing footnotes that are
 4    contained in documents that were submitted?
 5         MR. IMBROSCIO:  Object to the form.
 6         THE WITNESS:  When I said "footnotes," I
 7    basically -- for instance, I didn't go through the
 8    entire list of -- of references, that sort of thing.
 9    But, yes, I looked at the footnotes.
10    BY MR. JONES:
11         Q.  Do you think it's important when you're
12    reviewing a document to read the references and
13    follow those references through to make sure that
14    the authors have accurately characterized what --
15    what they've represented in their papers?
16         A.  It depends on the situation and -- and
17    what their references are.  I mean, no, I don't
18    think it's important to read every footnote or every
19    reference to document.
20         Q.  But you agree that in both this case and
21    when you worked at the FDA, we're dealing with
22    patient safety issues, right?
23         A.  That's correct.
24         Q.  But you don't think that it's important to
25    review the references contained in footnotes?
```

Page 19

```
 1         MR. IMBROSCIO:  Object to the form.
 2    Argumentative.
 3         THE WITNESS:  I think I've explained that
 4    I reviewed those documents and the necessary detail
 5    to be able to form my opinions and write my report.
 6    BY MR. JONES:
 7         Q.  Now, the documents that you reviewed
 8    that were not footnoted in your report, why
 9    did you not include those in your report?
10         A.  Because in writing the report, I was
11    looking for information that would be relevant to
12    what I was writing and would provide additional
13    information that the reader might want to see.  And
14    the other documents provided insight and background
15    and understanding and information for me but were
16    not necessarily information that I felt needed to be
17    in the report.
18         Q.  You mentioned that you reviewed some
19    deposition transcripts?
20         A.  That's correct.
21         Q.  Which depositions did you review?
22         A.  I reviewed Dr. Ross' deposition.  I
23    reviewed quite a few others.  Walsh.  I don't have a
24    list of all those depositions in front of me, so --
25         Q.  As we sit here today, can you recall any
```

Page 20

```
 1    depositions that you reviewed other than Walsh and
 2    Dr. Ross?
 3         A.  Fraunfelder to -- to some extent.  I -- I
 4    briefly looked at Etminan.  I looked at Plouffe.  I
 5    can't remember all the other names.  There was
 6    Connor or Korner or maybe both and other company
 7    witnesses that I'm not specifically remembering
 8    their names because I'm not particularly familiar
 9    with them.
10         Q.  Okay.  And did you -- any of these
11    depositions that you reviewed, did you review
12    them from the beginning to the end reading
13    every page?
14         A.  Some of them I did and some of them I
15    didn't.
16         Q.  Which ones did you review from the first
17    page to the last page?
18         A.  Particularly Dr. Ross and numerous ones of
19    the company witnesses as well.
20         Q.  Well, this is my only time to ask you the
21    questions.  So which of the numerous company
22    witnesses --
23         A.  Well, would you like to --
24         Q.  Hold on.  May I finish my question?
25         This is my only time to ask you about
```

Page 21

```
 1    this.  So would you be able to tell me as you sit
 2    here today which of the company witnesses you
 3    reviewed their transcripts from the first page to
 4    the last page?
 5         A.  If you can provide me with the document
 6    that lists all of them names, I can do that.
 7         Q.  From memory, you can't remember?
 8         A.  Look, I don't remember all of those names.
 9    I remember the concepts.  If you -- if I see the
10    documents, it will help me.  But, no, I didn't sit
11    down and memorize a list of names.
12         Q.  How did you decide which deposition
13    transcripts you were going to review in this case?
14         A.  I looked through them to see, you know,
15    who they were and what the person's responsibilities
16    were.  And I read as many of them as I could get
17    through.
18         Q.  Are you confident that you've been
19    provided with every deposition transcript that
20    relates to this case?
21         A.  I believe so.
22         Q.  And why do you believe so?
23         A.  Because the attorneys carefully sent me
24    deposition transcripts and I haven't known of
25    anything that I haven't been provided with.  And my
```

Golkow Technologies,  Inc877.370.3377

Dena R. Hixon, M.D.

Page 22

1  perception is that I've had a very complete supply
2  of depositions and other information to read and
3  review.
4        Q.  How did you decide which Bayer internal
5  documents you were going to review in this case?
6        A.  Based on some depositions that I had
7  reviewed for the previous cases and understanding
8  who those people were and their positions at -- at
9  Bayer and how relevant their testimony would be to
10 my report and my opinions.
11       MR. IMBROSCIO:  I think he's asking you
12 about documents, not depositions.
13       MR. JONES:  I think she was answering to
14 documents.
15 BY MR. JONES:
16       Q.  Weren't you?
17       A.  Oh, I'm sorry.  I was answering
18 depositions.
19       Q.  Oh, okay.
20       A.  Forgive me.
21          I read the vast majority of the documents
22 because it was important for gathering the
23 information.
24       Q.  The vast majority of what documents?
25       A.  Of all of the documents that I've listed.

Page 23

1        Q.  Okay.  And so my question is, how did you
2  select which documents to review for this case?
3        A.  I made every attempt to review all of
4  them.
5        Q.  Do you know how many documents -- how many
6  pages of documents have been produced in the benign
7  intracranial hypertension cases?
8        A.  Thousands.
9        Q.  Just thousands?
10       A.  Well, probably hundreds of thousands.
11 I -- I'm fully aware of what's in an NDA and what's
12 in an IND.  And I have read the information that is
13 relevant to the discussion at hand.  And I have
14 read -- excuse me -- the communications that were
15 produced, and there's -- you know, I can't think of
16 anything specific that I haven't reviewed.
17       Q.  Do you have access to a Bayer database of
18 the documents that Bayer has produced to Plaintiffs
19 in this case?
20       A.  To a Bayer database.  I'm not sure that I
21 have access to a Bayer database.  I have been
22 provided access to a -- a huge number of documents,
23 including NDA and IND documents and post-marketing
24 reports and communications.  So I have looked at a
25 huge amount of documents.

Page 24

1        Q.  And did the attorneys send you the documents
2  to review?
3        A.  Yes.
4        Q.  Okay.
5        A.  And in addition to what the attorneys sent
6  me, I looked for additional information as I went
7  along if there was something I felt that I needed
8  more information on.
9        Q.  Would it surprise you to learn that there
10 have been over 10 million pages of documents
11 produced in this case?
12       A.  That doesn't surprise me at all.
13       Q.  And have you had access to all 10
14 million pages of documents?
15       A.  Quite honestly, I haven't added up the
16 number of documents and the number of pages that I
17 have, but anything that I would have asked for was
18 provided to me.
19       Q.  I know you haven't added up the pages, but
20 can you tell me if you've had access -- that you've
21 had access to over 10 million pages of documents?
22       A.  I think that -- I think I have.
23       Q.  Did you review over 10 million pages of
24 documents?
25       A.  No, I didn't review over 10 million pages

Page 25

1  of documents, because having worked at FDA, I'm very
2  aware of the kinds of information that are not
3  relevant to the kind of work that -- that I was
4  doing here.
5          There are hundreds of thousands of pages
6  of chemistry, manufacturing, and controls
7  information.  There are many thousands of pages of
8  information on clinical pharmacology and
9  biopharmaceutics.  I certainly had information on
10 clinical data.  I had information on the preclinical
11 data.  And there certainly is a huge amount of
12 information in every NDA that is not relevant to my
13 task in this case.
14       Q.  Did you ever sit down at a database and do
15 keyword searches on the documents that were produced
16 in this case that amount to over 10 million pages of
17 documents?
18       A.  I didn't -- I didn't find a situation
19 where I needed to do that.
20       Q.  My question is different.
21          Did you do it or did you not?
22       A.  No.
23       Q.  And you mentioned that there are lots of
24 documents that aren't relevant to your task in this
25 case.  Did --

7 (Pages 22 to 25)

Dena R. Hixon, M.D.

Page 26

1    A. That's correct.
2    Q. And what's your task in this case?
3    A. Well, my task in this case was to review
4  the documents relevant to the -- basically the
5  approval of Mirena and the labeling of Mirena and
6  the background on -- on use of the product, its
7  risk-benefit analysis and IIH, and the information
8  available about IIH, what is IIH and what may or may
9  not cause IIH, and to develop opinions with regard
10 to whether the labeling was adequate and whether the
11 interactions with FDA were appropriate.
12   Q. And is it -- did I understand you
13 correctly to say that all of the information in the
14 NDA is not necessarily relevant to the task that you
15 have in this case?
16   A. That's correct.
17   Q. Okay.
18   A. There are details -- many details that are
19 not relevant.
20   Q. Which -- what parts of -- what parts of
21 the NDA would you consider to be not relevant to
22 your task in this case?
23   A. I think I already pointed out a lot of
24 that. A lot of the CMC details would not make a
25 difference in my opinion. A lot of the -- the raw

Page 27

1  data that's presented for animal studies and
2  clinical studies is not relevant. The -- the
3  detailed sections of statistics and -- and all of
4  the individual studies are not nearly as important
5  to what I need to do as the overview and the FDA
6  analysis of that material.
7    Q. Is there anything else -- you mentioned
8  the raw data underlining the animal studies, the
9  chemicals, manufacturing, and control information.
10 Is there anything else that's contained in the NDA
11 that you do not consider to be relevant to your task
12 in this case?
13   A. I'm sure that there's a lot more in that
14 10 million pages. Those are the things that come to
15 mind as we sit here.
16   Q. But I'm talking about the NDA, not
17 10 million pages. Is there anything else other than
18 the CMC information and the raw data underlining the
19 animal studies that you would consider to be not
20 relevant to your task in this case?
21      MR. IMBROSCIO: Larry, just so it's clear,
22 I think she -- I think she understood your
23 10 million representation to be your understanding
24 of what's in the NDA. And I know that's probably
25 not what you meant, but I think that was the source

Page 28

1  of her --
2       MR. JONES: Confusion?
3       MR. IMBROSCIO: -- confusion on that.
4       MR. JONES: Yeah.
5  BY MR. JONES:
6    Q. No. But, I mean, you know -- you worked
7  at FDA -- the NDAs are huge, but they're -- I don't
8  think they're 10 million pages.
9    A. Some of them might be.
10   Q. Okay. So I'm talking -- you reviewed the
11 NDA in this case, right?
12   A. I reviewed the parts of the NDA that I
13 needed to review. No one at FDA reviews every page
14 of the NDA.
15   Q. They don't?
16   A. No.
17   Q. Not even the team leader?
18   A. No.
19   Q. What parts of the NDA did you consider to
20 be not relevant to your task in this case?
21   A. I think I already answered that question.
22   Q. Well, if it's only the
23 underlining animal -- the raw data for the animal
24 studies and the CMC information, then you have
25 answered it. If there's anything else, I'm entitled

Page 29

1  to be able to find out.
2    A. Well, there is also all the raw data. I
3  mean, all the raw data is analyzed in the study
4  reports and it's reviewed at FDA and the information
5  is summarized by the disciplines that are relevant
6  to each section of the NDA.
7       For purposes of, for instance, a team
8  leader making a recommendation about approval of the
9  product, no team leader is going to review every
10 page of that NDA. A team leader would look at the
11 reviews of -- the summary reviews of each individual
12 discipline and go into any sections of the NDA that
13 they needed to look at in order to reach their
14 conclusion.
15      Likewise, with the kind of task that I had
16 before me here, that same sort of thing was the
17 relevant information that needed to be reviewed, not
18 to dig out every animal study, every piece of raw
19 data from anything, but to get the overall big
20 picture and look at the sections that are relevant
21 to the question at hand.
22   Q. So you didn't -- in this case, for your
23 task in this case, you didn't review any of the
24 underlining raw data contained in the Mirena NDA?
25   A. As far as I can think right now, there --

8 (Pages 26 to 29)

Dena R. Hixon, M.D.

Page 30

1 there wasn't any raw data that I needed to go back
2 and look at.
3     Q. Okay. And I'm just trying to make sure
4 that I'm understanding you correctly.
5     So for purposes of this case and your
6 analysis of the NDA, you relied upon the individual
7 reviewers who prepared their portions of the NDA?
8     A. That is largely true.
9     Q. Okay. How's it -- how's it not largely
10 true?
11     A. Well, there are things that I might not
12 remember sitting here right now that if -- when you
13 ask me further questions, I may remember and need to
14 discuss. But as far as the big picture of what
15 we're talking about, I'm giving you the information
16 that I can.
17     Q. Okay. Well, this is my only chance to ask
18 you.
19     A. I understand that.
20     Q. Okay?
21     And, you know, are you going to remember
22 something later that you reviewed?
23     A. No, not unless you ask me about something
24 different that I need to say, yes, that was
25 something that I know about or that I read.

Page 31

1     Q. How did you prepare for your deposition
2 today?
3     A. I went back and looked at my review and --
4 and looked through the information I had previously
5 read. And of course I sat down and talked to the
6 attorneys about the deposition.
7     Q. And just -- I want to put this out there.
8 I don't ever want to know what you talked to the
9 attorneys about.
10     A. I understand that, yes.
11     Q. I can know if you talked to them, how much
12 time you spent with them --
13     A. Okay.
14     Q. -- but not -- I don't want to hear about
15 your conversations.
16     A. Correct. I understand that.
17     Q. I just wanted to warn you. Okay?
18     A. Yes.
19     Q. Yeah. I mean, you've given depositions
20 before.
21     A. Yes.
22     Q. You know that, right?
23     A. Yes.
24     Q. Okay. When did you -- how many meetings
25 did you have with the attorneys in preparation for

Page 32

1 your deposition today?
2     A. Two.
3     Q. Okay. And when did those meetings take
4 place?
5     A. Yesterday and the day before.
6     Q. Okay. And how many hours did you meet
7 yesterday?
8     A. About five, I think.
9     Q. Okay. And how many hours the day before?
10     A. I think maybe six or seven.
11     Q. Okay. And did you review any documents
12 that are not listed in your 37-page report in these
13 two meetings?
14     A. I don't believe so.
15     Q. Putting aside your attorneys -- or Bayer's
16 attorneys, did you talk with anyone about your
17 deposition in this case?
18     A. No.
19     Q. You mentioned that you had looked at the
20 Fraunfelder deposition transcript and I think the
21 Etminan deposition transcript.
22     A. Briefly.
23     Q. Have you looked at any other of
24 Plaintiffs' experts' deposition transcripts besides
25 Fraunfelder and Ross -- or I'm sorry -- Fraunfelder

Page 33

1 and Etminan, but you had mentioned Ross earlier,
2 right?
3     A. Yes.
4     Q. Okay.
5     A. Yes.
6     Q. See my question was -- I said Ross because
7 I knew that from earlier.
8     So now, Fraunfelder, Ross, and Etminan,
9 you have looked at those deposition transcripts,
10 right?
11     A. Yes.
12     Q. Okay.
13     MR. JONES: Let's see. Who else has been
14 deposed in this case? Who are we missing? Maggio.
15 BY MR. JONES:
16     Q. Did you look at a Dr. Maggio -- John
17 Maggio's deposition transcript?
18     A. No, I did not see that one.
19     Q. Okay. And have you reviewed -- do you
20 know who -- sorry. My allergies are getting to
21 today.
22     MR. IMBROSCIO: This is a bad time to be
23 in with the allergies, I will tell you that.
24 BY MR. JONES:
25     Q. Have you -- do you know who the other

9 (Pages 30 to 33)

Dena R. Hixon, M.D.

Page 34

1  experts that -- are that Bayer has designated for
2  the benign intracranial hypertension cases?
3      A.  Okay.  The one that comes to mind is
4  Feigal, that I've heard his name, but I don't know
5  anything about him.
6      Q.  Okay.  Well, I might be able to make it a
7  little bit simpler for you.  You mentioned Feigal.
8  Do you know Dr. Feigal?
9      A.  No, I do not.
10     Q.  You didn't work with him at FDA?
11     A.  No.
12     Q.  Have you ever talked with him before?
13     A.  Not that I know of.
14     Q.  Huh?
15     A.  Not that I know of.
16     Q.  Have you talked with or otherwise
17 communicated with any of Bayer's experts in these
18 cases?
19     A.  No.
20     Q.  Do you know who Deborah Friedman is?
21     A.  No.
22     Q.  So if you don't know her, I'm taking it
23 you've never talked with her or otherwise
24 communicated with Deborah Friedman?
25     A.  That's correct.

Page 35

1      Q.  Since you left FDA, have you ever
2  discussed Mirena with anyone who is employed by FDA?
3      A.  No.
4      Q.  Have you read any of the deposition
5  transcripts of the Plaintiffs in these cases?
6      A.  Any of the deposition transcripts of the
7  Plaintiffs themselves?
8      Q.  Yes, ma'am.
9      A.  I don't believe so.
10     Q.  Okay.  And have you ever read any of the
11 deposition transcripts of the health care providers
12 of the Plaintiffs in these cases?
13     A.  I don't believe so.
14     Q.  Have you ever heard of Deborah Friedman?
15     A.  Well, the name sounds familiar and I've
16 seen the -- the request on this asking about Deborah
17 Friedman, but I do not know who Deborah Friedman is.
18     Q.  Okay.  Have you ever talked with or
19 otherwise communicated with any of the authors of
20 the medical journal articles that are cited in your
21 report?
22     A.  I don't believe so.
23     Q.  When I say -- when I mention the Rai
24 study, do you understand what I'm referring to?
25     A.  Yes, I do.

Page 36

1      Q.  Okay.  Have you ever, directly or
2  indirectly, for instance, through third parties,
3  communicated with any of the authors of the Rai
4  study?
5      A.  No, I have not.
6      Q.  Are you aware of whether anyone from Bayer
7  has, directly or indirectly, for instance, through
8  third parties, communicated with any of the authors
9  of the Rai study?
10         MR. IMBROSCIO:  Object to the form.
11         THE WITNESS:  That's not totally clear to
12 me, but I know that Bayer provided an analysis of
13 IIH cases and a signal assessment that discussed
14 that article, and I can't remember clearly whether
15 they had discussed the case with the authors or not.
16 BY MR. JONES:
17     Q.  Do you have some sort of vague
18 recollection that Bayer, directly or indirectly,
19 communicated with the authors of the Rai study?
20     A.  I'm sorry.  I really don't remember.
21     Q.  Are you aware of any efforts by anyone,
22 whether employed by Bayer or not, to write a
23 response to the Rai study for the purposes of having
24 it published?
25     A.  What I'm recalling about the Rai study and

Page 37

1  anything that had been written about it was
2  basically contained within the signal analysis that
3  was done in 2015.  I don't recall one that was done
4  for purposes of publication.
5      Q.  Okay.  So is -- your current knowledge to
6  date is you're not aware of anyone that is planning
7  to write a response to the Rai study for purposes of
8  publication?
9      A.  That's correct.
10         MR. IMBROSCIO:  I'm thinking about it,
11 Larry.
12         MR. JONES:  I'm sorry?
13         MR. IMBROSCIO:  I'm thinking about it.
14         MR. JONES:  I've thought about it.  They
15 don't care what lawyers like us think.
16 BY MR. JONES:
17     Q.  Are you aware of any efforts by anyone to
18 study the potential association between
19 Levonorgestrel and intracranial hypertension
20 pseudotumor cerebri?
21         MR. IMBROSCIO:  Objection.  Vague.
22         THE WITNESS:  Can you further clarify?
23 BY MR. JONES:
24     Q.  Oh, sure.  I'll break it down.
25         Are you aware of any proposed study to be

10  (Pages 34 to 37)

Dena R. Hixon, M.D.

Page 38

```
1    conducted by Bayer regarding the potential
2    association between Levonorgestrel and benign
3    intracranial hypertension?
4        A.  As I sit here now, I don't recall any
5    information about that.
6        Q.  Okay.  And are you aware of any efforts by
7    anyone outside of Bayer to conduct a study regarding
8    the potential association between Levonorgestrel and
9    benign intracranial hypertension pseudotumor
10   cerebri?
11       A.  Again, I'm not aware of any plans to do
12   that, and I'm not aware of any indication for doing
13   that.
14       Q.  Yet you haven't heard of any studies in
15   the works?
16       A.  No.
17       MR. IMBROSCIO:  What time are we at?
18       THE REPORTER:  10:00.
19       MR. JONES:  Do you want to take the
20   one-hour break?
21       MR. IMBROSCIO:  Sure.
22       MR. JONES:  Let's go off the record for a
23   break.
24       THE VIDEOGRAPHER:  The time is 10:02.
25   We'll go off the video record.
```

Page 39

```
1        (A recess was taken.)
2        THE VIDEOGRAPHER:  The time is 10:13.
3    Back on the video record.
4    BY MR. JONES:
5        Q.  Dr. Hixon, you were at FDA from January
6    1999 to November 2011; is that correct?
7        A.  That's correct.
8        Q.  Okay.  And at the time you left FDA, do
9    you remember what your salary was?
10       A.  At the time I left FDA, I don't remember
11   exactly, but I can give you an approximate number.
12   It was somewhere around 240,000.
13       Q.  Does $231,648 sound right?
14       A.  That's quite possible.
15       Q.  Okay.  And if I understood your testimony
16   correctly earlier today, in 2014, 2015, you received
17   between 150- and $200,000 for -- from Bayer for your
18   work in the MDL cases; is that correct?
19       A.  That's correct.
20       Q.  And in this case so far, you've received
21   approximately $54,300, correct?
22       A.  You are including the amount that has not
23   yet been invoiced, correct?
24       Q.  Correct.
25       A.  So that's approximate, yes.
```

Page 40

```
1        Q.  Okay.  And besides -- Bayer --
2    besides litigation consulting, does your company or
3    you individually do any other type of consulting
4    work?
5        A.  Yes.
6        Q.  And what kind of consulting work do you
7    do?
8        A.  I do a variety of consulting relating to
9    drug development and regulatory issues.  Some of
10   that involves helping companies to put together
11   their clinical study reports to submit to FDA or
12   discussing with them particular products that
13   they're interested in bringing to market and what
14   they might need to do in order to accomplish that
15   goal, or doing some due diligence for companies who
16   are looking to acquire either a product or another
17   company and wanting to look into whether there are
18   potential safety issues with the products they have
19   in mind.
20       I've also worked with brand name companies
21   whose products are going off patent and they're
22   wanting to estimate how long they have before they
23   will have generic competition so that they can
24   appropriately plan their supply chain.
25       I've worked with some generic companies
```

Page 41

```
1    with basic questions about what they need to do to
2    develop their generic product and -- a variety of
3    other issues that aren't coming to mind at the
4    moment.  But --
5        Q.  Okay.
6        A.  -- it kind of spans the gamut of new --
7    new drugs and generic drugs.
8        Q.  And when you're doing that work, what is
9    your billable hourly rate?
10       A.  It's the same as for litigation work, 600
11   an hour.
12       Q.  And you mentioned that you formed
13   Pharmaceutical Life -- Lifecycle Consulting in
14   December of 2011; is that correct?
15       A.  I think that's correct.
16       Q.  And so 2012 was your first real year
17   working in that business; is that correct?
18       A.  That's correct.
19       Q.  And approximately what were your gross
20   revenues for 2012 for Pharmaceutical Lifecycle
21   Consulting, LLC?
22       A.  Oh, this is approximate, but it was -- it
23   was not more than 200,000.
24       Q.  Okay.  And then in 2013, what were the
25   approximate gross revenues for Pharmaceutical
```

Dena R. Hixon, M.D.

Page 42

1  Lifecycle Consulting, LLC?
2      A.  Somewhere over 300,000, I think.  I'm --
3  I'm not remembering clearly, but that would be my
4  guess.
5      Q.  And what about for 2014?
6      A.  2014 I think was a little less.  I think
7  it was 200-something.
8      Q.  And what about for 2015?
9      A.  I think 2015 was very much the same as
10 2014.  So in the, you know, 250 to 300 range maybe
11 for -- for 2015.
12     Q.  And during 2014 -- during 2014, 2015, were
13 you working as a litigation consultant for anyone
14 other than Bayer on the MDL cases?
15         MR. IMBROSCIO:  I'm just going to object
16 to the form.  Object to the grammar, I think.
17         THE WITNESS:  I was doing other work
18 during that time.  I believe that I -- if you look
19 at my list of -- of testimonies that are in my -- my
20 report, I believe that I may have testified in some
21 cases in 2014.
22
23 BY MR. JONES:
24     Q.  Okay.  It looks like -- thanks for
25 referring me to that.  It looks like you testified

Page 43

1  in Anderson v. Janssen Pharmaceuticals February
2  25th, 26th, 2014.  Does that sound correct?
3      A.  That sounds correct.
4      Q.  And Royal v. Novartis Pharmaceuticals
5  Corporation June 19th, 2014.  Does that sound
6  correct?
7      A.  That sounds correct.
8      Q.  And do you remember approximately how much
9  you were paid for your time testifying in the -- in
10 those two cases in 2014?
11     A.  I wouldn't be able to break down the
12 amount that I was paid for testifying in each of
13 those cases because I had a deposition and then
14 testified for three trials.  And I wrote a number of
15 case-specific reports for that overall project, if
16 you will, so I'm not able to break that down.
17     Q.  Okay.  So as I understood your testimony,
18 your company generated approximately 250- to 300,000
19 in 2015 plus somewhere in the neighborhood of
20 200,000 in 2014.  So giving you the benefit of the
21 doubt, that would be about a half million dollars
22 between 2014 and 2015; is that correct?
23     A.  That's probably correct.
24     Q.  Okay.  And of that, your litigation
25 consulting work for Bayer in the MDL cases made up

Page 44

1  approximately 150- to 200,000 of that revenue,
2  correct?
3      A.  2014 and 2015?
4      Q.  Yes.
5      A.  I believe that's correct.
6      Q.  Okay.  And then you also testified in the
7  Anderson v. Janssen Pharmaceuticals and the Royal v.
8  Novartis Pharmaceuticals in 2014, so there's --
9  there's -- of the -- we'll give you the benefit of
10 the doubt again.  Of the $350,000 in remaining gross
11 revenues for those years, some portion of that was
12 for your work in the Janssen and Novartis cases,
13 correct?
14     A.  That's correct.
15     Q.  What percentage of your revenues would you
16 approximate came from litigation consulting in 2014
17 and 2015 versus your other consulting work?
18     A.  Well, again, I can only guess because I
19 don't have those numbers in front of me.  So given
20 that the litigation work takes a lot more of --
21 a lot more time than the other individual projects,
22 I believe that it's probably somewhere between 80
23 and 90 percent.
24     Q.  80 and 90 percent is --
25     A.  Litigation.

Page 45

1      Q.  -- litigation consulting?
2      A.  That's correct.
3      Q.  Do you have any employees at
4  Pharmaceutical Lifecycle Consulting, LLC?
5      A.  I do not.
6      Q.  And I have your address as 7304 Carroll
7  Avenue, Number 231; is that correct?
8      A.  That's correct.
9      Q.  And is that a physical office or is that
10 part of the Takoma Postal & Business Center?
11     A.  That's a mailing address.
12     Q.  Okay.  So you don't go to work at
13 7304 Carroll Avenue, Number 231 every day?
14     A.  That's correct.  I -- I have an office
15 nearby.
16     Q.  And where is your office located?
17     A.  At 7030 Carroll Avenue.
18     Q.  Is that a home office?
19     A.  No, it is not.
20     Q.  Do you share that office with anyone?
21     A.  It is a -- kind of an office suite where
22 different people rent individual office space, if
23 that makes sense.  So the space I rent is my own
24 space, I'm not sharing it with anyone else, but
25 within -- within that space, within the -- within

Golkow Technologies,  Inc877.370.3377

Dena R. Hixon, M.D.

Page 46

1  the space at that address, there are about six
2  different offices.
3      Q.  Okay.  I think we have something like that
4  on the floor above us at our office.
5          So it's a shared common reception area and
6  then each tenant has their own physical individual
7  office; is that right?
8      A.  That's correct, except that it really
9  doesn't have a reception area as such.
10     Q.  Okay.  Does your company have a website?
11     A.  No.
12     Q.  Has it ever had a website?
13     A.  No.
14     Q.  How do your potential clients find you?
15     A.  It's basically all through word of mouth.
16  I know some other people who previously worked at
17  FDA who are consultants and they had more clients
18  than they were able to handle, so when I started
19  consulting, they would refer clients to me when --
20  when they couldn't handle the work; and just through
21  word of mouth, from my previous consulting work and
22  from other consultants who -- who know the kind of
23  work I'm doing, referring people to me.
24     Q.  And the other consultants that have too
25  much work and refer clients to you, do you pay them

Page 47

1  any sort of referral fee?
2      A.  No.
3      Q.  Have you ever worked for a plaintiff or an
4  individual who alleged that they were injured by a
5  drug or device as a paid litigation consultant?
6      A.  No, I have not done that.
7      Q.  Other than -- well, let me back up.
8          The Janssen Pharmaceuticals cases,
9  those involved Topamax; is that correct?
10     A.  That's correct.
11     Q.  Have you ever done any litigation
12  consulting for Janssen for products other than
13  Topamax?
14         MR. IMBROSCIO:  I just want to caution the
15  witness that the fact of you consulting as a
16  consulting expert in any litigation is typically not
17  public until you are disclosed, and so I'd ask you
18  to keep that confidentiality in mind as you give
19  your answer on this, if you can answer generally.
20  But, you know, be careful not to reveal any
21  confidences that you -- you must keep given your
22  other relationships.  But do your best to answer
23  given that -- given that constraint.
24         THE WITNESS:  Okay.  And given that
25  constraint, I -- the answer is no.

Page 48

1          MR. IMBROSCIO:  You know what I'm getting
2  at?  I don't want her -- I don't know if she is or
3  isn't.
4          MR. JONES:  Right.
5          MR. IMBROSCIO:  I don't want her saying,
6  oh, I'm revealing -- I'm consulting for the blank
7  case and that's news.
8          MR. JONES:  No.  Yeah.  No, I get you.
9  I'm trying to think of a different way to answer
10  the -- ask the question.
11         THE WITNESS:  And let me go back and just
12  clarify.  Did you say any other consulting work or
13  any other litigation work?
14  BY MR. JONES:
15     Q.  Any other litigation consulting work.
16     A.  Okay.
17     Q.  Without knowing the product -- and I think
18  we're on good ground here -- have you consulted with
19  Janssen on any other litigation -- any other
20  litigation?
21     A.  No.
22     Q.  And the Royal v. Novartis Pharmaceuticals
23  Corporation case, the one in Cook County,
24  Illinois -- do you know which one I'm talking about?
25     A.  Yes, I do.

Page 49

1      Q.  -- what product did that involve?
2      A.  That involved Tegretol.
3      Q.  Can you spell that?
4      A.  Tegretol, carbamazepine.  It's T-e-g --
5      Q.  It doesn't -- the generic name doesn't
6  help me.
7      A.  T-e-g-r-e-t-o-l, Tegretol.
8          MR. IMBROSCIO:  And can you spell the
9  generic name since you've said it --
10         THE WITNESS:  Sure.
11         MR. IMBROSCIO:  -- and it will help her?
12         THE WITNESS:  C-a-r-b-a-m-a-z-i-n-e,
13  carbamazep -- I left something out.
14  BY MR. JONES:
15     Q.  I was going to call you the spelling bee
16  champion, but -- we wouldn't have known the
17  difference.
18     A.  C-a-r-b-a-m-a-z-e-p-i-n-e.
19     Q.  What is Tegretol?
20     A.  Tegretol is an antiepileptic drug.
21     Q.  And have you done any litigation
22  consulting work for Novartis other than the Tegretol
23  cases -- case?
24     A.  No.
25     Q.  I guess since we're going -- since we've

13 (Pages 46 to 49)

Dena R. Hixon, M.D.

Page 50

1    started into the testimony, we might as well talk
2    about that a little bit.
3            You left FDA in November of 2011, right?
4        A.   That's correct.
5        Q.   Why did you leave?
6        A.   I was at a point where the expanding
7    responsibilities of my job and the expanding
8    responsibilities on the home front were no longer
9    compatible and it was time to make a decision, and I
10   made a decision that I needed to have more control
11   over my time so I retired from FDA in order to do
12   something else.
13       Q.   Okay.  And you formed your consulting
14   company the next month, correct?
15       A.   That's correct.
16       Q.   And we talked about you're a medical
17   doctor.  You're an OB/GYN; is that correct?
18       A.   That's correct.  I was trained in both
19   family medicine and obstetrics and gynecology.
20       Q.   Okay.  And once you left FDA, did you --
21   did you start up an active clinical practice?
22       A.   No, I did not.
23       Q.   And do you have an active clinical
24   practice today?
25       A.   No, I do not.

Page 51

1        Q.   So you don't -- you don't see any OB/GYN
2    patients?
3        A.   Not now, that's correct.
4        Q.   Okay.  And you haven't since November of
5    2011 when you left FDA; is that correct?
6        A.   I haven't been actively seeing patients
7    since I left private practice at the end of 1998.
8        Q.   Okay.  When you formed your new consulting
9    company in December of 2011, did you have any
10   consulting clients lined up?
11       A.   No, I did not.
12       Q.   Do you consult for any companies other
13   than pharmaceutical or medical device companies?
14       A.   I -- I've done some consulting work for a
15   financial firm, basically due diligence work for
16   determining whether the company had adequately
17   evaluated any potential safety issues for a product
18   it was acquiring.
19       Q.   Okay.  I'm not sure that -- if I -- if
20   I've asked you this.  If I did, I apologize.  But do
21   you do or have you done, since you formed your
22   company in December of 2011, any sort of marketing
23   for clients?
24       A.   No, I have not done that.
25       Q.   You don't have any -- well, let me -- I

Page 52

1    don't want to assume anything.
2            Do you send out a newsletter to current or
3    potential clients?
4        A.   No, I do not.
5        Q.   Do you have any prepared materials that
6    would, for instance, include a bio on your experience
7    that you present to potential clients?
8        A.   No.
9        Q.   Do you go to conferences to try to network
10   with potential clients?
11       A.   No.  I go to conferences for continuing
12   medical education and that sort of thing, but not
13   for the purpose of networking.
14       Q.   Well, while you're at those conferences,
15   do you network?
16           MR. IMBROSCIO:  Object to the form.
17           THE WITNESS:  Not consciously.  It's not
18   my motivation.
19   BY MR. JONES:
20       Q.   No one wants to be known as the networker.
21   I get it.
22       A.   Oh, I don't know.  There are advantages to
23   networking, but --
24       Q.   I don't know.  Networking has a bad name
25   anymore.

Page 53

1            When you go to these continuing medical
2    education conferences, do you go to dinner with
3    employees from pharmaceutical companies?
4        A.   I haven't, no.
5        Q.   Attend shows with any of them?
6        A.   I have not.
7        Q.   Does FDA have any restrictions on its
8    former employees consulting for pharmaceutical
9    companies after they leave FDA's employment?
10       A.   Yes.  And that restriction is -- is
11   basically that a former employee is not allowed to
12   testify in a matter that significantly involves the
13   U.S. Government, where they're either a party or
14   have a substantial interest, meaning a financial
15   interest, basically, in the outcome.
16       Q.   And I appreciate that.  My question is a
17   little different.  It's a little nuance.
18           Are there any restrictions on consulting,
19   not litigation consulting necessarily, just
20   consulting?
21       A.   I've included the -- the restrictions.
22   There's a -- a CFR citation in my report about that.
23   And nothing comes to mind at the moment with regard
24   to what you just asked, so if you have a more
25   specific question.

14 (Pages 50 to 53)

Dena R. Hixon, M.D.

Page 54

1    Q.  No.  If you're going to rely on what's in
2  your report, we can just go with that.
3    A.  Okay.  That's fine.
4    Q.  When were you first contacted by Bayer
5  about potentially testifying in this particular
6  litigation?
7    MR. IMBROSCIO:  Can you just -- can you
8  just clarify, just because of the -- I think you
9  mean probably your -- your litigation as opposed to
10  Mirena generally.  Can you just --
11    MR. JONES:  Yeah.  Yes.
12    MR. IMBROSCIO:  -- help her out on that
13  distinction just to cut it off?
14  BY MR. JONES:
15    Q.  That's where I was going with this
16  particular litigation, but I understand that there
17  may be some confusion.  You may have trouble
18  separating the matters out in your mind.
19    So when did someone from Bayer talk to you
20  about testifying in the -- what we'll call the
21  benign intracranial hypertension pseudotumor cerebri
22  litigation?
23    A.  As far as contacting me and asking me to
24  begin working on that, that would have been, I
25  think, February of this year.

Page 55

1    Q.  And just so the record is clear, that's
2  February of 2016?
3    A.  That's correct.
4    Q.  Okay.  And were you contacted by an
5  employee of Bayer or were you contacted by one of
6  Bayer's attorneys?
7    A.  I was contacted by an attorney.
8    Q.  During the course of this litigation, the
9  benign intracranial hypertension pseudotumor cerebri
10  litigation --
11    A.  Okay.
12    Q.  -- have you communicated with any Bayer
13  employees?
14    A.  No, I have not.
15    Q.  Okay.  Your report says that you testified
16  in the In Re: Topamax Litigation in the Court of
17  Common Pleas, Philadelphia County, Deposition May
18  1st, 2013; is that correct?
19    A.  If that's what's in my report, that's
20  correct.
21    Q.  Okay.
22    MR. IMBROSCIO:  And the record should
23  reflect that the witness doesn't have a copy of
24  her report in front of her.  That may be worth
25  looking at --

Page 56

1    MR. JONES:  Right.
2  BY MR. JONES:
3    Q.  Are you --
4    MR. IMBROSCIO:  -- at some point.
5  BY MR. JONES:
6    Q.  Are you confused by -- you just are not
7  sure about the date?  You remember testifying in
8  that litigation, correct?
9    A.  Yes, I do.
10    Q.  Okay.  And from the case style -- which
11  might be too much lawyer lingo.  But In Re: Topamax
12  Litigation signals to me that this was some sort of
13  consolidated proceeding of multiple plaintiffs;
14  is that fair?
15    A.  That's correct.
16    Q.  Okay.
17    A.  Yes.
18    Q.  And you testified for the defendant in
19  that case, correct?
20    A.  That's correct.
21    Q.  And that was -- that's Janssen
22  Pharmaceuticals, right?
23    A.  That's correct.
24    Q.  Okay.  And I saw a reference to
25  Ortho-McNeil, Janssen Pharmaceuticals.  Was that the

Page 57

1  name of the company, or do you have any idea why I
2  would have seen Ortho-McNeil attached to Janssen?
3    A.  I'm not sure why you see that reference.
4  I am aware that both Ortho-McNeil and Janssen are
5  both affiliated in some way with Johnson & Johnson.
6    Q.  Okay.
7    A.  But I don't know the exact relationship
8  between any of them.
9    Q.  Okay.  I was just trying to figure
10  out -- I don't know enough about the companies to --
11  to know whether those are separate companies.  Do
12  you know, Ortho --
13    A.  Yes, they are separate companies --
14    Q.  They are.
15    A.  -- but I don't know any further details
16  about those individual companies and their
17  relationships.
18    Q.  Did you -- was your client just Janssen
19  Pharmaceuticals or was your client also Ortho-McNeil;
20  do you remember?
21    A.  Of course my interactions were with the
22  attorneys, and my understanding was that it was
23  Janssen.
24    Q.  Okay.  Fair enough.  I just -- merely
25  curious about that.

15 (Pages 54 to 57)

Dena R. Hixon, M.D.

Page 58

1     So the deposition was in 2013, according
2  to your report, May 1st, 2013. So do you have any
3  idea about when you would have begun working on that
4  case?
5     A.  I believe it was sometime in the fall of
6  2012.
7     Q.  And what were the -- do you remember what
8  the allegations were in that case from the
9  plaintiffs, the folks that claimed they were
10 injured?
11    A.  The allegation was that women who had
12 taken the product during pregnancy had babies with
13 birth defects and they believed that they were
14 caused by the product.
15    Q.  And what was your -- you know, you had
16 mentioned earlier your task in this case. What
17 was your task in that case?
18    A.  My task in that case was to review the
19 regulatory record and -- and the adverse events, and
20 also to review some individual case reports related
21 to times of exposure and -- and the possibility of
22 the time of exposure coinciding with the formation
23 of the birth defect.
24    Q.  And was your -- were your opinions about
25 whether or not the product warnings were sufficient

Page 59

1  to warn the users of these birth defects?
2     A.  It was about the adequacy of the labeling
3  in that regard.
4     Q.  And was it also about whether or not the
5  company complied with FDA regulations?
6     A.  That's correct.
7     Q.  And your opinion was that the warnings
8  were strong enough and the company complied with the
9  regulations?
10    A.  My opinion was that the warnings were
11 appropriate at the time of the event.
12    Q.  So it sounds like your the opinions
13 you gave in that case were pretty similar to
14 your task in this case, your opinions in this
15 case; is that fair to say?
16    A.  I am a little uncomfortable kind of
17 comparing that case and this case because they're
18 different products and they're different cases.
19    Q.  Right.
20    A.  So can you ask that in any other way?
21    Q.  Yeah, I will because that -- that's fair.
22    Putting -- taking out the product and --
23 and the injuries allegedly caused in a case, from
24 kind of a global FDA regulatory expert kind of role,
25 your opinions in that case were similar to your

Page 60

1  opinions in this case; is that correct?
2     A.  Let me see if I can answer it in a way I'm
3  comfortable with --
4     Q.  Sure.
5     A.  -- because, again, I don't like to be
6  making a comparison between the two cases because --
7  excuse me -- I would look at each individual case
8  without regard to the other cases.
9     However, in both cases, I found that the
10 labeling was appropriate --
11    Q.  Okay.
12    A.  -- and that the interactions with FDA were
13 appropriate.
14    Q.  Okay. And do you remember whether any of
15 your opinions were excluded or limited by the court
16 in that case?
17    A.  No, they were not.
18    MR. JONES:  How are we doing on the video?
19 BY MR. JONES:
20    Q.  Did you testified at some of these Topamax
21 trials, correct?
22    A.  That's correct.
23    Q.  Okay. And you testified, according to
24 this, at the -- is it -- C-z-i-m-m-e-r. Do you
25 remember --

Page 61

1     A.  Czimmer.
2     Q.  Just Czimmer --
3     A.  Czimmer.
4     Q.  -- silent C?
5     Okay. You testified in the Czimmer case,
6  according to this, October 28th, 29th, 2013. Does
7  that sound about correct?
8     A.  That sounds correct.
9     Q.  Okay. And were you testifying in that
10 case that you thought the warnings were appropriate
11 and the company's interactions with FDA were
12 appropriate?
13    A.  That's correct.
14    Q.  Okay. And the jury in that case, they
15 disagreed, didn't they?
16    A.  Well --
17    MR. IMBROSCIO:  I'm going to object to the
18 form of the question.
19    You can --
20 BY MR. JONES:
21    Q.  You can answer.
22    A.  I -- clearly the jury decided in favor of
23 the plaintiff in that case. However, exactly what
24 the jury disagreed with, I don't know. So whether
25 they were disagreeing with my testimony or they were

Dena R. Hixon, M.D.

Page 62

1    disagreeing with other testimony is not clear.
2        Q.  Do you agree that the jury disagreed that
3    the labeling was adequate and/or the company's
4    interactions with FDA were inadequate?
5            MR. IMBROSCIO:  Object to the form.
6    Compound.
7            THE WITNESS:  Well, insofar that that was
8    a -- a part of the basis for the entire trial and
9    they decided on behalf of the plaintiff, clearly
10   they were disagreeing in general with the -- with
11   the defendant.
12   BY MR. JONES:
13       Q.  Okay.  And according to my research, the
14   jury awarded $562,184.68 in future health care costs
15   and another $3,440,000 for pain and suffering.  Is
16   that consistent with your recollection?
17       A.  That's consistent with my recollection,
18   yes.
19       Q.  Okay.  And then you next -- the next
20   Topamax case you testified in was Powell v. Janssen
21   Pharmaceuticals.  Here it's -- in your report, it
22   says November 12th, November 13th, 2013.  Does that
23   sound correct?
24       A.  That's correct.
25       Q.  And you gave the same opinions in the

Page 63

1    Powell case, correct?
2        A.  When you say "the same," I don't know that
3    it was exactly the same, but yes, it was at least
4    similar opinions.
5        Q.  I mean, did you modify your testimony in
6    the two weeks between the Czimmer and the Powell
7    trials?
8        A.  Well, obviously, I didn't say the same
9    words and it was a different situation, but my
10   opinion was still the same as it had been in my
11   report.
12       Q.  Which was that the product labeling was
13   adequate to warn the plaintiff of the alleged risks,
14   correct?
15       A.  That the product labeling was appropriate
16   at the time.
17       Q.  Okay.  And that the interactions with FDA
18   at the time of approval were also adequate, correct?
19       A.  That's correct.
20       Q.  And once again, the jury disagreed with
21   you, didn't they?
22       A.  Again, the -- as in the other case, the
23   jury decided in favor of the plaintiff.
24       Q.  The jury -- the jury awarded about
25   $11 million to the plaintiff in that case, correct?

Page 64

1        A.  They did.
2        Q.  I think we're coming to the end of the
3    tape, so let's go off the record so he can change
4    tapes.
5        A.  Okay.
6            THE VIDEOGRAPHER:  The time is 10:53 a.m.
7    This is the end of Disc Number 1.  We'll go off the
8    video record.
9            (A recess was taken.)
10           THE VIDEOGRAPHER:  This is the beginning
11   of Disc Number 2 in the deposition of
12   Dr. Dena Hixon.  The time is 11:03 a.m.  We're back
13   on the video record.
14   BY MR. JONES:
15       Q.  Dr. Hixon, we're back after a break.
16   Before we went off, we were talking about the cases
17   that you had testified in.  The next one on your
18   list is Anderson v. Janssen Pharmaceuticals.  And I
19   have that you testified February 25th, 26th, 2014.
20   Does that sound about correct?
21       A.  That sounds correct.
22       Q.  Okay.  And did you give the same opinions
23   in the Anderson case that you gave in Powell and
24   Czimmer?
25       A.  Yes.

Page 65

1        Q.  Okay.  And, again, the jury disagreed with
2    you in that case, didn't they?
3        A.  And, again, I would say I'm not sure just
4    what the jury disagreed with, but they decided in
5    favor of the plaintiff again.
6        Q.  And they awarded the plaintiff about
7    $3 million in that case; is that correct?
8        A.  I believe that's correct.
9        Q.  Okay.  And in the -- in the Topamax cases,
10   isn't it true that the plaintiffs alleged that
11   within a year of approval by the FDA that the
12   company knew of an increased risk for birth defects
13   including cleft palates?
14           MR. IMBROSCIO:  Object to the form.
15           THE WITNESS:  That's what they alleged.
16   BY MR. JONES:
17       Q.  And isn't it true that the plaintiffs
18   alleged that the pharmaceutical company in that case
19   didn't tell the doctors about that information?
20           MR. IMBROSCIO:  Object to the form.
21           THE WITNESS:  Again, yes, that's what they
22   alleged.
23   BY MR. JONES:
24       Q.  And isn't it true that the pharmaceutical
25   company claimed that the reports of cleft lip or

17 (Pages 62 to 65)

Dena R. Hixon, M.D.

Page 66

1    cleft palate never exceeded the background rates
2    after 10 years of experience with the medicine?
3        A.   As far as I recall, that is true.
4        Q.   What is the status of the coordinated
5    Topamax litigation in Pennsylvania?  Is it still
6    ongoing?
7        A.   I really don't know for sure what the
8    current status is.
9        Q.   Okay.  You've -- it looks like the last
10   time you testified was a little bit over two years
11   ago.  You don't have any indications that you're
12   going to be asked to testify again at a future
13   trial?
14       A.   I don't have any indications at this time
15   one way or another about that.
16       Q.   But nothing's on the schedule?  There's no
17   scheduled trial date that you're supposed to testify
18   at?
19       A.   I'm not scheduled, as far as I know, to
20   testify.
21       Q.   Okay.  Then going to the next case, Royal
22   v. Novartis Pharmaceuticals Corporation, June 19th,
23   2014.  This was the Tegretol case?
24       A.   That's right.
25       Q.   Okay.  And you gave a deposition in that

Page 67

1    case?
2        A.   I did, yes.
3        Q.   Okay.  And that case -- it looks like
4    that's coming up on two years since you gave the
5    deposition in the Royal case.  Did that case ever go
6    to trial?
7        A.   No, it did not.
8        Q.   Okay.  Has it settled or is there a trial
9    date that's been scheduled?
10       A.   I understand that it settled at mediation.
11       Q.   Okay.  We'll talk about the Mirena MDL in
12   a second, but before we get there, I want to talk
13   about before you were involved with the MDL.  Had
14   you ever worked with any of the attorneys at Shook
15   Hardy & Bacon?
16       A.   No, I had not.
17       Q.   Okay.  And had you ever worked with any of
18   the attorneys at the Goldman Ismail firm?
19       A.   No, I had not.
20       Q.   And had you ever worked with any attorneys
21   at the Covington & Burling firm?
22       A.   Not that I recall.
23       Q.   Okay.  What about a law firm called Eckert
24   Seamans?  Have you ever worked with them before?
25       A.   I don't remember them.

Page 68

1        Q.   Going back to the Royal case for a second.
2    Do you remember what the plaintiffs alleged in that
3    case?
4        A.   Excuse me.  The plaintiffs alleged that
5    the company had not adequately warned about the
6    potential for Tegretol to result in -- for the use
7    of Tegretol to result in blindness.
8        Q.   Okay.  And do you remember anything else
9    about what the plaintiffs alleged in that case?
10       A.   I don't specifically remember the
11   allegations.
12       Q.   Okay.  Well, do you remember what your
13   opinions were in the Royal v. Novartis
14   Pharmaceuticals case?
15       A.   My opinions were that the labeling was
16   adequate in that they warned about Stevens-Johnson
17   syndrome which was the cause of the visual impairment.
18       Q.   Did you also testify in that case that the
19   company's interactions with FDA were appropriate?
20       A.   I don't specifically remember whether that
21   was a -- a part of the opinions at that point for
22   that case.
23       Q.   Okay.  And your deposition was in June of
24   2014 in that case.  Do you remember approximately
25   when you were hired to work on that litigation?

Page 69

1        A.   I can only give an estimate.  And I
2    believe that that was about three months prior to
3    the deposition.  I'm not real sure.
4        Q.   Okay.
5            MR. JONES:  Did you hand me a list of a
6    supplemental reviewed and relied --
7            MS. NATALE:  Yeah.  They gave us one copy.
8            MR. JONES:  Oh, wasn't there just a --
9    wasn't there a single sheet?
10           MS. NATALE:  Yeah, it was a single sheet.
11           MR. IMBROSCIO:  We have other copies.  You
12   need some more copies of something?
13   BY MR. JONES:
14       Q.   Yeah, I just want to look at this
15   supplemental list of materials reviewed, Dena Hixon,
16   that's been handed to you by counsel.
17           Were these -- were these documents -- did
18   you review these transcripts and depositions and
19   labeling before you signed your 37-page report?
20       A.   No, I did not.
21       Q.   Okay.  This is something you've reviewed
22   since you submitted your report?
23       A.   That's correct.
24       Q.   And these aren't cited via footnote in
25   your report; is that correct?

18 (Pages 66 to 69)

Dena R. Hixon, M.D.

Page 70

1    A.  That's correct.
2         MR. JONES:  Let's go -- let's just make
3    that Deposition Exhibit 2 since she looked at it.
4         (Exhibit 2 was marked for identification
5         and is attached to the transcript.)
6         MR. IMBROSCIO:  Larry, you may have this.
7    Do you mind if I just mark her report so she has it
8    in front of her?  You -- you're referring to it from
9    time to time and --
10        MR. JONES:  Yeah.
11        MR. IMBROSCIO:  -- it's useful to have it
12   in front of her.
13        MR. JONES:  That's fine.  I just don't
14   have a copy.  I figured --
15        MR. IMBROSCIO:  Okay.
16        MR. JONES:  -- she'd have a copy.
17        MR. IMBROSCIO:  Yeah.  Let's go ahead and
18   mark that 3, then, just for good order sake.
19        (Exhibit 3 was marked for identification
20        and is attached to the transcript.)
21        MR. IMBROSCIO:  There you go.
22        THE WITNESS:  Thank you.
23   BY MR. JONES:
24        Q.  Now, I understand that you were involved
25   with the Mirena approval decision back in 2000; is

Page 71

1    that correct?
2         A.  That is correct.
3         Q.  Okay.  And were you the team leader for
4    that approval?
5         A.  I was.
6         Q.  And other than the 2000 initial approval,
7    did you remain involved with the Mirena product over
8    the course of your remaining career at FDA?
9         A.  No, because I left the division in 2002 so
10   I would not have had any involvement with Mirena
11   after that time.
12        MR. IMBROSCIO:  After 2002, you mean?
13        MR. JONES:  Right.
14        THE WITNESS:  That's correct.  Sorry.
15        MR. IMBROSCIO:  That's fine.  Just making
16   sure you had it right.
17   BY MR. JONES:
18        Q.  And tell me, while you were at FDA, were
19   you ever involved in any sort of regulatory
20   activities involving Topamax or Tegretol?
21        A.  I don't believe so.
22        Q.  Okay.  But you weren't involved in the
23   approvals of Topamax or Tegretol?
24        A.  That's correct.
25        Q.  Oh, I almost forgot to talk to you about

Page 72

1    the Mirena MDL.
2         So you are currently an expert in the
3    Mirena -- In Re: Mirena IUD Products Liability
4    Litigation; is that correct?
5         A.  That's correct.
6         Q.  Okay.  And it looks like from this you
7    gave deposition testimony on September 22nd, 2015;
8    is that correct?  I'm on page 4.
9         A.  I'm just looking for the date.
10        Yes, that's correct.
11        Q.  Okay.  And when were you first contacted
12   to be involved in the In Re: Mirena IUD Products
13   Liability Litigation MDL?
14        A.  I believe that was late in 2013.
15        Q.  And do you remember who contacted you to
16   become involved in that?
17        A.  I believe it was Hunter Ahern at Shook
18   Hardy Bacon.
19        Q.  Okay.  When you were at FDA, did you have
20   any social interactions with employees from Bayer?
21        A.  No.
22        Q.  None of them -- none of Bayer employees
23   were your social friends?
24        A.  No.
25        Q.  Okay.  Are you -- do you consider any

Page 73

1    employees at Bayer to be your friends today?
2         A.  No.
3         Q.  But when you were at FDA, you did have
4    contact -- business contact with Bayer employees,
5    correct?
6         A.  Yes.
7         Q.  And who would you have -- do you remember
8    the names of some of the folks at Bayer that you
9    would have had contacts with?
10        A.  All I can say is that when I saw the names
11   on some of the deposition transcripts that they were
12   familiar to me.  I'm not sure if I personally had
13   had any discussions with them or not.
14        Q.  Okay.  What's the -- what are the
15   plaintiffs alleging in the In Re: Mirena IUD
16   Products Liability Litigation?
17        A.  The allegation is primarily that uterine
18   perforations can occur at a time later than the
19   insertion and that that is a separate adverse event
20   that has not been adequately warned of.
21        Q.  Okay.  And do I understand correctly that
22   your task in that litigation is focused on the
23   warning aspect of the case versus the mechanism
24   of whether or not it could even occur?
25        A.  That's correct.

19 (Pages 70 to 73)

Dena R. Hixon, M.D.

Page 74

1   Q. Okay.
2   A. But in that case, it's very hard to -- to
3   totally separate the -- the mechanism idea from the
4   warning.
5   Q. Okay. All right. And other than the
6   plaintiffs' allegations that the company has failed
7   to adequately warn about this migration perforation,
8   do they allege any other sort of allegations that
9   you've been retained to testify about?
10      Let me -- that's kind of a confusing
11  question.
12      A. That is a confusing question.
13      Q. Let me simplify it.
14      A. Okay.
15      Q. In sum and substance -- I mean, we've
16  talked about in cases you talk about, you've
17  testified about the adequacy of a company's warning
18  that's on their product. And then kind of prong
19  two, as I'll call it, is that the company's
20  interactions with FDA were adequate as well.
21      Are those the same two prongs that you
22  have been retained to testify about in the Mirena
23  MDL?
24      A. In general, yes.
25      Q. Okay.

Page 75

1   A. My role is purely as a regulatory expert,
2   not as a causation expert or as a medical expert or
3   any other role.
4   Q. Epidemiology expert?
5   A. Correct.
6   Q. Okay. And is the same true in this
7   particular case, your -- you've been retained,
8   your task is as a -- a regulatory expert, right?
9   A. That's correct.
10      Q. Not as a medical expert, right?
11      A. Right. My understanding is that I'm here
12  as a regulatory expert.
13      Q. Okay. Not as an epidemiology expert?
14      A. That's correct.
15      Q. Not as a pharmacokinetics expert?
16      A. That's correct.
17      Q. Not as an IIH expert?
18      A. That's correct.
19      Q. And maybe I should -- I'm sorry. Go on
20  and finish. I didn't mean to interrupt you.
21      A. I thought that perhaps I should clarify
22  that although my role is not to be an expert in
23  those fields, I do have some expertise in those
24  fields just by virtue of the kind of work I did at
25  FDA that incorporated those kinds of data into the

Page 76

1   regulation process.
2   Q. Okay. Well, let me ask the question this
3   way. If you were at a conference of
4   epidemiologists, would you feel comfortable standing
5   up and saying, I am an expert in epidemiology?
6   A. I would not do that, no.
7   Q. Okay. You wouldn't feel comfortable doing
8   that?
9   A. Right. I -- I understand the role of an
10  expert in litigation to be someone who has more
11  knowledge than the average person in that field and
12  therefore can help the jury to understand the
13  application of that kind of data.
14      Q. And if you were at a conference of
15  neuro-ophthalmologists, would you feel comfortable
16  standing up and saying that you are an expert in
17  benign intracranial hypertension pseudotumor
18  cerebri?
19      A. Absolutely not.
20      Q. Okay.
21      A. But, again, from the point of view of
22  being able to explain this kind of event and -- and
23  the FDA use of that data, yes.
24      Q. What are the symptoms of pseudotumor
25  cerebri?

Page 77

1   A. The most common symptoms are headache or a
2   change in pattern or severity of preexisting
3   headaches or -- and/or visual -- it's most often
4   described as visual obscuration. So visual changes
5   at any rate.
6   Q. Okay. Anything else?
7   A. Well, are you -- you asked about symptoms,
8   so are you including signs as well as symptoms?
9   Q. Sure, signs --
10      A. So --
11      Q. What are the signs and symptoms of --
12      A. Well, symptoms are what the patient would
13  notice and complain about, and signs are what the
14  physician would notice on examination. So the
15  predominant sign of intracranial hypertension,
16  including, you said, pseudotumor cerebri, the -- the
17  cardinal sign would be a finding of papilledema on
18  examining the eyes.
19      Q. Okay. Any other signs of pseudotumor
20  cerebri?
21      A. Clearly elevated intracranial pressure,
22  which is generally something that requires a lumbar
23  puncture in order to know about that.
24      Q. Okay. Any others?
25      A. Those are the primary ones that come to

Dena R. Hixon, M.D.

| Page 78 |
|---|

```
 1   mind.
 2       Q.  Okay.  So --
 3       A.  There are probably others.
 4       Q.  -- those were the signs, you said?
 5       A.  Well --
 6       Q.  Versus the symptoms?
 7       A.  -- first was the symptoms and the second
 8   was the signs.
 9       Q.  Okay.  So --
10       A.  The signs are what are found on
11   examination.
12       Q.  Okay.  So let's go back to the symptoms,
13   then.  Other than headache, visual obscurations,
14   what are the other symptoms of pseudotumor cerebri?
15       A.  They aren't coming to mind at the moment.
16       Q.  Okay.  What's the cause of pseudotumor
17   cerebri?
18       A.  It's unknown.
19       Q.  What are the risk factors of pseudotumor
20   cerebri?
21       A.  Okay.  The only risk factors that have
22   been demonstrated are female sex, childbearing age,
23   overweight or obesity, and recent weight gain,
24   recent significant weight gain.
25       Q.  Okay.  Any others?
```

| Page 79 |
|---|

```
 1       A.  There has been some suggestion of various
 2   drugs that may possibly be associated, but in
 3   general, the -- the studies that have been published
 4   haven't really shown strong evidence of that.
 5       Q.  Is there a difference between a risk
 6   factor and an association?
 7       A.  Well, a risk factor isn't necessarily a
 8   causal factor, but it is basically a strong enough
 9   association that one would -- would correlate the --
10   the finding with -- with those factors.  So the
11   finding of pseudotumor cerebri is often correlated
12   with women of childbearing age who are overweight or
13   obese and/or have had recent significant weight
14   gain.
15       Q.  You agree that obesity doesn't cause
16   pseudotumor cerebri, correct?
17       A.  I don't believe anybody knows the answer
18   to that.  There's an association there, but the
19   mechanism of -- that causes pseudotumor cerebri, to
20   my understanding, is not known.
21       Q.  Do you know why obesity -- what mechanism
22   makes obesity a risk factor for pseudotumor cerebri?
23       A.  That is not known, to my knowledge.
24       Q.  What -- you mentioned that -- strike that.
25           Do you know what percentage of obese or
```

| Page 80 |
|---|

```
 1   overweight women of childbearing age in the United
 2   States develop pseudotumor cerebri?
 3       A.  So the available information suggests that
 4   it's approximately 19 or 20 per hundred thousand per
 5   year of obese or overweight women of childbearing
 6   age.
 7       Q.  And what study are you getting that from?
 8   Is it the Durcan study?
 9       A.  No, I don't -- give me one minute.
10           Okay.  It was the Durcan study.  And I
11   believe similar numbers have been reported in the
12   Wall and Lee studies.
13       Q.  And do you know how many individuals
14   participated in the Durcan study?
15       A.  I don't remember the population that was
16   evaluated in the Durcan study, but that certainly
17   was not the kind of trial where people were selected
18   to enroll in the trial and followed over time.  That
19   was more of an epidemiological population study.
20       Q.  So you don't remember how many people were
21   involved in that study?
22       A.  No, I'm sorry, I don't.
23       Q.  Do you remember how the information was
24   gathered from the study participants?
25       A.  Do you have a copy of the Durcan study
```

| Page 81 |
|---|

```
 1   available?
 2       Q.  No.
 3       A.  Well, my recall of the Durcan study, I
 4   believe this is the -- study where queries were
 5   sent to all of the neurologists, I think, in the
 6   state of Iowa and also in the state of Louisiana,
 7   and they asked for information about the number of
 8   patients that -- that the physicians had seen with
 9   the diagnosis of -- of idiopathic intracranial
10   hypertension.  And they continued to follow up over
11   a period of time with similar queries to the
12   physicians and they compared those results to the
13   population in those states.
14       Q.  Do you remember what the response rate was
15   from the physicians?
16       A.  I don't remember exactly what the response
17   rate was, but the authors were comfortable with the
18   results they got because of the -- the follow-up.
19   And they discovered from -- from follow-ups that the
20   physicians who hadn't responded -- in general they
21   hadn't responded because they hadn't seen any
22   patients with that diagnosis.  And they felt that --
23   that their methods of follow-up had been adequate
24   to -- to give that determination.
25       Q.  So the Durcan study authors sent out
```

21 (Pages 78 to 81)

Dena R. Hixon, M.D.

## Page 82

1  questionnaires to health care providers seeking
2  information about cases of pseudotumor cerebri that
3  they'd seen.  Is that a fair representation of what
4  your understanding is?
5       A.  Specifically to the health care providers
6  who would have managed patients with that diagnosis.
7       Q.  Is there anything wrong with sending out
8  questionnaires as part of a study?
9       A.  Well, clearly there are different methods
10 to do studies, but this kind of study is a -- you
11 know, it's looking -- it's looking for rates within
12 the population.  And when this study was done -- my
13 understanding is that this was at a time when there
14 were not the same kind of large databases available
15 that we have now to be able to gather this kind of
16 information and that that was probably the -- the
17 best method they had to do it.
18       But, yes, of course there are always some
19 drawbacks to any study.  And within this study, one
20 would be concerned about lack of response from some
21 doctors.
22       Q.  But you still consider this to be good,
23 sound scientific evidence?
24       A.  Well, all of the -- that's not the only
25 study that has given similar results with regard to

## Page 83

1  the population incidence of -- of -- of idiopathic
2  intracranial hypertension.
3       Q.  My question is different.
4       Do you consider the Durcan study to be
5  sound scientific evidence to support the proposition
6  that you've cited in the expert report you've
7  tendered in this case?
8       A.  And what I'm saying by mentioning that
9  there are other studies is that, yes, I think that's
10 sound science.  I think any study needs to be
11 confirmed with other studies, and I think we have
12 that in this case because there were multiple
13 studies.  There have been multiple studies that have
14 presented similar results.
15       Q.  Isn't it true that actually the ranges are
16 kind of all over the board?
17       MR. IMBROSCIO:  Object to the form.
18 Vague.
19       THE WITNESS:  Well, the ranges vary
20 somewhat, but the studies have pointed out, for
21 instance, that the rates within the general
22 population are about one per hundred thousand.  And
23 certainly in some other countries they are somewhat
24 different, because they're somewhat lower in Japan
25 and somewhat higher in Benghazi.

## Page 84

1       In women of childbearing age, the rate is
2  about three to four per hundred thousand.  And when
3  that -- when the population considered includes only
4  women who are 10 percent or more above their ideal
5  weight, it is in the range of maybe 15 -- I think 15
6  was the number that was given -- per hundred
7  thousand.  And in women who are 20 percent or more
8  above their ideal weight, it is about 19 per hundred
9  thousand women.
10 BY MR. JONES:
11      Q.  In the Durcan study, were any controls
12 used by the authors?
13      A.  I'm sorry.  You would have to give me
14 that -- that paper to review again because I don't
15 remember the -- details of that study.
16      Q.  Are the details of the studies that you
17 review and rely upon for purposes of presenting an
18 expert report, are the details important?
19      MR. IMBROSCIO:  Object to the form.
20 Argumentative.
21      THE WITNESS:  You know what, in -- in
22 these cases, you have to look at the details of the
23 study or you don't know what they did, or there are
24 a lot of confounders that can be present in these
25 studies.  So yes.

## Page 85

1  BY MR. JONES:
2       Q.  Are the details important?
3       A.  Yes, they are.
4       Q.  Okay.  In the Durcan study, did they
5  control for the confounder of women who were using
6  contraceptive products?
7       MR. IMBROSCIO:  Object to the form.
8       THE WITNESS:  Again, if you can show me
9  that article, I can better remember the details.
10 BY MR. JONES:
11      Q.  Ma'am, with all due respect, you're the
12 expert.  Do you remember the details of the studies
13 that you've relied upon in your expert report?
14      MR. IMBROSCIO:  Objection.
15      THE WITNESS:  I have not committed those
16 to memory.
17      Sorry.
18      MR. IMBROSCIO:  Objection.  Argumentative.
19 The witness has answered.
20 BY MR. JONES:
21      Q.  What were some of the other studies that
22 you referred to for your conclusion that obesity and
23 overweight is a proven risk factor for pseudotumor
24 cerebri?
25      A.  The Lee and Wall -- it's not really a

Dena R. Hixon, M.D.

Page 86

1    study, but it's a Lee and Wall publication in
2    UpToDate 2015 and --
3        Q.  Which footnote are you referring to?
4        A.  Footnote 134.
5        Q.  Okay.  Let me ask you a question about Lee
6    and Wall.  Did -- these authors, did they do their
7    own epidemiology study in this article?
8        A.  Again, if you can provide me with those
9    articles, I can better remember the details of the
10   articles.
11       Q.  But you don't remember it as you sit here
12   right now?
13       A.  No, I have not committed them to memory.
14       Q.  What other studies do you rely upon for
15   your conclusion that obesity and overweight and
16   recent weight gain are proven associations with the
17   development of pseudotumor cerebri?
18       A.  Well, there's footnote 135, the Daniels
19   study.  There's footnote 136, the Ko study -- or I
20   should say the presentation.  I think there may be
21   some others that aren't coming to mind at the
22   moment, but --
23       Q.  Okay.  Well, let's go to -- let's go to
24   footnote 135, the Daniels Profiles of Obesity,
25   Weight Gain and Quality of Life in Idiopathic

Page 87

1    Intracranial Hypertension.  Did that author conduct
2    an epidemiology study?
3        A.  I'm sorry.  I'm not remembering the
4    details of how that -- how that was done, and I
5    would appreciate it if you could provide me the
6    article.
7        Q.  Footnote 136, the Ko Weight Gain and
8    Recurrence in Idiopathic Intracranial Hypertension,
9    a Case Control Study, can you tell me how many
10   individuals were studied in that case control study?
11       A.  I have not committed that to memory.
12       Q.  Do you know how many participants were
13   involved in that study?
14       A.  I don't remember that.
15       Q.  Do you know what the methods of that study
16   were?
17       A.  Well, it was clearly a case control study
18   according to its title.
19       Q.  How did they gather the information in
20   their case control study?
21       A.  If you can give me the article, I will be
22   glad to refresh my memory on that.
23       Q.  Have you reviewed any other
24   epidemiology --
25           MR. IMBROSCIO:  Just so the record is

Page 88

1    clear, you are declining her request for a copy of
2    the article?
3           MR. JONES:  It's not my responsibility.
4           MR. IMBROSCIO:  Okay.  That's fine.
5    That's fine.
6    BY MR. JONES:
7        Q.  Any other epidemiology studies that you've
8    reviewed that support your conclusion that obesity,
9    overweight, and recent weight gain are proven
10   associations or risk factors for the development of
11   pseudotumor cerebri?
12       A.  Give me a minute.  I want to look at -- at
13   my reference list and at my review.
14           Let me read to you from my report because
15   I think this summarizes the data from those studies.
16       Q.  What page are you reading from?
17       A.  I'm on page 21.
18           So although the overall annual incidence
19   of IIH was estimated to be approximately 1 per
20   100,000 person-years in the general population,
21   based on data from 30 years ago, IIH is markedly
22   more common in women of childbearing age
23   (approximately 3.5 per hundred thousand), and most
24   common in the subset of those women who are
25   overweight, obese, or have experienced recent weight

Page 89

1    gain.  One study found that women between ages 20
2    and 44 who were 10 percent or more over ideal body
3    weight had an incidence rate of 14.85 per hundred
4    thousand women-years, and that similarly aged women
5    who were 20 percent or more over ideal weight had an
6    incidence rate of 19.3 per hundred thousand women.
7    Other studies have yielded similar findings, and a
8    prospective study of 50 patients diagnosed with IIH
9    found that 94 percent of them were obese.
10          MR. IMBROSCIO:  If you can slow it down
11   for the court reporter.
12          THE WITNESS:  I'm sorry.
13          MR. IMBROSCIO:  She's having a tough time
14   keeping up.  She's going fast.
15          THE WITNESS:  Thank you.
16          Epidemiological -- epidemiology studies
17   have consistently found excess weight to be a risk
18   factor for developing IIH, and recent weight gain
19   appears to be an independent risk factor.  As the
20   U.S. population has become heavier in the decades
21   since the original 1 in 100,000 person-years
22   incidence rate was calculated, one would expect a
23   higher overall incidence rate of IIH in the general
24   population.  Interestingly, while systemic estrogen
25   levels tend to be high in obese women, progesterone

23 (Pages 86 to 89)

Dena R. Hixon, M.D.

Page 90

1    levels tend to be lower.
2        And the footnotes in all of that are
3    footnote 132 through footnote 137. So we have
4    references from Durcan, Wall, Lee, Daniels, Ko, and
5    Yeung.
6    BY MR. JONES:
7        Q. Okay. And we've talked about all of those
8    except for footnote 133, Idiopathic Intracranial
9    Hypertension. A Prospective Study of 50 Patients.
10       Do you -- do you know how the study
11   authors gathered the information about the 50
12   patients in the prospective study cited in footnote
13   133?
14       A. Well, this basically -- in my report, I
15   said that a prospective study of 50 patients who had
16   already been diagnosed with IIH found that
17   94 percent of them were obese.
18       Q. Okay.
19       A. So it's looking at patients who already
20   have that diagnosis and determining what their
21   characteristics are.
22       Q. And where do -- where do the authors of
23   this study get their information on these 50
24   patients?
25       A. Again, I believe that is in the article,

Page 91

1    but I don't have the article in front of me. So if
2    I could have the article, I can provide that
3    information.
4        Q. Did they use any case controls in this
5    study that's referenced in footnote 133?
6        A. This is not describing a case control
7    study. It's describing a prospective study of
8    the -- the patients with IIH.
9        Q. Okay. And do you know whether the authors
10   Wall and George, did they use their files involving
11   their patients or did they seek information about
12   patients from other health care providers?
13       A. It's hard to remember, having read many
14   different articles, what came from which article,
15   but Wall was also an author in the Lee and Wall
16   study in UpToDate. And they have provided a summary
17   of information from other studies as well as their
18   own.
19       Q. What other studies did they provide a
20   summary of in this article?
21       A. I have not committed that to memory.
22       Q. Okay. And let's talk about footnote
23   number 137, the Yeung, Y-e-u-n-g, Adiposity and Sex
24   Hormones Across the Menstrual Cycle: the BioCycle
25   Study. Tell me about the BioCycle study.

Page 92

1        A. Well, that was the study that looked at
2    systemic levels of estrogen and of progesterone in
3    obese women. And it showed that the levels of
4    estrogen were higher in obese women, and it is well
5    known that fatty tissue produces estrogen. But it
6    also showed that progesterone levels were lower,
7    which goes against the -- the suggestion that it's
8    the progesterone in IIH that might be responsible
9    for women who have developed IIH while using
10   Norplant.
11       Q. Okay. And did you provide me with any
12   information different than the sentence that you
13   wrote citing to footnote 137 where you say:
14   Interestingly, while systemic estrogen levels tend
15   to be higher in obese women, progesterone levels
16   tend to be lower? Did you -- in your answer, did
17   you provide me with any information that's different
18   about that study or expands upon what happened in
19   that study than what's in that sentence?
20       A. No, I didn't. And I would be happy to do
21   that if I have -- if you can provide me with a copy
22   of that.
23       Q. Was -- the BioCycle study, was that a PK
24   study?
25       A. I don't remember.

Page 93

1        Q. You don't know what kind of equipment may
2    have been used to test systemic estrogen levels or
3    progesterone levels in the BioCycle study in
4    footnote 137?
5        A. Well, the way to find out about the
6    systemic levels is to draw blood and measure it.
7        Q. Using -- what kind of equipment did they
8    use, did these authors use in this study?
9        A. They would have had to use the analytical
10   study -- the analytical equipment just the same as
11   what is done in a PK study, but I don't remember any
12   further details about -- about the design of that
13   study.
14       Q. And you'd agree, wouldn't you, that
15   Levonorgestrel is a potent synthetic progestin,
16   correct?
17       A. I agree with that.
18       Q. Okay. And the sentence you cite doesn't
19   talk about a synthetic progestin, does it?
20       A. That's correct, but synthetic progestins
21   were developed to mimic the effects of natural
22   progesterone.
23       Q. Isn't it true that Levonorgestrel and
24   synthetic progestins are much more potent than
25   natural progesterone?

24 (Pages 90 to 93)

Dena R. Hixon, M.D.

Page 94

1          A.  They are more potent, yes, but one has to
2    keep into consideration that the amounts that are
3    used are -- are smaller, and therefore using a
4    smaller amount of a synthetic progestin would give
5    systemic amounts that are similar to those produced
6    by a larger amount of natural progesterone.
7          Q.  Right.
8          A.  So it's all -- it's all a matter of
9    dose-response.
10         Q.  Are you a sex hormone expert?
11             MR. IMBROSCIO:  Object to the form.
12             THE WITNESS:  I am not specifically a sex
13   hormone expert, but I certainly have had a
14   significant amount of experience reviewing hormones
15   for women's reproductive health care at FDA.
16   BY MR. JONES:
17         Q.  When you were at FDA, did you -- were you
18   ever responsible for the pharmacology reviews
19   involving products that contained female sex
20   hormones?
21         A.  Again, I wasn't responsible for the
22   pharmacology reviews except to review the summary
23   reviews and take those into account in recommending
24   approvals or other actions.
25             MR. JONES:  All right.  Let's break for

Page 95

1    lunch.
2              THE VIDEOGRAPHER:  The time is 11:55 a.m.
3    We'll go off the video record.
4              (A lunch recess was taken from 11:55 to
5              1:08 p.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21       A F T E R N O O N   S E S S I O N
22             THE VIDEOGRAPHER:  The time is 1:08 p.m.
23   We're back on the video record.
24             MR. JONES:  Dr. Hixon, welcome back from
25   lunch.  At this time, I think that I don't have any

Page 96

1    additional questions for you.
2              MR. IMBROSCIO:  Okay.  And we have no
3    questions.  Thank you very much.
4              MR. JONES:  That was fast.
5              MS. PALEY:  That's good, right?
6              THE VIDEOGRAPHER:  Hold on -- hold on just
7    a second.
8              The time is 1:08 p.m.  This is the end of
9    Disc Number 2 and the end of the video deposition.
10   We'll go off the video record.
11             (Off the record at 1:08 p.m.)
12
13
14
15
16
17
18
19
20
21             ACKNOWLEDGMENT OF DEPONENT
22
23   I, DENA R. HIXON, M.D., do hereby acknowledge that I
24   have read and examined the foregoing testimony, and
25   the same is a true, correct and complete

Page 97

1    transcription of the testimony given by me and any
2    corrections appear on the attached Errata sheet
3    signed by me.
4
5
6    _____     _____
7     (DATE)              (SIGNATURE)
8
9
10
11
12
13
14
15
16
17
18
19
20
21             CERTIFICATE OF NOTARY PUBLIC
22        I, Samara J. Zink, the officer before whom
23   the foregoing deposition was taken, do hereby
24   certify that the witness whose testimony appears in
25   the foregoing deposition was duly sworn by me to

25 (Pages 94 to 97)

Dena R. Hixon, M.D.

Page 98

1    testify to the truth, the whole truth, and nothing
2    but the truth concerning the matters in this case.
3        I further certify that the foregoing
4    transcript is a true and correct transcript of my
5    original stenographic notes.
6        I further certify that I am neither
7    attorney or counsel, nor related to or employed by
8    any of the parties to the action in which this
9    deposition is taken; and furthermore, that I am
10   not a relative or employee of any attorney or
11   counsel employed by the parties hereto, nor
12   financially or otherwise interested in the outcome
13   of this action.
14
15
16        _____
17        Samara J. Zink
18        Notary Public in and for the
19        District of Columbia
20
21
22   My commission expires:  October 14, 2016
23
24
25

Page 99

1              E R R A T A   S H E E T
2    IN RE:  Copley v. Bayer Healthcare
3    WITNESS: DENA R. HIXON, M.D.
4    PAGE   LINE    CORRECTION AND REASON
5    ____  ____   _____
6    ____  ____   _____
7    ____  ____   _____
8    ____  ____   _____
9    ____  ____   _____
10   ____  ____   _____
11   ____  ____   _____
12   ____  ____   _____
13   ____  ____   _____
14   ____  ____   _____
15   ____  ____   _____
16   ____  ____   _____
17   ____  ____   _____
18   ____  ____   _____
19   ____  ____   _____
20   ____  ____   _____
21   ____  ____   _____
22   ____  ____   _____
23   ____  ____   _____
24   ____  ____   _____
25   ____  ____   _____

Page 100

1              E R R A T A   S H E E T
2    IN RE:  Copley v. Bayer Healthcare
3    WITNESS: DENA R. HIXON, M.D.
4    PAGE   LINE    CORRECTION AND REASON
5    ____  ____   _____
6    ____  ____   _____
7    ____  ____   _____
8    ____  ____   _____
9    ____  ____   _____
10   ____  ____   _____
11   ____  ____   _____
12   ____  ____   _____
13   ____  ____   _____
14   ____  ____   _____
15   ____  ____   _____
16   ____  ____   _____
17   ____  ____   _____
18   ____  ____   _____
19   ____  ____   _____
20   ____  ____   _____
21   ____  ____   _____
22   ____  ____   _____
23   ____  ____   _____
24   _____    _____
25     (DATE)         (SIGNATURE)

26 (Pages 98 to 100)