# Exhibit D

David William Feigal, Jr., M.D., M.P.H.

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION


- - -


KATRINA DAWN COPLEY,              :    CIVIL ACTION
              Plaintiff,          :    NO. 3:14-cv-00406
                                  :
      vs.                         :
                                  :
BAYER HEALTHCARE                  :
PHARMACEUTICALS, INC., BAYER      :
PHARMA AG, and BAYER OY,          :
              Defendants.         :

ADDITIONAL CAPTIONS LISTED ON NEXT PAGE

- - -

Wednesday, May 4, 2016

- - -


      Videotaped deposition of DAVID WILLIAM FEIGAL,

JR., M.D., M.P.H., held at COVINGTON & BURLING, L.L.P.,

2029 Century Park East, Suite 3100, Los Angeles,

California, commencing at approximately 9:06 a.m.,

before Rosemary Locklear, a Registered Professional

Reporter, Certified Realtime Reporter and California CSR

(#13969).


- - -

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph | 971.591.5672 Fax
deps@golkow.com

David William Feigal, Jr., M.D., M.P.H.

| Page 2 | Page 4 |

**Page 2**

```
 1          UNITED STATES DISTRICT COURT
 2         FOR THE NORTHERN DISTRICT OF ALABAMA
 3                     ---
 4
 5   SHAMEKA M. BRIDGES, AND    :  CASE NO.
     PETERSON BRIDGES,         :  2:14-cv-00036-WMA
 6      Plaintiffs,   :
        :
 7   vs.              :
        :
 8   BAYER HEALTHCARE        :
     PHARMACEUTICALS, INC., BAYER :
 9   PHARMA AG, and BAYER OY,   :
        Defendants.   :
10
11                     ---
12
13          UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF INDIANA
             HAMMOND DIVISION
14
15                     ---
16
17   KATHLEEN CHEEK and BILLY    :  CASE NO.
     CHEEK,          :  2:15-cv-00020
        Plaintiffs,   :
18        :
19   vs.              :
        :
20   BAYER HEALTHCARE        :
     PHARMACEUTICALS, INC., et  :
21   al.,           :
        Defendants.   :
22
23                     ---
24
25
```

**Page 3**

```
 1          UNITED STATES DISTRICT COURT
 2         FOR THE WESTERN DISTRICT OF MISSOURI
                WESTERN DIVISION
 3
                     ---
 4
 5   SARAH D. HOOVER         :  CIVIL ACTION NO.
        Plaintiff,   :  3:14-cv-05090-SRB
 6        :
     vs.              :
 7        :
 8   BAYER HEALTHCARE        :
     PHARMACEUTICALS INC., BAYER :
 9   PHARMA AG, and BAYER OY,   :
        Defendants.   :
10
                     ---
11
12
13          UNITED STATES DISTRICT COURT
14         FOR THE NORTHERN DISTRICT OF ALABAMA
                     ---
15
16   SHENIKA J. HOUSTON,      :  CASE NO.
        Plaintiff,   :  2:14-cv-00035-WMA
17        :
     vs.              :
18        :
19   BAYER HEALTHCARE        :
     PHARMACEUTICALS INC., et al.,:
        Defendants.   :
20
21                     ---
22
23
24
25
```

**Page 4**

```
 1          UNITED STATES DISTRICT COURT
 2            WESTERN DISTRICT OF VIRGINIA
 3                     ---
 4
 5   EMILY C. KELLINGTON      :  CASE NO.
        Plaintiff,   :  5:14-cv-00002-MFU
 6        :
     vs.              :
 7        :
 8   BAYER HEALTHCARE        :
     PHARMACEUTICALS INC.,    :
        Defendant.   :
 9
10                     ---
11   APPEARANCES:
12
13   JONES WARD, P.L.C.
     BY:  LAWRENCE L. JONES, II, ESQUIRE
14   larry@jonesward.com
     BY:  CHRISTINA NATALE, ESQUIRE
15   christina@jonesward.com
     Marion E. Taylor Building
16   312 South Fourth Street, 6th Floor
     Louisville, Kentucky 40202
17   (502) 882-6000
     Appearing on behalf of the Plaintiffs
18
19
     COVINGTON & BURLING, L.L.P.
20   BY:  PAUL W. SCHMIDT, ESQUIRE
     pschmidt@cov.com
21   One CityCenter
     850 Tenth Street, NW
22   Washington, DC 20001-4956
     (202) 662-6000
23   Appearing on behalf of the Defendants
24
25                     ---
```

**Page 5**

```
 1   ALSO PRESENT:
 2
 3      RYAN WONG, Video Operator
 4
 5                     ---
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

2 (Pages 2 to 5)

David William Feigal, Jr., M.D., M.P.H.

## Page 6

```
 1                    I N D E X
 2
 3   WITNESS                        PAGE
 4
 5   DAVID WILLIAM FEIGAL, JR., M.D., M.P.H.
 6
 7     By Mr. Jones                   9
 8
 9              - - -
10
11            EXHIBIT INDEX
12   NUMBER                       MARKED
13
14   Feigal-1    10-page document dated 4/22/16    9
             entitled "Notice of Video
15           Deposition of David Feigal,
             MD, MPH"
16
17   Feigal-2    1-page document dated 4/4/13     12
             entitled "Invoice," plus
18           attachments
19   Feigal-3    2-page letter dated 1/14/13 to   14
             Earle Martin from Hunter K.
20           Ahern, plus attachment
21   Feigal-4    1-page letter dated 10/22/14     25
             to Hunter K. Ahern, Esq., from
22           Ellen C. Teplitzky
23
24
25
```

## Page 7

```
 1            EXHIBIT INDEX (Continued)
 2   NUMBER                       MARKED
 3
 4   Feigal-5    1-page document entitled      46
             "David Feigal, M.D., M.P.H.,
 5           Supplemental Materials
             Reviewed"
 6
 7   Feigal-6    2-page E-mail dated 10/23/02   147
             to Mirja Heikkinen from Pirjo
 8           Sallinen, MIR_PSEU_00546368 -
             MIR_PSEU_00546369
 9   Feigal-7    5-page document dated 6/2/99   264
             entitled "Mirena FC Minutes of
10           the Projectteam Meeting
             (Leiras/Berlex),"
11           MIR_JR_00186491 -
             MIR_JR_00186495
12
13   Feigal-8    60-page document dated 11/07   272
             entitled "FDA Science and
14           Mission at Risk"
15
     (Exhibits retained by the court reporter and attached to
16   transcript.)
17
18              - - -
19
20
21
22
23
24
25
```

## Page 8

```
 1       VIDEO OPERATOR:  We are now on the record.
 2       My name is Ryan Wong.  I am a videographer for
 3   Golkow Technologies.  Today's date is April 4th, 2016,
 4   and the time is 9:06 a.m.
 5       MR. JONES:  May the 4th.
 6       MS. NATALE:  May the 4th.
 7       VIDEO OPERATOR:  Oh, May the 4th.  I'm sorry.
 8       This video deposition is being held in Los
 9   Angeles, California, in the matter of Katrina Copley
10   versus Bayer HealthCare and others, for the United
11   States District Court, Middle District of Tennessee.
12       The deponent is Dr. David Feigal.
13       Counsel, please identify yourselves for the
14   record.
15       MR. JONES:  Larry Jones for the plaintiffs.
16       MS. NATALE:  Christina Natale for the
17   plaintiffs.
18       MR. SCHMIDT:  Paul Schmidt for Bayer.
19       And we cross-noticed this in a few other cases
20   so if you don't have the caption, I can get them to you
21   at a break.
22       VIDEO OPERATOR:  The court reporter is Mary
23   (sic) Locklear, and will now swear in the witness.
24       DAVID WILLIAM FEIGAL, JR., M.D., M.P.H., having
25   been duly sworn, was examined and testified as follows:
```

## Page 9

```
 1              EXAMINATION
 2   BY MR. JONES:
 3     Q.    Good morning, sir.  My name is Larry Jones.  We
 4   met just a couple of moments ago.  I represent the
 5   plaintiffs in this case.
 6       And my phone is dinging, and that's probably a
 7   good lesson to everyone to turn their phones off.
 8       Can you please state your full name for the
 9   record.
10     A.    Yes.  My name is David William Feigal, Junior.
11     Q.    Okay.  And, Doctor, you're a Medical Doctor;
12   correct?
13     A.    That's correct.
14     Q.    And, Dr. Feigal, where do you currently reside?
15     A.    I reside in Santa Rosa Valley, California.
16     Q.    Okay.  And do you intend to appear live to
17   testify at the trial in these cases?
18     A.    If asked, yes, I would.
19       (Exhibit Feigal-1 was marked for
20   identification.)
21   BY MR. JONES:
22     Q.    Dr. Feigal, I'm going to hand you a document
23   that we're marking as Plaintiff's Exhibit 1 --
24     A.    Yes.
25     Q.    -- which I will represent to you is the
```

David William Feigal, Jr., M.D., M.P.H.

| Page 10 | Page 12 |
|---|---|

**Page 10**

1     Deposition Notice served in this case.
2         Have you seen this document before?
3     A.   Yes, I have.
4     Q.   Okay. And the Deposition Notice asks for
5     certain documents --
6         MR. JONES: I don't have an extra copy.
7         MS. NATALE: Do you need one?
8     BY MR. JONES:
9     Q.   How many document requests are there on there?
10    I don't have a copy.
11    A.   Oh. 23.
12    Q.   Okay. And did you -- have you seen this before?
13    A.   Yes.
14    Q.   And did you engage in efforts to try to locate
15    the documents listed here in the Deposition Notice?
16    A.   Yes, I did.
17    Q.   And tell me what kind of efforts you engaged in
18    to locate the documents listed in the Deposition Notice.
19    A.   I went down through the list to see which of
20    these documents I had. Some of them aren't things that
21    I have or ever had, some of them -- and I had
22    discussions with Mr. Schmidt about which of these I was
23    to produce and so then I went through my files and
24    pulled the documents that I could and I've brought them
25    with me today.

**Page 11**

1     Q.   Okay. And do you have those documents with you
2    here today?
3    A.   Yes, I do.
4    Q.   And can I have them?
5    A.   Sure.
6         This is just a copy of my report.
7    Q.   Okay.
8    A.   But what I'm providing for you are the
9    documents, each of them have a yellow sticky on them
10   which indicates which number of the Document Request it
11   is.
12   Q.   Okay.
13   A.   And then I've also brought for you an updated
14   copy of my prior testimony since.
15   Q.   Okay.
16   A.   Since we've submitted that initially, I've done
17   two depositions, and they're reflected on that new list.
18   Q.   Okay. So it looks like you've provided an
19   updated CV in response to Items 1 and 2 on the document
20   list; is that correct?
21   A.   That's correct. I believe it's the same CV that
22   I submitted before, but I brought one for your
23   convenience.
24   Q.   Okay. And then the next thing that it looks
25   like you've produced -- and I appreciate the sticky

**Page 12**

1     notes -- is you responded to Request Number 23 with a
2    copy of several invoices; is that correct?
3    A.   Yes. Those are actually all of the invoices
4    over time that relate to Mirena, not just this case but
5    other cases before then.
6    Q.   When you say "other cases before then," what are
7    you talking about?
8    A.   I was originally retained to prepare a report on
9    Mirena and issues relating to uterine perforation, and
10   so most of the invoices actually reflect that. The
11   work -- the invoices for IIH began in February of this
12   year. There's two copies there, by the way.
13   Q.   Oh, okay. Great.
14        Is there two copies of everything?
15   A.   Except for the CV.
16   Q.   Okay.
17        MR. JONES: I'm going to mark a copy of these
18   invoices as Deposition Exhibit Number 2.
19        (Exhibit Feigal-2 was marked for
20   identification.)
21   BY MR. JONES:
22   Q.   And is Exhibit Number 2, is that a true and
23   accurate copy of what you just described regarding your
24   invoices?
25   A.   Yes, it is.

**Page 13**

1     Q.   Okay. And then the next item that you've
2    provided is -- has a sticky note that says "25" on it so
3    that's -- you're responding to Document Request Number
4    25; is that correct?
5    A.   Actually, it's probably 22. Because there is no
6    25.
7    Q.   Yeah, that's what I was going to say. It says
8    "25" on it --
9    A.   Yeah.
10   Q.   -- on the sticky, but there's -- it doesn't --
11   this doesn't go up to 25.
12   A.   It's 22.
13   Q.   Okay.
14   A.   Yeah. And -- yeah.
15   Q.   And that Item 22 says, all consulting contracts
16   or retention letters concerning the witness's
17   involvement in the Mirena litigations.
18   A.   Yes, that's correct.
19   Q.   So that's --
20   A.   That's the original -- that's the original
21   retainer letter and a modification letter where my rates
22   changed.
23   Q.   Okay.
24        MR. JONES: Let's mark that as Deposition
25   Exhibit Number 3.

David William Feigal, Jr., M.D., M.P.H.

Page 14

1      (Exhibit Feigal-3 was marked for
2  identification.)
3      MR. JONES:  Paul, did you want this back?
4      MR. SCHMIDT:  Yes.
5  BY MR. JONES:
6      Q.    And then there is a -- one copy of an updated
7  prior testimony list?
8      A.    Yes.
9      Q.    Is that correct?
10     A.    That's correct.  Yeah.  I already gave a copy to
11 Mr. Schmidt.
12     Q.    Now, can you -- I've received a previous list of
13 your testimony.
14        Can you help me understand, was this merely your
15 attempt to update to date or were there additions within
16 the body of the other?
17     A.    No, there's no additions within the body.  There
18 may have been one that dropped off because it's now
19 before the four-year time period, but there's two
20 additions on the last page.
21        So I think there's one deletion, the first line
22 on the old report has been deleted because now it's
23 longer than four years ago, and then there's two
24 additions for two depositions that are done recently.
25     Q.    And the list of your prior testimony is three,

Page 15

1  four, five, six pages for the last four years; is that
2  correct?
3      A.    That's correct.
4      Q.    Okay.  So you've given sworn testimony before?
5      A.    I have.
6      Q.    How many times in your life have you given a
7  deposition?
8      A.    Well, I've probably -- I did my first
9  deposition, actually, as a fact witness for the
10 Government in about 1995 but then not again until I
11 began work as an expert.
12        I would say that there are probably, you know,
13 an additional three or four trial, at-trial, testimonies
14 before the ones on that list and there's probably an
15 additional 10 or 15 depositions.
16     Q.    Okay.  So let's -- depositions in the last four
17 years, we have 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12?
18        MR. SCHMIDT:  Do you have a copy that he could
19 follow along with?
20        MR. JONES:  He only gave me one copy.
21        THE WITNESS:  I gave you one and I gave you one.
22 Why don't I look at the one I gave you.
23        MR. JONES:  Okay.
24 BY MR. JONES:
25     Q.    Let me -- depositions, 1, 2, 3, 4, 5, 6, 7, 8,

Page 16

1  9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22,
2  23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36,
3  plus you say probably another 10 or 15 before this
4  period; is that correct?
5      A.    Yes; going all the way back to 1995.  Yes.
6      Q.    Okay.  So 46 to 51 depositions.
7        And you said going all the way back to 1995, but
8  I understood you a second ago to say that after you
9  testified for the Government as a fact witness in '95,
10 you hadn't testified at a deposition again until you
11 started your consulting work; is that correct?
12     A.    That's correct.  The next deposition that I had
13 was probably approximately in 2005.
14     Q.    Okay.  So since 2005, would it be fair to say
15 that you've given between 46 and 51 depositions?
16     A.    Yes.
17     Q.    And that was as a paid litigation consultant?
18     A.    Yes.
19     Q.    And then let's look at -- you have a list of
20 trial or arbitration testimony in the last four years.
21 We have 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14,
22 15, 16, 17, 18, 19, 20.  20.
23        So 20 instances of trial or arbitration
24 testimony in the last four years?
25     A.    That's correct.

Page 17

1      Q.    And how many did you say it would have been
2  before the four-year period?
3      A.    I don't recall what I said before.  Probably
4  four or five.
5      Q.    Okay.
6      A.    And I would point out that in the last -- in
7  this list, half of them all relate to one matter, the
8  cases involving Takeda Pharmaceuticals.  So there were
9  ten trials all on the same matter.
10     Q.    But you were paid in those cases to -- you were
11 paid for your time giving the testimony in those cases;
12 correct?
13     A.    Oh, yes.
14     Q.    And you represent that you were an expert for
15 Takeda in those cases?
16     A.    Yes, I was retained by attorneys for Takeda.
17 Yes.
18     Q.    And those were involving Actos; right?
19     A.    That's correct.
20     Q.    And what was the claimed injury in Actos?
21     A.    Bladder cancer.
22     Q.    And were you testifying as a regulatory expert
23 in those cases?
24     A.    Yes.  Also, to an extent, as an epidemiologist.
25 But epidemiology is one of the tools of safety

David William Feigal, Jr., M.D., M.P.H.

Page 18

1  surveillance, and I was providing testimony about
2  post-market surveillance, regulatory, and the
3  epidemiology that supported the labeling changes.
4     Q.    Did you give testimony in those Actos cases that
5  Takeda had adequately warned of the risk of bladder
6  cancer in their product label?
7     A.    Yes.  Generally speaking, yes, that was the
8  testimony that I offered.
9     Q.    And did you give testimony in the Actos cases
10  that Takeda's interactions with the FDA were
11  appropriate?
12     A.    With respect to the safety surveillance, yes,
13  and the labeling updates and the submission of required
14  documents, yes, I did.
15     Q.    And those are similar to the opinions that
16  you're giving in this case as well; correct?
17     A.    At a very high level.  But the facts are -- you
18  know, the circumstances and the facts are very
19  different.
20     Q.    Sure.  Okay.  And you say that you were
21  contacted to testify in the -- we'll call these -- the
22  Mirena MDL, when I refer to that, is it fair to assume
23  that those are the migration/perforation cases?
24     A.    You can refer to them that way, yes.
25     Q.    Okay.  Is that a fair differentiation?  I'm

Page 19

1  trying to differentiate between these cases.
2           I'd like to call those the MDL or the
3  migration/perforation cases and these the pseudotumor
4  cerebri cases.
5     A.    Sure, that's fine.
6     Q.    Okay.  And did I understand you to say that you
7  were first contacted to testify in the pseudotumor
8  cerebri cases in February of 2016?
9     A.    '13.  Oh, pseudotumor cerebri, that's '16, yes.
10  February of '16.
11     Q.    Okay.  I do see that you first billed for the
12  migration/perforation cases in February 2013.  So are we
13  sure that it was February on --
14     A.    Yes.
15     Q.    -- both?
16     A.    Yes.
17     Q.    Okay.
18     A.    Yes.
19     Q.    And who contacted you to discuss your potential
20  expert retention in the pseudotumor cerebri cases in
21  February of 2016?
22     A.    Mr. Schmidt and his colleagues.
23     Q.    Mr. Schmidt and his colleagues?
24     A.    Yes.
25     Q.    Okay.  It wasn't anybody from Shook Hardy Bacon?

Page 20

1     A.    Not that I recall.  I think with these cases I
2  primarily interacted with the attorneys from Covington &
3  Burling.
4     Q.    Okay.
5           MR. SCHMIDT:  And, Larry, I apologize.  We also
6  had a supplemental reliance list, if you wanted to
7  review that at some point.
8           MR. JONES:  Yes.  Of course.  Thanks.
9           MR. SCHMIDT:  A few copies.
10  BY MR. JONES:
11     Q.    Sorry for the lack of questions.  I'm just going
12  through --
13     A.    No.  No.  That's quite all right.
14     Q.    -- the documents that you gave me.
15     A.    That's quite all right.
16     Q.    The document that has a sticky note on it, 22,
17  it did say "25" but we figured out it was 22, this
18  appears to be a consulting agreement between your
19  company, NDA Partners, L.L.C.?
20           Is that your company?
21     A.    Yes, that's correct.
22     Q.    Are you a partner in that company?
23     A.    I am.
24     Q.    A full equity partner?
25     A.    Yes.  There's 11 of us, yes.

Page 21

1     Q.    Okay.
2     A.    I'm one of 11.
3     Q.    Does your wife, does she work there?
4     A.    She is.  And she's now an equity partner as
5  well.
6     Q.    She is an equity partner?
7     A.    Yes.
8     Q.    Okay.  I just wondered if -- I saw her bio and I
9  thought, I wonder if they're related.
10     A.    People ask me if we're related, and I usually
11  say, yes, for the last 35 years.
12     Q.    Yeah.  They tell you you kicked your
13  coverage?  Okay.
14           So I'm looking at a January 14th, 2013, letter
15  from Hunter Ahern, partner at Shook, Hardy & Bacon, to
16  Earle Martin --
17     A.    Yeah.
18     Q.    -- Earle Martin, partner and general manager,
19  NDA Partners, L.L.C.
20           Is that a document that you produced to me?
21     A.    Yes, it is.
22     Q.    And January 14th, 2013, is this when you were
23  retained for the migration/perforation cases?
24     A.    Yes, it is.
25     Q.    Okay.  And it says that, we understand that you

6 (Pages 18 to 21)

David William Feigal, Jr., M.D., M.P.H.

Page 22

1    have assigned David W. Feigal, M.D., M.P.H., to this
2    project.
3              Who was the point of contact initially on this
4    particular project?  Was it Mr. Martin or was it you?
5    A.    It was me.
6    Q.    Okay.
7    A.    And then to get an agreement between the
8    attorney's firm and our group and to set up the billing
9    arrangements, I turn that over to Mr. Martin and his
10   staff.
11   Q.    Okay.  And it says, this will confirm that Bayer
12   has authorized us to retain you as expert consultants in
13   this matter at your customary fee of $500 per hour.
14             So that was your rate in 2013?
15   A.    That's correct.
16             MR. JONES:  Okay.  Let's mark this as Deposition
17   Exhibit 4 or 3?  Four.  Okay.
18   BY MR. JONES:
19   Q.    Is that a --
20             MR. SCHMIDT:  I'm sorry.  What was 3?  I thought
21   that was 3.
22             THE WITNESS:  No.  Three was the -- oh, I've
23   already got it marked as 3.  I've got both copies.
24             MR. SCHMIDT:  You marked the same one twice as
25   two different numbers.

Page 23

1              MR. JONES:  Oh, I did?
2              Okay.  So what do we have going on here?
3              THE WITNESS:  Three and 4 are both the same.
4              MR. SCHMIDT:  I think 3 and 4 are the same
5    document.
6              MR. JONES:  Oh.  Oh, I gave you my copy.  I'm
7    sorry.
8              THE WITNESS:  Yeah.
9              MR. JONES:  So that's not Exhibit 4.  Let's
10   strike that.
11             Here's your sticker back.
12   BY MR. JONES:
13   Q.    And is that a true and accurate copy of the
14   retention letter, the initial retention letter, for your
15   consulting arrangement with Shook Hardy Bacon and Bayer
16   back in January 2013?
17   A.    Yes, it is.
18   Q.    Then we'll -- I'm looking at a letter that
19   you've produced to Hunter Ahern, it's addressed to
20   Hunter Ahern, partner, Shook Hardy & Bacon, October
21   22nd, 2014, from Ellen Teplitzky, T-E-P-L-I-T-Z-K-Y?
22   A.    Yes.
23   Q.    Okay.  And this appears to be advising Shook
24   Hardy that your new rate is $600 per hour for consulting
25   and $700 per hour for deposition or expert witness

Page 24

1    testimony; is that correct?
2    A.    You've read that correctly but, actually, I only
3    charge 600, no matter what the work is, so whether it's
4    deposition testimony or whatever.
5              I think some of my other partners in the group
6    have a differential rate.  But I don't charge for travel
7    or for depositions.  So it's a flat 600 for my time, no
8    matter what I'm doing.
9    Q.    Okay.  The next sentence says, non-productive
10   travel time will be charged at $300 per hour.
11             Did I read that correctly?
12   A.    Yes.
13   Q.    And do you charge non-productive travel time at
14   $300 per hour?
15   A.    I do not.  Some of my partners do that.
16   Q.    Do you charge non-productive travel time at $600
17   per hour?
18   A.    No, I don't charge for my travel time, just
19   out-of-pocket travel expenses.
20   Q.    And I think you clarified this for me but, as we
21   sit here today, your billable rate is $600 per hour;
22   right?
23   A.    That's correct.
24   Q.    Okay.
25   A.    Whether it's deposition or report writing or

Page 25

1    research, it's $600 an hour.
2    Q.    And how often does your company raise your rate?
3    A.    That was the first time we did it after, I
4    think, nine years, and it's -- it was sort of across the
5    board for multiple partners.  We had had the same rate
6    for about nine, ten years and we raised it.
7    Q.    And do you testify at or do you bill at $600 per
8    hour for consulting and deposition or trial testimony?
9    When you work on other matters currently, is your rate
10   $600 per hour?
11   A.    For legal consulting, yes, it's the same for all
12   of my clients.
13             MR. JONES:  And then let's just go on and mark
14   that as Deposition Exhibit 4.
15             (Exhibit Feigal-4 was marked for
16   identification.)
17   BY MR. JONES:
18   Q.    Dr. Feigal, did I mark a copy of these invoices
19   yet or did you give me two copies?
20   A.    No.  You did mark it.  That was Exhibit 2.
21             MS. NATALE:  That's 2.
22             MR. JONES:  Okay.  Let's go to Exhibit 2, then.
23             MR. SCHMIDT:  May I see Exhibit 4, please,
24   David?
25             THE WITNESS:  Sure.

7 (Pages 22 to 25)

David William Feigal, Jr., M.D., M.P.H.

Page 26

1  BY MR. JONES:
2  Q.  So you were first contacted to consult in this
3  case in February of 2016; correct?
4  A.  Yes.  It looks like that's when the work
5  started.  You noticed the letter was dated in January.
6  So I was probably contacted in January, I suggested we
7  get a retainer letter in place, and then I started
8  reviewing documents in February of 2013.
9  Q.  Right.  I'm talking about in the --
10  A.  Oh.
11  Q.  -- PTC cases.
12  A.  I'm sorry.  Yes.  That's February of this year,
13  yes, 2016.
14  Q.  And there is no separate letter of consulting or
15  agreement for this case, is there?
16  A.  No, there is not.
17  Q.  And so let's go back.
18       It looks like you've provided two invoices that
19  relate to this case.
20  A.  Yes.
21  Q.  One is dated 3/14/2016, service date 2/29/2016.
22       That's just -- the service date is just the
23  billed date; right?  That's the last day of the month?
24  A.  That's right.
25  Q.  Okay.  And then you go over, consultant, David

Page 27

1  Feigal, description, for professional services rendered
2  February 1st, 2016, to February 29th, 2016; is that
3  correct?
4  A.  Yes.
5  Q.  Okay.  And it looks like you spent 8.5 hours
6  working on this case in February of 2016; correct?
7  A.  That's correct.
8  Q.  And what did you do during those exactly 8.5
9  hours during the month of February 2016?
10  A.  As I recall, it was sometime in the second half
11  of the month we had an initial couple-hour meeting here
12  at this building to discuss the background of the case.
13       Prior to that, they had sent me a small number
14  of documents that I reviewed before that meeting.  And
15  so this just reflects the time to review that document
16  and those meetings and any document review I did after
17  the meeting.
18  Q.  And how many documents -- how long did the --
19  did you meet with the Covington & Burling lawyers once
20  or more than once?
21  A.  It was just once.
22  Q.  And how long did that meeting last?
23  A.  As I recall, it was two hours.
24  Q.  Okay.  And so for the other 6.5 hours, how many
25  documents did you review?

Page 28

1  A.  I don't recall exactly.
2       Actually, I have one more thing which I've
3  brought you in response to your request, and it's my
4  working document.  So you can see the documents that
5  have highlighting, and if you look in here, you'll see
6  folders by the dates on which I received documents.
7  Q.  Okay.
8  A.  So except for one -- there's one folder that's
9  just labeled "IIH."
10  Q.  Okay.
11  A.  But you can see from probably the dates the
12  documents were created or saved the rough time frame.
13       So this isn't the sum total of all the documents
14  I've ever had for Mirena but it's the ones I've had
15  since I began working on pseudotumor cerebri.
16  Q.  Okay.  And is that thumb drive for us?
17  A.  Yes.
18  Q.  Okay.
19  A.  Yeah, it's for you.
20  Q.  During February of 2016, were you provided with
21  plaintiffs' expert reports in this case?
22  A.  I was, yes.
23  Q.  Okay.  And how many of those expert reports were
24  you provided with?
25  A.  I think that at that initial time I was provided Dr.

Page 29

1  Ross, Dr. Etminan, never quite sure how to say Dr.
2  Frau --
3  Q.  Fraunfelder.
4  A.  -- Fraunfelder's deposition, and one other whose
5  name I can't remember.
6  Q.  And you said "deposition," but those were --
7  A.  I mean they --
8  Q.  -- just reports; correct?
9  A.  No.  These were reports.  That's correct.  I
10  later have -- I later have -- at a later point in time,
11  I have depositions from Dr. Ross and --
12  Q.  Would it --
13  A.  Yeah.
14  Q.  What about Dr. Mazzeo's report; were you ever
15  provided with Dr. Mazzeo's report?
16  A.  I don't recall.  There was -- there were
17  additional reports.  I just -- I don't recall.
18  Q.  At what point did you determine that you could
19  give an expert opinion in this case for Bayer?
20  A.  We had a follow-up conversation by telephone, as
21  I recall, sometime in early March and I provided my
22  initial, preliminary observations and opinions about the
23  issues, particularly those in Dr. Ross's and Dr.
24  Etminan's reports, and they asked me if I would begin
25  working on a report.  And at that point I began working

David William Feigal, Jr., M.D., M.P.H.

## Page 30

1  on a report that would be filed. And when I do that,
2  I'm also willing to offer testimony, if requested, at a
3  deposition or trial.
4  Q.  Okay. And we have -- going to the last page,
5  the next invoice, it's dated 4/26/2016, for professional
6  services rendered March 1st, 2016, through March 31st,
7  2016.
8       Did I read that correctly?
9  A.  Yes.
10  Q.  Okay. And 41.5 hours, for a total of $24,900
11  for that month; is that correct?
12  A.  That's correct.
13  Q.  Okay. And when you add that to the $5,100 from
14  the prior month, you are at exactly $30,000; is that
15  right? Is my math right?
16  A.  It looks like that's correct.
17  Q.  What work did you do during your 41.5 hours
18  during the month of March 2016?
19  A.  Well, during March, I filed the report that we
20  have today. And so the work would have involved writing
21  the report, reviewing the documents that were necessary
22  to write that report, there were also conversations with
23  attorneys during this time about the report and about
24  some of my opinions.
25  Q.  And what date did you submit your final report?

## Page 31

1  A.  The date is on Page 52 of the report. March
2  24th.
3  Q.  And between the two invoices, it looks like you
4  spent exactly 50 hours.
5       Well, does any of this 41.5 hours include time
6  spent after you submitted your report?
7  A.  It may have, but I suspect most of that will be
8  in the April invoice, which hasn't been prepared yet.
9  Q.  Right. I mean, after March 24th did -- was
10  there any billable time after March 24th --
11  A.  In the March?
12  Q.  -- between -- yes, in the March period.
13  A.  I don't think there was -- I don't think there
14  was very much, if any.
15  Q.  Okay. So you spent exactly 50 hours meeting
16  with lawyers from Covington & Burling, reviewing
17  documents, reviewing the expert reports of Dr. Ross, Dr.
18  Etminan, Dr. Fraunfelder, and writing your report; is
19  that correct?
20  A.  That's correct.
21  Q.  And how many pages is your report?
22  A.  It is 52 pages.
23  Q.  So that's less than an hour per page; correct?
24  A.  Well, not all 52 pages are new. The background
25  section on my background is the same, much of the

## Page 32

1  background information on the initial approval of Mirena
2  had been previously written for other reports. So 50
3  hours was the time necessary to write the material
4  specific to pseudotumor cerebri.
5  Q.  And can you go to the portion of your report
6  that says "References Cited"?
7  A.  Yes.
8  Q.  Are you there?
9  A.  Yes.
10  Q.  Okay. And looking at this, this has 82
11  references that were cited in your report; correct?
12  A.  Yes, that's correct.
13  Q.  Okay. And as part of this 50 hours, did you
14  review every one of these 80 references?
15  A.  Well, some of these are references to sections
16  that had been previously written, but if they are new
17  references about pseudotumor cerebri, yes, I did review
18  them.
19  Q.  And did you review them cover to cover?
20  A.  Not all of them. Some of them are documents
21  that only small parts of the documents are relevant to
22  the reference in the -- reference in the text. Others
23  are documents that establish different regulatory
24  milestones such as, you know, typically, I'll reference
25  approval documents and reviews. But these are all --

## Page 33

1  these are the reports among the total number of
2  documents that I had that I, you know, specifically
3  referenced in my report.
4  Q.  Okay. And so those are the ones that you
5  specifically referenced in your report, those 82
6  citations; correct?
7  A.  That's correct.
8  Q.  Okay. And then I have a listing of David Feigal
9  M.D., materials reviewed.
10     Is that in your report? Do you see that?
11  A.  I don't think I have that. Was that Exhibit B?
12  Oh, wait. Wait. I do. Yes. Yes. It's here.
13  Q.  Do you have it?
14  A.  Yeah.
15  Q.  Okay.
16  A.  Yes.
17  Q.  And it says "Academic Literature"; right?
18  A.  Yes.
19  Q.  Okay. And we have, I'm going to count them in
20  my head to save the court reporter.
21     Okay. I count 89 pieces of academic literature
22  that you reviewed; correct?
23  A.  Yeah. Well, these -- yes, these are the
24  materials that I had available to me and I'm familiar
25  with all of them. I've reviewed some of them in more

David William Feigal, Jr., M.D., M.P.H.

Page 34

 1  detail than others.
 2  Q.    Okay.  Well, it says "Materials Reviewed."
 3        Did you review these 89 materials or not?
 4  A.    Yes.
 5  Q.    Okay.  So that's 89 plus the 82 that you cite so
 6  that's 171.  Then you have --
 7  A.    Well, I would just point out, there may be
 8  duplicates because what I asked the Covington to do is
 9  to actually provide me a list of all the documents that
10  they had provided to me, and so some of these documents
11  will be on the citation, they should -- most of them
12  will also be on this list.
13  Q.    So Covington provided this list?  They typed it
14  up?
15  A.    Yes.  Yes.  This is the one part of the report
16  that I asked them to produce.  I ask them -- I ask
17  clients when I'm working with them to keep track of what
18  they've sent me and to give a list of that and then I
19  provide that to you so you know everything that I've
20  been sent.  And the materials I'm sent I review.
21  Q.    And Covington provided all of these documents on
22  Pages 1 through 12 of the Materials Reviewed; is that
23  correct?
24  A.    Substantially.  There are some things, for
25  example, statute and regulations, I also give them my

Page 35

 1  list of things that are on my list that they didn't
 2  provide and then they add that to their list to create
 3  the comprehensive list.
 4  Q.    And then statutes, let's look at "Statutes and
 5  Regulations" on Page 7.
 6  A.    Sure.
 7  Q.    Looks like you reviewed seven statutory or
 8  regulatory sections; is that correct?
 9  A.    Yes.  All of these are Federal Register notices
10  of proposed and final rules pertaining to labeling, and
11  then the Code of Federal Regulation, those are the
12  labeling regulations.
13  Q.    Okay.  And then you have "Labels and Other
14  Materials Obtained from Drugs@FDA Or Other Public
15  Sources."
16        Do you see that?
17  A.    Yes, that's right.
18        When I'm working with a material that's, you
19  know, on a case that's FDA reviewed, I go to the FDA
20  databases and I download copies there of the labels that
21  I need and if there's reviews or other documents on the
22  FDA website.  So I obtain those myself, although
23  oftentimes the law firm will send me the same documents.
24  But I pull those directly.
25  Q.    Okay.  And that's eight items; correct?

Page 36

 1  A.    Yes, that's right.
 2  Q.    Okay.  And then "Deposition Testimony," you have
 3  "Deposition of Juliane Schoendorf"; is that correct?
 4  A.    That's correct.
 5  Q.    Okay.  And did you review that entire deposition
 6  from cover to cover?
 7  A.    I don't recall if I did or not.  Some --
 8  sometimes I use the index to find key sections, so I
 9  just don't recall if I read the entire thing.
10  Q.    Were you provided the entire deposition?
11  A.    Yes, I was.
12  Q.    Do you remember how many pages it was?
13  A.    Several hundred pages, but I don't remember
14  exactly.
15  Q.    Then you have "Documents Received From
16  Plaintiffs" and you have two items; is that correct?
17  A.    Yes.
18  Q.    Then you have "Documents From Bayer
19  Productions," and I'm going to count those.
20        And I count 69 items.  Does that sound correct?
21  A.    Does, yes.
22  Q.    Okay.  And then we have "Expert Reports," and I
23  see three reports and the reliance materials provided by
24  Dr. Ross and Dr. Fraunfelder; is that correct?
25  A.    Yes.  And Dr. Etminan.

Page 37

 1  Q.    Yeah.  But no reliance materials for Dr.
 2  Etminan?
 3  A.    That's correct.
 4  Q.    Okay.  Then this morning I've been, just now
 5  I've been provided with supplemental materials reviewed,
 6  and it looks like this is 11 depositions that you
 7  reviewed; is that correct?
 8  A.    Well, as provided, yes.
 9  Q.    I'm sorry?
10  A.    Yes, as provided.  And I familiarized myself
11  with those depositions.
12  Q.    Did you review them from cover to cover?
13  A.    No, I did not.
14  Q.    And the supplemental materials reviewed lists
15  depositions of Dr. Fraunfelder, Dr. Etminan, Dr. Ross,
16  Antonio Costales, Nancy Konnerth, Suzette Thomas, Leo
17  Plouffe, Herman Ellman, Brenda Marczi, Paul Korner, and
18  Chuck Walsh.
19        You didn't review those before you prepared your
20  report, did you?
21  A.    That's correct.  If they're on the supplementary
22  list, those are materials that I've reviewed between the
23  production of the report and our conversation today.
24  Q.    And why didn't you review these depositions
25  before you issued your report?

10 (Pages 34 to 37)

David William Feigal, Jr., M.D., M.P.H.

Page 38

1    A.   I'd have to look at the timing to see if they
2  were -- some of them were available.  Company
3  depositions were available.  They were simply materials
4  that I had not yet reviewed, but after the report, in
5  discussing the issues in the case, I asked for them or
6  the company -- or the attorneys thought it was relevant
7  and they sent them to me.
8    Q.   Okay.  I'm going to back off the 11 depositions
9  that were not reviewed before your report and, according
10  to my calculations, give or take, there were
11  approximately 265 documents that you reviewed before
12  preparing your report; is that correct?
13    A.   That's correct.
14    Q.   And you did that in 50 hours.
15    A.   Yes, that's correct.
16      Some of them I reviewed closely, others were for
17  looking things up and were as part of a complete set of
18  documents, not all of which I needed to rely on for the
19  report.
20    Q.   Do any of the -- did any of the medical
21  literature that you reviewed suggest a causal
22  association between levonorgestrel and pseudotumor
23  cerebri?
24    A.   I think some of the literature, particularly
25  around the Norplant, raised that hypothesis.  Most of

Page 39

1  the authors in their papers usually conclude that more
2  research is needed.
3    Q.   Did any of the Bayer internal materials that you
4  reviewed suggest a causal association between
5  levonorgestrel and pseudotumor cerebri?
6    A.   No, I don't think they did.
7    Q.   Did you cite all of the materials that may have
8  suggested a causal association between levonorgestrel
9  and PTC in your report that you tendered in this case?
10    A.   I did not cite all of the documents that I
11  relied on in my report.  The report cites the more
12  important documents and selected documents but there are
13  also materials in the list of materials reviewed that I
14  reviewed and am familiar with, but I didn't attempt to
15  create an exhaustive list of all the citations to all
16  the documents.
17    Q.   Did you do your own literature search in this
18  case to look for medical literature or materials that
19  suggest, that may suggest or disprove a causal
20  association between levonorgestrel and PTC?
21    A.   Yes, I did.
22    Q.   Okay.  And how much time did you spend doing
23  your own literature search?
24    A.   I don't recall exactly.  I used PubMed and a
25  service which will pull the full-text articles of the

Page 40

1  literature from a PubMed search when they're in the
2  public domain.  Typically, such a search on a topic like
3  that would take me several hours.
4    Q.   Okay.  And in this case, did you spend more or
5  less than ten hours doing a literature search to
6  determine whether or not there was or was not a causal
7  association between levonorgestrel and pseudotumor
8  cerebri?
9    A.   Less than on the literature search itself.  And,
10  of course, there was also literature, much of the same
11  literature that I came across in the PubMed search, that
12  was provided to me in the materials or was referenced by
13  plaintiffs' experts or was discussed at various times in
14  the history of the FDA interactions for these -- for the
15  products that we're reviewing.
16      So in terms of review of the literature, it's
17  actually probably a significant fraction of the time,
18  but the actual PubMed search didn't take me very long,
19  just a few hours.  And I used it primarily to get
20  oriented to what the information is out there, to
21  identify articles that I don't seem to have that the law
22  firm can track down copies and provide copies for me.
23    Q.   And how much time did you spend reviewing the
24  literature that comprised the results of your literature
25  search?

Page 41

1    A.   Well, I think that blends into the, you know,
2  the literature search articles that I identified plus
3  the literature that's -- that is -- pardon me -- is part
4  of the production in the case or other documents.
5      That review all together is probably -- I would,
6  you know, just have to estimate.  But probably about 30
7  percent of the time in terms of the document review is
8  taking a look at the medical literature that decisions
9  are being made about and what other medical literature
10  is available at the same time and at later points in
11  time.
12    Q.   So 30 percent of 50 hours would be about 15
13  hours; is that correct?
14    A.   Yes.  Embedded in the process of the review,
15  yes.  I don't track it separately.
16    Q.   Now, other than the articles cited in your
17  report, did you find any other medical literature or
18  materials in which the authors suggested a causal
19  association between levonorgestrel and pseudotumor
20  cerebri?
21    A.   I can't think of any sitting here right now,
22  aside from the literature and aside from discussions in
23  company and FDA documents, no.
24    Q.   You don't believe that there's a causal
25  association between levonorgestrel and pseudotumor

David William Feigal, Jr., M.D., M.P.H.

Page 42

1  cerebri; correct?
2  A.    I believe at the present time that is --
3  that that is correct.
4  Q.    But you realize that there are medical
5  researchers out there who have published articles that
6  disagree with you; correct?
7         MR. SCHMIDT: Object to the characterization.
8         THE WITNESS: I would have to look at their
9  statements to see actually if we disagree.
10        There are authors that discuss the hypothesis
11 that levonorgestrel causes pseudotumor cerebri.
12 Oftentimes, in their discussions they point out the
13 limitations of the available evidence and call for more
14 research and place caveats.  So you have to kind of look
15 at what they say.  But there are many -- there are
16 papers, as you know, that have looked at that hypothesis
17 that there could be a relationship.
18 BY MR. JONES:
19 Q.    Have you ever heard of a doctor named Deborah
20 Friedman?
21 A.    Yes.
22 Q.    Okay.  And do you know Deborah Friedman?
23 A.    I have reviewed -- I reviewed materials I
24 believe that she's -- she has written.  I would have to
25 see the materials to refresh my memory on who she is.

Page 43

1  Q.    Have you ever met her?
2  A.    No.
3  Q.    Have you ever talked to her?
4  A.    No.
5  Q.    Did you know that Bayer had hired her as a
6  consultant on pseudotumor cerebri?
7  A.    I may have known that.  I'm familiar with the
8  name from my review.  I just don't remember the context
9  of how I know her.
10 Q.    Were you aware that she has written in at least
11 one article that levonorgestrel implants are a cause of
12 pseudotumor cerebri?
13        MR. SCHMIDT: Object to characterization.
14        THE WITNESS: I don't recall that, but I'd be
15 happy to look at the article if you'd like me to comment
16 on it.
17 BY MR. JONES:
18 Q.    When you were doing your medical literature
19 research and review, did you find any materials that you
20 thought were counter to your position that there is no
21 evidence of a causal association between levonorgestrel
22 and pseudotumor cerebri?
23        MR. SCHMIDT: Object to characterization.
24        THE WITNESS: Well, the evidence all comes from
25 observational studies and epidemiology, and there are

Page 44

1  authors from time to time that discuss that hypothesis
2  and discuss that data.
3         As I mentioned, they usually -- you know, I'm
4  not sure I can tell from the articles what their
5  thinking or what their belief is.  They often state the
6  evidence for the hypothesis and also in the same breath
7  talk about the limitations and how more research is
8  needed.
9         MR. JONES: Okay.
10 BY MR. JONES:
11 Q.    Getting back to your References Cited, looks
12 like you cite a lot of medical journal articles.  Is
13 that fair?
14 A.    Yes.
15 Q.    Okay.  Looks like you cite the Federal Register
16 a few times; is that correct?
17 A.    Yes.
18 Q.    Okay.  And those are proposed rule discussions
19 and regulations that govern product safety at FDA.  Is
20 that fair?
21 A.    Yes, there's both proposed and final rules in
22 those citations.  I usually -- most of them pertain to
23 standards for labeling.
24 Q.    Then it looks like you cite Physicians' Desk
25 Reference.

Page 45

1         That's the PDR is what we know it as; right?
2  A.    Yes, that's correct.
3  Q.    And just so the jury knows, that's this big,
4  thick book of labeling for products that doctors can
5  refer to; right?
6  A.    Yes.  Before the computer, that was what most
7  doctors had in clinics to look up information on drugs.
8  Q.    I wonder how their sales are doing these days.
9  A.    I don't know.  They still ask me for 60 bucks
10 every year.
11 Q.    Really?
12 A.    I still get a copy.  But, you know, truth be
13 told, I actually go to the Internet to get labels.
14 Q.    Then you cite some Bayer internal documents,
15 "Integrated Summary of Efficacy," "Integrated Summary of
16 Safety"; is that correct?
17 A.    Yes.
18 Q.    Some FDA guidance materials?
19 A.    Yes.
20 Q.    And what are the FDA guidance materials?  What's
21 their -- why are they important to cite?
22 A.    FDA has hundreds of guidance documents which
23 they've written and they actually publish for comment
24 and modify over time.
25        The guidance documents represent FDA's current

David William Feigal, Jr., M.D., M.P.H.

Page 46

1  thinking on how to comply with different requirements of
2  the regulations and the Food, Drug and Cosmetic Act.
3  Q.    And you think those are pretty good sources of
4  information?
5  A.    I think they are a good source, yes, for -- you
6  know, many times, there's more than one way to comply
7  with the regulation, and there you can see what FDA's
8  current thinking is on, for example, use of epidemiology
9  studies and safety evaluations is a very useful
10 guidance.
11 Q.    Okay.  Looks like you rely on some ACOG
12 bulletins or opinions; is that right?
13 A.    Yes.
14 Q.    And what's ACOG?
15 A.    American College of Obstetrics and Gynecology.
16       MR. JONES:  I'm going to go on and mark this
17 supplemental materials list, too, so we don't lose track
18 of that.
19       (Exhibit Feigal-5 was marked for
20 identification.)
21       MR. JONES:  That's Deposition Exhibit 5.
22 BY MR. JONES:
23 Q.    Now, back to these invoices, we're at May the
24 4th or 5th.  I can't remember what day it is.
25       Has an invoice been prepared for the work that

Page 47

1  you've performed for this case during the month of April
2  2016?
3  A.    No, it has not yet.
4  Q.    Okay.  Have you -- when I worked in a law firm
5  and I billed clients, I used to have to submit my time
6  to somebody who would prepare the bills.
7        Have you done that in this case for the month of
8  April?
9  A.    No, I have not done that yet.
10 Q.    Do you have any idea how much time that you've
11 spent in the month of April working on the pseudotumor
12 cerebri cases?
13 A.    No, I haven't added that up.
14 Q.    Is it less than five hours, more than five
15 hours?
16 A.    Well, it would be more than five hours.
17 Q.    Less than 20?  More than 20?
18 A.    It's probably also more than 20.  It wouldn't
19 surprise me if it's comparable to the time spent in
20 March, but I don't know exactly.
21 Q.    Okay.  And the time spent in March was 41.5
22 hours.
23 A.    Yes.
24 Q.    Okay.  And then what did you do to prepare for
25 your deposition here today?

Page 48

1  A.    I reviewed my report; I reviewed some of the
2  materials; I continued to read the materials relating to
3  Dr. Ross's opinions, including his deposition, which
4  I -- if I had it, I had not gone through it in as much
5  detail at the time I'd written the report as afterwards;
6  I spent some of the time with some of the estimates that
7  Dr. Ross had presented from his use of the epidemiologic
8  databases, I spent some time checking those numbers and
9  those systems; talked with attorneys in preparation for
10 this.  Those are the types of things I did.
11 Q.    How many times did you meet with Bayer's
12 attorneys in preparation for this deposition?
13 A.    Once.
14 Q.    And when was that?
15 A.    It was last -- I think it was last Thursday.
16 Q.    And how long did that meeting last?
17 A.    Four or five hours.
18 Q.    And since that time, you haven't met with
19 Bayer's attorneys again in preparation for this
20 deposition?
21 A.    No, I have not.
22 Q.    Any telephone conferences with them between last
23 Thursday and today?
24 A.    Yes, I did have a brief, half-hour discussion
25 with the attorneys Monday morning.

Page 49

1  Q.    Okay.  And --
2        MR. SCHMIDT:  Larry, I don't know if you want to
3  speak or not or just talk to you about it on the break,
4  but there was an earlier meeting that I think he's
5  forgotten.
6        THE WITNESS:  Okay.  Thank you.
7        MR. SCHMIDT:  And if you find that
8  objectionable, I won't do that again.
9        MR. JONES:  No.  No.  No.  No.
10       THE WITNESS:  No.  He's right.
11       MR. SCHMIDT:  Trying to help.
12       THE WITNESS:  There were two meetings.
13       MR. JONES:  Okay.
14 BY MR. JONES:
15 Q.    And now that your recollection has been
16 refreshed, do you remember when the other meeting was
17 other than last Thursday?
18 A.    It was about ten days before that.
19 Q.    Okay.
20 A.    And it was also a four- or five-hour meeting.
21 Q.    Okay.
22       MR. SCHMIDT:  Bless you.
23 BY MR. JONES:
24 Q.    Have you -- are you aware of how many experts
25 Bayer has designated in these pseudotumor cerebri cases?

13 (Pages 46 to 49)

David William Feigal, Jr., M.D., M.P.H.

Page 50

1   A.   No, I'm not.
2   Q.   Have you reviewed any of the reports of Bayer's
3   other experts in these cases?
4   A.   No, I don't believe so.  I've reviewed Bayer
5   company documents and depositions but I don't believe I
6   have reviewed any of the other Bayer expert materials.
7   Q.   Have you reviewed any of the deposition
8   testimony of any of the other experts designated by
9   Bayer?
10  A.   No, I have not.
11  Q.   Do you know who Dena Hixon is?
12  A.   Yes, I do.
13  Q.   And how do you know who Dena Hixon is?
14  A.   As I recall, Dena was at the FDA at the same
15  time I was.  She was in the Division of Metabolic
16  Endocrine, which then later was split and became the
17  Division of Reproductive and Urological Products.
18  Q.   And when is the last time you talked with or
19  otherwise communicated with Dena Hixon?
20  A.   You know, I don't know if I've ever met her face
21  to face.  I just know of her.
22  Q.   And you don't believe that you've ever received
23  Miss Hixon's report in this case?
24  A.   I do not think I have had -- I don't recall ever
25  having seen it.

Page 51

1   Q.   My colleague tells me that, according to the
2   stuff on the thumb drive that she's looking at that you
3   provided to us, that you received a copy of Miss Hixon's
4   report on April the 12th, 2016.
5   A.   Oh, then I stand corrected.  I haven't looked at
6   it.
7   Q.   So you don't know whether or not her opinions
8   are valid or not?
9   A.   Yes.  I don't have any opinions about her
10  opinions.
11  Q.   Between the time you were contacted to consult
12  in the pseudotumor cerebri cases and today, have you
13  ever talked with any Bayer employees?
14  A.   No, I have not.
15  Q.   Have you ever asked through counsel to talk to
16  any Bayer employees?
17  A.   No.
18  Q.   Why not?
19  A.   I thought that the documents produced spoke for
20  themselves.
21  Q.   Do you -- when I say "the Rai study," do you
22  know which abstract I'm talking about?
23  A.   Yes, I do.
24  Q.   Okay.  And do you know or have you ever met any
25  of the listed authors of that particular study?

Page 52

1   A.   I have not.  I actually looked to see -- since
2   both my father and my stepfather were faculty at the
3   University of Utah, two different departments, I did
4   actually look to see if there were any people there that
5   I knew from those contacts.  But that's been some time
6   since I've had any contact with the university and --
7   but I did look up the -- him and the department and
8   mostly focusing on him, not so much the other authors.
9   But I didn't recognize any of the names.
10  Q.   When you say "him," who are you referring to?
11  A.   Or is it a her?  Dr. Rai.
12  Q.   Dr. Rai.  Dr. Rai, it's a she.
13  A.   Oh, okay.
14  Q.   She's Rai.
15  A.   Okay.
16  Q.   And so that was kind of a long answer.  I just
17  wanted to make sure that I understood it.
18       You do not know any of those authors?
19  A.   No, I -- no, I do not.  And I did look up her
20  status as -- and she's a research fellow at the
21  university.
22  Q.   Okay.  And have you ever had any contact with
23  any of those authors?
24  A.   No, I have not.
25  Q.   Have you ever attempted, directly or indirectly,

Page 53

1   to contact those authors about their particular study?
2   A.   No.
3   Q.   Have you had any contact with anyone at their
4   university about the study that they have performed?
5   A.   No.
6   Q.   What was your purpose of trying to figure out if
7   you had any contacts at the University of Utah?
8       MR. SCHMIDT:  Object to characterization.
9       THE WITNESS:  It's -- I just wanted to see if
10  there were anybody that I knew, since, as I mentioned,
11  both my father and stepfather were at the university.
12  Both of them were department chairs.  So over the years,
13  I've socially met a number of faculty from the medical
14  school at the university and so I was just interested to
15  see if there was anybody that I knew, but I did not
16  recognize any of the names.
17  BY MR. JONES:
18  Q.   Are you still working on the Mirena MDL case?
19  A.   There's no -- there's been no activity in the --
20  in recent months but, as I understand it, it will
21  probably become active again at some time in the future.
22       That's just with respect to my activities.  I'm
23  sure that there's activities for some people.
24  Q.   I'm sure the lawyers.
25       Do you remember how long your report was,

14  (Pages 50 to 53)

David William Feigal, Jr., M.D., M.P.H.

Page 54

1 approximately, in the Mirena MDL case?
2 A.    It was similar in length to this report,
3 although, as I recall, a bit -- you know, perhaps a bit
4 longer.
5 Q.    And in the Mirena MDL case, based upon my
6 calculations, you've been paid to date $100,000 --
7 $100,600.  Does that sound correct?
8 A.    It does sound like it's probably correct, yes,
9 since 2013.  Yes.
10 Q.    Now, you have given me an updated testimony
11 list.
12       Do you have any trial testimony scheduled in the
13 next six months?
14 A.    No.
15 Q.    Have you ever testified in favor of an
16 individual human being who alleged that they were
17 injured by the product of a pharmaceutical or medical
18 device company?
19 A.    I have been engaged in and retained in cases
20 like that.  None of them have ever required deposition
21 or testimony at trial.  Some are still active and
22 haven't progressed that far, others resolved before
23 testimony was required.
24 Q.    How many of those cases have you worked on the
25 side of the individual person who claimed that they were

Page 55

1 injured?
2 A.    I would estimate there's probably been four or
3 five over the years.  There's one that's currently
4 active.
5       VIDEO OPERATOR:  Counsel.
6       MR. JONES:  Oh, thank you.
7       Are we at about an hour on the video?
8       VIDEO OPERATOR:  Yes.
9       MR. JONES:  We normally take hour breaks so
10 people can have bio breaks.
11       THE WITNESS:  Sure.
12       MR. JONES:  So let's go off the record.
13       VIDEO OPERATOR:  We are going off the record.
14       The time is 10:14 a.m.
15       (Recess, 10:14-10:27 a.m.)
16       VIDEO OPERATOR:  We are back on the record.
17       The time is 10:27 a.m.
18 BY MR. JONES:
19 Q.    Dr. Feigal, welcome back from the break.
20       Before the break, we were talking about, you'd
21 mentioned that maybe you've had four or five clients
22 over the years where they were individuals who alleged
23 that they were injured by a drug or medical device and
24 that kind of got me thinking, none of those are listed
25 on the trial or deposition testimony list; right?

Page 56

1 A.    That is correct.
2 Q.    Okay.  So in your business there are -- you do
3 have engagements that do not ultimately end up resulting
4 in testimony; is that correct?
5 A.    Yes, that's correct.
6 Q.    Okay.  And other than what's listed on your
7 testimony list, since you've been consulting after you
8 left FDA, approximately how many other medicolegal cases
9 have you been involved in in which you were not required
10 to testify in any way?
11 A.    I don't know.  I have never really tried to
12 count that up or estimate it.  It's -- I would say that
13 more than half of the engagements result in a
14 deposition, at least a deposition, so this may
15 represent, you know, approximately half of the
16 engagements I've had.
17 Q.    Okay.
18 A.    But that's just a rough, rough guess.
19 Q.    And how long have you been doing medical-legal
20 consulting?
21 A.    Since 2005.
22 Q.    Okay.  So about 11 years?
23 A.    That's correct.
24 Q.    What percentage of your time in 2015 was devoted
25 to medical-legal consulting?

Page 57

1 A.    In 2015 it was approximately 40 percent.
2 Q.    Okay.  What about 2016?
3 A.    It's been about 25 percent.
4 Q.    2015?
5 A.    '15 was --
6 Q.    Or 2014.  I'm sorry.
7 A.    Oh, '14.  I'm sorry.  '14 was probably 30, 35
8 percent.
9 Q.    And what about 2013?
10 A.    Probably about the same.
11 Q.    And at NDA Partners, L.L.C., is that what it is?
12 A.    Yes.  Uh-huh.
13 Q.    What else do you do in the rest of your time?
14 A.    The company's prime focus is actually assisting
15 start-up companies, develop their research plans, their
16 regulatory strategies, assist them in designing the
17 initial studies they need to do for their drugs and
18 medical devices, and assist them in properly writing and
19 submitting, keeping the records of those studies,
20 submitting them to FDA.  We participate with those
21 companies in some of their FDA meetings, in others we
22 work behind the scenes.
23       And there are some companies where we will
24 actually on a contract basis drop in management, if you
25 will.  I've been chief medical officer of three

15  (Pages 54 to 57)

David William Feigal, Jr., M.D., M.P.H.

## Page 58

1  different companies on a part-time basis on a contract
2  through NDA Partners.  We will -- with some of the
3  companies, they're increasingly virtual companies where
4  they don't have a full-time staff and they work -- the
5  company actually consists of contract staff who will
6  actually do actually most of the work for the company.
7  But that's a more recent type of thing we've been doing.
8       Over the years, we've largely worked with the
9  companies in that early sort of strategic phase where
10 they're trying to get their product started.  And we
11 work with their investors as well as with the companies,
12 help investors, due diligence, evaluate products.
13 Q.    In 2015 you said about 40 percent of your time
14 was on medical-legal consulting.
15      What did you do for the other 60 percent of the
16 time?
17 A.    I worked with small -- I worked with these small
18 companies.
19      In a typical point in time, I typically have
20 between 12 and 20 active small clients.  You know, for
21 example, this morning before this meeting I took a call
22 from one of those clients on a study design issue that
23 they were discussing with their statisticians.
24      And so it's a lot of -- it's a very interactive
25 process working with these companies as they try and

## Page 59

1  move their products forward.
2  Q.    Okay.  And how much do you bill those clients
3  per hour?
4  A.    The rate that we have for small companies is
5  billed by the task.  We identify a task and then we
6  price that, and it's a fixed price.  If it takes less
7  time than that, billed at $500 an hour, they pay the
8  less; if it takes more time, we just do it for the fixed
9  cost.
10 Q.    Okay.  Looking at your testimony list, for the
11 last four years it doesn't look like that there have
12 been any updates on the trial testimony.  The prior copy
13 that I had had the last trial 9/29 to 10/1/15 and
14 10/6/15, and that's the same as on the updated list; is
15 that correct?
16 A.    Yes.  There have not been any trials this year
17 since that time.
18 Q.    Okay.  And let's look at that list.  Can you get
19 that list?
20      THE WITNESS:  Can I get the list from you, Paul,
21 prior testimony?
22      There it is.  Yes.  Okay.
23      MR. JONES:  Okay.
24 BY MR. JONES:
25 Q.    Going in reverse chronological order, that was

## Page 60

1  the George Decou, D-E-C-O-U, versus Takeda
2  Pharmaceuticals?
3  A.    Yes.
4  Q.    And that was in Nevada; right?
5  A.    Yes, it was.
6  Q.    Okay.  And how many days did you testify at that
7  trial?
8  A.    That trial settled during my testimony so they
9  probably weren't done with me, but I testified on the
10 29th, the 1st, and the 6th.  So I testified on three
11 days and we still weren't done.
12 Q.    Okay.  And that was an Actos case --
13 A.    Yes.
14 Q.    -- like we talked about earlier?
15 A.    Yes, it was.
16 Q.    Okay.  Then the one going up before that,
17 Pericor Therapeutics versus Merck, that looks like that
18 was a Triple A arbitration?
19 A.    That's correct.  That was a --
20 Q.    Okay.
21 A.    That was a business dispute between Merck and
22 another company.
23 Q.    Right.
24      Going up before that, Kevin Phillips versus C.R.
25 Bard, 2/5/2015, what was that case about?

## Page 61

1  A.    That was a case that was -- involved an alleged
2  injury from a medical device, an inferior vena cava
3  filter.
4  Q.    IVC?
5  A.    Yeah, IVC.
6  Q.    And what were -- well, did you testify in that
7  case that the company properly warned its users of the
8  risks?
9  A.    Actually, not.  In that case I was actually an
10 epidemiology expert and so I provided testimony about
11 what was known from the medical literature about the
12 performance of various IVC filters and whether or not
13 accurate estimates were available about rates of
14 different complications.
15 Q.    Okay.  And the jury verdict in that case was
16 about $2 million; is that correct?
17 A.    I don't know.
18 Q.    Okay.  Let's go up to the next one, Kristufek,
19 K-R-I-S-T-U-F-E-K, versus Takeda Pharmaceuticals.
20      That one looks like it was in Philadelphia; is
21 that correct?
22 A.    Yes, it was.  Uh-huh.
23 Q.    Okay.  Was that an Actos case as well?
24 A.    Yes, it was.
25 Q.    And it looks like you testified on three

David William Feigal, Jr., M.D., M.P.H.

Page 62

1    different days during that trial?
2    A.    I did.
3    Q.    Is that three full days?
4    A.    I think it was two half days and a full day.
5         And, as you notice, the -- you may notice, the
6    Phillips trial was going on at the same time, so I had
7    to -- I had to go from Philadelphia to Nevada and back.
8    Q.    Oh, wow.
9    A.    It was a -- it was a busy week.
10   Q.    I didn't notice that, but you're right.
11        And in that case the jury awarded approximately
12   $2.3 million; correct?
13   A.    I don't know.
14   Q.    The next one up, the Drakes versus Allergan in
15   the District of Vermont, what was that case about?
16   A.    That case related to the drug Botox used to
17   treat spasticity from cerebral palsy and an allegation
18   that a seizure disorder had been caused by the Botox
19   injections.
20   Q.    And what was your role in that case?
21   A.    To evaluate the evidence for the association
22   between botulinum toxin and seizure disorders and the
23   accompanying warnings in or considerations for warnings
24   in the product labeling and the interactions between the
25   company, FDA, and the European authorities on that

Page 63

1    topic.
2    Q.    Okay.  So at a high level, kind of like what
3    you're testifying to in this case?
4    A.    Yes, at a high level.
5    Q.    Okay.  And isn't it true that the jury awarded
6    approximately 6.5 million in that case?
7    A.    I remember there was a plaintiffs' verdict.  I
8    don't -- I don't know the amounts.
9    Q.    Okay.  The next one up, Myers versus Takeda
10   Pharmaceuticals in West Virginia, do you remember that?
11   A.    I do.
12   Q.    Okay.  Was that also an Actos case?
13   A.    It was.
14   Q.    And in that case, according to my research,
15   there was a defense verdict but the plaintiff was
16   awarded $155,000 because the company had destroyed
17   documents.
18        Were you aware of that?
19   A.    I was aware of that jury and that award, yes.
20   Q.    The next one up, Wisniewski,
21   W-I-S-N-I-E-W-S-K-I, versus Takeda Pharmaceuticals in
22   Philadelphia, was that another Actos case?
23   A.    Yes.
24   Q.    And in that case the jury awarded approximately
25   $2.14 million; is that correct?

Page 64

1    A.    Again, I don't know.  I don't -- usually I don't
2    keep track of the awards, and I also realize that there
3    are some negotiations and settlement process that
4    changes those from the time of the trial.  So I --
5    sometimes I know, but usually I don't know what the
6    results are.
7    Q.    Tersigni, T-E-R-S-I-G-N-I, versus Wyeth
8    Pharmaceuticals and Pfizer in the District of
9    Massachusetts, do you remember that case?
10   A.    I do.
11   Q.    And what was the drug at issue in that case?
12   A.    The drug was fenfluramine and dexfenfluramine.
13   Q.    Is that Fen-Phen?
14   A.    Yeah.  It's part of the -- one of the fens.
15   Yeah.
16   Q.    Oh, it's just one of the fens?
17   A.    The other is phentermine.
18   Q.    And my research tells me that there was a
19   defense verdict in that case.
20        Does that sound --
21   A.    Yes, I believe there was.
22   Q.    Then going above that, Diane Whitlatch,
23   W-H-I-T-L-A-T-C-H, versus Takeda Pharmaceuticals in Cook
24   County, Illinois, do you remember that case?
25   A.    Yes.

Page 65

1    Q.    Okay.  And that was an Actos case?
2    A.    Yes, it was.
3    Q.    Okay.  And in that case was there a defense
4    verdict?
5    A.    I don't recall.
6    Q.    In fairness to you, I believe that there was --
7    A.    Oh, okay.
8    Q.    -- based on my research.
9         Going above that, In Re:  Actos.  This would be
10   Allen, A-L-L-E-N, versus Takeda Pharmaceuticals in the
11   Western District of Louisiana.
12        Do you remember that case?
13   A.    I do.
14   Q.    And you testified for two days in that case?
15   A.    I did.
16   Q.    And at a high level, you testified that the
17   warnings were appropriate and that the interactions
18   were -- with FDA were appropriate; is that correct?
19   A.    Yes.  At a high level, that's correct.
20   Q.    Okay.  And in that case the jury awarded $9
21   billion; is that correct?
22   A.    It was a large amount, later reduced, but I
23   don't know where that finally settled.  But it was -- it
24   was a large amount.
25   Q.    The next one is Kendall versus Hoffmann,

17 (Pages 62 to 65)

David William Feigal, Jr., M.D., M.P.H.

| Page 66 |
| --- |

1  H-O-F-F-M-A-N-N, in Atlantic City, New Jersey.
2      Do you remember that case?
3  A.   Yes, I do.
4  Q.   What was that?  Was that an Accutane case?
5  A.   Yes, it was.
6  Q.   And what did you -- at a high level, what did
7  you testify about in the Accutane case?
8  A.   I testified about the adequacy of the warnings
9  for inflammatory bowel disease and the appropriateness
10  of the changes to the labeling that occurred over time.
11  Q.   And in that case the jury awarded approximately
12  1.58 million; is that correct?
13  A.   Again, I don't know.
14  Q.   Okay.  Above that, Alen versus Takeda
15  Pharmaceutical in Nevada.
16      Do you remember that case?
17  A.   I do.
18  Q.   Okay.  And that was an Actos case?
19  A.   It was.
20  Q.   And that was a defense verdict in that case;
21  correct?
22  A.   I do recall that, yes.
23  Q.   The next one, Camhong, C-A-M-H-O-N-G,
24  last name, A-N, versus Takeda Pharmaceuticals in
25  Baltimore City, Baltimore, do you remember that?

| Page 67 |
| --- |

1  A.   Yes.
2  Q.   And was that an Actos case?
3  A.   Yes, it was.
4  Q.   And in that case the jury awarded approximately
5  1.7 million to the plaintiff?
6  A.   Again, I don't know.
7  Q.   Okay.  Going above that, Fleischmann,
8  F-L-E-I-S-C-H-M-A-N-N, versus DJO, Inc., in San Diego
9  County, do you remember that case?
10  A.   I do.
11  Q.   And was that a pain pump case?
12  A.   No.  It was a -- it was a cold therapy device.
13  It was a device that would wrap around the knee and --
14  or the shoulder or whatever orthopedic part that was --
15  had been surgery and would cool the -- cool the joint to
16  treat pain.  But --
17  Q.   Okay.
18  A.   But strictly through cooling.
19  Q.   Okay.  And my research says that was a defense
20  verdict.
21      Do you remember?
22  A.   Yes, I believe that's correct.
23  Q.   Okay.  The next one, Delores and Milton Tietz,
24  T-I-E-T-Z, versus Abbott Labs, in Cook County, Illinois,
25  do you remember that one?

| Page 68 |
| --- |

1  A.   Yes, I do.
2  Q.   And what was the -- what drug or device was
3  involved in that one?
4  A.   The drug was a drug called Humira, H-U-M-I-R-A,
5  and it was an allegation that there was an injury
6  associated with the use of that drug.
7  Q.   Okay.  And at a high level, did you testify
8  about the adequacy of the warnings and the company's
9  involvement with the FDA?
10  A.   Yes, I did.
11  Q.   Okay.  And the plaintiff was awarded
12  approximately 2.2 million in that case?
13  A.   As I recall, there was a plaintiffs' verdict,
14  yes.  I don't know the amount.
15  Q.   Okay.  Then we -- above that we have Cooper
16  versus Takeda Pharmaceuticals in San Francisco County;
17  is that correct?
18  A.   Yes, that's correct.
19  Q.   I'm a little confused because under the date it
20  says Los Angeles, California.  Is that right?
21  A.   You know, it may be -- I think the San Francisco
22  is wrong.  I think it's Los Angeles.  Because I don't
23  remember testifying in San Francisco.
24  Q.   Okay.  And was that an Actos case?
25  A.   Yes, it was.

| Page 69 |
| --- |

1  Q.   Okay.  And in that case the jury awarded
2  approximately 6.5 million to the plaintiff?
3  A.   Again, I don't recall.
4  Q.   Okay.  Going above that, In Re:  Gadolinium,
5  this is the Decker versus GE Healthcare case in the
6  Northern District of Ohio.
7      Do you remember that case?
8  A.   I do.
9  Q.   And what is gadolinium?
10  A.   Gadolinium is a drug that's given intravenously
11  and allows you to visualize vascular structures and --
12  on MRI scans and to -- it highlights different tissues
13  in different ways so it's used largely to detect brain
14  tumors and other types of abnormalities like that.
15  Q.   And what did the plaintiffs allege in that case?
16  A.   They alleged that there had been an injury from
17  the gadolinium that had caused a very severe
18  rheumatologic disease.
19  Q.   And what was your role in that case?
20  A.   It was evaluating the signal detection, the
21  evaluation of the initial evidence that the gadolinium
22  contrast agents were related to this syndrome, and then
23  a testimony on the nature and -- of the company's
24  interactions with FDA in updating their labeling.
25  Q.   Was your client GE in that case?

18 (Pages 66 to 69)

David William Feigal, Jr., M.D., M.P.H.

Page 70

1    A.    Yes, it was.
2    Q.    I used to represent GE too.
3    A.    Oh.
4    Q.    The plaintiff -- the jury awarded the plaintiff
5    approximately 5 million in that case?
6    A.    I don't know the amount, but I do recall it was
7    a plaintiffs' verdict, yes.
8    Q.    Okay.  Going up next, we have an arbitration
9    hearing, Eagle Pharmaceuticals versus The Medicine
10   Company.
11         Was that a business dispute?
12   A.    It was.
13   Q.    Okay.  Going next, we have Reynolds, Wilkinson,
14   Young, Rossitto, R-O-S-S-I-T-T-O, versus Hoffmann in
15   Atlantic County, New Jersey.
16         Do you remember that case?
17   A.    Yes, I do.
18   Q.    Was that an Accutane case?
19   A.    Yes, it was.
20   Q.    Was there a defense verdict in that case?
21   A.    As -- there were four plaintiffs.  As I recall,
22   there were both defense and plaintiffs' verdicts in that
23   case.
24   Q.    Mixed bag?
25   A.    Mixed, yes.  Two -- it was two defense and two

Page 71

1    plaintiffs, as I recall.
2    Q.    Okay.  Then going up to 5/23/12, the Everetts
3    versus C.R. Bard in Maricopa County, Arizona.
4          Do you remember that case?
5    A.    I do.
6    Q.    Was that an IVC case?
7    A.    Yes, it was.
8    Q.    And do you remember whether there was a defense
9    verdict in that case?
10   A.    I don't recall.
11   Q.    Other than IVC, Accutane, gadolinium, Actos,
12   Humira, Fen-Phen, and Botox, what other drugs or medical
13   devices have you given testimony on in your consulting
14   career?
15   A.    Well, that would be reflected in the deposition
16   testimony in the remainder of the report.
17   Q.    Okay.  So it might help you if we go through
18   some of that?
19   A.    Okay.  Do you want to go front to back or back
20   to front?
21   Q.    Well, let's see.  Let's start on -- let me make
22   sure that I'm on the right page with you.
23   A.    I mean, if you want, I could actually walk down
24   through them and just briefly describe them.
25   Q.    Yeah.  Yeah.

Page 72

1    A.    Describe them.
2          So starting in 2012, there's a case where I
3    represented plaintiffs who had a dispute with BlueCross,
4    and we had a settlement in that in which case the
5    plaintiffs got their bills paid.  BlueCross ended up
6    paying.
7    Q.    What was the nature of that dispute?
8    A.    BlueCross had denied payment for an artificial
9    intervertebral disk that I think over 40 plaintiffs had
10   had placed and had either bills or paid for out of their
11   own pocket.
12         BlueCross stated that they declined to pay for
13   it because it was an investigational product but, in
14   fact, it was an approved product and it was used on
15   label and it had been approved for about eight years.
16   So --
17   Q.    Okay.
18   A.    -- that was the -- I was -- I played a small
19   role in just saying whatever else BlueCross has the
20   authority to pay for or not pay for, this was not an
21   investigational product.
22   Q.    Okay.  Treadwell v. Allergan.
23   A.    So this is a Botox case involving a series of
24   alleged injuries that probably were -- I actually don't
25   remember the exact details of the plaintiff's injuries

Page 73

1    but --
2    Q.    Is it basically the same as the Botox case that
3    you testified at trial about?
4    A.    No.  You know, each of the Botox cases have been
5    slightly different.  All of them have the common theme
6    in it that it's a patient who has a neurologic condition
7    that they feel is associated with their Botox use but in
8    each case it was a different neurologic condition.
9    Q.    Okay.  In Re:  Cold therapy cases, what was that
10   about?
11   A.    Those are the cases that show up in trial with
12   DJO with --
13   Q.    Oh.
14   A.    -- with alleging injuries from a cooling device.
15   Q.    The wrap; right?
16   A.    Yeah, the wrap.
17   Q.    Okay.
18   A.    The cooling wrap.
19   Q.    Dalton versus Animas Corporation.  That's in
20   Louisville, my neck of the woods.
21   A.    It is.  That was a case involving an insulin,
22   insulin pump that -- and alleged injury from a pump
23   which discharged more insulin than was intended so --
24   Q.    Was that -- who had that case?  Greg Bubalo?
25   A.    I don't think so.  I know Mr. Bubalo, but I

19 (Pages 70 to 73)

David William Feigal, Jr., M.D., M.P.H.

Page 74

1   don't believe that he was involved with that, with this
2   particular case.
3   Q.     You know him from the Fen-Phen; right?
4   A.     Right.  That's correct.  Yeah, that's correct.
5   Q.     Next, Calisi, C-A-L-I-S-I, versus Abbott Labs?
6   A.     This was a Humira case.
7   Q.     Okay.
8   A.     Eagle is -- Eagle and gadolinium we've talked
9   about.  Cooper --
10  Q.     Right.
11  A.     -- we've talked about.
12         The Wells is a case where I wasn't called to
13  testify at court, but it involved another child with
14  cerebral palsy --
15  Q.     Okay.
16  A.     -- and Botox.
17  Q.     Was that -- is that the -- no.  What drug was
18  involved for that?  Oh, Botox.  Okay.  Got you.
19  A.     Yeah, this was Botox.
20         Bard, this was a case where I was an
21  epidemiologist offering testimony in epidemiology about
22  what was known about the use of surgical mesh and
23  pelvic.
24  Q.     Is this the -- okay.  Have you testified -- you
25  haven't testified in any of those mesh cases?

Page 75

1   A.     Not in court.  I've provided a deposition but
2   not in court.
3   Q.     And what company did you work for?  Did you work
4   for Bard in that case?
5   A.     I was asked to provide these by attorneys for,
6   yes, C.R. Bard.
7   Q.     Okay.
8   A.     Yeah.
9          And An, the next case, we've talked about.
10         The next page has a deposition for Fen-Phen
11  that's related to I'm not even sure which cases.
12  Q.     That's okay.
13  A.     The --
14  Q.     Brown?
15  A.     Yeah.  I don't -- I guess --
16  Q.     Is that a med-mal case?
17  A.     You know, this reference looks incomplete.  I
18  can't quite tell which case this is.  You know, I have
19  not done very many med-mal, but I don't recall this
20  case.
21  Q.     Okay.  And we have Actos.
22  A.     Then we have, yeah, more Actos.  The Wendell
23  is -- I would have -- is probably a Humira case but I'm
24  not sure.
25  Q.     Do all of those companies there -- what's their

Page 76

1   involvement with Humira?
2   A.     All of those cases -- all of those companies
3   make TNF-alpha inhibitors, and I think this was a
4   patient who had been on four or five different drugs in
5   the class.
6   Q.     Got you.
7   A.     As I recall.
8          Then there was an inferior vena cava, a
9   deposition relating to Accutane and inflammatory bowel
10  disease.
11         The next two are on the -- result also in trial
12  testimony.
13         The case involving Gates was with the da Vinci
14  robotic surgery device made by Intuitive.
15  Q.     What was your role in the da Vinci case?
16  A.     As a medical device expert on manufacturing and
17  design standards that companies have to meet and what
18  was known about the problems with, basically, the FDA
19  aspects of the approval of products like that.
20  Q.     Okay.  And the Willoughby case?
21  A.     The Willoughby case was a med-mal case that also
22  cited the hospital engineer, which was an employee of, a
23  contract employee of General Electric, one of their
24  companies.  And so I offered opinions on the proper role
25  of and the responsibilities of hospital engineers, as

Page 77

1   opposed to device manufacturers.  The injury was caused
2   by a malfunctioning surgical table.
3          So the Drake case we've discussed.
4          The next Bard cases are IVC, deposition relating
5   to inferior vena cavas.
6          We've talked about Brunston and --
7   Q.     Now, on the Campbell case --
8   A.     Yes.
9   Q.     -- it says it's in Scott Circuit Court in
10  Kentucky.
11         Do you remember who the attorney was who took
12  your deposition in that case?
13  A.     I don't.
14  Q.     Okay.
15  A.     There are some memorable ones but I don't recall
16  in that case.
17  Q.     Okay.  Brunston versus Guy versus Bayer
18  HealthCare?
19  A.     I believe this is a deposition relating to
20  Mirena but I'm not sure.  But I -- I'm not sure which --
21  if that's the case.
22  Q.     Let me ask you -- let me stop you for a second.
23         Other than the Mirena cases, have you ever
24  served as an expert for Bayer?
25  A.     I have evaluated other product issues.  I can't

David William Feigal, Jr., M.D., M.P.H.

## Page 78

1  remember if they came to depositions and if this is one
2  of them.
3      Q.    Okay.
4      A.    And I don't recall at this point what they were.
5      Q.    Have you ever worked with the attorneys from
6  Covington & Burling before on any of the other cases?
7      A.    Yes, I have.  With the Accutane cases.
8      Q.    Okay.  Anything other than Accutane?
9      A.    I believe the Covington attorneys have -- well,
10  I'm not sure.  I can't remember if they also had a role
11  in some of the Actos trials or not.
12      Q.    And what about the attorneys from Shook Hardy
13  Bacon; have you ever worked with those --
14      A.    Shook --
15      Q.    -- with that firm before?
16      A.    Shook Hardy had -- some of their attorneys had a
17  role in some of the Actos cases as well.
18      Q.    What about Goldman Ismail; have you ever worked
19  with them before?
20      A.    There is a partner, there is a firm in Los
21  Angeles where one of the names in the firm is Ismail.
22  I'm not sure if it's the same -- if it's the same firm.
23  But I have worked on -- yes, I have worked on -- if it's
24  the same firm, I have worked on cases with them.
25      Q.    What kind of cases?

## Page 79

1      A.    As I recall, these are probably on this list as
2  a deposition for -- relating to Lexapro and Celexa.
3      Q.    Okay.  What about, have you ever worked with a
4  firm called Bartlit Beck?
5      A.    Yes.  Bartlit Beck I believe were the attorneys
6  in Chicago that represented Allergan in the Drake case.
7      Q.    Okay.
8      A.    So finishing up the list, the Zimmer Nexgen
9  knee, this was a case involving knee implants, and I
10  offered testimony on a manufacturer's responsibility to
11  evaluate their product prior to approval and once on the
12  market.
13      Q.    What about Jones v. Pfizer, which is right above
14  that?  I think we skipped that.
15      A.    Yeah, we did.
16      What I don't recall, that may have been a --
17  that may have been a Fen-Phen case, since they acquired
18  Wyeth.  So I don't remember.  I'd have to go back and
19  look to see if that was a Fen-Phen case.  But I believe
20  that's what it may have been.
21      Q.    Larson v. Abbott?
22      A.    That would have been a Humira case.
23      Q.    In Re:  AlloDerm, AlloDerm case.
24      A.    This was a dispute over a banked human tissue
25  product that was actually called AlloDerm, and it -- my

## Page 80

1  role is to -- largely as a rebuttal witness to
2  plaintiffs' witness who asserted that the company was
3  required to meet certain device requirements but, in
4  fact, they are not because it's a banked human tissue.
5  So I did a deposition for that.
6      Q.    Okay.  Enoch, E-N-O-C-H, v. Forest Research
7  Institute?
8      A.    This is a deposition about Lexapro and Celexa.
9      Q.    Good v. Pfizer Wyeth, is that Fen-Phen?
10      A.    Yes, it is.
11      Q.    Then we have the Mirena migration/perforation
12  case.
13      You gave a deposition on October the 20th, 2015;
14  is that right?
15      A.    Yes, that's correct.
16      Q.    And then we have U.S.A., State of California,
17  Colorado, ex rel., Alex Booker and Edmund Hebron versus
18  Pfizer.
19      Is that a qui tam case?
20      A.    I believe it was, yes.
21      Q.    And who did you serve as an expert for in that
22  case?
23      A.    For Pfizer.
24      Q.    And that's obviously been unsealed; correct?
25      A.    You know, I don't know the status of that.

## Page 81

1      Q.    The next one, Sherrer versus Truman Medical
2  Center, Boston Scientific, C.R. Bard, is that a
3  transvaginal mesh case?
4      A.    I believe so, yes.
5      Q.    Okay.  The next one is Forsta, F-O-R-S-T-A, AP,
6  A-P, hyphen, F-O-N-D-E-N and Danske, D-A-N-S-K-E, Invest
7  Management A/S individually and on behalf of all other
8  similarly situated plaintiffs versus St. Jude Medical,
9  Inc., and others.
10      What's that case about?
11      A.    It's a shareholder suit about -- alleging that
12  there was information that the Saint Jude Corporation
13  should have disclosed.
14      Q.    What -- who do you serve as an expert for in
15  that case?
16      A.    I was an expert on behalf of Saint Jude.
17      Q.    The next one is Bartolini, B-A-R-T-O-L-I-N-I;
18  Raquel, R-A-Q-U-E-L; McGuinness, M-C-G-U-I-N-N-E-S-S,
19  hyphen, Colin, C-O-L-I-N, versus Abbott.
20      What's that case about?
21      A.    That case involves the drug Depakote and the
22  issue of birth defects.
23      Q.    And what is your -- what's your role in that
24  case?  What kind of testimony are you giving in that
25  case?

David William Feigal, Jr., M.D., M.P.H.

Page 82

1   A.    As a safety expert on safety labeling and
2   warnings and the relationship between the evolving
3   evidence over time and the adequacy of the label --
4   labeled warnings.
5   Q.    So I'm looking at your report, and you say you
6   served as an expert consultant on regulatory matters
7   under the jurisdiction of the United States Food and
8   Drug Administration, as an expert clinical
9   epidemiologist, and on matters related to pharmaceutical
10  products, the pharmaceutical industry, and other areas
11  within my expertise as described below; is that correct?
12  A.    Yes.
13  Q.    Okay.  So what do -- what subject matters do you
14  intend to offer an expert opinion in these cases?
15  A.    Well, I think it's probably easiest to start
16  perhaps with my general, you know, principle conclusions
17  near the end of the report at 51.
18  Q.    Well, can I interrupt?  Maybe I can --
19  A.    Sure.
20  Q.    -- shortchange this.
21  A.    Sure.
22  Q.    It's probably a poor question.
23  A.    Okay.
24  Q.    Are you purporting to offer an epidemiology
25  expert opinion in this case?

Page 83

1   A.    Yes, as an -- as epidemiology applies to
2   evaluating evidence for inclusion in the product
3   labeling and the adequacy of warnings.
4   Q.    Okay.  And you are providing expert testimony
5   as -- in an FDA regulatory capacity as well; correct?
6   A.    Yes, that's correct.
7   Q.    Are there any other areas, areas of expertise,
8   that you claim besides epidemiology and FDA regulatory
9   issues?
10  A.    Well, it relates to the regulatory areas, but I
11  am an expert on safety communications and warnings,
12  whether they come from companies or from FDA and whether
13  they're required by FDA or not.
14  Q.    And your report that you've submitted, the
15  substance of it is 52 pages long; correct?
16  A.    That's correct.
17  Q.    Okay.  And these are the opinions that you're
18  going to be giving in this case; correct?
19  A.    Yes; to a large extent.  There may be things
20  that come up today or that come up in reaction to things
21  that developed after the report, such as other
22  depositions, but I don't think any of them have required
23  me to amend this report.  I think this report does cover
24  the areas that I intend to offer opinions about.
25  Q.    Okay.  Well, this is my only opportunity to

Page 84

1   depose you and find out what your opinions are going to
2   be when we get to the trial of this case, and so are
3   there any opinions that you have about this case that
4   you did not include in your 52-page report?
5   A.    Generally speaking, no.  There may be things
6   that I would be asked an opinion about that isn't word
7   for word contained in the report, but they would all be
8   related to opinions in the report.  So you can rely on
9   the report as the basis for my opinions.
10  Q.    Okay.  And you did a really nice job of putting
11  together a table of contents, which makes it easier to
12  kind of flow through it.
13      Section I is your qualifications; is that right?
14  A.    That's correct.
15  Q.    Okay.  And then Section II is titled "FDA
16  Requirements and Review Practices," and under that are
17  various subheadings; correct?
18  A.    That's correct.
19  Q.    But, by and large, would you agree with me that
20  the information contained in Section II is basic
21  background information on FDA processes for drug
22  development and drug labeling?
23  A.    Yes, it is.  It's tailored to the issues in this
24  case.  So there have been sections in other reports that
25  I didn't include here that weren't at issue here.  And

Page 85

1   because there were many issues around pharmacovigilance,
2   the pharmacovigilance in this section is written with
3   this case in mind.
4       But it is general background.  It's stuff, it's
5   materials that would apply to -- generally, to all
6   products in a similar situation, looking at a safety
7   issue developing after approval.
8   Q.    Okay.  And then Section III, you discuss Mirena
9   specifically and the IND and NDA approval; correct?
10  A.    That's correct.
11  Q.    So you start getting more specific in Section
12  III.
13  A.    That's right.  And that section, Section III, is
14  basically the background, the type and size of studies
15  that led to the approval and what was known at the time,
16  and so that also is general in the sense that it doesn't
17  really dig down in yet to the issues around IIH.
18  Q.    Okay.  And then Section IV is titled "Idiopathic
19  Intracranial Hypertension"; right?
20  A.    Yes, that's right.
21  Q.    And you don't claim to be an expert in
22  idiopathic intracranial hypertension, do you?
23  A.    No, I'm not.  I mean, in the days when I was
24  seeing patients, I took care of a patient with
25  pseudotumor cerebri, as we called it back then, but I'm

David William Feigal, Jr., M.D., M.P.H.

Page 86

1  not an expert -- I don't -- I'm not offering myself as
2  an expert on that condition.
3  Q.    When is the last time you treated any patients?
4  A.    I still am actively licensed, but I have not
5  been seeing patients since 1992, when I went to FDA.
6  Q.    Okay.  And how many years were you seeing
7  patients before 1992?
8  A.    As a licensed physician, from 1977 through 1991.
9  Q.    And did you serve in -- I looked at your CV.
10  It looks like you had a lot of administrative
11  responsibilities during those years; correct?
12  A.    Well, I had my share.
13      I was the residency coordinator for a couple of
14  years and I was an epidemiology program director and I
15  was a director of quality-assurance at San Francisco
16  General Hospital, but I also had a very active faculty
17  practice as a member of, you know, three medical schools
18  I was faculty at and saw patients on a regular basis in
19  the house staff and student and fellows' clinics and was
20  an attending on the hospital services, including the
21  consult services for other disciplines, approximately
22  four months of the year.
23      So I would say probably about half my time as an
24  academic was spent in clinical care of patients or
25  patients of the house staff I supervised.

Page 87

1  Q.    You're smiling because you anticipated my next
2  question, which was what percentage of the time?
3      During those years when you were working at the
4  hospitals, how many patients did you diagnose with
5  pseudotumor cerebri?
6  A.    I can recall one.
7  Q.    Okay.  How many patients during that time did
8  you treat for pseudotumor cerebri?
9  A.    We treated that patient.  That patient remained
10  on my medical service with neurology consultants and
11  neuro-ophthalmologists acting as consultants.
12      We treated her as -- it's an unusual enough
13  condition that I can't claim to remember all my patients
14  but, as I recall, we treated her with diuretics and
15  repeated lumbar punctures.
16  Q.    Do you remember what caused that particular
17  patient's pseudotumor cerebri?
18  A.    I don't think we knew.  She was a patient who
19  was obese and a patient who had taken tetracycline, but
20  I don't think we knew.
21  Q.    And at least in some medical literature
22  tetracycline has been associated with the development of
23  PTC; correct?
24  A.    Yes.  I haven't critically reviewed that
25  literature, but that is one of the drugs that's

Page 88

1  discussed as a potential cause.
2  Q.    Then Section V of your report is titled David
3  Ross's, "Dr. David Ross's Report."
4      Do you see that?
5  A.    Yes.
6  Q.    Okay.  And then is it fair to say that what's in
7  that report or what's in that section of your report is
8  your criticisms of Dr. Ross's expert report in this
9  case?
10  A.    Yes, it is.
11  Q.    And you know Dr. Ross from FDA; right?
12  A.    Yes, I -- he -- I was responsible -- I was
13  responsible for the division he was part of and I was
14  the director of that division for a year and remember
15  working with him as he reviewed a supplemental
16  application for a New Drug Application that year, so
17  actually I knew Dr. Ross fairly well.
18  Q.    What drug was that?
19  A.    It was -- you know, I forget which drug it was.
20  It was a -- as I recall, it was a cephalosporin, an
21  antibiotic, and the indication was, I believe, a novel
22  indication, which was to prevent infections in patients
23  getting cancer chemotherapy.
24      Eventually, that drug didn't need to be used
25  anymore because growth factors could be used to raise

Page 89

1  white counts to prevent the infections.
2  Q.    Uh-huh.
3  A.    But in the day and when I was practicing, that
4  was the most common cause of death in cancer patients
5  was infections complicating their chemotherapy.
6      So that was quite an important new indication,
7  and he was the primary reviewer for that.
8  Q.    Okay.  And what -- you said you were the head of
9  that division?
10  A.    That's correct.  I was the director of the
11  Division of Anti-Infective Products, which is where he
12  was working in probably about 1994, 1995.  I don't
13  remember exactly.
14  Q.    And how much interaction would you have with Dr.
15  Ross?
16  A.    Well, a fair amount.  As a division director in
17  the division, as I recall, we may have had not more than
18  a dozen physician reviewers and we would make rounds, if
19  you will, on our drugs, talk about the drugs that were
20  being evaluated that the physician reviewers had
21  responsibility with.
22      They usually had the lead responsibility for the
23  clinical aspects of the drugs.  The teams also included
24  other disciplines like toxicologists and
25  pharmacologists.  But I would have had almost -- you

23 (Pages 86 to 89)

David William Feigal, Jr., M.D., M.P.H.

Page 90

1  know, certainly every week and almost -- in some time
2  periods, you know, several times a week direct
3  interactions with Dr. Ross.
4      Q.   Did you get along with Dr. Ross?
5      A.   Yes.
6      Q.   Was he a good employee?
7      A.   For the year I worked with him, I thought he did
8  a very good job, yes.
9      Q.   Do you think he's smart and competent?
10     A.   Well, you know, my direct experience is limited
11 to that year and that review, but I thought he did a
12 good job.
13     Q.   Okay.  Do you think he's smart and competent?
14     A.   I think he is smart.  You know, competent is
15 just a little too broad.  I think you'd have to talk
16 about specific work products or specific opinions and
17 things.  I don't think he and I would always agree.
18     Q.   You don't think that the two of you would agree
19 or you and I would agree?
20     A.   He and I would agree.
21     Q.   Okay.
22     A.   I don't know about you.
23     Q.   Did you guys ever have any conflict with one
24 another?
25     A.   Not that I recall.

Page 91

1      Q.   Did you ever sanction him, punish him, write him
2  up for any sort of deficiencies in his work product at
3  FDA?
4      A.   No.
5      Q.   Then the next section, Section VI, is "Dr.
6  Mayhar Etminan's Report," and it looks like you spend
7  between Page 45 and 48 on your criticisms of his report;
8  is that correct?
9      A.   That's correct.
10     Q.   Okay.  And I don't -- did you know that he is
11 not going to be an expert in this case?
12     A.   Yes, I was informed that he withdrew.
13     Q.   Okay.  So we will probably not talk about that
14 today, which may make you happy.
15     A.   I'd be happy to talk about it, but since he's
16 withdrawn --
17     Q.   Well, I know.  But it will be shorter.
18     A.   No.  I'm --
19     Q.   Shorter is happier for everybody.
20     A.   Shorter is good.
21     Q.   Okay.  And then it looks like you spend Page 50
22 criticizing Dr. Fraunfelder's report; is that correct?
23     A.   Well, I make comments about it, yes.
24     Q.   Make comments?
25     A.   Yes.  I mean, I don't -- yes, I make criticisms

Page 92

1  of his report.  Yeah, that's what these three sections
2  are about are my criticisms or comments on points that
3  they're making.
4           MR. JONES:  Okay.  Jumping back up for a second,
5  we're two minutes until the video ends, and I don't
6  think I can get a question out and an answer in two
7  minutes.
8           THE WITNESS:  All right.
9           MR. JONES:  So let's go off the record, take a
10 short break, and we'll come back to it.
11          VIDEO OPERATOR:  We are going off the record.
12          This is the end of Media Number 1.
13          The time is 11:17 a.m.
14          (Recess, 11:17-11:31 a.m.)
15          VIDEO OPERATOR:  We are back on the record.
16          This is the beginning of Media Number 2, and the
17 time is 11:31 a.m.
18          MR. JONES:  Excuse me.
19 BY MR. JONES:
20     Q.   Dr. Feigal, we're back on the record after a
21 break.
22          Let's go to your CV.
23     A.   Sure.
24     Q.   Talk about it for a second.
25     A.   Okay.

Page 93

1      Q.   Okay.  We talked already about your experience
2  prior to 1992.
3           It looks like you went to the FDA beginning in
4  1992.
5      A.   That's correct.
6      Q.   And what was your position in 1992 when you
7  started at FDA?
8      A.   My initial position was I was a director of the
9  Division of Anti-Viral Drugs.
10     Q.   Okay.  And that was in the Center for Drug
11 Evaluation and Research?
12     A.   That's correct.
13     Q.   And what did you do as the division director for
14 anti-viral drug products?
15     A.   Our division was one of nine divisions that
16 divided up the drugs that are on the market and the
17 drugs -- and also the drugs that are in testing.
18          So I had responsibility for all of the drugs for
19 AIDS and influenza and herpes infections and as well as
20 drugs for fungal infections and tuberculosis.
21 Basically, all the non-sort of bacterial infections.  We
22 also had the transplant drugs in our division.
23          So as the division director, I was responsible
24 for both the investigational phase and the
25 post-marketing phase for the drugs we were responsible

24 (Pages 90 to 93)

David William Feigal, Jr., M.D., M.P.H.

Page 94

1   for.
2   Q.    And how many employees did you have working for
3   you in the Division of Anti-Viral Drug Products?
4   A.    When I started, there were 60.  Within a couple
5   of years, it was up closer to 120.
6   Q.    Okay.  And did your division include any
7   contraceptive products?
8   A.    It did.  We had responsibility for the topical
9   contraceptives, such as nonoxynol-9 that was used in
10  contraceptive foams and is used with coating on condoms.
11  Q.    Okay.  Any others?
12  A.    Those were the principal ones.
13  Q.    Okay.  And was that a product that was approved
14  as a new product while you were the director for the
15  Division of Anti-Viral Drug Products?
16  A.    No.  It was an old product and, largely, an OTC
17  product.  But we were very actively involved with
18  contraception and -- because of the interest in
19  providing ways of preventing HIV transmission during
20  sex, which is how it's usually transmitted, and so I
21  served on a number of groups that evaluated
22  contraceptive methods and contraceptive studies during
23  those years.
24  Q.    Okay.  Then -- so you started as the director of
25  that division in '92?

Page 95

1   A.    Yes, that's correct.
2   Q.    And stayed in that position until '96?
3   A.    Yes.  I held some positions concurrently but I
4   was the division director from, yeah, 1992 through 1996.
5   Q.    And what -- you held positions concurrently in
6   the period between '92 and '96?
7   A.    Yes.  So --
8   Q.    What positions?
9   A.    Well, I was the director of the Office of Drug
10  Evaluation-IV from 1995 through 1997.  And so the
11  structure at FDA is that the new drug divisions report
12  to one of five office directors and the office directors
13  have -- supervise the division directors.  So I
14  concurrently held both the office position and was at
15  any given time the director of one of my divisions.
16  Q.    And what products or what types of products did
17  the Office of Drug Evaluation-IV regulate?
18  A.    That office had responsibility for all types of
19  infections, not just the viral and the tuberculosis and
20  fungal that I talked about before, but it was all the
21  anti-infective products.
22        It was about -- it was a very large group of
23  drugs.  It was about a quarter of the drugs on the
24  market were our responsibility.
25  Q.    And it included OTC products?

Page 96

1   A.    It could.  It was -- there was an OTC drug
2   division as well, and so there was a joint
3   responsibility between the OTC group and the new drug
4   groups.
5   Q.    Okay.  And you did -- so you were in those
6   positions.
7         By '97, had you given up the position of
8   director Division of Anti-Viral Drug Products?
9   A.    Yes.  In '97 I moved from the Center for Drugs
10  to the Center for Biologics, where I was the deputy
11  medical -- deputy -- the medical duty director, center
12  director.
13  Q.    And then take me to '97 to '99.  What did you do
14  at FDA then?
15  A.    So in '97 to '99 I was the medical deputy center
16  director in Biologics.  I was the second, if you will,
17  in support of the center director for Biologics and I
18  also had organizational units that directly reported to
19  me, including the epidemiology, biostatistics, the
20  pharmacovigilance programs, advisory committees.  So I
21  had a role as a deputy and then some direct
22  responsibility, organizational responsibilities.
23  Q.    Going back to the Office of Drug Evaluation-IV,
24  currently, the FDA website says the Office of Drug
25  Evaluation-IV includes three divisions:  The Division of

Page 97

1   Nonprescription Drug Products, the Division of Medical
2   Imaging Products, and the Division of Pediatric and
3   Maternal Health.
4         Is that the same structure as it was back in
5   1995 to 1997?
6   A.    No.  They've renumbered the offices and now the
7   office that I formerly had is -- because all of the
8   drugs are for infections, it's called the Office of
9   Anti-Infective Drug Products, I think is the name of the
10  office.  So that's -- most of the offices just have a
11  number --
12  Q.    Uh-huh.
13  A.    -- but my old office was named after the
14  products, since they're -- all the products were pretty
15  much in one area.
16  Q.    So today that particular office doesn't have a
17  number assigned to it?
18  A.    That's right.
19  Q.    I'm just trying to understand the structure.
20  A.    Yeah.  No.  That's right.  No.  It's a little --
21  it's a little irrational, but the others are all
22  numbered and then there's that office which actually
23  just has -- is called the Office of Anti-Infective Drug
24  Products, as I recall.
25  Q.    Okay.  So from '92 to '97 you were part of the

David William Feigal, Jr., M.D., M.P.H.

| Page 98 |
| --- |

1  Center for Drug Evaluation and Research, the CDER;
2  correct?
3  A.    That's correct.
4  Q.    Okay.  And then '97 to '99 you moved over to the
5  Center for Biologics Evaluation and Research, the CBER;
6  correct?
7  A.    That's correct.
8  Q.    And that's a different division, obviously.
9  A.    Yes.  It's a -- there are three medical product
10  groups that report to the commissioner, Center For
11  Drugs, Biologics, and Devices.  All of them have
12  slightly longer names than that, but those are the three
13  categories you can think about.
14  Q.    Okay.  And then the devices, from '99 to 2004
15  you served in the Center For Devices and Radiological
16  Health; right?
17  A.    Yes, that's right.  I was the director on this
18  one.
19  Q.    Okay.  So that, the Center For Devices and
20  Radiological Health, they don't regulate drugs in that
21  division; correct?
22  A.    No.  If they're -- if the product is regulated
23  as a drug, it's in CDER, but there are combination
24  products and drug delivery devices, some of which are
25  regulated in the device center.

| Page 99 |
| --- |

1  Q.    That's a good point.
2         You're familiar with the Mirena product; right?
3  A.    Yes.
4  Q.    And it's a -- is it a combination product?
5  A.    It is, yes.
6  Q.    Okay.  Because it's a device that releases a
7  synthetic progestin drug; correct?
8  A.    That's correct.
9  Q.    And so does Mirena come under the guise of
10  the -- under the regulatory authority of the CDRH or the
11  CDER?
12  A.    It's the responsibility of CDER and it has an
13  approval as a drug.
14  Q.    Okay.
15  A.    The contraceptives that have no drug action,
16  like the old Lippes Loop and the Dalkon Shield, were
17  regulated as devices.
18  Q.    What about, do you know what ParaGard is --
19  A.    Yes.
20  Q.    -- the copper IUD?
21  A.    Yes.
22  Q.    Is that under CDRH or CDER?
23  A.    You know, I always have to look that up, but I
24  think it's regulated as -- I think it's regulated in
25  CDER but I have to look it up to be sure.

| Page 100 |
| --- |

1         I can make the case it belongs in either, but
2  the copper is thought to have a drug-like effect and
3  that's the rationale for that it's different than just a
4  plain plastic IUD.
5  Q.    Were you ever -- during your time at FDA between
6  '92 and 2004, were you ever personally involved in any
7  part of the regulatory action related to Mirena?
8  A.    No.
9  Q.    During your time at FDA between '92 and 2004,
10  were you ever personally involved in any aspect of
11  regulating ParaGard?
12  A.    No.
13  Q.    Have you ever written any medical articles
14  related to the Mirena product?
15  A.    No, I have not.
16  Q.    Have you ever personally been involved in any
17  epidemiology studies involving the Mirena product?
18  A.    No, I have not.
19  Q.    During your time at FDA between '92 and 2004,
20  were you ever involved in any way with the Norplant
21  product?
22  A.    No, I was not.
23  Q.    Have you ever written any medical articles
24  related to the Norplant product?
25  A.    No.

| Page 101 |
| --- |

1  Q.    Have you ever conducted any epidemiology studies
2  related to the Norplant product?
3  A.    No, I have not.
4  Q.    Have you ever written any medical articles
5  related to levonorgestrel?
6  A.    No.
7  Q.    Have you ever been involved in, personally
8  involved in, any epidemiology studies involving
9  levonorgestrel?
10  A.    No, I have not.
11  Q.    And in preparing your report in this case, you
12  didn't engage in any sort of epidemiology studies
13  related to Mirena or Norplant; correct?
14  A.    Not in the usual sense of that.
15         I did independently use some of the same tools
16  that the plaintiffs' experts used to look at the
17  epidemiology of the reporting of IIH associated with
18  different products using software such as OpenVigil,
19  which both Drs. Ross and Etminan used.
20  Q.    But you didn't develop any of your own methods
21  to study the epidemiology or any sort of relationship
22  between Mirena and pseudotumor cerebri?
23         MR. SCHMIDT:  Objection.  Vague.
24         THE WITNESS:  I didn't develop new methodology.
25  I used my knowledge of epidemiologic methods to evaluate

26 (Pages 98 to 101)

David William Feigal, Jr., M.D., M.P.H.

Page 102

1    the existing literature and the evidence that's
2    available through post-marketing surveillance.
3    BY MR. JONES:
4    Q.    And you did that for purposes of criticizing
5    plaintiffs' experts' methodology and results in this
6    case; correct?
7          MR. SCHMIDT: Object to characterization.
8          THE WITNESS: Well, that's probably where I
9    summarized it in my report but it would have been
10   relevant for me to do that proactively even if they
11   hadn't used those methods.  The tools they were using
12   were appropriate, even if I disagree with exactly how
13   they used them or their conclusions.
14   BY MR. JONES:
15   Q.    So the tools were appropriate?
16   A.    Yes, for evaluating reporting rates the
17   OpenVigil tool is an appropriate and -- convenient and
18   appropriate tool for constructing the kinds of tables
19   and analyses that are used in pharmacovigilance.
20   Q.    So is it fair to say that your criticisms are of
21   the data that they inputted into these tools?
22   A.    The criticisms are the way that they made their
23   selection of how to construct the tables rather than the
24   software that generated the tables.
25   Q.    Have you ever heard the -- strike that.

Page 103

1          Okay.  So you left FDA in 2004 and went to NDA
2    Partners, L.L.C.; correct?
3    A.    That's correct.
4    Q.    And was NDA Partners, L.L.C., in existence at
5    that time or were you a founder?
6    A.    I'm almost a founder.  It was -- it had been in
7    existence about six months and it was just getting
8    started and organized.  But they've taken to calling me
9    a founder now but in the early days they were -- they
10   pointedly reminded me that I joined late.
11   Q.    Yeah, that happens.  But six months is -- I'm
12   with you.  You should be designated as a founder.
13         How did you hook up with these folks to get
14   started in NDA Partners, L.L.C.?
15   A.    Well, after leaving FDA, we -- I left FDA, my
16   wife and I had -- she'd at the National Cancer
17   Institute, I had worked at the FDA.
18         She got a great job with a new research
19   institute in Phoenix, Arizona, and when I moved to
20   Phoenix, Arizona, I didn't find a university that had --
21   there was no medical school in that town, at least there
22   wasn't then, and there wasn't any other -- I thought I
23   would go back to university and go back to teaching but
24   there really wasn't something that was a good fit for me
25   so I began looking at opportunities to work as a

Page 104

1    consultant.
2          I think initially I thought it would just be a
3    bridge until I found something else.  But I considered
4    two different firms and selected NDA Partners.
5    Q.    And when you were at FDA, obviously, you were in
6    the Washington, D.C., area; right?
7    A.    Yes, that's correct.
8    Q.    Okay.  And where -- back in 2004, where was NDA
9    Partners, L.L.C.?  Where was their office located?
10   A.    We had a physical office for the business side
11   of things in Virginia, in suburban Virginia.  It's now
12   in Madison, Virginia, down near the University of
13   Virginia.
14   Q.    And how many individuals were part of NDA
15   Partners, L.L.C., when you started discussing an
16   opportunity with them?
17   A.    There were ten partners.
18   Q.    Okay.  And had you had any sort of dealings with
19   these ten individuals while you were at FDA?
20   A.    Yes.  The founder of the group is Carl Peck, and
21   Carl was the director of the Center For Drugs and the
22   person who recruited and hired me at FDA to be the
23   division director for Anti-Viral Drugs.
24         There were other members that I knew.  One of
25   them had actually been on an advisory committee that --

Page 105

1    while I was at -- while I was at FDA, Dr. Lou Scheiner,
2    and while I was at FDA and Dr. Peck had left FDA and he
3    was a faculty at Georgetown, some of his faculty who I
4    met at that point were also partners in this -- had left
5    the university and were parts of this firm.  So I knew
6    about half of the -- the I knew about half of the partners
7    when I joined them.
8    Q.    Did you voluntarily leave FDA?
9    A.    Yes, I did.
10   Q.    Then from 2006 to 2008 it looks like you went to
11   work for a pharmaceutical company?
12   A.    Yes, that's right.  I became an inactive
13   partner.  I kept my equity but I became an inactive
14   partner.
15         Elan allowed me to follow up with my existing
16   clients but I took no new clients during that time.  And
17   I -- at Elan Pharmaceuticals I was the senior
18   vice-president for global regulatory, safety, and
19   biostatistics.
20   Q.    And what kind of products does Elan
21   Pharmaceuticals deal in?
22   A.    The company has changed at different points in
23   time, but when I was there, the products that were
24   active were products for neurologic diseases, such as
25   multiple sclerosis, Parkinson's disease, Alzheimer's,

27 (Pages 102 to 105)

David William Feigal, Jr., M.D., M.P.H.

## Page 106

1    chronic pain which requires pain pumps into the
2    intrathecal space by the spinal cord.
3         So it was largely a neurology product, product
4    company, at the time that I worked there.  We had a
5    couple of antibiotics but the new products were all in
6    the neurology area.
7    Q.   Any contraceptive products?
8    A.   Not at the time I was there.
9    Q.   Okay.  Then 2008 to 2010 -- well, let me back
10   up.
11        Why did you leave Elan Pharmaceuticals?
12   A.   I was commuting from Phoenix to South San
13   Francisco and my wife had -- was still at the research
14   institute in Phoenix, and so after about a year we made
15   a decision to sort of look for a job where we could both
16   work in the same city.  And we looked for something in
17   the Bay area, where I was working, but Amgen in Southern
18   California offered both of us a position, and so I left
19   Elan at that point and both of us went to work for
20   Amgen.
21   Q.   And what did your wife do for Amgen?
22   A.   She's an oncologist.  She was director of one of
23   the large divisions at the National Cancer Institute.
24   So she became part of their cancer drug product
25   development team.

## Page 107

1    Q.   And what kind of products did Amgen sell?
2    A.   Amgen had six or seven products on the market.
3    Most of these were -- the most successful of them were
4    biological products, some of them were growth factors.
5         I mentioned before that growth factors can
6    stimulate the body to make more white cells, which
7    protects you from infections and cancer.
8         The erythropoietin was another product that they
9    manufactured that could stimulate the body to make red
10   cells and treat anemia in patients that don't have
11   normal levels of erythropoietin, which is the situation
12   with kidney failure.
13        They also had products to treat psoriasis,
14   rheumatologic conditions, and, you know, products for
15   cancer, for bone disease.
16        Those were the six or seven approved products,
17   and then at any given time they typically had about 40
18   products that were in human clinical trials being
19   evaluated for whether they should progress to more
20   extensive trials.
21   Q.   Any contraceptive products while you were
22   working at Amgen?
23   A.   No, there were not.
24   Q.   And then you left Amgen to go back to NDA
25   Partners in 2010; is that correct?

## Page 108

1    A.   That's correct.
2    Q.   Why did you leave Amgen?
3    A.   It was a planned departure.  I was -- I wanted
4    to actually increase the amount of time I spent
5    teaching, and it was a real challenge for me to teach in
6    Arizona while I was working for Amgen in California and
7    with their schedules.  And I also enjoyed the
8    independence of being a consultant.
9         And so I actually informed the person I reported
10   to that I was planning to leave and he asked me to stay
11   for another six months to recruit and train a successor,
12   and I did that and then left at that point.
13   Q.   Were you ever asked to leave Elan
14   Pharmaceuticals or Amgen?
15   A.   No.
16   Q.   And at Amgen, as the vice-president of global
17   regulatory affairs, what did you do?
18   A.   I was responsible for a team of regulatory
19   affairs professionals.
20        I had direct responsibility for the U.S. and
21   Canada interactions; I had supervisory and strategic
22   responsibilities for European submissions, although we
23   had a group of regulatory people on the ground in Europe
24   that did the direct work there that was somewhat
25   parallel to my activities; and I also had

## Page 109

1    responsibilities for a regulatory policy staff that
2    evaluated FDA guidances and, you know, changing FDA
3    policies and changes even in the law.
4    Q.   Were you involved in preparing NDAs for Amgen?
5    A.   BLAs, yes.  These were biologics, so like --
6    they're like an NDA, except they're biological licenses
7    instead of New Drug Applications.
8    Q.   Okay.
9    A.   But we also did have NDAs as well.  We had a
10   product, it would have been supplements that I would
11   have been involved in, but we had a small molecule for
12   bone disorders and kidney disease that I was involved in
13   preparing reports and applications for new indications,
14   designing studies for new indications, post-market
15   surveillance, those types of things.
16   Q.   Were you -- while you worked at Amgen, were you
17   involved in preparing Periodic Safety Update Reports for
18   products?
19   A.   I was responsible for submitting them and
20   seeing -- you know, reviewing them as part of that
21   process.
22        At Elan, those -- the safety reports and things
23   were my direct responsibility because at Elan I had
24   regulatory and safety.
25        At Amgen, I was in a much larger company and I

David William Feigal, Jr., M.D., M.P.H.

Page 110

1  was responsible for regulatory but I had a role in all
2  of the safety communications and filings and on all the
3  safety committees and so forth but safety itself was
4  directly supervised by another individual.
5     Q.   Were you the signatory on the PSURs?
6     A.   No, I was not.
7     Q.   But you did review the PSURs?
8     A.   Yes.
9     Q.   That was part of your job?
10    A.   Yes, that was part of my job.
11    Q.   And --
12    A.   And at Elan, my job was to organize the staff to
13  prepare them.  And I was much more hands on there,
14  although I still was not the signatory, as I recall.  I
15  may have been but I don't think I was.
16    Q.   The PSURs I've seen have been, you know, very
17  large.  I mean, there are many, many pages.
18    A.   Yes.
19    Q.   Based upon your experience from the
20  pharmaceutical company side, tell me a little bit about,
21  you know, what goes into preparing a PSUR.
22    A.   Sure.  Well, you know, it's a very structured
23  document.  It has a very specific organization and
24  content.
25       Some of it I sort of describe as being similar

Page 111

1  to getting a phone book.  You can look things up and you
2  know where to find them.  You don't have to start at the
3  beginning and start reading to try and find things.
4       So the PSUR is a -- well, the PSUR is the
5  European format, as you may know.  The U.S. requires
6  Periodic Adverse Drug Event Reports, PADERs, and annual
7  reports, quarterly reports initially, then annual
8  reports.
9       FDA will accept PSUR reports because they're so
10  similar.  So, actually, while I was at FDA, FDA agreed
11  and the Europeans agreed that they would accept an
12  annual report and that the annual report would be due on
13  the drug's birthday, actual birthday.
14       Before that, when I arrived, actually, you
15  almost had an annual report in every region due every
16  couple of months because it was totally unsynchronized
17  and there were different reports.
18       So anyway, they are different formats, but
19  whether we -- you know, we can call them PSURs or
20  PADERs, whatever you'd like.
21       One large part of it is to collect the
22  individual spontaneous reports that have occurred and to
23  actually print those and to provide those.  Now they're
24  electronic, of course.
25       Those same reports are actually organized by

Page 112

1  type of condition.  So if you were interested in what
2  are the neurologic complications of levonorgestrel,
3  there will be a section where you can actually look and
4  see what types of things have been reported.  Headache
5  could be a common one but an IIH a rare one.
6       And there is a -- sections that -- where you
7  compile the literature.  FDA has changed its policy from
8  time to time.  There was a period where they said, don't
9  send in the literature when everything was paper because
10  the FDA has access to the National Library of Medicine.
11       Now, because everything is electronically, the
12  practice varies.  But you submit a bibliography of new
13  information, you provide in the annual reports or the
14  periodic safety reports listings of the ongoing studies
15  and there will be a section that describes that.
16       And there are also are parts of the PSUR where
17  you address specific issues that are being followed.
18  Some of these come from requests from a regulatory body.
19  In Europe, there's actually a formal process for
20  designating certain issues for follow-up.
21       So the process of putting these together, one
22  year it starts, as soon as you finish one year's report,
23  you start compiling it the next.  And then when it's
24  compiled, generally speaking, there's a cover letter
25  that's written by someone in regulatory affairs and it's

Page 113

1  submitted electronically these days, in paper in the old
2  days to the regulatory agencies for their records and
3  their review.
4     Q.   So how -- you know, generally, when you're
5  preparing one of these periodic reports, how much time
6  goes into compiling the information and putting that in
7  the form that the regulatory body wants it in?
8     A.   The compiling is not the whole picture because
9  most of the reports have already been -- like I say, the
10  15-day reports that may be provided again in the PSUR.
11  The real time of preparing those went into the time when
12  the reports initially came in and the people, the staff,
13  are collecting the information, getting follow-up with
14  the reporter, coding them, entering them into the
15  database.
16       At the end of the year, when they're all in the
17  database -- and Argus is one of the databases -- then
18  the database is actually designed to actually create the
19  reports either with the MedWatch format or the SIANS
20  format, the European format, and spit them out, if you
21  will, all organized.
22       So the compiling at the end of the day now is
23  not where all the time is.  The time comes in collecting
24  the original information.
25       But that said, I think when the company puts

29 (Pages 110 to 113)

David William Feigal, Jr., M.D., M.P.H.

Page 114

1    together a PSUR, it also takes that opportunity to make
2    sure that they read it and sort of take a look at the
3    summary at this point in time and say, all right, is
4    there -- are there things in here we haven't noticed
5    before or, you know, does this give us a better insight
6    into something?
7         So there's -- I can't even begin to estimate the
8    hours. I think our staff that did most of the work at
9    Elan, a small company, was about 16 people but at Amgen,
10   between regulatory and safety, there were over 900
11   people. And so it's -- there's a lot of -- there's a
12   lot of people that go into that. And then most
13   companies had contractors to help with the
14   post-marketing surveillance.
15   Q.    And so back when you were at Elan and Amgen, is
16   that back in the days you said you'd still send it to
17   FDA in paper form?
18   A.    No. It was electronic by then.
19   Q.    It was?
20   A.    Yeah.
21   Q.    Okay.
22   A.    It's gotten more and more electronic.
23        You know, in those days we would actually, for
24   example, just to give you a small example, we would
25   actually write out the MedDRA codes, that's the coding

Page 115

1    dictionary for adverse reactions, they actually write
2    them out on the form. Now FDA says submit them
3    electronically and just submit the code, don't submit
4    the text, because the text may change slightly over
5    time. Like, you know, as you know, this syndrome has
6    been called different things over time but,
7    ideally, the code will always be the same.
8    Q.    Right.
9    A.    So FDA now says, well, just submit it
10   electronically and just submit the code.
11        So there's -- it gets more and more electronic
12   over time.
13   Q.    Now, when you were back at FDA in 2004, were you
14   guys getting them electronically or in paper back then?
15   A.    We were getting them electronically, although in
16   those days what electronic usually meant was that we
17   would get PDF files, we would get Acrobat files, and
18   some of them in Word documents. If we wanted the
19   ability to edit or cut and paste things from the
20   documents, it's easier to do that in Word than Acrobat
21   PDFs.
22        Where things evolved since then is that now
23   they're submitted almost like web pages where the
24   information on the reports is tagged the way -- I don't
25   know if you've ever seen what's underneath a web page,

Page 116

1    but it's all plain text but there's a lot of
2    instructions that says, you know, this font, this color,
3    center it --
4    Q.    Right.
5    A.    -- and so forth, or this is the table of
6    contents or this is a new page.
7         All of that tagging is now embedded so that the
8    reports actually automatically load into the databases,
9    automatically load into the FDA record systems and the
10   European record systems and the Japanese record systems.
11   They've harmonized and standard this -- standardized
12   this and this has been a process that has been evolving.
13        And FDA calls submitting now publishing. When
14   you submit something, you publish it to the FDA website
15   because it's coming in as a tagged document. Labels are
16   all that way now.
17   Q.    Now, back when you said that it might arrive in
18   PDF form or Word form, was somebody just E-mailing a
19   document to somebody?
20   A.    No. In those days, what you'd get is you'd get
21   the paper for archival records, and some reviewers would
22   actually work off of a paper record when it came in but
23   they would also have the PDF that they could load on
24   their computer. And so you -- a typical application
25   would be the paper submission plus the electronic

Page 117

1    versions.
2    Q.    Okay.
3    A.    And then FDA would load the electronic versions
4    into its electronic document room, but for a long period
5    and I imagine some types of records might -- this still
6    might be true, they kept both the paper and the
7    electronic. And it depended on the reviewers, which
8    they preferred to work with oftentimes in the old days.
9         There was even a period where every company did
10   something slightly different and they actually sent in
11   the computers but then they sent in the paper for
12   archival purposes.
13        So it's really evolved over this time period.
14   When I arrived at FDA in '92, we weren't using Windows
15   and we didn't even have E-mail that was the same
16   system-wide. If you wanted to send an E-mail to another
17   floor, you printed it out and somebody put their
18   sneakers and ran upstairs.
19   Q.    Uh-huh. Uh-huh.
20   A.    It was called sneaker mail.
21   Q.    It's amazing how far we've come along.
22   A.    Yeah. My first job in college was to calculate
23   standard deviations on a manual calculator so...
24   Q.    Well, you know, I've worked on a gubernatorial
25   campaign, a successful one, in 1995 and I tell people we

David William Feigal, Jr., M.D., M.P.H.

## Page 118

1    had one computer --
2    A.   Yeah.
3    Q.   -- for the entire state.  That's amazing.
4    A.   Yeah.  You know, in those days, the University
5    of California listed the university's fax machine.  It
6    was not plural.
7    Q.   Okay.  One other thing.  This has been helpful,
8    kind of getting a peek behind the curtain.
9    A.   Yeah.
10   Q.   Today, when somebody is sitting at FDA and one
11   of these periodic reports comes in, what are they seeing
12   on the FDA side?  Is it going into a database?
13   A.   It will be, quote, published to FDA, so it will
14   be uploaded electronically and then it goes into an
15   electronic record room.  And the record room still has
16   much of the same structure that the paper records have.
17   So the submissions are numbered and they're classified
18   in different, you know, different types and there's a
19   database that has the high-level summary of what each
20   submission is.  You can see a little of that on the
21   public sites.
22        The reviewer can actually pull up any of those
23   documents and then, depending on the types of documents,
24   the reviewer can do a full text search.  The documents
25   for the last 15 years have had hyperlinks, so you're in

## Page 119

1    the table of contents, you click, you jump to that
2    section.
3         So there's a lot -- it's a lot easier to
4    navigate this stuff now than it was, but even when it
5    was paper, people could do it because it was so
6    organized.
7    Q.   How is -- over at FDA, you know, based upon your
8    experience, you know, how are people assigned to -- how
9    does one know, an employee know, okay, hey, we've got a
10   PSUR in for this product, that's my task?  How do people
11   know that?  Are they, people, assigned to specific
12   products or what?
13   A.   Yes, they are.
14        So drugs which are active have a team assigned
15   to it that will -- in contraception would typically
16   consist of a physician, a pharmacologist, an animal
17   toxicologist, animal pharmacologist, a statistician on
18   an as-needed basis, and a project manager who is
19   responsible for coordinating things on the team.  Used
20   to be called consumer safety officers, now they're
21   called project managers.
22   Q.   Has it ever been called a team leader?
23   A.   No.  A team leader is within a discipline.  So
24   each -- so among the physicians, for example, a typical
25   division might have three medical team leaders or four

## Page 120

1    medical team leaders.  Each of those team leaders would
2    have -- do their own work.  They would have some primary
3    responsibilities but they would supervise -- if it's a
4    physician team leader, they would supervise, say, three
5    other physician reviewers.  So each physician has a
6    portfolio of drugs that they're responsible for.
7         The CSO is the point of contact with the
8    regulatory group in the company.  As documents come in
9    every day, the CSOs are informed that there's new
10   documents for drugs they are responsible for.
11        So for active drugs, a medical officer might be
12   responsible for a dozen very active drugs and 20 sleepy
13   drugs, and some drugs that if anything ever comes in,
14   that -- you know, there are some drugs that FDA is still
15   responsible for that are just barely used anymore.  So
16   they have -- their work is sort of prioritized by how
17   active the products are.
18        But when something new comes in, they learn
19   about it.  There is usually a little bit of a lag
20   because even though it's loaded and it's somewhat
21   automatic, it's the CSO's job to identify -- you know,
22   identify the documents.
23        So when I was division director, actually -- and
24   I think things may be busier these days, but in my day,
25   as I recall, one year, when we looked, we were averaging

## Page 121

1    about 70 submissions a day.
2         And a submission could be as short as a
3    thank-you letter --
4    Q.   Uh-huh.
5    A.   -- for a recent meeting or meeting minutes or it
6    could be a PSUR or it could be a single safety report.
7         So we had 16 medical officer reviewers and there
8    would be about -- you know, between them, they would
9    have eight or so new documents per day that would be
10   logged in that -- and they would be informed of that and
11   they would sort of keep track of that.
12        And then the teams would meet and they would go
13   over what's new this week, what's pending, do we have
14   company meetings coming up, are there reports, are there
15   deadlines, are there advisory committees so...
16   Q.   And do these individuals that review these
17   submissions, do they have any other responsibilities in
18   their job other than reviewing submissions?
19   A.   In the new drug divisions, which we're talking
20   about, where Dr. Ross and I both spent our time in the
21   drug center, that is the principal responsibility is to
22   review submissions, but in -- it isn't all just
23   reactive.
24        There are times when an issue is identified that
25   the staff work on, so they might actually seek a consult

David William Feigal, Jr., M.D., M.P.H.

Page 122

1    from the epidemiology group or they may ask the FDA's
2    staff to prepare a report of 15-day reports and then
3    they'll typically ask the company at the same time they
4    do an internal one, because they have slightly different
5    databases in the company than FDA.
6          They may actually do literature reviews and
7    things but it's almost all -- it almost all does relate
8    to their products.  There are other responsibilities,
9    you know, there's training and different kinds of things
10   that they have to do and they have to supervise other
11   people, but it is organized around the submissions that
12   come in.
13   Q.    And when we talk about submissions, are these
14   people part of the teams of people who review New Drug
15   Applications and Investigational New Drug Applications?
16   A.    Yes.  In -- there have -- there are places in
17   the FDA where they separate the investigational from the
18   approved and they have separate teams once a product is
19   approved, but in drugs the same team is responsible for
20   the -- everything going on with the product when it's --
21   whether it's investigational or on the market or
22   sometimes it's a mix.  You may have studies for new
23   indications for an old product at the same time it's
24   approved for older indications.  So it's one team that
25   has responsibility for that.  And yeah.

Page 123

1    Q.    I think I'm understanding you.  I just want to
2    make sure that I'm clear.
3          The team members that would be involved in an
4    NDA, for instance, for purposes of continuity, is it
5    that same team that then is responsible for reviewing
6    the periodic reports?
7    A.    Yes.  And that's the team that's responsible for
8    maintaining the product's labeling.
9          So there is a safety and epidemiology group and
10   there's an advertising and promotion group that's
11   separate from the new drug groups.  They each have their
12   responsibilities.  The epidemiology group puts together
13   the database of the AERS reports as it comes in, they do
14   some of their own safety research, but the same type of
15   information is also going to the team that's responsible
16   for the drug.
17   Q.    Uh-huh.
18   A.    And so they work together.
19         There are more people in the new drug divisions
20   actually tracking safety than there are people in safety
21   and epidemiology, which have a very small part of it.
22         The team sees everything.  They see the animal
23   work, they see the pharmacology, they see the chemistry
24   and manufacturing, which isn't much of an issue with
25   this product, they see recalls that happen.

Page 124

1          I mean, it's -- the new drug division, it's a
2    bit of a misnomer because it's really the new and the
3    old.
4    Q.    Uh-huh.
5    A.    They have the responsibility for new products on
6    the market and maintaining the labels and making the
7    labeling changes and then the other groups work as
8    consulting groups to them, although many of those groups
9    actually have staff that are virtually embedded in the
10   new drug divisions.
11         There's typically these days a deputy director
12   for safety in most of the new drug divisions that
13   explicitly interacts with safety staff.
14   Q.    On these teams, how many different New Drug
15   Applications or IND applications would they be dealing
16   with in a year, on average?
17   A.    I would say that, you know, if you look at how
18   many New Drug Applications for novel products that had
19   never been previously approved, the number per year for
20   the whole FDA ranges between 20 products and 40
21   products.  I think one year it hit 50 or 55.  But 20 to
22   40.  I think the overall average over all the years is
23   24, is two dozen.
24         So those 24 applications are split up among what
25   are now 16 new drug divisions, and so in any new drug

Page 125

1    division there's probably only one or two novel products
2    that's going to be approved for the first time in a
3    given year.
4          Some areas, you know, are -- get more of them,
5    like the cancer.  There's a lot more going on with
6    cancer.  So that's with the new ones.
7          Now, there also are New Drug Applications where
8    there's a capsule version of what was a pill, and that's
9    largely reviewed by the pharmacologists and the
10   chemists, not so much by the medical officer.  There's
11   about 50 or 60 of those a year.  And then there's the
12   labeling supplements and all of the rest of that type of
13   stuff.
14         But your average medical officer would probably
15   only deal with a brand-new drug every couple of years
16   but would have applications for new versions of old
17   drugs or new indications or safety updates for probably
18   I would say averaging 8 to 20 drugs at any given time,
19   of which there's probably three or four that are really
20   active and the rest it's more -- you know, there's not
21   as many things going on.
22   Q.    What about generic drugs?
23   A.    That's a whole different division.  And those
24   come in by the hundreds.
25   Q.    It's -- but it's part of the CDER, right,

David William Feigal, Jr., M.D., M.P.H.

Page 126

1  though?
2  A.    It is.  It's its own group.  And the generic
3  drugs, you know, do not review labeling at all, they
4  don't review safety at all.  They review whether a
5  product is bioequivalent, meaning if you take two
6  versions of the same drug, do you get the same blood
7  levels and is the manufacturing being done to FDA
8  standards.  That's the basis for the approval of a
9  generic drug.
10  Q.    Okay.  Back to your CV, it looks like you taught
11  a food and drug law class at Arizona State University?
12  A.    Yes.
13  Q.    Is that right?
14  A.    Yes.  I still do.
15  Q.    Okay.  Yeah.  It says 2005 to, nothing is in
16  there so --
17  A.    Yeah.  I've done that --
18  Q.    So you've been teaching that for the last 11
19  years or so?
20  A.    Yeah.  Whatever that is.  Yeah, 11 or 12.
21  Q.    And is that -- is there a law school at Arizona
22  State?
23  A.    Yes.  They're quite proud of it.  I know in the
24  East you probably don't even know that there's a
25  university called Arizona State.  But it does have a

Page 127

1  good law school and --
2  Q.    Is this course at the law school?
3  A.    Yes.  It's an elective course.  It's jointly
4  offered to law students and engineering graduate
5  students.
6  Q.    Okay.  And tell me a little bit about what you
7  teach in the food and drug law course.
8  A.    We -- it's an elective in both the engineering,
9  College of Engineering and the College of Law.
10       It's -- what we teach is basically how FDA, as a
11  consumer protection organization, is structured, how it
12  derives its authorities, what types of products it has
13  oversight for, and how it specifically interacts with
14  different types of products.
15       So we begin the course by presenting some of the
16  historical background on adulteration, which is really
17  what drove a lot of these issues in the 1800s and the
18  early laws in the 1900s and the push for accurate, truth
19  in advertising, if you will.
20  Q.    Uh-huh.
21  A.    So there you get misbranding.
22  Q.    Uh-huh.
23  A.    So we talk about those as being sort of the core
24  around -- authorities around which the FDA consumer
25  protections are built and then we spend several weeks on

Page 128

1  each product type.
2       So we'll talk how are drugs developed, what are
3  the rules for investigational drugs, what's the logic
4  for how they're done, how do the regulations actually
5  shape the science, the studies that are done.
6       And then we do the same thing with biologics and
7  with devices and combination products, and we talk about
8  how much of FDA's regulation revolves around rules
9  around labeling, which is, you know, in law speak,
10  speech.
11  Q.    Uh-huh.
12  A.    And that's actually FDA's probably principal
13  tool is regulating speech.  And we talk about -- there's
14  been a lot of developments and controversies over the
15  years of how speech is regulated by consumer protection
16  agencies.
17       And so we present that sort of framework, talk
18  about FDA's enforcement authorities, we talk about
19  manufacturing standards for different types of products,
20  we take a brief look at how other countries organize
21  their, you know, their efforts, some similar, some not
22  so similar.  We look at how FDA gets involved when
23  there's a public health crisis like a new epidemic or
24  something like that so -- and what does FDA do to
25  encourage development of products where there's unmet

Page 129

1  medical need.
2       So there's 13 two-hour lectures in the course
3  and the principal teachers for the last ten years have
4  been myself and a pharmacist/lawyer.  And so we have
5  kind of complementary backgrounds.  He teaches the
6  engineers a little bit about torts and to give them some
7  background and we talk about how preemption is a factor
8  in that.
9       The course is really more a health policy course
10  than a law school course, per se.  It's not taught like
11  a case law law course.
12  Q.    Uh-huh.
13  A.    It's really more kind of a blend of health
14  policy.
15       There are two very different groups of students.
16  Some of them know a lot of science and the other of them
17  know a lot of law and then they see kind of how the two
18  merge together.
19  Q.    Do you use a textbook in this course?
20  A.    We have.  We've used a textbook by Adams that's
21  published by the Food Drug Law Institute on FDA.
22       Frankly, we found it was too much law and not
23  enough of the science background so we largely teach the
24  course based on FDA documents and public documents and
25  when a topical issue arises, you know, such as

33 (Pages 126 to 129)

David William Feigal, Jr., M.D., M.P.H.

Page 130

1  compounding, for example, we'll even pull in the press
2  stories and the Center for Disease Control documents and
3  things.
4          So we have a tool called Blackboard, which
5  wasn't around in my day when I was a student, but it
6  allows the students to actually have access to reading
7  materials.  And so we have them read sections of the law
8  and sections of regulations and the guidances that all
9  fit together and then we usually try and find some
10 topical news stories and things to kind of put some
11 flesh on the bones.
12 Q.    Other than the Adams textbook, have you ever
13 used any other textbooks?
14 A.    No.  Some of the students follow Peter Barton
15 Hutt's book.  He's got a case law, case law book.
16         I taught an undergraduate version of the course
17 for a couple of years and we used, I think his name is
18 Hilt, but there was a book written with kind of more of
19 a lay perspective that we used when we taught it with
20 undergraduates.  And we didn't -- we didn't cover much
21 law.
22         That one really was looking at sort of just the
23 whole system and how the Government sets up
24 administrative agencies that have responsibilities that
25 are delegated to it by Congress and how that all works.

Page 131

1  Q.    And you mentioned your lawyer/pharmacist that --
2  A.    Yes.
3  Q.    -- co-instructs with you.
4          What's his or her name?
5  A.    His name is Roger Morris.  He's at Quarles.  So
6  he's another volunteer faculty like myself.
7  Q.    And you mentioned that he kind of provides the
8  insight on the tort law.
9  A.    Well, he does -- he's the lawyer of the two of
10 us, so if it's something that has to be framed in the
11 way that lawyers think about things, he does that part
12 of the lecturing, I bring the medical, the FDA, the
13 policy, the regulatory sides of things.  So we
14 complement each other pretty much.
15 Q.    And in this course do you teach or discuss the
16 difference between common law and FDA regulations?
17 A.    Very, very lightly.  We sort of talk about the
18 fact that there are these different -- particularly for
19 the engineers.  The law students probably know this.
20 But we talk about how there are different ways that the
21 law comes about.  Common law is one, legislation that
22 specifies certain things interacts with common law
23 but -- and then there's administrative law, which is
24 kind of an interesting body unto itself.
25         But that's probably a more advanced topic.  This

Page 132

1  is really -- you know, could be nicknamed FDA-101.  It's
2  similar to the courses that companies offer their
3  employees that are getting into regulatory except that
4  we do more deliberately sort of focus on the fact that
5  the law gives FDA certain authorities and then they have
6  to actually find ways to use those authorities to get
7  what they want done and how they -- and the rule-making
8  process and the transparency, which is unique in this
9  country compared to many other countries.
10 Q.    And you mentioned preemption before, which is a
11 legal concept.
12 A.    Yes.
13 Q.    And do you -- have you guys taught in this class
14 about, have you heard of a case called Wyeth v. Levine?
15 A.    Yes.  And Mensing and other things.
16         You know, in 2005 preemption was one of our more
17 boring topics.  It's gotten progressively more
18 interesting over the years, probably more to the faculty
19 than to the students.
20         So we introduce the concept that
21 there are times when the federal law preempts state
22 laws.
23 Q.    Uh-huh.
24 A.    And we don't really offer opinions about it, we
25 just really say this is -- these are the developments,

Page 133

1  these are -- this has been how it's been applied --
2  Q.    Uh-huh.
3  A.    -- and, you know, talk about some of the ways
4  that that influences consumers' ability to, you know,
5  seek remedies through the tort system as opposed to some
6  other mechanism.  So, yeah, it's been an interesting,
7  it's an interesting area.
8  Q.    And you understand that in Wyeth v. Levine the
9  Supreme Court has said the manufacturer is responsible
10 for its label; correct?
11 A.    Yes.  And I don't think FDA would have ever
12 disagreed with that.  It's that who is responsible.
13 They're also responsible to comply with the labeling
14 requirements of the Food, Drug and Cosmetic Act.  But it
15 is their label.  They're -- you know, I think I've said
16 in testimony that the buck stops with the company when
17 it comes to the label.
18 Q.    Uh-huh.
19         MR. JONES:  I have 12:26.  Do you want to go for
20 lunch now?
21         MR. SCHMIDT:  Sure.
22         MR. JONES:  I mean, this is a good breaking
23 point.
24         MR. SCHMIDT:  Sure.
25         MR. JONES:  All right.  Let's go off for lunch.

34 (Pages 130 to 133)

David William Feigal, Jr., M.D., M.P.H.

Page 134

1    VIDEO OPERATOR:  We are going off the record.
2    The time is 12:26.
3    (Luncheon recess, 12:26-1:21 p.m.)
4        AFTERNOON SESSION
5    VIDEO OPERATOR:  We are back on the record.
6    The time is 1:21 p.m.
7  BY MR. JONES:
8  Q.    Dr. Feigal, welcome back.  I hope you had a nice
9  lunch.
10 A.    Yes.  Thank you.
11 Q.    FDA regulations have the same binding force as
12 the law itself; correct?
13 A.    Generally speaking, yes, that's true.
14 Q.    Okay.  And failure of a product to meet these
15 standards is a violation of the law; correct?
16 A.    It can be, yes.
17 Q.    And do you agree that not all adverse effects
18 can be anticipated during clinical trials?
19 A.    Yes.
20 Q.    Let's talk about, what's an Investigational New
21 Drug Application?
22 A.    That is an application for FDA to seek
23 permission to conduct studies in humans for a drug which
24 is not approved for marketing in the United States.
25 Q.    And was there an IND submitted for Mirena?

Page 135

1  A.    Yes, there was.
2  Q.    And who submitted the IND for Mirena?
3  A.    You won't mind if I refer to my report.
4        But the initial IND was filed in 1983 by the
5  Population Council, which is a non-profit organization
6  that has developed some contraceptives over the years.
7  Q.    What do you know about the Population Council
8  other than that?
9  A.    I've had a little bit of contact with them over
10 the years.  I co-served as the head of an antimicrobial
11 contraceptive task force with someone from the
12 Population Council when I was in anti-viral drugs, but
13 my understanding is it's a non-profit organization that
14 helps develop contraceptive alternatives for women.
15 Q.    Who have you worked with from the Population
16 Council?
17 A.    You know, I've forgotten his name over the
18 years.
19 Q.    Did you -- are you aware that the Population
20 Council developed the Norplant implant device?
21 A.    I may have known that.  I don't recall if I knew
22 that or not.
23 Q.    Did you know that the Population Council had
24 developed the copper IUD ParaGard?
25 A.    No.  I may have known that.  I don't remember

Page 136

1  which -- other than the morning-after pill, I'm not sure
2  if I remember any other specific.  But I know that they
3  have been developing contraceptives for many years.
4  Q.    And did you review the Mirena IND before
5  preparing your report in this case?
6  A.    I did review selected summary documents that
7  described the IND and the early development when I
8  prepared my first report for Mirena last year.
9  Q.    How many pages is that IND?
10 A.    I don't know.
11 Q.    You reviewed the summary reports contained
12 within the IND?
13 A.    No.  What I reviewed is some of the key
14 documents from the NDA which describe the entire IND
15 process and the studies that were conducted under that
16 IND.
17 Q.    Okay.  So you did not review the actual IND?
18 A.    I don't recall if I had access to the actual
19 IND, but I had the descriptions at the time of the
20 approval of the product in the NDA documents.
21 Q.    Okay.  And what is an NDA?
22 A.    NDA is a New Drug Application.  So that's an
23 application if it's an initial IND for the first
24 authorization to market a drug in the United States.
25 Q.    Okay.  And it's the drug product's sponsor that

Page 137

1  submits to FDA an NDA containing the data that it has
2  gathered on the product's safety and effectiveness; is
3  that correct?
4  A.    Yes, that's part of what's in an NDA.
5  Q.    What else is in an NDA?
6  A.    Well, there are extensive records about the
7  manufacturing, there are animal studies that are used
8  for a variety of different kinds of purposes, there are
9  summaries of the clinical trials individually both with
10 respect to the effectiveness and the safety of the
11 product.
12     The various sections are organized into --
13 organized and described in different summaries, the
14 important ones for safety and effectiveness or the
15 Integrated Summary of Safety and the Integrated Summary
16 of Effectiveness.
17     And then the NDA also contains listings of the
18 original data that the patient, or if it's an animal
19 study at the animal level, and often contains -- and
20 today always contains data sets of that data for the FDA
21 statisticians to evaluate.
22 Q.    That sounds like a lot of data.
23 A.    They are.  They're big applications.
24 Q.    Okay.  And did you review the NDA for Mirena?
25 A.    I reviewed some of the summary documents that

35 (Pages 134 to 137)

David William Feigal, Jr., M.D., M.P.H.

Page 138

1   described the relevant portions of the NDA for my
2   opinions.
3       Q.   Other than the summary documents, did you review
4   the rest of the NDA?
5       A.   All of the different sections?  No, I did not.
6       Q.   Do you know how many pages the Mirena NDA was?
7       A.   I do not.
8       Q.   Do you know how many volumes the Mirena NDA was?
9       A.   No, not sitting here, I don't.
10      Q.   Do you -- can you approximate how many pages
11  would comprise the original Mirena NDA?
12      A.   No, I really don't have a way to do that because
13  I don't know the types of individual data that -- the
14  bulkiest part of the NDAs are the so-called raw data,
15  the individual data, but at this time period, in 2000,
16  it still wouldn't have contained all of the case reports
17  for them.  So I just don't have enough information to be
18  able to estimate what -- you know, what -- how many
19  volumes or the size of the application.
20      Q.   Do you agree that the ultimate purpose of the
21  review of the preclinical and clinical data contained
22  within the NDA is for FDA to review and ultimately
23  approve the product with a label that provides adequate
24  instructions for the safe and effective use of the drug
25  for the purposes indicated?

Page 139

1       A.   Long, long question.
2            Generally speaking, that is correct.  There's a
3   part of the statute that actually does refer to adequate
4   instructions for use but that pertains to
5   over-the-counter drugs.  But FDA's understanding of what
6   adequate instructions for use for a prescription product
7   is found in prescription drug labeling sections, 201
8   and 202.
9       Q.   When a product is -- when a New Drug Application
10  is submitted, it is based, in part, upon preclinical and
11  clinical studies conducted by the product sponsor;
12  correct?
13      A.   Yes, that's correct.
14      Q.   FDA doesn't do any of its own independent,
15  individual studies; correct?
16      A.   That's almost always true.  FDA does not do the
17  clinical studies or the animal studies.  The sponsor
18  does those and then FDA reviews the data and inspects
19  those studies.
20      Q.   In this case, FDA did not do any sort of
21  independent studies on Mirena before it was approved;
22  correct?
23      A.   Not to my knowledge.
24      Q.   Now, the contents of a label, they're initially
25  the result of discussions between the sponsor and the

Page 140

1   FDA; correct?
2       A.   Yes.
3       Q.   And I think you described it in your report as a
4   negotiation; is that correct?
5       A.   I may have used that word.  It's -- you know,
6   "discussion" is also a good word.
7            A label consists of a concise summary of
8   scientific evidence, and there is some discussion
9   between the manufacturer and the FDA on the best way to
10  summarize the information that's available.
11      Q.   But you used the word "negotiation" in your
12  report; right?
13      A.   I don't recall if I did.  But it's -- but I
14  would agree that it's not negotiation in the business
15  sense of trading this for that, it's really more of a
16  discussion of trying to develop a consensus, a consensus
17  on what is an adequate description, what is an adequate
18  summary of the scientific evidence on which the approval
19  is based.
20      Q.   Now, you say in your report at Page 5 that Phase
21  1 trials are small, closely monitored studies, usually
22  in normal volunteers, to learn how a drug is absorbed
23  and eliminated from the body and to determine doses for
24  further testing; is that correct?
25      A.   Yes.

Page 141

1       Q.   Okay.  And you say, typically, fewer than a
2   hundred subjects participate in Phase 1 trials; is that
3   correct?
4       A.   Yes, for most drugs that's typical.
5       Q.   Do you know how many subjects participated in
6   the Mirena Phase 1 trials?
7       A.   I don't know if -- I don't know if I described
8   that.  I really described Mirena from the standpoint of
9   the evidence that was available at the time of its --
10  time of its approval, and I do have the numbers of the
11  total number of patients studied from all the different
12  phases and in the pivotal trials but I don't know if I
13  broke out the Phase 1 trials separately.
14      Q.   Okay.  And you say, Phase 2 trials are the first
15  trials to evaluate the effectiveness of the drug for
16  patients with a particular condition.  These studies
17  often involve several hundred patients.
18           Is that correct?
19      A.   Yes, that's correct.
20      Q.   And it says, they are used to learn enough about
21  the drug to plan for larger trials in Phase 3 that will
22  study the safety and effectiveness of the drug for one
23  or more indications; is that correct?
24      A.   Yes, that's correct.
25      Q.   And do you have any idea as we sit here today

David William Feigal, Jr., M.D., M.P.H.

Page 142

1    how many subjects were involved in Mirena Phase 2
2    trials?
3    A.    No, I didn't break it out that way. I think
4    what I summarized is that the application contained 20
5    clinical trials and was based on total study of 3,021
6    patients.
7    Q.    Okay. And then you say that the purpose of
8    Phase 3 trials is to study the safety and effectiveness
9    of the drug for one or more indications; correct?
10   A.    Yes, that's correct.
11   Q.    And what indication was studied in the Mirena
12   Phase 3 trials?
13   A.    It was its indication as a contraceptive, to
14   prevent pregnancy.
15   Q.    It was not studied at that time for heavy
16   menstrual bleeding?
17   A.    Eventually, that is another indication that was
18   sought. I don't recall the timing. As I recall, that
19   was an indication which was obtained later.
20   Q.    Okay. And just so we're clear, at the time
21   Mirena was approved it was approved for contraception,
22   not for the treatment of heavy menstrual bleeding;
23   correct?
24   A.    I believe that's correct. I might need to
25   review the history. I focused on the initial approval

Page 143

1    and not on the subsequent approvals in my report.
2    Q.    And did you say something about you thought
3    there were about 20 trials that preceded the Mirena
4    approval?
5    A.    Yes.
6    Q.    Then you mentioned something about pivotal
7    trials?
8    A.    Yes.
9    Q.    And what are pivotal trials?
10   A.    Pivotal trials are usually the subset of trials
11   that form the basis for the evidence of effectiveness.
12       Safety is based on all the clinical trials but
13   effectiveness usually relies on one or more clinical
14   trials, Phase 3 clinical trials, that demonstrates
15   effectiveness.
16   Q.    So if I'm understanding you correctly, the
17   safety of the product and the warnings that are
18   ultimately included in the product's labeling are
19   determined from the company's experience in the 20
20   clinical trials that preceded approval.
21   A.    Yes. It would be their experience in -- it
22   would be their entire -- the safety would be based on
23   their entire body of studies.
24       Since this was a product that was marketed
25   outside the United States, it would also -- the safety

Page 144

1    evaluation at the time of the NDA approval would also
2    include evaluation of the marketing safety experience in
3    Europe, for example, as well.
4    Q.    And how many subjects did you say were
5    participants in the Mirena pre-approval trials?
6    A.    The safety -- the FDA's Integrated Summary or
7    the company's Integrated Summary of Safety described
8    safety based on 3,021 women in 20 clinical trials, 2,899
9    for women from contraceptive studies, with the remainder
10   being for studies of menorrhagia or endometrial
11   protection.
12   Q.    And are you sure that that 3,021 number doesn't
13   come from the pivotal trials versus the 20 trials that
14   you've discussed a moment ago?
15   A.    Yes. I describe -- in my report in the section
16   on effectiveness I describe the pivotal trials, and the
17   summary of effectiveness describes 17 trials of the 20
18   and they also described that the trials included 1,594
19   women from qualified sites, sites which where the
20   clinical trial standards met the same standards that a
21   U.S. study would meet.
22   Q.    Mirena is indicated for usage for a five-year
23   period; correct?
24   A.    Yes.
25   Q.    And how many of these 3,021 women were studied

Page 145

1    for a full five years?
2    A.    I'm not sure I noted that in my report, except
3    for effectiveness. Among the effectiveness patients,
4    there were 633 women of the 1,594 that completed five
5    years of study.
6    Q.    So this five-year product was approved based
7    upon a study containing only 633 women who used the
8    product for five years; is that correct?
9    A.    Yes, that's correct. It was a study of, you
10   know, close to 1,600 women but only 633 had used the
11   product for five years.
12   Q.    How many used the product for just one year or
13   less?
14   A.    I didn't break that out in my report. I would
15   have to go back to the document to look that up.
16   Q.    How many were -- of these women used the product
17   for two years or less?
18   A.    Again, I didn't look -- I didn't break that out.
19   I presented representative summary statistics of, you
20   know, the description of the effectiveness. So that
21   information I'm certain would be in the reports but I'd
22   have to go back to the reports to look for that
23   information.
24   Q.    What reports are you talking about?
25   A.    Well, the source I relied on is the Integrated

37 (Pages 142 to 145)

David William Feigal, Jr., M.D., M.P.H.

Page 146

1  Summary of Safety, which summarizes all of the studies,
2  rather than trying to compile the data from the
3  individual studies myself.
4  Q.    How many of these women were studied in the
5  United States?
6  A.    As I understand it, the majority of them were
7  not, that these were the studies that had been conducted
8  in Europe, where it was first approved.
9  Q.    How many of these women -- strike that.
10       Are you aware that certain study data was
11  excluded from full analysis because the studies were
12  conducted at unqualified sites?
13  A.    Yes. I mean, I described the fact that the
14  pivotal trials were based on qualified sites that met
15  certain criteria, that met U.S. standards. There were
16  other sites that, for different reasons, were not
17  considered, were not relied on for the effectiveness
18  because, one reason or another, that they didn't meet
19  U.S. standard for trials.
20  Q.    Do you believe a pharmaceutical product should
21  be approved based upon less-than-perfect data?
22  A.    Well, I think you always have less-than-perfect
23  data. It's a matter of judgment as to whether or not
24  the data is adequate to describe the effectiveness.
25       And the criteria for whether a site was

Page 147

1  qualified or not, as I understand it, was criteria that
2  FDA worked out with the company.
3  Q.    Does goodwill with the regulators ever come into
4  play in the product approval process?
5  A.    Well, I mean, I think companies do strive to
6  have a good relationship with FDA but I don't think FDA
7  tries to factor in whether there is goodwill or some
8  other kind of ill will with a company. They try and
9  look objectively at the information that's in the
10  application.
11  Q.    Do friendships between government regulators and
12  pharmaceutical companies develop from time to time?
13       MR. SCHMIDT: Objection. Vague.
14       THE WITNESS: I mean, there's a lot of people
15  in -- on both sides of the table. I'm certain that
16  there probably are friendships and that there are many
17  relationships who are -- they're cordial working
18  relationships.
19       (Exhibit Feigal-6 was marked for
20  identification.)
21       MR. SCHMIDT: What number are we at?
22       THE COURT REPORTER: Six.
23  BY MR. JONES:
24  Q.    Dr. Feigal, I've handed you an E-mail that we're
25  marking as Deposition Number 6.

Page 148

1  A.    Yes.
2  Q.    And I want to refer you to the E-mail towards
3  the bottom from Dr. Bettina Fiedler.
4       And this E-mail is talking about getting
5  approval in another country. And Miss Fiedler, can you
6  read what she says starting at "However" there in the
7  middle of the paragraph?
8  A.    However, you should be aware that the Berlex
9  regulatory affairs is currently going through a major
10  reorganization.
11  Q.    All right. No. The other "however" above that.
12  Here. You can see on the ELMO.
13  A.    Oh, up there. I'm sorry. There are several
14  howevers on this page.
15  Q.    Yeah.
16  A.    However, with regard to the U.S. submission of
17  Mirena, you should be aware of one big difference to
18  your situation in Japan. The FDA is highly interested
19  in getting the product onto the U.S. market, therefore,
20  they worked intensively with Berlex and Leiras to be
21  able to accept data that were not always so perfect.
22  Q.    Keep going.
23  A.    So the Berlex approach of the submission may not
24  be so helpful to you because it was based on some
25  goodwill from the authority, which I'm afraid the

Page 149

1  MHLW -- that's the Japanese FDA -- may not have towards
2  a fertility-control product.
3  Q.    Okay. Did you know, based upon your review of
4  the documents that you were provided in this case, that
5  the FDA was highly interested in getting the product
6  onto the market in the U.S.?
7  A.    Well, this isn't the FDA speaking, but FDA, in
8  general, is highly interested in seeing that new, safe
9  and effective products come on the market. It's not an
10  adversarial relationship.
11  Q.    Did you know from your review of the documents
12  that you were provided in this case that Bayer felt that
13  the FDA had worked intensively with Berlex and Leiras to
14  be able to accept the data that were not always so
15  perfect? Did you know that?
16  A.    Well, I was aware of the fact that FDA carefully
17  developed criteria for identifying clinical trials where
18  the sites met the U.S. standard and then didn't consider
19  the other sites' data for effectiveness, and so I
20  imagine that was a process where they had to work
21  closely together and intensely to see if there was
22  something that -- in those trials that could be used for
23  an approval decision.
24  Q.    Do you agree that the data submitted for the
25  approval of the Mirena product were not always so

38 (Pages 146 to 149)

David William Feigal, Jr., M.D., M.P.H.

Page 150

1  perfect?
2  A.    I don't know what this person meant, but if it's
3  simply commenting on the fact that some of the sites,
4  looking back over studies done over the past ten years,
5  didn't meet the standards for clinical trials at the
6  time of the approval, it may simply be referring to the
7  fact that there would be sites that would be relied on
8  and other sites which wouldn't be considered for
9  effectiveness.
10  Q.    Did you know, based upon your review of the
11  documents provided to you, that Bayer felt that the
12  approval of Mirena was based on some goodwill from the
13  authority, meaning the FDA?
14  A.    I'm -- I don't think it was based on goodwill.
15  I think it was based on the evidence, which is well laid
16  out in the summary documents.
17       I think the author here is commenting on the
18  country differences.  As I understand, Japan has been
19  very reluctant to approve hormonal contraceptives, and
20  condoms are the major form of contraception in Japan,
21  unlike this country.
22       So I think they're commenting on the fact that
23  the environment is different, going to a regulatory body
24  that approves hormonal contraceptives in many different
25  forms compared to a country that relies on barrier

Page 151

1  contraceptive methods.
2  Q.    So are you disagreeing with Bettina Fiedler, the
3  global regulatory affairs employee for the company, when
4  he or she says that the approval was based on some
5  goodwill from the authority?
6       MR. SCHMIDT:  Object to characterization,
7  foundation.
8       THE WITNESS:  Well, I think she's describing --
9  I mean, I don't know what she meant.  I don't.  I don't
10  know what she meant by that, but what she's describing
11  is the fact that there was data that wasn't relied on.
12  That's the data that's less than perfect.  That's part
13  of the record of the approval process.
14       If that's what she means by goodwill, then I
15  would agree that FDA was willing to accept historical
16  studies and to identify the subset of studies that met
17  FDA's current standards.
18       FDA could have taken a hard position and just
19  said, do the studies, do new studies and start over, but
20  they worked with the company to see if there were
21  studies that met the standards, found those studies, and
22  made a decision based on them.
23  BY MR. JONES:
24  Q.    Based upon some goodwill from the authority --
25  A.    No.  I don't think --

Page 152

1  Q.    -- according to Miss Fiedler.
2  A.    Well, I don't know what she means by goodwill,
3  but you can see that FDA did work with the company to
4  identify the subset of studies that they wished to
5  consider that they considered met FDA standards for
6  adequate and well-controlled trials to be the basis for
7  the effectiveness.
8  Q.    And just to be clear, you've never seen this
9  document before today; correct?
10  A.    Not that I recall.
11  Q.    It's not something that Bayer's lawyers provided
12  to you; correct?
13  A.    If they do, I don't recall having seen it.
14       MR. JONES:  And just for the record, we'll note
15  that that's Bates numbered MIR_PSEU_00546368.
16  BY MR. JONES:
17  Q.    Down towards the bottom of Page 6 of your report
18  you say, FDA employs a number of resources in reviewing
19  the NDA data, including a team of physicians and other
20  scientists who are experts in their respective fields.
21  This team prepares detailed reports in their area of
22  expertise based on their findings.
23       Are these the summary reports that you've
24  mentioned you reviewed earlier?
25  A.    No.  The documents that I'm -- the ISS and the

Page 153

1  ISE are actually the company documents.
2       FDA has reviews of those documents, and I read
3  those as well, but I -- for the description of what was
4  in the ANDA, I took that from the company's summaries.
5  Q.    Okay.  It says, these reviews and reports may
6  contain conclusions and recommendations of the
7  individual reviewers at the time they are written but do
8  not necessarily represent the final FDA position; is
9  that correct?
10  A.    Yes, that's correct.
11  Q.    Your next sentence you say, during the review
12  process, FDA has complete access to all of the data from
13  the studies in the NDA either as submitted at the time
14  of filing or per FDA's request to the NDA applicant.
15       Did I read that correctly?
16  A.    Yes.
17  Q.    Do you know, based upon your review of the
18  documents in this case, whether FDA had complete access
19  to all of the data from the studies in the NDA or
20  whether they had requested it at some point?
21  A.    Well, there certainly were both.  I think that I
22  described that during the NDA, the company submitted 41
23  supplements.
24       So supplements typically contain additional
25  information or analyses or data that FDA requests.  So

David William Feigal, Jr., M.D., M.P.H.

Page 154

1  there's, you know, evidence that it was a very
2  interactive process, that FDA used not only the NDA but
3  requested additional information and it was submitted 41
4  different times.
5      Q.    Did FDA have access to the case reporting forms
6  from the studies that were listed in the NDA?
7      A.    I would -- I don't know. I don't know directly
8  which case reports. There are always some case reports
9  that are included but I don't know if this application
10  had all case reports.
11     Q.    And when I say "case reports," I'm talking about
12  the case report forms.
13          You know what that is; right?
14     A.    Yes. Right. The raw data from the
15  individual --
16     Q.    Right.
17     A.    -- trial participants. Yes.
18     Q.    Does FDA engage in a risk/benefit assessment
19  during its new drug approval process?
20     A.    Yes.
21     Q.    Okay. And I believe you said that this
22  risk/benefit assessment is conducted with every FDA
23  approved on the market and is a crucial element of the
24  drug approval process; is that correct?
25     A.    Yes.

Page 155

1      Q.    And so we're talking about Mirena, a
2  contraceptive; right?
3      A.    Yes.
4      Q.    Okay. Were there other contraceptives on the
5  market at the time Mirena was approved?
6      A.    Yes.
7      Q.    There were oral contraceptives; right?
8      A.    Yes.
9      Q.    Norplant was still on the market in the U.S. at
10  that time; correct?
11          MR. SCHMIDT: Bless you.
12          THE WITNESS: I don't recall the year Norplant
13  was withdrawn but --
14  BY MR. JONES:
15     Q.    If you don't know, that's fine.
16     A.    Yeah.
17     Q.    ParaGard, the copper IUD, that was on the market
18  at the time; right?
19     A.    There were copper IUDs on the market at the
20  time, yes.
21     Q.    Copper IUDs have been on the market in the U.S.
22  since the 1980s; right?
23     A.    Yes.
24     Q.    And a copper IUD is a non-hormonal IUD; right?
25     A.    That's correct. I think there were -- I think

Page 156

1  the Copper T was actually on the market in the 1970s.
2      Q.    And the Mirena, that's a hormonal IUD; right?
3      A.    That's correct.
4      Q.    And it releases a potent synthetic progestin
5  called levonorgestrel; correct?
6      A.    That's correct.
7      Q.    And do you agree that there is systemic
8  circulation of levonorgestrel in Mirena users?
9      A.    Yes.
10     Q.    And you agree that Mirena users experience
11  systemic hormonal effects as a result of their use of
12  the IUD; correct?
13          MR. SCHMIDT: Objection. Characterization.
14          THE WITNESS: They can. There may be systemic
15  effects. It does circulate systemically, yes.
16  BY MR. JONES:
17     Q.    This process of the risk/benefit assessment,
18  that continues to occur throughout the life of the drug;
19  correct?
20     A.    Yes, that's correct.
21     Q.    As the company receives reports of adverse
22  effects, they are to continue balancing the risks versus
23  the benefits; correct?
24     A.    Yes, that's correct.
25     Q.    And do you agree that once a drug is on the

Page 157

1  market, the number of patients who take the drug expands
2  from a few hundred or a few thousand patients in the
3  clinical trials to tens of thousands or even millions of
4  patients who are prescribed the drug?
5      A.    Yes. I think I've written that or something
6  similar to it in my report.
7      Q.    I think that's straight from your report.
8          And do you -- I think we talked earlier about
9  all adverse effects can't be expected to be picked up in
10  pre-approval trials; correct?
11     A.    That's correct.
12     Q.    Okay. And so isn't it true that there's a
13  period of time as a drug develops more users and more
14  usage that new adverse effects may come to the attention
15  of the manufacturer?
16     A.    Yes, that's correct.
17     Q.    And those manufacturers are supposed to receive
18  that information and determine whether or not an update
19  to their label is necessary; correct?
20     A.    Yes, that's correct.
21     Q.    And at all times while their product is on the
22  market, a drug manufacturer is responsible ultimately
23  for its label; correct?
24     A.    That is correct.
25     Q.    And when you're talking about premarket studies,

David William Feigal, Jr., M.D., M.P.H.

Page 158

1  isn't it true that this testing is conducted in a
2  limited number of patients; correct?
3      A.    Well, relative to the eventual use, that is
4  correct.  Sometimes it's a very large number of
5  patients, but compared to the use once the product is
6  approved, it is limited, yes.
7      Q.    Okay.  And these premarket studies are conducted
8  on a population that's relatively healthy; correct?
9          MR. SCHMIDT:  Object to characterization.
10         THE WITNESS:  Generally speaking.  Not always.
11  But for a product to be used by healthy people, it
12  certainly would be conducted in healthy people, yes.
13  BY MR. JONES:
14     Q.    Well, isn't it true that many of these studies
15  actually have exclusion factors where they keep people
16  out that have certain health conditions?
17     A.    Yes, that's correct.
18     Q.    And they have inclusion factors where they bring
19  in individuals to study that they would like to study in
20  a product; correct?
21     A.    Yes, that's generally true.  It varies from
22  product to product and who the target users are.  But it
23  is true that the studies try to remove some of the
24  sources of variation, variability, such as patients who
25  have other conditions going on that complicate the

Page 159

1  interpretation of the studies.
2      Q.    Do you know what percentage of women studied in
3  the premarket studies for Mirena would be classified as
4  overweight or obese?
5      A.    I don't think I know that.  I don't think I know
6  that number.
7      Q.    Would you agree that it's a relatively small
8  percentage of the women studied?
9          MR. SCHMIDT:  Objection.  Foundation.
10         THE WITNESS:  I don't think I know one way or
11  the other.  It depends on the setting where the studies
12  are being conducted, and rates of obesity vary in
13  different populations and different ages and with
14  socioeconomic status, so I just don't know one way or
15  the other.
16  BY MR. JONES:
17     Q.    What is post-marketing surveillance?
18     A.    It's a required activity of companies with
19  products on the market, where they collect information
20  about the reports of potential adverse reactions and
21  look for other ways that -- to identify safety
22  information.
23     Q.    And this information includes spontaneous
24  reports from -- of individual cases from health-care
25  practitioners; right?

Page 160

1      A.    Yes, it does.
2      Q.    Patients?
3      A.    Patients?  Yes.  It -- patients do directly
4  report both to the company and to the FDA.
5      Q.    Okay.  The name Foreign Adverse Experience
6  Reports, are those part of the post-marketing
7  surveillance?
8      A.    Yes.  The company is responsible for analyzing
9  all of those.  The FDA actually identifies which types
10  of foreign information it would like to have submitted
11  and in different settings.  So there are slightly
12  different rules for foreign reports than U.S. reports
13  but the company's responsibility is to know about it all
14  and then there's rules about which ones get submitted to
15  FDA and how.
16     Q.    They're supposed to know about all of the
17  information that's out there?
18     A.    No matter how they learn of it, the company is
19  responsible to know about the safety information for
20  their product, whether it's from patients, foreign, from
21  health-care providers or even from lawsuits.
22     Q.    Right.  Clinical trials?
23     A.    From clinical trials.
24     Q.    Information from the medical literature?
25     A.    Yes.

Page 161

1      Q.    You mentioned lawyers and lawsuits; right?
2      A.    Yes.
3      Q.    And is -- do you put less credence in a report
4  of an adverse event that is learned from a lawyer versus
5  someone else?
6      A.    No.  The credence of the report should be based
7  on the content of the report, not who reported it.
8          So there are reports that are incomplete and
9  difficult to interpret that come from lawyers and ones
10  that come from doctors and so forth.  So you judge each
11  report in terms of what you know about it.
12         There may be limitations in getting follow-up
13  information when there's lawsuits involved but --
14  compared to a report from a patient or a doctor but the
15  credibility of the report depends on the quality of the
16  report.
17     Q.    Well, as it relates to lawyers and the
18  follow-up, isn't it true that it might actually result
19  in more information because the lawyers can provide
20  copies of their client's medical records?
21     A.    It can.  It -- the way that the privacy laws
22  allow post-market surveillance where the patient doesn't
23  give their consent to have their medical history shared
24  with a drug company, which I think would surprise a
25  certain number of patients, but the context for that is

David William Feigal, Jr., M.D., M.P.H.

Page 162

1    that the company may seek follow-up from the party that
2    reports the problem but they are not allowed to contact
3    anybody else who they may know of who might have more
4    information.  They always have to work with the
5    reporter.
6         So it will -- reporters vary, no matter who they
7    are, in terms of their ability or willingness to provide
8    additional information.
9    Q.    Can the FDA ask the individual reporter for
10   permission to contact his or her health-care providers?
11   A.    Well, could they is an interesting question.
12        It's not part of the practice because the
13   privacy laws, which are, have the nickname of HIPAA,
14   actually have a very specific description of how you can
15   get information for a post-market report and it limits
16   it to seeking information from the reporter.
17        I think that FDA or the company can always
18   request that a reporter could ask other people to
19   contact FDA and to become a reporter themselves but
20   there are certain rules about how this is done.
21        And then other countries have rules, some of
22   them even much stricter than the U.S., about privacy.
23   In some countries, doctors are not allowed to actually
24   report to the companies, they have to report to the
25   government.  So it just varies on who the report is

Page 163

1    from, the circumstances.
2    Q.    With all due respect because you worked at the
3    FDA, that seems silly to me.  It seems like it ties the
4    FDA's hands a little bit.
5         Is that a fair characterization?
6    A.    Well --
7         MR. SCHMIDT:  Object to form.
8         THE WITNESS:  No, I don't think so.  I think
9    that -- I think what it is is it -- and, you know, it's
10   not part of the -- it's not part of FDA's law, it's part
11   of HIPAA, it's part of the health privacy laws that are
12   part of HIPAA, is that it balances the public health
13   need for reports with the patient's need for privacy.
14   BY MR. JONES:
15   Q.    Now, a pharmaceutical company, when they receive
16   a report from a consumer, are they also limited only to
17   talking with the consumer about the report?
18   A.    No.  To the reporter.  So if it's a consumer,
19   they can talk to the patient, if that's the reporter.
20   Q.    Right.
21   A.    If it's a doctor, they can only talk to that
22   doctor and they can only request additional information
23   from that doctor.  And that doctor has no limitations on
24   what they can provide, it's just they have to -- they're
25   the only person the company, under the rules, can ask

Page 164

1    for more information in post-market surveillance.
2    Q.    Could a pharmaceutical company ask a patient for
3    a HIPAA release to talk to his or her other doctors?
4    A.    That's probably a legal question that I just, I
5    don't know the -- I don't know the answer.
6         One, I don't offer legal opinions as an expert.
7    But I think that's a legal issue around what is
8    permissible and whether or not that would be something
9    that's trying to subvert the privacy balance that's
10   built into HIPAA.
11   Q.    Maybe that would be a good topic for your food
12   and drug law class.
13   A.    It is an interesting topic.
14   Q.    Serious and unexpected adverse events must be
15   reported within 15 days of receipt by the manufacturer;
16   correct?
17   A.    That's correct.
18   Q.    And those are known commonly as 15-day reports?
19   A.    Yes.
20   Q.    And do you agree that the purpose of spontaneous
21   reporting systems is to detect a signal of a previously
22   unknown potential association between an adverse effect
23   and a drug?
24   A.    Yes.
25   Q.    And beyond examining individual spontaneous

Page 165

1    reports, signal evaluation may include epidemiological
2    studies, research on the pathophysiology of the adverse
3    reaction and, where feasible, clinical trials; correct?
4    A.    Yes, those are all things you can do.  Yes.
5    Q.    And another important source of safety
6    information comes from clinical trials and other studies
7    conducted after the initial market approval; correct?
8    A.    Yes, that's correct.
9    Q.    And even Phase 4 studies or post-marketing
10   commitments.
11   A.    Yes, that's correct.
12   Q.    Now, in addition to clinical trials, there may
13   also be publications of individual patients or series of
14   patients thought to have had adverse experiences from a
15   drug or from related drugs; correct?
16   A.    Yes, that's correct.
17   Q.    And do you agree that it's well known and
18   understood that additional information about the
19   benefits and risks of medicines will become available
20   after they're approved and that the evaluation of that
21   information is an ongoing process?
22   A.    Yes.
23   Q.    Now, you talk about hierarchy of evidence, of
24   scientific evidence; right?
25   A.    Yes.

42 (Pages 162 to 165)

David William Feigal, Jr., M.D., M.P.H.

Page 166

1    Q.    There is a recognized hierarchy of scientific
2    evidence relevant to the assessment of drug safety;
3    right?
4    A.    Yes.
5    Q.    And while it may be at the bottom, spontaneous
6    reports are part of that hierarchy of evidence; correct?
7    A.    Yes, they play a role, particularly in providing
8    a signal and identifying a safety, potential safety
9    issue that needs follow-up.
10   Q.    And would you agree that infrequent or rare
11   adverse reactions are often described initially by
12   individual case reports either reported to the company
13   or FDA or published in medical literature as a case
14   series after the product enters the market?
15   A.    Yes, I would agree with that.
16   Q.    And you agree that a PTC is a rare event;
17   correct?
18   A.    Yes, it is.
19   Q.    Do you agree that, when performed properly,
20   case-control studies are the best method to determine
21   whether there's an increased risk of infrequent adverse
22   events associated with a drug?
23   A.    Yes, when well conducted, when well performed,
24   they are one of the better sources of information about
25   rare events.

Page 167

1    Q.    And when both the drug use is infrequent and the
2    adverse event is rare, the very large
3    pharmacoepidemiology databases may be the only practical
4    method to assess the risk; correct?
5    A.    Yes, that's correct.
6    Q.    And are you aware of private companies that
7    provide access to information from regulatory adverse
8    event databases like FDA and WHO?
9    A.    Yes, there are open source, if you will.  I'm
10   not quite sure of the -- who -- the structure of all of
11   the organizations that provide them, but there are
12   open-source tools for searching regulatory databases and
13   adverse experience databases.
14   Q.    Well, let me make sure that we're talking about
15   the same thing.
16         I understand that there are companies out there
17   that will sell subscriptions that a company can buy that
18   would allow them to, basically, search FDA adverse event
19   data; is that correct?
20   A.    Yes, there are.  The FDA makes the data
21   available publicly, you know, on a quarterly basis, and
22   so many companies construct their own databases, but
23   they may choose to use the services of a contractor.
24   Q.    They don't make it real easy to see the
25   information, do they?

Page 168

1         MR. SCHMIDT:  Object to characterization.
2         THE WITNESS:  The downloadable forms are
3    deconstructed, if you will.  You have to put it back
4    together yourself.  And they're very large and they're
5    cumbersome and it's challenging to set it up right to
6    get the information that you want.  But it is relatively
7    straightforward but there's -- it's tedious, at best.
8         MR. JONES:  Yeah.  I actually, point of
9    interest, I had a -- hired a software developer to
10   build me a database --
11        THE WITNESS:  Uh-huh.
12        MR. JONES:  -- so I could look at it.
13        THE WITNESS:  Yeah.  Well, you know firsthand
14   that the definitions change for the fields, the fields
15   move --
16        MR. JONES:  Uh-huh.
17        THE WITNESS:  -- and there are other challenges
18   as well.
19   BY MR. JONES:
20   Q.    Now, you mentioned that some companies will
21   construct their own databases to be able to review the
22   FDA adverse event information; is that correct?
23   A.    Yes.
24   Q.    Did any of the companies that you worked at have
25   such a database?

Page 169

1    A.    No, neither Elan nor Amgen had such a database.
2    Q.    Do you know whether Bayer has such a database?
3    A.    I do not.
4         Generally, when you're dealing with your own
5    products, you use your own database, and I don't know if
6    they also -- I didn't see anything that indicated that
7    they had an in-house copy of the AERS, now called FAERS,
8    database.
9    Q.    Do you know if they have a subscription to be
10   able to search through the FDA database?
11   A.    I don't know.
12   Q.    You mentioned earlier something along the lines
13   of a company as part of their post-marketing
14   surveillance should be looking for anything that's out
15   there that relates to the safety of their product.
16        Do you remember talking about that?
17   A.    Yes.
18   Q.    Okay.  And would that include looking at the
19   FAERS database?
20   A.    It could.  It depends on the -- it depends on
21   the product and depends on the reporting patterns.
22        90 percent of the reports, on average, that are
23   in FAERS have come from the companies who are
24   responsible for the products.  So, generally speaking,
25   the company databases are pretty complete, plus they

43 (Pages 166 to 169)

David William Feigal, Jr., M.D., M.P.H.

| Page 170 |
| --- |

1  have reports which FDA does not request as part of
2  FAERS. So the company database is typically larger than
3  the FAERS database, although there's always something in
4  FAERS that may not -- the company may not have.
5  Q.    Did you know that in this case that Bayer didn't
6  look at the FAERS database regarding Mirena and PTC
7  until 2015?
8      MR. SCHMIDT: Object to characterization.
9      THE WITNESS: I'm not -- no, I don't know if I
10  know when they first looked at it. No.
11  BY MR. JONES:
12  Q.    Did you know that when Bayer looked at the FAERS
13  database in 2015, that they actually found cases in
14  FAERS that were not part of their database?
15  A.    I don't recall if I knew that, but I would
16  expect that to be the case. There would always be a
17  small percentage of reports that went directly to FDA.
18  Q.    Did you know that it was not part of their, of
19  Bayer's pharmacovigilance practices prior to 2015 to
20  review the FAERS database?
21      MR. SCHMIDT: Object to form and foundation.
22      THE WITNESS: I don't. No, I don't think I've
23  seen any company SOPs about what their standard
24  practices were.
25      MR. JONES: Yeah, I was going to ask you that.

| Page 171 |
| --- |

1  You jumped ahead of me.
2  BY MR. JONES:
3  Q.    Have you reviewed any of Bayer's
4  pharmacovigilance standard operating procedures, or
5  SOPs?
6  A.    No, I have not. I have reviewed the analyses
7  themselves but not the SOPs.
8  Q.    The SOPs weren't provided to you by Bayer's
9  lawyers?
10  A.    No. And I didn't request them.
11  Q.    When you're evaluating whether or not a
12  pharmacovigilance department interacted appropriately
13  with the FDA, don't you think that it would be important
14  to know what their standard operating procedures are?
15      MR. SCHMIDT: Object to form.
16      THE WITNESS: In some circumstances. But I
17  think here I think that the documents of the analyses
18  that they did, by my review, were adequate.
19  BY MR. JONES:
20  Q.    Other than the FAERS database from FDA, what
21  other safety databases are available from government
22  regulators worldwide?
23  A.    Well, there is a -- there's a European database.
24  There's actually different names for it. But one of the
25  databases is maintained in Sweden and it has a

| Page 172 |
| --- |

1  collection of adverse experiences from different
2  regulatory bodies. The FDA reports make up about 60
3  percent of the reports in the database but the other 40
4  percent come from other countries.
5  Q.    And what's the name of that database?
6  A.    It's part of the EudraVigilance system. WHO is
7  responsible for it. I can't think of the exact name at
8  the moment, but it's the system that's based in Sweden.
9  Q.    Is it the one from the Uppsala Monitoring
10  Centre?
11  A.    Yes, it's in Uppsala, Sweden.
12  Q.    Okay. Did you say EudraVigilance?
13  A.    Well, EudraVigilance is one of the descriptions
14  of the European pharmacovigilance databases.
15  Q.    Do you know, does Eudra, is EudraVigilance and
16  WHO the same data source or does EudraVigilance feed
17  into WHO? Do you know?
18  A.    My understanding is EudraVigilance feeds into
19  WHO, but I'd have to review to see the exact
20  relationships. But there is -- the Swedish database is
21  the other large database.
22  Q.    So is the Swedish database something different
23  from WHO?
24  A.    No. That's the WHO-sponsored --
25  Q.    Okay.

| Page 173 |
| --- |

1  A.    -- database that has U.S. and other country data
2  in it.
3  Q.    Do you know what other countries report to WHO?
4  A.    My understanding is that it -- it's -- the next
5  largest collection come from the European Union. I
6  don't -- I'm not sure what the reporting rate is for
7  different countries.
8  Q.    Can you turn to Page 12 of your report.
9  A.    Okay.
10  Q.    Okay. This is -- this isn't very helpful for me
11  to read it sideways.
12  A.    I have it in front of me if -- but --
13  Q.    This is the -- this is from Page 12 of your
14  report, the "Hierarchy of Study Design and Evidence For
15  Drug-Associated Adverse Effects."
16      Did I read that correctly?
17  A.    Yes.
18  Q.    Now, did you make this chart or did you pull
19  this from somewhere?
20  A.    No. I made this chart.
21  Q.    Okay. And "Hierarchy of Designs (Strongest to
22  Weakest)," and then you have, "Adverse Effects assessed
23  prospectively before adverse event?" "Controls for
24  selection Bias/and Ascertainment Bias?" "Can estimate
25  relative risk or hazard compared to control group?"

David William Feigal, Jr., M.D., M.P.H.

Page 174

1    And, "Can study rare events?"
2         Did I read that correctly?
3    A.    Yes.
4    Q.    Okay.  And so it -- as it relates to pseudotumor
5    cerebri, we've established that's a rare event; right?
6    A.    Yes.
7    Q.    Okay.  So a randomized, controlled trial is not
8    going to work to study that rare event; correct?
9    A.    That's correct.  They just can't be big enough.
10   Q.    Okay.  And registries or uncontrolled cohort
11   studies, that's not going to work either; right?
12   A.    That's correct.
13   Q.    Okay.  And then you say maybe for controlled
14   cohort studies, enroll patients starting a new drug and
15   compare it to similar patients not taking the drug.  You
16   say maybe.
17        Why maybe on that?
18   A.    Well, for registries and other uncontrolled
19   cohorts, the biggest -- well, there's two issues, but
20   one of the more important ones is that even for two
21   drugs in the same class, the types of patients that are
22   prescribed one drug versus another may be very
23   different.
24        So, for example, you know, relevant to Mirena,
25   if there's a condition that's associated with obesity

Page 175

1    and there's recommendations to use IUDs in obese women,
2    then even if you put together a cohort of, say, oral
3    contraceptive users and Mirena users, you would have --
4    you wouldn't have controlled the selection bias.  The
5    patients would have been selected for a risk factor for
6    a condition.
7         So there are ways that you can, with registries
8    that you can try and match participants with one
9    exposure to another but it's not done very often.  Those
10   are called case cohort studies.
11        So, generally speaking, you can't really control
12   why the patient got the drug.
13   Q.    I think you've been talking about registries and
14   other controlled cohort studies; right?
15   A.    Oh, okay.  Where were you?
16   Q.    Yeah.  See, look up -- I'm up here on the
17   screen.
18   A.    Oh, okay.
19   Q.    You had "no" there so you can't --
20   A.    Yeah.
21   Q.    I was up above that, the controlled cohort
22   studies.  You said maybe --
23   A.    Oh, yeah.
24   Q.    -- on can study rare events.
25        Why maybe?

Page 176

1    A.    It may be that you have a circumstance of a very
2    high-risk patient population that you could enroll in
3    the cohort that has a high -- where the rate becomes
4    common enough that you could study it.
5    Q.    Okay.  Would a -- how many individuals would it
6    take in a controlled cohort study to study a rare event?
7    A.    It depends how enriched the population would be
8    by your -- by the types of patients that you enrolled.
9         So if the condition was -- you know, let's say
10   that the clinical trial was 20 times too small but you
11   could enrich the population in a cohort study to have
12   the condition occur 20 times more often, then you may
13   well be able to actually study it in that kind of a
14   setting.
15   Q.    And when you say enrich it, you mean enroll
16   people that would be more at risk for the adverse event
17   that you were studying.
18   A.    Yes.  For example, when they're studying heart
19   disease, if you enroll smokers with high blood pressure
20   and high cholesterol, you'll find more -- you'll see
21   more heart attacks than you would if you just enrolled
22   all comers taking the drug from the general population.
23   Q.    Okay.  I know from reading your report that you
24   believe that obesity -- overweight and obesity and
25   recent weight gain are risk factors for developing PTC;

Page 177

1    right?
2    A.    Yes.
3    Q.    Okay.  So let's use that example and focus on
4    the second category here.
5    A.    Yes.
6    Q.    You agree that not everyone who is overweight or
7    obese develops PTC; correct?
8    A.    That's right.  It's still relatively rare.  It's
9    20 times more common than non-obese but 20 times rare is
10   still rare.
11   Q.    Yeah.  We'll talk about those numbers in a bit
12   but --
13        So from a percentage-wise, how many -- what
14   percent of overweight or obese women ultimately end up
15   developing PTC?
16   A.    Oh, from a percentage it's still well, well
17   under -- I mean, if the rate is one in a hundred
18   thousand for non-obese, approximately, or two in a
19   hundred thousand, it's -- you know, we can discuss what
20   the correct number would be but, you know, it could be
21   as high as 20 per hundred thousand, but that's still
22   pretty rare when you talk about how many patients you'd
23   have to enroll to find PTC in cases.
24   Q.    Right.  So for purposes of studying PTC and
25   obesity, the controlled cohort study that you say maybe

45 (Pages 174 to 177)

David William Feigal, Jr., M.D., M.P.H.

Page 178

1  can be used to study an adverse event or a rare adverse
2  event, it's not really practical.
3      A.   It doesn't work here, no.  That's right.
4      Q.   Okay.
5      A.   That's right.
6      Q.   And so then the --
7          MR. JONES:  How much time do we have left?
8          VIDEO OPERATOR:  Two minutes.
9          MR. JONES:  I don't think we can get through the
10  next one in two minutes.
11         THE WITNESS:  All right.
12         MR. JONES:  He only has two minutes on the tape.
13         THE WITNESS:  Sure.
14         MR. JONES:  So let's take a break.
15         THE WITNESS:  Okay.
16         VIDEO OPERATOR:  We are going off the record.
17  This is the end of Media Number 2, and the time
18  is 2:24 p.m.
19         (Recess, 2:24-2:41 p.m.)
20         VIDEO OPERATOR:  This is the beginning of Media
21  Number 3.
22         We are back on the record at 2:41 p.m.
23  BY MR. JONES:
24      Q.   Dr. Feigal, we're back from break with a new
25  videotape.

Page 179

1          Let's go back up to the controlled cohort
2  studies that we were talking about, the second box.
3      A.   Sure.
4      Q.   That would be a prospective study; correct?
5      A.   Right.  And a cohort usually implies an exposure
6  cohort, so you'd prospectively follow Mirena patients to
7  see if they developed IIH.
8      Q.   And you couldn't ethically put individuals in a
9  prospective controlled cohort study without advising
10  them that you were studying the risk of pseudotumor
11  cerebri and whether or not they would develop it;
12  correct?
13     A.   Generally speaking, that would be correct.  You
14  generally disclose the purpose, the research purposes,
15  of the study to the study participants.
16     Q.   I mean, by and large, when you're looking at
17  studying a potential association between levonorgestrel
18  and PTC, you don't have a choice but to do a
19  retrospective study, ethically; correct?
20     A.   I think you could do them prospectively but the
21  condition is so rare that I would agree with you that
22  the only studies that are feasible are retrospective
23  studies.
24     Q.   Okay.  Then going down to the next box, we have,
25  "Case-Control Studies (enroll patients who have already

Page 180

1  had an adverse effect and compare similar patients
2  without the adverse effect and look back to see drug
3  use)."
4      A.   Yes.
5      Q.   Is that correct?
6      A.   Yes, that's correct.
7      Q.   Okay.  And you have that that -- you can use
8  that kind of case-control study to study a rare event;
9  correct?
10     A.   Yes.
11     Q.   And that kind of study can estimate the relative
12  risk or hazard compared to the control group; right?
13     A.   Right.
14     Q.   And you have maybe controls for selection bias
15  and maybe controls for ascertainment bias; right?
16     A.   Yes.
17     Q.   Okay.  So explain that to me.
18     A.   Well, people who have a -- you know, here you're
19  studying people who have a condition like PTC and people
20  who don't, and when you're trying to evaluate the two
21  groups of patients, just by virtue of the fact that the
22  person has the condition, they may have had different
23  medical care, they may have had more interactions, they
24  may be -- have been exposed to more drugs because of
25  their underlying condition.

Page 181

1          If you were looking at PTC in general, not just
2  with -- as a risk for Mirena, you would probably be
3  studying men and women and yet if the question was about
4  Mirena, you would really only be interested in the
5  women.
6          So you have to make sure that the selection of
7  cases is representative and the selection of controls is
8  as comparable as though you had set up a cohort study
9  years ago and when them forward.
10         And there are examples from the literature where
11  they looked at dietary risk factors, for example, for
12  pancreatic cancer but the controls came from the GI
13  practice and the GI practice took care of many patients
14  who were put on special diets.
15     Q.   Uh-huh.
16     A.   So then the pancreatic cancer patients generally
17  had not been put on special diets and so they tended to
18  show that -- in that particular study they raised the
19  question of whether caffeine caused pancreatic cancer.
20  But it was selection bias because the controls were a
21  group that had been advised not to drink coffee because
22  they had ulcers, for example.
23     Q.   Okay.  So --
24     A.   So that's just an example of -- you just have to
25  pay a lot of attention to the details to make sure that

David William Feigal, Jr., M.D., M.P.H.

Page 182

1    your cases and controls are representative of their, you
2    know, respective populations.
3    Q.    So selection bias is, you want to figure -- you
4    want to try to do your best to find cases and controls
5    that are pretty daggone similar?
6    A.    Well, you want them to be each representative of
7    their own population. So you've got the cases -- you've
8    got the population that has the disease. You want your
9    cases to be typical of those patients.
10   And then the controls are supposed to be
11   comparable. Maybe they're supposed to be the same age,
12   same age and sex. You know, you might control for that,
13   but in other respects you want them -- you don't want
14   them to be different in some way because, you know, in
15   my example of trying to study diet in a population who
16   had been put on special diets, they don't represent the
17   general population's eating.
18   Q.    Uh-huh.
19   A.    So that's why you -- that's why selection
20   matters.
21   Q.    So on selection bias, what's the process for
22   trying to minimize selection bias? What are good
23   methods for developing a study that's going to minimize
24   selection bias?
25   MR. SCHMIDT: Objection. Vague.

Page 183

1    THE WITNESS: Well, you'd start with your cases
2    and you'd say, what are the cases that I want to study
3    and is there a way that I can select a representative
4    sample?
5    So if, for example, you've got -- you're at a
6    university and the only -- you only see the most severe
7    and unusual cases and all the milder ones are out in the
8    general practices, you'd want a way to find, to select
9    your cases from that whole, not just the university but
10   from the general practice. In other words, you'd only
11   be looking at part of the spectrum of the disease.
12   With respect to the controls, you want to make
13   sure that the controls are the appropriate control
14   group. You want them to be the same kinds of patients
15   as the cases, except that they didn't develop the
16   disease, PTC in this case.
17   And so if PTC can, you know, develop in a
18   healthy person, for example, then you want to make sure
19   that your controls could -- you know, largely reflected
20   a healthy population.
21   That's often a challenge for hospital-based
22   studies and medical records systems because the more
23   interactions you have with a health-care system, the
24   more times you're hospitalized or things, more likely
25   you're not an average, healthy person --

Page 184

1    MR. JONES: Uh-huh.
2    THE WITNESS: -- that you're part of that
3    spectrum that is more complicated.
4    BY MR. JONES:
5    Q.    So that's the challenge to case controls is
6    to -- one of the papers that was written years ago about
7    this is the problem of spectrum and bias, being the
8    right spectrum of patients and not being biased in the
9    way that they're ascertained.
10   You may have more data on one group than the
11   other and that makes -- that may make something
12   artificially appear to be the case but it's just that
13   you collected more information on one group. So that's
14   a challenge.
15   BY MR. JONES:
16   Q.    Say I was doing a study and you and Mr. Schmidt
17   were my control group. Would it be acceptable for me to
18   just walk out in the lobby of the law firm and select
19   two other people and say this is going to be my control
20   group?
21   A.    No. You'd want a --
22   MR. SCHMIDT: Objection to -- object to
23   foundation.
24   THE WITNESS: You'd want a little more care than
25   that.

Page 185

1    If you look at how case-controlled studies do,
2    they usually have a large population of controls.
3    Controls are easier to come by than cases. So they
4    usually take the cases that -- all the cases that they
5    can find, because they're studying rare things so cases
6    are precious, so they find all the cases. You have to
7    make sure it's the right place that gets the right
8    cases, as I mentioned before.
9    For controls, then they typically randomly
10   select them from medical records, other kinds of ways to
11   show that they're representative of the same population
12   that the cases came from. So that's the selection bias
13   aspect.
14   Then the ascertainment issue is you have to have
15   the same access to information for the cases and
16   controls. And so if, for example, you can contact cases
17   because they're patients in your clinic but the
18   controls, you know, you don't have a relationship with,
19   you don't have a way to contact them, then you may have
20   incomplete information on one group compared to much
21   more complete on the other and that could create some
22   biases.
23   So the attention is really on the details in the
24   specific studies to do these right.
25

47 (Pages 182 to 185)

David William Feigal, Jr., M.D., M.P.H.

Page 186

BY MR. JONES:
1
2   Q.   So on the selection bias, again, if you and Mr.
3   Schmidt were my cases --
4   A.   Yeah.
5   Q.   -- would it be appropriate for me to get my
6   controls by saying, you know, each of you call two of
7   your friends and ask them if they'll participate in my
8   study?
9        MR. SCHMIDT:  Object to foundation.
10       THE WITNESS:  Well, I chuckled because --
11       MR. SCHMIDT:  Incomplete hypothetical.
12       THE WITNESS:  -- because friend controls
13  actually are one of the ways that people select controls
14  in case-controlled studies.  They actually ask people to
15  identify someone like them in their community that they
16  can approach and ask if they'd participate in a study.
17       More often, they come from what I would guess,
18  say, convenience collections of people, such as you
19  mentioned the lobby, but from the hospital, it would
20  probably be other people in the clinic who don't have
21  the condition.  That's -- you know, that's commonly
22  done.  Or if you're selecting from a large health
23  database and identifying them, then other participants
24  in the health database.

Page 187

BY MR. JONES:
1
2   Q.   And on this -- what did you call it?  Friend
3   control?
4   A.   Yes.
5   Q.   You said that people were asked to find a friend
6   that's like them?
7   A.   Yes.
8   Q.   Doesn't that introduce some bias into -- you
9   know, is Paul or is Mr. Schmidt like me or you like -- I
10  mean, that introduces some biases as well.
11  A.   No.  That's absolutely right.  No.  No.  So
12  that's not a great way to do it.  But that has -- that
13  is a method that has been used.
14  Q.   Okay.  And then -- okay.  So is there -- in
15  terms of the controls for selection bias and
16  ascertainment bias, can you ever eliminate in one of
17  these case-control studies, absolutely eliminate
18  selection bias and ascertainment bias?
19  A.   No.  And what the appropriate thing to do is to
20  estimate what -- you know, what the -- how large a
21  problem it could be.
22       So you shouldn't just discard studies because
23  you can think of a reason that they might not be -- that
24  there could be a problem with the study.  You should
25  also -- the responsible thing to do is to then assess

Page 188

1   how big of a problem could that be with this.
2        And you'll actually see that done in some
3   articles, where they try and estimate what effects could
4   be of things that, you know, could be biased in the
5   study.
6   Q.   And is there a way of -- is there an accepted
7   way of quantifying the amount of selection bias or
8   ascertainment bias?
9   A.   The usual -- well, yes, but there isn't -- it
10  isn't quite as standardized as calculating a P-value
11  from a two-by-two table, which is really pretty, pretty
12  well worked out.  There's a lot more judgment involved.
13  But there are techniques that involve modeling, where
14  you make some assumptions about how big a bias effect
15  could be and see how much that would change your result.
16  That's one -- you know, that's one common method.
17  Q.   And do you agree that -- well, strike that.
18  Okay.
19       Let's move to the next box here,
20  "Pharmacoepidemiology Studies (cohort or case-control
21  designs conducted with insurance databases)."  And you
22  have yes, can study rare events; yes, can estimate
23  relative risk or hazard compared to control group;
24  again, we're at maybe/maybe on selection bias and
25  ascertainment bias; and adverse effects assessed

Page 189

1   prospectively before the adverse event or adverse
2   effect, you have yes/no on that.
3        Tell me why that's yes/no.
4   A.   Well, ideally, when you're studying an exposure
5   risk, you want to know that the exposure -- know about
6   the exposure before you know about the adverse effect
7   because we know that people who have had, you know,
8   particularly a serious adverse effect spend a lot of
9   time thinking about what did I do to deserve this cancer
10  or this birth defect or this problem and they can
11  remember a lot more drugs that they took and they can
12  remember a lot more other behavioral kinds of things
13  than someone where, you know, nothing is going on in
14  their life.
15       And so you can't always -- in these databases,
16  some of them are just cross-sections of one point in
17  time and you don't have any historical record that the
18  exposure occurred well before the event.  And with the
19  databases, it's less of a problem of memory because you
20  are collecting but it's an issue sometimes that you just
21  can't reconstruct the time sequence when two things, you
22  know, two things appear together.
23       You can't tell from some databases, for example,
24  when someone is diagnosed whether it's a new diagnosis,
25  and if you don't know when the diagnosis started, then

48 (Pages 186 to 189)

David William Feigal, Jr., M.D., M.P.H.

Page 190

1  you don't know if they took the drug before the
2  diagnosis. So that's a bit of a problem. If someone
3  already has the condition when they take the drug, the
4  drug couldn't have caused it. So that's the issue
5  there.
6    Q.    I'm just having trouble understanding how you
7  can use an insurance database to study something
8  prospectively.
9    A.    Well, it's a retrospective/prospective.
10   Q.    Okay. Explain that to me.
11   A.    Well, if you had an insurance record that had
12  five years' worth of data, for example, you can go back
13  to that first year and find the people who do not yet
14  have --
15       MR. SCHMIDT: Bless you.
16       THE WITNESS: -- the condition that you're
17  looking at and you looked at the drugs they're taking
18  and then you look at the second year and the third year
19  and you can see all the things that are going on for
20  that patient and then they develop the complication, and
21  then you can see -- and then you can say, all right,
22  they were exposed to these things before the event of
23  interest and are people who have the event more likely
24  to have had those exposures than the controls?
25       Now, a lot of studies can't establish the start

Page 191

1  of a condition. There are some conditions where the
2  condition starts and then it may occur again later and
3  you don't know that it's the first episode.
4       And then the other challenge if it's billing
5  data is that you really have to validate that just
6  because it's coded that way, they really had the
7  disease, not that they're being evaluated, did they have
8  the disease? Because they get coded the same sometimes.
9       But it's -- the different insurance databases
10  have different quality of longitudinal information. And
11  so if you have a disease that can appear and then, say,
12  be quiet for five years and then appear again and you've
13  only got two years of data, year before, year after, and
14  they develop the disease in the second year, you don't
15  know that they've had it before from an insurance
16  database, you've just got the codes.
17       Now, the way you can get around that is in the
18  systems where you also have access to the medical
19  records. So some of the systems, like Kaiser, for
20  example, with their databases, they start their task by
21  looking at the codes but then they pull the charts and
22  see what's really going on. So they use the codes to
23  pull the charts and then they can do -- then they can
24  simulate what a prospective cohort study is because they
25  can identify an exposure and they can follow those

Page 192

1  patients forward -- you know, forward in time.
2       So those are sometimes called
3  retrospective/prospective studies.
4  BY MR. JONES:
5    Q.    Follow them forward in time based upon the
6  treatment that they've had.
7    A.    Yeah. You're looking at the exposures, whether
8  you're looking at the risk from cigarettes, from
9  obesity, or from a drug, but the point is you've got
10  longitudinal information that you can rely on. And not
11  all insurance databases do. So that's why it's yes/no.
12   Q.    Okay. And then the next in your hierarchy is,
13  "Case Series (a collection of patients with an adverse
14  event)," and you have yes, it can study a rare event;
15  no, it cannot estimate relative risk or hazard; then you
16  get into the ascertainment and selection bias, maybe/no,
17  and no.
18   A.    Yeah. And our problem here is we don't have a
19  control group. So we may have -- I may say I've got
20  five cases in my clinic, but you'd say, compared to
21  what?
22   Q.    Uh-huh.
23   A.    And then the question is, why do you have five
24  cases in your clinic or your referral center or so
25  forth?

Page 193

1       But the problem with the case series is that it
2  doesn't have a control group so you really can't make a
3  comparison. The case series are helpful in describing
4  how patients do with a condition, what the spectrum is,
5  what they look like, how many of them might have a
6  factor, in this case, for example, obesity, but you
7  don't have any control group to try and get, link it
8  back to in terms of, you know, population.
9    Q.    And when we talk about case series, this is what
10  we see in medical journals, doctors writing in saying,
11  hey, I've had this experience, I had five patients --
12   A.    Right.
13   Q.    -- in my clinic --
14   A.    Right.
15   Q.    -- and here are the details; right?
16   A.    Right. Right. Right. The minimum number seems
17  to be three to write them up but --
18   Q.    Okay.
19   A.    -- but before the journal editors will publish
20  it but -- unless it's very unusual.
21       But yeah. So these are sort of the uncontrolled
22  collections. They're a step up from an individual case
23  report in that somebody has systematically tried to
24  describe the condition they're describing. They're
25  writing a paper about the condition, if you will,

49 (Pages 190 to 193)

David William Feigal, Jr., M.D., M.P.H.

Page 194

1   because these often come from the literature, or a
2   company could do one as part of its evaluation. But --
3   and so it will have some uniformity in the way that it
4   describes and assesses them but it won't have a control
5   group. So that's why it's limited.
6       Q.    Okay. You mentioned the individual case
7   reports. So what you're --
8       A.    Yes.
9       Q.    -- talking about there is not Spontaneous
10  Adverse Event Reports, you're talking about a
11  health-care professional who writes something up?
12      A.    No. It can be any -- it can be from any source.
13      Q.    Okay.
14      A.    It can be from any source.
15          The case series are almost always going to be
16  written up by a health professional or a safety
17  professional but the case reports, as we've talked about
18  earlier, they come from any source. You can learn
19  about them from any source.
20      Q.    And the individual case reports, the spontaneous
21  reports, the quality of the data, I believe you would
22  agree, is hit or miss.
23      A.    Yeah, it's varied.
24      Q.    Sometimes they're well documented?
25      A.    Right.

Page 195

1       Q.    Many times they're not; right?
2       A.    Right. And then they're contradictory and
3   there's, you know, the individual -- they vary in their
4   quality.
5       Q.    And with the case series, you get more detail
6   because a health-care professional is kind of putting
7   their reputation on the line by publishing something?
8       A.    Well, and they're trying to write up --
9           MR. SCHMIDT: Object to characterization.
10          THE WITNESS: I think what -- whether it's their
11  reputation or not, they're trying to write up and
12  describe a specific thing. They think there's some
13  commonality to those cases. So there's more detail and
14  there's more -- they're more likely to note whether
15  there's common features to the cases that might be a
16  risk factor, although you don't have a control group.
17          With the individual cases, you don't have a
18  control, you don't have any -- you know, you don't have
19  anything to anchor those things to.
20          MR. JONES: Okay.
21  BY MR. JONES:
22      Q.    And the Rai abstract, would that be -- on the
23  first page, would that be what you would consider a
24  case-control study?
25      A.    It -- I think that's what he was trying or she

Page 196

1   was --
2       Q.    She.
3       A.    -- trying -- I'm sorry. She was trying to do.
4   My -- but being an abstract, there's really not --
5   there's not very many details in the methods about where
6   the controls came from.
7           And so, for example, you know, in terms of
8   ascertainment bias, it wasn't clear if they had the
9   ability to actually telephone the controls as well as
10  the cases. So there was just -- because it's an
11  abstract, it's -- you know, abstracts are typically 10
12  or 11 sentences long and often works in progress.
13          But that study is, I think, designed as a
14  case-controlled study but there's a lot of questions
15  about that study that we probably want to talk about.
16      Q.    And it's longer than 10 or 11 sentences long;
17  right?
18      A.    I'd have to count them. But when I used to
19  advise students writing abstracts, I'd say, you've got
20  ten sentences, three for introductions, three for
21  results, and three for conclusions.
22      Q.    Well, we'll look at it in a little bit.
23      A.    All right.
24      Q.    And you've mentioned, you know, that there's
25  some information, based upon your review of that

Page 197

1   abstract, that you don't know whether, for instance,
2   they had the opportunity to telephone controls; right?
3       A.    Well, that's right. We don't -- there are some
4   things that we don't know -- although we'll get to
5   this, the other thing that was unusual was the number of
6   cases that he identified. When you look at some of the
7   other -- or she identified.
8           When we look at some of the other literature,
9   you'll see far fewer cases being identified by a
10  combined effort of nine or ten university hospitals. So
11  if a paper ever is written about that, we'll be able to
12  answer some of those questions.
13          But it's -- the other possibility, which gets to
14  selection, is it could be that the net was cast very
15  broadly in terms of trying to obtain possible cases.
16  And we know that the ICD-9 codes, when they're used for
17  PCT, are actually only referring to an actual case of
18  PTC about half the time. So we just don't know that
19  about that abstract.
20      Q.    Right. And you're speculating that in that
21  particular study that only 50 percent of the cases
22  identified by ICD-9 code might not be PTC cases;
23  correct?
24      A.    Well, that's right. There's no description.
25  Normally, in a study, in a study that has ability to

David William Feigal, Jr., M.D., M.P.H.

Page 198

1    write a longer methods section, they would describe how
2    they validated their selection criteria and how they
3    know that the cases are PTC.
4        Q.    Are you aware of whether or not those authors
5    have a full article in process?
6        A.    I don't know one way or the other.
7        Q.    In progress?
8              Have you heard from anyone, any of your
9    colleagues in the medical community, that these authors
10   have developed a full article that's now under -- being
11   subjected to the peer-review process?
12       A.    No, I don't know one way or the other.
13             MR. SCHMIDT:  It's kind of like the next J. K.
14   Rawling's book.  All we hear is chattering.  Might be
15   coming, it might not be.
16             MR. JONES:  Do share.
17   BY MR. JONES:
18       Q.    An individual --
19             MR. JONES:  That's a good joke.
20   BY MR. JONES:
21       Q.    An individual spontaneous --
22             MR. SCHMIDT:  That will be my contribution.
23   I'll shut up now.
24   BY MR. JONES:
25       Q.    An individual spontaneous case report is the

Page 199

1    observation of an adverse event associated with a drug;
2    correct?
3        A.    That's correct.
4        Q.    And these reports may be useful in some cases to
5    detect signals of a potential association between
6    outcomes and medical treatments; correct?
7        A.    That's correct.
8        Q.    And the FDA and product manufacturers use
9    spontaneous reports to detect new potential safety
10   issues; correct?
11       A.    Yes.
12       Q.    And these reports, even when aggregated, cannot
13   provide estimates of incident -- incidence rates or
14   prevalence for the product, let alone provide
15   comparative rates between products; correct?
16       A.    Yes, that's correct.  And FDA has said that as
17   well.
18       Q.    So you can't use spontaneous reports to try to
19   determine what the incidence rate is; correct?
20       A.    That's correct.
21       Q.    And if someone tried to use spontaneous reports
22   to estimate incidence rates, that would be contrary to
23   what FDA says; correct?
24       A.    Well, not --
25             MR. SCHMIDT:  Object to characterization.

Page 200

1              THE WITNESS:  Not exactly.
2              I think that you can make some estimates, with
3    limitations, if you know the total sales of the product
4    but the problem with spontaneous reports is that there's
5    always a degree of underreporting.
6              So if you were to get a number of reports that
7    when you divided it by your known sales of the product,
8    for example, and that was already more reports than you
9    would expect from the background rate and even though
10   you couldn't estimate the incidence, you'd say this
11   looks like we've got an association with the drug.
12             On the other hand, if it's a serious condition
13   where the reporting is generally better and the rates
14   are below or similar to the background rates, that's
15   reassuring but it isn't a reason to stop looking.
16             You -- but that is something that companies
17   commonly do is they compare the rates compared to sales,
18   and that helps also understand over time if the
19   reporting is going up and the sales are going up
20   proportionally, then you may be looking at something
21   that isn't changing.
22             On the other hand, if the reporting is going up
23   and the sales are flat, then it may be a problem that
24   increases with time, with, you know, more prolonged
25   exposure to the same number of patients.

Page 201

1              So there are some clues, but you just can't do
2    epidemiology from aggregated case reports.
3    BY MR. JONES:
4        Q.    Can you point me to anything and -- any FDA
5    guidances, FDA regulations, statutes governing FDA that
6    says if you have sales data, then you can use
7    spontaneous reports to provide estimates of incidence
8    rates or prevalence for the product?
9        A.    Not in those exact terms but, you know, if you
10   look at the quote that starts on Page 13 and goes on to
11   Page 14, FDA is talking about the factors by which you
12   evaluate the number of reports you have.
13             So, for example, they point out publicity is
14   something that can increase the number of reports, or
15   how long the product has been -- has been -- the product
16   has been marketed.
17             So I think these are more qualitative things
18   that you evaluate.  So you do look at your sales and you
19   do, you know, calculate some numbers but you use the
20   information more qualitatively.  You can't assert that
21   that's the known incidence or prevalence of the adverse
22   effect in all users of the drug because you just don't
23   have all the reports.
24       Q.    I'm trying to find in the quote that you've
25   cited me to anywhere where it discusses sales data, if

51 (Pages 198 to 201)

David William Feigal, Jr., M.D., M.P.H.

Page 202

1    you have sales data, that you can use spontaneous
2    reports to provide estimates of incidence rates or
3    prevalence for the product.
4    A.    Well --
5    Q.    Can you point me to that?
6    A.    -- it's not in the report, but it isn't what
7    I've said.
8          What I've said is that you take that information
9    into account.  You know, they point out other factors,
10   such as publicity or length of time on the market, which
11   may relate to cumulative exposure and sales.  These are
12   factors to consider when you look at why are you getting
13   reports and how many you're getting but FDA's bottom
14   line is that you can't calculate accurate incidence or
15   prevalence rates.
16   Q.    And when you talk about FDA talking about
17   publicity and time on the market, extent of use, it's
18   not talking about calculating an incidence rate from
19   that data, is it?
20   A.    No, it's not.  It's talking about -- although
21   you can do that.  But it's talking about evaluating the
22   relationship of the reports, the reports to the total
23   sales.
24         And it's a common practice in industry to sort
25   of say, if these were all the reports we had and this is

Page 203

1    the incidence and this -- if this is all the reports and
2    this is the sales, what would the incidence be, you'll
3    see that done.  But they don't -- I think everyone will
4    acknowledge that doesn't calculate accurate incidence
5    and prevalence.
6    Q.    Going back to your hierarchy of study design and
7    evidence for drug-associated adverse effects, are you
8    aware of any efforts by Bayer to -- strike that.
9          Are you aware of any case-control studies that
10   Bayer has conducted to study the potential association
11   between pseudotumor cerebri and Mirena?
12   A.    No, I'm not.  And I think even the Rai article,
13   you know, illustrates how difficult it is to actually
14   organize those studies.
15   Q.    And are you aware of any efforts by Bayer to
16   conduct a pharmacoepidemiology study to examine the
17   potential association between pseudotumor cerebri and
18   Mirena?
19   A.    No, I'm not aware of any pharmacoepidemiology
20   studies that have been completed and I don't recall
21   reviewing documents about plans so -- but there
22   certainly -- there certainly -- I'm not aware of any
23   that have been conducted.
24   Q.    Have you been a part of designing
25   pharmacoepidemiology studies in your career?

Page 204

1    A.    Yes, I have.
2    Q.    Okay.  And so you've looked at the Rai study --
3    A.    Yes.
4    Q.    -- from the abstract.
5    A.    Yes.
6    Q.    How much would you estimate a study like the Rai
7    study would cost?
8          MR. SCHMIDT:  Objection.  Foundation.
9          THE WITNESS:  If it involves contacting
10   patients, chart reviews, certain amount of work before,
11   the individual patient cost, once identified, is
12   probably in the range of three to four thousand dollars
13   per patient.  The upfront work of doing the database
14   work and all of that type of stuff, maybe a few, you
15   know, a few tens of thousands of dollars.
16         So I can't do the math in my head, how that
17   works out, but those are sort of typical costs for
18   studies like that today.
19   BY MR. JONES:
20   Q.    So are you of the understanding that the
21   patients who participated in the telephone interviews in
22   the Rai study were paid three or four thousand dollars
23   apiece?
24   A.    No.  That's the labor cost of the study
25   personnel from the time they identify a patient, do the

Page 205

1    interview, fill out the case report forms, get the data
2    in the database.  If you just add up the hours of their
3    time, that would be my estimate.  Could be a less
4    than that.  But, no, that's assuming you're not paying
5    the patients, that the patients are just voluntarily
6    participating.
7    Q.    And I think that maybe that study said that they
8    were volunteers.
9    A.    Yes.  That wouldn't surprise me.
10   Q.    Do you agree that generally rigorous
11   pharmacoepidemiologic studies, such as case-control
12   studies and cohort studies with appropriate follow-up,
13   are usually employed to further examine the potential
14   association between a product and an adverse event?
15   A.    I don't think they're --
16         MR. SCHMIDT:  Objection.
17         THE WITNESS:  I don't think they're usually
18   employed.  They're a tool that's being used more and
19   more as the databases become more accessible.
20         It's only been within the last half decade that
21   the databases linked pharmacy records with medical
22   diagnoses.  So there was a lot of pharmacoepi in the
23   past that was simply based on studying patterns of drug
24   use to try and guess what was going on medically.
25         MR. JONES:  I --

David William Feigal, Jr., M.D., M.P.H.

Page 206

1        THE WITNESS:  So that the tools have gotten
2    better and better.  So I wouldn't say usual,
3    but it's a tool that's being employed more often, more
4    and more often today.
5    BY MR. JONES:
6    Q.    Will you turn to Page 13 of your report?
7    A.    Yes.
8    Q.    And do you see down at the last full paragraph
9    where it says, "According to FDA"?
10   A.    Yes.
11   Q.    Can you read that into the record.
12   A.    Yeah.
13         Rigorous pharmacoepidemiology --
14   Q.    Can you start with the beginning of the
15   sentence.
16   A.    Okay.  According to FDA, rigorous
17   pharmacoepidemiologic studies, such as case-controlled
18   studies and cohort studies with appropriate follow-up,
19   are usually employed to further examine potential
20   association between a product and an adverse event.
21   Q.    Okay.  So you did say "usually employed" in your
22   report; right?
23   A.    Well, the FDA said that.  And they're actually
24   not referring to the kind of insurance database studies
25   that I was jumping to the conclusion that we were

Page 207

1    talking about.  They're talking about the typical -- the
2    traditional types of case control and cohort studies
3    where they actually enroll patients in those studies
4    rather than just study their records.
5    Q.    If you don't understand a question, feel free to
6    ask me to clarify it.
7    A.    Yes.
8    Q.    Okay?
9    A.    I apologize if I misunderstood.
10   Q.    Isn't it true that FDA does not require that a
11   causal relationship between a product and an event be
12   proven before allowing it to be added to the product
13   labeling?
14   A.    Yes, that's correct.  The standard is reasonable
15   evidence of a causal association.
16   Q.    That's the standard for what?
17   A.    That's the standard for a warning or precaution.
18   The standard for an adverse reaction is some basis to
19   believe there's a causal association.
20   Q.    Some basis to believe.
21   A.    Yes.  That's been the standard since 2006.
22   Q.    And what's the standard for adding an event to a
23   product label in the post-marketing experience section?
24   A.    Well, that is the standard:  Some basis to
25   believe that there's a causal association.

Page 208

1    Q.    Is it your testimony and belief that every
2    warning and adverse reaction listed in the current
3    Mirena label is supported by reasonable evidence of a
4    causal association?
5    A.    I haven't --
6         MR. SCHMIDT:  Objection.  Foundation.
7         THE WITNESS:  I haven't really looked.  You
8    know, I've only really -- in my work with Mirena have
9    really only looked at perforation and IIH so I don't
10   really have any opinions about the others.
11   BY MR. JONES:
12   Q.    But you're giving an opinion in this case that
13   the labeling was adequate; correct?
14   A.    Yes; with respect to PTC.
15   Q.    When is the last time you reviewed the label?
16   A.    I think I've looked at the label within the last
17   week.
18   Q.    And based upon your -- does FDA allow anything
19   in a product label in the warnings or adverse reactions
20   section that is not supported by reasonable evidence of
21   a causal association?
22   A.    Generally speaking, no.  That is the standard
23   for a warning and precaution.
24   Q.    And you said the some-basis standard related to
25   the adverse reactions portions of the label; right?

Page 209

1    A.    Yes.
2    Q.    And then I asked you about what the standard is
3    for the post-marketing experience section of the label
4    and you suggested that the standard is the same; is that
5    correct?
6    A.    Yes.  The adverse reactions section has two
7    sections, one of them is adverse reactions from clinical
8    trials.  And when they're controlled clinical trials,
9    the basis to believe that there's a possible causal
10   association is the fact that they're -- that the rates
11   are different in one group than the other, although
12   sometimes they'll actually also include information
13   showing comparisons of things where there's no
14   difference.
15         But, generally, where there is a difference,
16   it's because there's more of the adverse event in the
17   drug than in, for example, the placebo arm.
18         The post-marketing experience section often
19   begins with, has been reported, and they list the things
20   that have been reported where there's some basis to
21   believe there's a causal association.
22   Q.    Has --
23   A.    So the standard is the same but the source of
24   the evidence is a little different.  One comes from a
25   clinical trial and the other comes from mostly

53 (Pages 206 to 209)

David William Feigal, Jr., M.D., M.P.H.

Page 210

1  spontaneous reports and some, the literature.
2     Q.    Has pseudotumor cerebri been reported in
3  relation to Mirena?
4     A.    Yes, it has.
5     Q.    Is there some basis to believe that there's a
6  causal association?
7     A.    In my opinion, no.
8     Q.    And you don't think that the Rai abstract
9  provides some basis of evidence of a causal association?
10    A.    No, not as written, it does not.
11    Q.    What's it going to take to satisfy you that
12 there is some basis of -- for believing there's a causal
13 association between Mirena and PTC?
14        MR. SCHMIDT:  Objection.  Foundation.
15        THE WITNESS:  If there was a study which could
16 demonstrate that the rate was higher than the background
17 rate after controlling for weight and recent weight
18 gain, then I think if there was an increased risk of --
19 that was unlikely to be due to chance, that would be
20 some basis to believe that there was reasonable evidence
21 of a causal association.
22 BY MR. JONES:
23    Q.    What do you define as recent weight gain?
24    A.    Well, some of the case-controlled studies that
25 have looked at the role of obesity have shown that as a

Page 211

1  risk factor for recurrence, as little as 7 percent total
2  body -- total body weight is correlated with a -- is
3  correlated with recurrence.
4        And the authors also commented that weight loss
5  of 7 percent also is about the average weight loss for
6  patients where loss of weight with resolution of the
7  resolution of the syndrome.  So that's -- that would be
8  one, you know, criteria to start.  If you had enough
9  information to document that kind of level of change,
10 then that would fit with the current literature.
11    Q.    Okay.  You answered the weight gain part of it.
12        What do you define as recent?
13    A.    I don't know if I have a working definition.  It
14 would be recent in relationship to the development of
15 the PTC.
16    Q.    Can you point me to any scientific literature
17 anywhere in the world that defines what recent is in
18 relation to recent weight gain and its risk factor --
19    A.    I don't --
20    Q.    -- for the development of PTC?
21    A.    I don't recall how it was defined in the studies
22 where you used that term.
23        I would go back and look to what were the
24 definitions the authors used where they found it was a
25 risk factor and that would probably be a reasonable

Page 212

1  definition to use.  But I don't -- sitting here today, I
2  don't know what that is.
3     Q.    Do you agree that not all patients who have PTC
4  experience a resolution of symptoms with weight loss?
5     A.    I think that would probably be correct, yes.
6     Q.    FDA does not receive reports for every adverse
7  event or medication error that occur with a product;
8  correct?
9     A.    That's correct.
10    Q.    And many factors can influence whether or not an
11 event will be reported, such as the time the product has
12 been marketed and the publicity about an event; correct?
13    A.    Yes, that's correct.
14    Q.    And are you aware of any publicity about the
15 connection between the potential association between
16 Mirena and pseudotumor cerebri?
17    A.    I personally have not come across any publicity
18 about this.  May be out there but I have not noticed
19 any.
20    Q.    So you can't testify or you're not giving an
21 opinion that publicity about the product or pseudotumor
22 cerebri contributed to an increase in reporting of
23 events involving Mirena and pseudotumor cerebri?
24    A.    No, for this specific case, I don't know of any
25 publicity associated with the potential risk.

Page 213

1     Q.    You agree that reporting of adverse events by
2  physicians and patients is both voluntary and
3  spontaneous; correct?
4     A.    Yes.
5     Q.    What's a disproportionality analysis?
6     A.    It is a -- that's a term that's usually used to
7  describe an increased proportion of reports of a side
8  effect for one drug compared to other drugs reporting
9  that same side effect.
10        So if one drug, say, 2 percent of its side
11 effects were PTC and another drug was 1 -- and all other
12 drugs was 1 percent of the reports with PTC, that would
13 give you a reporting ratio of 2, you know, 2 percent
14 compared to 1 percent, and that -- one of the
15 descriptions of that is a disproportionality analysis.
16    Q.    And I understand from your report that you don't
17 believe that a disproportionality analysis can establish
18 a causal association between an event and a drug;
19 correct?
20    A.    Yes, that's correct.
21    Q.    Okay.  And wouldn't the converse be true as
22 well?  A disproportionality analysis can't rule out a
23 causal relationship either, can it?
24    A.    I would agree with that.  Yes, I would agree
25 with it.

54  (Pages 210 to 213)

David William Feigal, Jr., M.D., M.P.H.

Page 214

1     The analyses are used primarily to detect
2 signals, and so it could be used to say there's no
3 signal, but that's only indirect evidence about whether
4 there's a potential relationship or not.
5 Q.    Other than checking the work of plaintiffs'
6 experts in this case, did you conduct your own
7 independent disproportionality analysis?
8 A.    For this case, for this -- and for this
9 condition, I -- what motivated me to do it was reading
10 the reports by the plaintiffs' experts, and that's when
11 I went to the database and repeated their analysis.
12 Q.    Okay. But you just repeated their analysis, you
13 didn't try to conduct your own analysis; correct?
14 A.    Well, I ran variations on their analyses, not
15 all of which I think they reported.
16     So, for example, I also looked to see what
17 happened when you used the -- when you restricted the
18 cases to women of childbearing potential, for example.
19     So I did something -- I did analyses that they
20 didn't do but I looked to see where their numbers came
21 from and then I did variations on their analyses.
22 Q.    Did you put those in your report?
23 A.    Not all of them, no, I did not.
24 Q.    What database did you use?
25 A.    I used OpenVigil, both 2.0, which Dr. Ross

Page 215

1 initially used, and 2.1, which Dr. Etminan used.
2 Q.    When you're talking about case-controlled
3 studies, there is a way to control for confounders,
4 isn't there?
5     MR. SCHMIDT: Objection. Vague.
6     THE WITNESS: There are methods to control for
7 confounding, yes.
8     MR. JONES: Okay.
9 BY MR. JONES:
10 Q.    And one would be a --
11     MR. SCHMIDT: Bless you.
12 BY MR. JONES:
13 Q.    -- sensitivity analysis?
14 A.    No. I think that's more an analysis of the
15 hypothetical effects of confounders.
16     Usually if you say you've controlled for
17 confounders, you've measured a confounding variable and
18 you've adjusted for it in some way. You've either gone
19 at multivariate analysis that includes both the drug and
20 a confounder so you'd, for example, simultaneously
21 estimate the risk of Mirena and weight and weight gain
22 or you control for confounding in the selection of your
23 controls.
24     So if you selected a case and you found that
25 that case had a BMI of, say, 35, and then you picked a

Page 216

1 control whose weight was between, you know, 33 and 37,
2 you would be able to control for weight as a confounder
3 even though you didn't estimate the risk of weight by
4 using that design.
5     So control usually means that you've got the
6 variable in the patients that you're studying.
7 Sensitivity analysis means you've done a bunch of
8 hypothetical exercises to see what could have happened.
9 Q.    But you're -- maybe control was the wrong word.
10 You can account for confounding bias; correct?
11 A.    Yeah, I'd say the controls account for it and
12 the modeling assesses it, assesses the potential, the
13 hypothetical role.
14     They're slightly different. I may be being too
15 picky about the words. I think it's appropriate to
16 after you've done an analysis where you were unable to
17 measure confounders to try and model what the potential
18 effects could be.
19 Q.    Have you ever used a sensitivity analysis in any
20 of the studies you've been involved in?
21 A.    Yes.
22 Q.    So it's an accepted scientific method; correct?
23     MR. SCHMIDT: Objection. Vague.
24     THE WITNESS: Well, there are various methods
25 and they have their strengths and weaknesses. They're

Page 217

1 the methods that are used to actually assess how robust
2 your result is, could your result be due to something
3 that you haven't measured or haven't accounted for.
4 BY MR. JONES:
5 Q.    Do you know Sebastian Schneeweiss,
6 S-C-H-N-E-E-W-E-I-S-S, at the Division of
7 Pharmacoepidemiology and Pharmacoeconomics at the
8 Brigham & Women's Hospital and Harvard Medical School?
9 A.    I know of Dr. Schneeweiss. I think it's
10 Schneeweiss.
11 Q.    I'll take your word for it.
12 A.    But I had trouble with the gender of Dr. Rai so
13 I'm not sure how good I am on people today.
14     But I know of him, yes.
15 Q.    Okay. And is Dr. Schneeweiss respected in the
16 field of pharmacoepidemiology?
17 A.    Yes, I believe he is.
18 Q.    Okay. And are you aware of his "Sensitivity
19 Analysis and External Adjustment For Unmeasured
20 Confounders in Epidemiologic Database Studies of
21 Therapeutics"?
22 A.    Yes. As I recall, Dr. Etminan may have
23 identified that paper as the source of the methods that
24 he used, and he did that, I went and looked at that
25 paper. I didn't -- I'm looking to see if I referenced

David William Feigal, Jr., M.D., M.P.H.

Page 218

1    that. And I may not have referenced it, but it should
2    be in my total list, because I have that paper, I've
3    seen that paper.
4        Q.    And if I understand it, you didn't have any
5    problems with Dr. Schneeweiss's sensitivity analysis,
6    your problem was with the data that Dr. Etminan used to
7    plug into the Schneeweiss spreadsheet; correct?
8            MR. SCHMIDT: Object to form.
9            THE WITNESS: Well, there are two issues.
10       I think Dr. Schneeweiss's method is a reasonable
11   method to assess the effect of a potential confounder.
12       There were sort of two issues with Dr. Etminan's
13   numbers. One is the numbers that he used. It depends
14   on which tables we're talking about from his report or
15   from his paper but, for example, when he was looking at
16   disproportionality, he was looking at reports rather
17   than cases, and it's more important to look at cases
18   because reports -- there's almost two reports for every
19   case, so you just have a number of duplicates.
20       So that's one issue with the cases. And you
21   should also, you know, be comparing to women and so
22   forth. So that's an issue with the tables.
23       But the other issue that I would have with Dr.
24   Etminan is the range of values that he used to put in
25   his modeling and in the way that he described the

Page 219

1    results of his analysis.
2        So I had a number of issues with how Dr. Etminan
3    applied Dr. Schneeweiss's methods but I don't have a
4    problem with Dr. Schneeweiss's methods themselves.
5    BY MR. JONES:
6        Q.    In going to Page 15 of your report, the last
7    sentence of the paragraph under Item Number 7 reads,
8    while a manufacturer only has access to its own data,
9    FDA has access to data from all manufacturers relating
10   to the drug, which can often provide important adverse
11   event information.
12       Did I read that correctly?
13       A.    Yes, you did.
14       Q.    Okay. And isn't it true that Bayer has equal
15   access to FDA data?
16       A.    No. They have access to the AERS database
17   that -- but in the example I gave where, you know, a
18   company might use another company's product in clinical
19   trials, clinical trials adverse events don't go into the
20   AERS database.
21       Q.    So when you're talking about data, you're
22   talking about clinical study data.
23       A.    Well, I mentioned -- that's one of the sources
24   here, but yes. I mean, the -- when a drug becomes a
25   standard -- and I'm not sure there -- how many of them,

Page 220

1    how many contraceptives have compared themselves
2    directly to, you know, to Mirena -- then it becomes used
3    as a control in other studies that the company doesn't
4    have access to.
5        So, for example, Mirena did a large
6    post-marketing study with 60,000 women comparing Mirena
7    users to copper IUD users so they had a lot of data
8    about copper IUDs that were in study reports and things
9    but they weren't in the AERS database and they weren't
10   data that the copper IUD manufacturers had direct access
11   to.
12       Q.    Do you know whether or not Bayer has access to
13   the Norplant study data?
14       A.    I don't know. I don't know to what extent they
15   have that data.
16       I know that they have a follow-on product to
17   Norplant and that there's been -- but I'm not sure what
18   the relationship is with the companies in terms of
19   exchange of data and exchange of original records with
20   respect to Norplant. It was originally brought to
21   market by Wyeth.
22       Q.    Is that what you think?
23       A.    Well, let me look. Because I actually wrote
24   down -- I wrote up a bit about Norplant so hate to --
25           MR. SCHMIDT: Objection to the memory test.

Page 221

1            THE WITNESS: Hate to provide --
2            MR. JONES: I didn't ask him a question.
3            THE WITNESS: You didn't. You know, you didn't.
4            MR. SCHMIDT: You said, is that what you think?
5            THE WITNESS: Well --
6            MR. SCHMIDT: I never object in the ether.
7            MR. JONES: I didn't ask him a memory test.
8            MR. SCHMIDT: To be fair, this is about my
9    fourth objection today.
10           THE WITNESS: Well, as I recall, Norplant was
11   not the original, but at the time that some of the
12   issues around Norplant came up Wyeth-Ayerst was the NDA
13   holder.
14           MR. JONES: Okay.
15   BY MR. JONES:
16       Q.    Have you ever heard of a company called Leiras
17   Oy?
18       A.    Yes.
19       Q.    And you would agree that Leiras Oy is now Bayer
20   Oy; correct?
21       A.    My understanding is that, yes, that Bayer --
22   that that's now part of the Bayer family of companies.
23       Q.    Okay. And did you know that Leiras Oy
24   manufactured Norplant on behalf of Wyeth?
25       A.    I think I did know that, yes.

56 (Pages 218 to 221)

David William Feigal, Jr., M.D., M.P.H.

Page 222

1   Q.   And did you know that Leiras Oy marketed
2   Norplant outside of the United States back in the '90s?
3   A.   Yes, I did know that.
4   Q.   Have you been provided in this case any adverse
5   event data related to Norplant from Bayer's lawyers?
6   A.   I do have some information about the adverse
7   events and the literature, the medical literature, about
8   Norplant's safety as it relates to these cases and those
9   are cited in the report.
10   Q.   Do you know what an Adverse Event Report is?
11   A.   Yes.
12   Q.   Have you been provided with any Adverse Event
13   Reports related to Norplant and pseudotumor cerebri by
14   Bayer's lawyers?
15   A.   Not that I recall.
16   Q.   Did you ask Bayer's lawyers for any of that
17   information?
18   A.   No, I did not.  I reviewed the circumstances
19   under which Norplant came to have a warning about
20   pseudotumor cerebri.
21   Q.   Did you know that Wyeth sent out a
22   dear-health-care-professional letter in the 1990s
23   advising health-care professionals about the potential
24   or advising physicians about the change to the label
25   adding pseudotumor cerebri?

Page 223

1   A.   Yes, I'm aware of that.
2   Q.   Have you ever seen that
3   dear-health-care-professional letter?
4   A.   I think I have, although I don't recall.  But I
5   think I have.  I'm familiar with the labeling change.
6   Q.   Have you seen the dear-health-care provider
7   letter within the scope of your work on this case?
8   A.   Well, that's when I would have seen it.  I don't
9   recall sitting here if I've seen the letter.  I'm
10   familiar with the labeling change.
11   Q.   Okay.  But you don't know whether you've seen
12   the letter or not?
13   A.   I think I have, but I don't know for certain.
14   Q.   Did you ever ask Bayer's lawyers to provide you
15   with that dear-health-care-provider letter?
16   A.   No, I didn't ask to see the letter.  But I don't
17   know if they sent it to me and that's -- if that's in
18   the material that I've reviewed.
19   Q.   You don't know whether it's on your reviewed or
20   relied upon list?
21   A.   I could look, but I don't know specifically if
22   it is or isn't.
23   Q.   In Footnote 10 of your report on Page 15 you
24   say, you quote from a source and say, the authors go on
25   to comment, quote, even in the cases when the event

Page 224

1   appears in the product labeling, many factors other than
2   a true causal relationship between a drug and an event
3   may influence the labeling, such as some class effects,
4   litigation and publicity.
5   Did I read that correctly?
6   A.   Yes.
7   Q.   And what source are you citing for that?
8   A.   Apologize that isn't clear, but that is
9   a -- I believe that is a -- refers to the Levine
10   article, which is Reference 36 in the end notes, and
11   that's just a -- it's a quote from the Levine article.
12   Q.   And do you believe FDA allows events to be
13   listed in product labeling when there is something other
14   than a true causal relationship between a drug and an
15   event, such as litigation?
16   A.   Well, that's an interesting question.
17   The event is usually listed first and the
18   litigation comes later so -- so I can't think of a
19   situation where litigation reports resulted in what was
20   the first notice of an adverse event and was the result
21   of a labeling change.
22   Q.   So you believe that an event listed in a label
23   usually leads to litigation?
24   A.   No.
25   MR. SCHMIDT:  Object to characterization.

Page 225

1   MR. JONES:  I was trying to figure out --
2   THE WITNESS:  No, I didn't say that.  But where
3   there are -- you know, FDA, for example, has written
4   about the situation with Accutane where they point out
5   in one year 97 percent of the reports were from
6   litigation reports and they were commenting on how that
7   made -- how that distorted disproportionality analyses
8   when there was a large number of litigation reports.
9   That was an FDA comment.
10   So they're -- but what I was saying was the
11   opposite, which is I can't think of a situation where
12   litigation itself was the first reasonable evidence of a
13   causal association that led to a labeling change.
14   Usually something leads to the labeling change.  Some of
15   those -- some things in labeling do lead to lawsuits but
16   certainly not all.
17   BY MR. JONES:
18   Q.   When you talk about litigation reporting, you're
19   talking about the company is reporting to FDA that
20   they're involved in litigation; isn't that correct?
21   A.   That's right.  Well, what they're reporting
22   is -- actually, what they do is they report the facts of
23   the case that are described in the legal document, which
24   may be a Complaint, for example.  As -- and then the
25   source down at the bottom, the way FDA identifies those

David William Feigal, Jr., M.D., M.P.H.

Page 226

1  as a report from a lawyer is that many companies then
2  identify that the reporter was a lawyer.
3     Q.    Well, I'll tell you something that has bothered
4  me throughout this case is that it doesn't indicate that
5  it is the defense lawyer, the company's lawyer, who is
6  reporting that.
7       Do you realize that?
8       MR. SCHMIDT: Object to the preamble.
9       THE WITNESS: Actually, I don't think that's the
10  case. I think that the reporter in that case is
11  actually the attorney who's filed the Complaint. But, I
12  mean, that's my understanding of who the reporter is.
13  The reporter is the person who sent in the information
14  to Wyeth, not the people at Wyeth that evaluated the
15  information, which in a legal case would involve an
16  attorney.
17  BY MR. JONES:
18     Q.    Well, I've made no reports to FDA but I see that
19  it's listed as a lawyer report in Bayer's documents
20  so --
21     A.    Well, I think --
22       MR. SCHMIDT: Object to lawyer testimony.
23       THE WITNESS: -- the way that it would occur is
24  that if you made a compliant about a case, one, if they
25  can identify it as a case they already know about, if it

Page 227

1  has new information, then they could file a new report
2  to the same ISR, the same study report, and say this is
3  a supplement. If it's a patient that they didn't
4  previously know about, then they would -- the company's
5  practice would be to fill out the MedWatch form based on
6  the information in the Complaint.
7  BY MR. JONES:
8     Q.    You agree -- I'm sorry.
9     A.    Yeah. And the reporter then would be the
10  attorney who submitted the complaint because that's the
11  source of the information about the patient.
12     Q.    You agree that labeling is the key source to
13  assure safe use of a drug product; correct?
14     A.    I would agree with that. It's one of the most
15  important sources about the safety information about a
16  product, yes.
17     Q.    And a label is intended to provide physicians
18  with a clear and concise summary of the information
19  necessary for the safe and effective use of the drug;
20  correct?
21     A.    Yes.
22     Q.    An FDA-approved label is intended to assist a
23  prescriber in making decisions for individual patients;
24  correct?
25     A.    Yes, that's correct.

Page 228

1     Q.    And you agree, don't you, that contraception
2  choice is also a decision to be made by the individual
3  patient; correct?
4     A.    Yes, I agree with that.
5     Q.    You agree that labeling is the FDA's principal
6  tool for educating health-care practitioners about the
7  risks and benefits of approved products to help ensure
8  safe and effective use; correct?
9     A.    Yes; both directly as prescribing information
10  and then all of the promotional materials that are based
11  on the labeling that are derived from the labeling. The
12  label plays an important role there.
13     Q.    And FDA-approved labels are supposed to be
14  balanced and accurate; correct?
15     A.    That's the standard for promotional materials.
16  But, yes, labels, generally speaking, are going to be
17  balanced and accurate.
18     Q.    And warnings describe serious adverse reactions
19  and potential safety hazards, limitations in use imposed
20  by them, and steps that should be taken if adverse
21  reactions occur; correct?
22     A.    Yes, that's correct.
23       MR. JONES: How long have we been going on this
24  tape?
25       VIDEO OPERATOR: One hour, eight minutes.

Page 229

1       MR. JONES: Why don't we take a little break.
2       VIDEO OPERATOR: We are going off the record.
3  The time is 3:49 p.m.
4       (Recess, 3:49-4:01 p.m.)
5       VIDEO OPERATOR: We are back on the record.
6  The time is 4:01 p.m.
7  BY MR. JONES:
8     Q.    Dr. Feigal, welcome back.
9       You note in your report that the Mirena
10  prescribing information label also contains information
11  for patients; is that correct?
12     A.    Yes, there's a section that's called that. That
13  section is actually written for doctors to give them
14  guidance on what to tell patients about. So it's not
15  written to be given to patients but it's written for
16  doctors to give recommendations on what to include in
17  providing information about the product.
18     Q.    And nothing in there warns of the potential of
19  developing pseudotumor cerebri with Mirena usage;
20  correct?
21     A.    That's correct.
22     Q.    Okay. And do you understand that there was also
23  a Patient Information Booklet that was also given to the
24  patients at the time of insertion?
25     A.    Yes.

58 (Pages 226 to 229)

David William Feigal, Jr., M.D., M.P.H.

Page 230

1  Q.    Okay. And that also contains no reference to
2  pseudotumor cerebri, does it?
3  A.    That's correct. It does not.
4  Q.    Do you agree that before 2007, FDA had no
5  authority to order label changes?
6  A.    No, not exactly. They -- after 2007, they had
7  very specific authority to order label changes with
8  certain time frames, but before that time, FDA had a
9  number of ways that they would accomplish getting
10  labeling changes that FDA felt were appropriate.
11  Q.    Well, can you cite me to the specific authority
12  that allowed FDA to order label changes before 2007?
13  A.    Yes. The authority is based on the misbranding,
14  that if FDA determines that a label is inadequate,
15  doesn't meet the labeling standards, then the product
16  must be revised to address the issue that FDA is
17  concerned about in order for it not to be misbranded.
18      So FDA generally didn't have to resort to
19  actually actions against products. Part of what FDA
20  does via companies is communicate with them frequently
21  about changes that it asks the companies to evaluate and
22  incorporate in their labeling or make a proposal to them
23  as to what to do instead or why it may not be needed.
24  Q.    Before 2007, if a product was misbranded, FDA
25  could force the removal of the product from the market;

Page 231

1  correct?
2  A.    They could. They could do -- most common
3  regulatory action would be a product seizure. But yes,
4  they could.
5  Q.    But there was no specific legal authority before
6  2007 for FDA to order a label change; correct?
7  A.    Not in the same way that it was written after
8  2007. But before that time, if you go through the
9  records, you'll find any number of times where FDA sends
10  companies labeling that it wants, sometimes class
11  labeling -- that almost always comes from FDA -- but
12  also to address safety problems that have come to FDA's
13  attention that the company may not even be aware of yet.
14  Q.    Can you look at Page 18 of your report.
15  A.    Yes.
16  Q.    I want to point out that there's a difference in
17  font between the body of the report and the footnotes.
18      Do you see that?
19  A.    Yes.
20  Q.    Okay. And why is that?
21  A.    Probably just the vagaries of Microsoft Word
22  that I don't -- when things -- particularly if I've cut
23  and pasted from one document to another, sometimes the
24  formatting from the other document gets carried over. I
25  try to clean that up but --

Page 232

1  Q.    Did someone insert these footnotes for you?
2  A.    No. This is all my -- this is all my own work.
3  Q.    You wrote this report?
4  A.    I did.
5  Q.    Do you agree that the importance of safe and
6  reliable contraception is beyond question?
7  A.    Yes, I would agree.
8  Q.    Do you agree that several major categories of
9  contraceptives are widely available?
10  A.    Yes, I would agree with that.
11  Q.    Do you agree that several reversible drugs and
12  device contraceptive methods are available that are not
13  hormonal?
14  A.    Yes. They vary in their effectiveness, but yes,
15  there are several -- there are many options that women
16  can choose from.
17  Q.    Are you aware of any Adverse Event Reports
18  involving the copper IUD ParaGard and pseudotumor
19  cerebri?
20  A.    I do not -- I don't -- I'm not aware of any.
21  No, I'm not.
22  Q.    You mention in your report an ACOG bulletin that
23  says that levonorgestrel IUDs may represent a
24  particularly sound choice. Does that sound correct?
25  For obese women. Sorry.

Page 233

1  A.    Yes, they -- yes, I did cite an ACOG document
2  where the product is recommended for obese women.
3  Q.    Did you know that one of the ACOG bulletins that
4  you cited to was prepared by a physician who is a Bayer
5  consultant for Mirena?
6      MR. SCHMIDT: Object to the characterization.
7      THE WITNESS: No, I don't know -- I didn't look
8  to see in the document the disclosures from the authors
9  of the bulletin.
10  BY MR. JONES:
11  Q.    Do you think that there should be disclosures in
12  the ACOG bulletin if it was prepared by a Bayer
13  consultant for Mirena?
14  A.    Possibly. It depends on the circumstances of
15  the relationship, the consulting relationship. Most
16  journals have their own policies which they ask their
17  authors to follow so...
18  Q.    You mention in your report that LNG,
19  levonorgestrel, is an active ingredient in 54 NDAs and
20  ANDAs; is that correct?
21  A.    Yes.
22  Q.    And you say that the FDA labeling database lists
23  75 separate product labels where LNG is an active
24  ingredient; is that correct?
25  A.    Yes.

David William Feigal, Jr., M.D., M.P.H.

Page 234

1    Q.    Did you do any searches of either the FDA
2  database or the WHO database to determine how many
3  Adverse Event Reports had been made alleging the
4  development of pseudotumor cerebri in relation to use of
5  these 75 separate product labels?
6    A.    The databases aren't organized that way.  The
7  databases are organized by -- the databases are
8  organized by the drug and by the drug product name.
9         So you can separate out Mirena in your searches
10  by searching on the drug product name, Mirena.  If you
11  search on levonorgestrel, you could identify the
12  levonorgestrel combination birth-control pills by also
13  specifying the estrogen component.
14        I did do searches initially of levonorgestrel
15  alone for all products but because I was largely looking
16  at the searches and with respect to Dr. Ross's and Dr.
17  Etminan's work, I mostly focused on the Mirena reports.
18    Q.    How many of the 75 separate products were
19  levonorgestrel combined with something else?
20    A.    Probably a very large number of them.
21    Q.    Most of them; right?
22    A.    Probably.  You can tell by the number of
23  generic birth-control pills that have been approved as
24  ANDAs.
25    Q.    And when you go into the WHO database and

Page 235

1  search, as you noted, you can put in levonorgestrel;
2  right?
3    A.    Yes.
4    Q.    And the adverse event that you are interested
5  in; correct?
6    A.    Yes.
7    Q.    And the report, the output, will actually list
8  the products that are associated with those reports;
9  correct?
10    A.    In the WHO, yes.
11    Q.    Okay.  And did you try to determine how many
12  pseudotumor cerebri reports were listed in connection
13  with other levonorgestrel-based products?
14    A.    No, I did not.
15    Q.    Would it surprise you to learn that if you were
16  to do a search like that, that Norplant and Mirena would
17  have far, far, far more reports than any other
18  levonorgestrel-based product?
19        MR. SCHMIDT:  Objection.  Foundation.
20        THE WITNESS:  I don't know if it would surprise
21  me or not.
22        I think -- I'm unaware of any protective effect
23  from the combination products, so it raises the question
24  of why do some products get reports and others not?  And
25  one of the things that we know actually increases the

Page 236

1  reporting rate is actually having an adverse reaction in
2  the labeling, as it is for Norplant.
3  BY MR. JONES:
4    Q.    But there's no similar adverse reaction for
5  pseudotumor cerebri in the Mirena label; correct?
6    A.    That's correct.  And then you have to look at
7  the relative use of the product.  So a product could
8  appear to have a large number of reports just by virtue
9  of the fact that it has the majority of the uses of that
10  product.
11    Q.    Can you tell me from your report how many
12  adverse reports there have been made in the FDA FAERS
13  system for Mirena during the life of the product?
14    A.    I don't know if I reported that.  That is one of
15  the things in OpenVigil.  It doesn't show the whole life
16  of the product because I think OpenVigil goes back to
17  2004, not all the way back to -- not all the way back to
18  2000.
19        MR. JONES:  Christina, will you help us find
20  this?
21        MS. NATALE:  Uh-huh.
22        MR. JONES:  It's 76.
23        THE WITNESS:  I mentioned in my report in
24  OpenVigil there are 73,330 reports --
25        MR. JONES:  Okay.

Page 237

1        THE WITNESS:  -- associated with Mirena.
2  BY MR. JONES:
3    Q.    So you used OpenVigil for that calculation?
4    A.    Yes.
5    Q.    And how many reports were there for ParaGard?
6    A.    There are very few reports for ParaGard in that
7  system.
8        I think that the challenge, and I don't know if
9  it's in my report, but that is the marketing period for
10  ParaGard.
11    Q.    Okay.  At Page 44 of your report you say there
12  were 73,330 Adverse Event Reports associated with
13  Mirena; correct?
14    A.    Yes.
15    Q.    And then at Page 45 you say there were 2,266
16  reports with ParaGard; correct?
17    A.    Yes.  But pointing out that --
18    Q.    ParaGard was approved in 1984; correct?
19    A.    Yes, that's right.
20        I mean, part of the point that I made was that
21  this product had already been on the market for almost
22  20 years before the OpenVigil database is collecting
23  things, and the older products are known to have far,
24  far fewer reports than the products when they're first
25  on the market.

David William Feigal, Jr., M.D., M.P.H.

Page 238

1    Q.    How far back does the OpenVigil data go?
2    A.    I believe to 2004.
3    Q.    Is that just that you limited the search to 2004
4    or is that the oldest data that's available in
5    OpenVigil?
6    A.    That's the oldest data that's available in
7    OpenVigil.
8    Q.    Are you sure about that?
9    A.    No.  I'd have to look at their website, but
10   that's what -- as I recall, that's what the numbers are
11   for OpenVigil.
12   Q.    But over the same time period that you searched
13   there were approximately 35 times the number of adverse
14   events reported with Mirena than with ParaGard; correct?
15   A.    Yes.  That's not surprising for a new product
16   compared to an old product.
17   Q.    Do you -- Mirena has been on the market in the
18   U.S. for 16 years now; is that correct?
19   A.    Yes, that's correct.
20   Q.    Okay.  How many Adverse Event Reports have there
21   been associated with Mirena in the last year?
22   A.    I didn't look that up.
23   Q.    Do you know whether the number of reports,
24   adverse reports, associated with Mirena have gone up or
25   gone down in the last year?

Page 239

1    A.    I didn't do that analysis.
2    Q.    Do you know -- you write in your report that
3    Mirena was first approved for marketing in Finland in
4    1990; is that correct?
5    A.    Yes.
6    Q.    And actually that's not exactly true, is it?
7    A.    Well, I don't know what you mean.
8    Q.    Well, isn't it true that when it was approved,
9    when the product was approved for marketing in Finland
10   in 1990, it was under the name Levonova?
11   A.    I don't recall what the European marketing name
12   was.
13   Q.    Have you ever heard of Levonova before?
14   A.    I may have.  I didn't really focus on the
15   marketing of the product before it was approved in the
16   U.S.
17   Q.    At any point during the course of your work in
18   this case have you ever searched to see if there were
19   any pseudotumor cerebri reports in association with
20   Levonova?
21   A.    In the 1990s or you mean still currently?
22   Q.    At any time.
23   A.    I don't know if it's still marketed by that
24   name.  But I have -- you know, with -- if it's marketed
25   by Bayer under a different name than Mirena, the reports

Page 240

1    would still come into the AERS database as reports of
2    Mirena adverse experiences, so I would assume that the
3    European reports are actually in the FAERS database.
4    Q.    But you're just assuming that.  You don't know.
5    A.    Well, it's -- they're --
6          MR. SCHMIDT:  Object to form.
7          THE WITNESS:  They actually can separate it out
8    by country because Dr. Ross's analysis did the U.S.  I
9    tried to see what he was doing and looked at the U.S.,
10   Dr. Etminan looked at the worldwide reports, as I
11   recall, and I looked at the total in the world.  But I
12   didn't try and separate out European reports.
13   BY MR. JONES:
14   Q.    So my question is direct.  Have you ever sat
15   down at a database and searched to determine whether
16   there were any pseudotumor cerebri reports associated
17   with the usage of Levonova?
18         MR. SCHMIDT:  Object to the preamble.  Asked and
19   answered.
20         THE WITNESS:  Not directly.  I have searched for
21   the levonorgestrel irrespective of product that would
22   have included Levonova but I did not look for Levonova
23   per se.
24   BY MR. JONES:
25   Q.    Do you know how many different formulations of

Page 241

1    Mirena there have been since it was first approved as
2    Levonova in Finland in 1990?
3          MR. SCHMIDT:  Objection.  Vague.
4          THE WITNESS:  No, I have not tracked the
5    different formulation changes.
6    BY MR. JONES:
7    Q.    Did you know that the initial studies of the
8    product that were submitted to FDA were based upon
9    formulations different than the formulation that has
10   been marketed in the United States?
11         MR. SCHMIDT:  Object to foundation.
12         THE WITNESS:  I didn't -- I don't recall if I
13   knew that.  I focused on the product that was approved
14   in the U.S. and has been used in the U.S.
15   BY MR. JONES:
16   Q.    The initial IND was submitted to FDA by the
17   Population Council on August 17th, 1983; is that
18   correct?
19   A.    Yes, that is correct.
20   Q.    Okay.  And then on November 12th, 1997, the IND
21   was transferred to Berlex Labs, who filed the NDA on
22   January 21st, 2000; is that correct?
23   A.    Yes.
24   Q.    Do you know why there was a 17-year lag between
25   the IND being submitted and the NDA being filed?

David William Feigal, Jr., M.D., M.P.H.

Page 242

1     MR. SCHMIDT: Object to characterization.
2     THE WITNESS: I don't know exactly, but during
3  this time period, the use of IUDs in the U.S. dropped
4  markedly and many, many IUDs were withdrawn from the
5  market after the experience with the Dalkon Shield. So
6  there was a time period here where there was much less
7  interest in the IUD as a contraceptive method than there
8  is today because of that experience.
9  BY MR. JONES:
10    Q.    Based upon your review of the NDA materials, you
11 realize that Leiras Oy was also involved in seeking
12 approval for Mirena in the United States; correct?
13    A.    I don't recall the exact business relationship
14 between different partners.  There were different
15 people -- different companies and different entities
16 involved with the product at different points in time.
17    Q.    You write that FDA approved Mirena on
18 December 6th, 2000, after 41 supplemental submissions;
19 is that correct?
20    A.    Yes.
21    Q.    And did you read all 41 supplemental
22 submissions?
23    A.    No.  I read their decision based on the review
24 of that cumulative information.
25    Q.    Did you know that in the period before Mirena

Page 243

1  was approved for use in the United States, that
2  intracranial -- benign intracranial hypertension was
3  added to its investigator brochure?
4     A.    I think I did know that, yes.
5     Q.    Did you know that as far back as the mid-'90s,
6  that benign intracranial hypertension was included as a
7  target diagnosis in a hospitalization study being done
8  by the company?
9     A.    I don't --
10    MR. SCHMIDT: Object to foundation.
11    THE WITNESS: I don't recall this.  I don't
12 recall that study.
13 BY MR. JONES:
14    Q.    Were you provided the hospitalization study?
15    MR. SCHMIDT: Same objection.
16    THE WITNESS: Not that I recall.
17 BY MR. JONES:
18    Q.    Have you ever heard of the hospitalization
19 study?
20    A.    Not sitting here today, I don't remember that
21 particular study.
22    Q.    Were you provided with the investigator's
23 brochure?
24    A.    I'm not sure.  But I was aware that the
25 investigator's brochure was based on information that

Page 244

1  included information related to Norplant.
2     Q.    Did you know that in the hospitalization study
3  section listing benign intracranial hypertension as a
4  target diagnosis that Bayer said or that the company at
5  that time said that benign intracranial hypertension was
6  known to be related to hormonal contraceptives?
7     MR. SCHMIDT: Objection.  Foundation.
8     THE WITNESS: I haven't seen that document and
9  I'm not aware that that study actually identified any
10 cases or any study identified cases of benign
11 intracranial hypertension at that time.
12 BY MR. JONES:
13    Q.    You've given opinions in this case that benign
14 intracranial hypertension/pseudotumor cerebri is not
15 related to hormonal contraceptives; correct?
16    A.    Well, my opinion is specific to Mirena but I
17 also -- I didn't really -- I don't have access to and I
18 don't think -- I don't know if the data -- the documents
19 exist to revisit the entire story with Norplant.  But I
20 think with what we know today about Norplant and its
21 follow-on products and pseudotumor cerebri, that that
22 association doesn't meet the current standard for
23 reasonable evidence of causal association, even for
24 Norplant.
25    Q.    Isn't it true that you write in your report that

Page 245

1  benign intracranial hypertension/pseudotumor cerebri is
2  not related to use of hormonal contraceptives?
3     A.    Well, that is my opinion.  I think I've focused
4  first on Mirena but, as I just finished up, I also
5  believe that's true about Norplant.  And I don't see any
6  evidence that it's related to the oral contraceptives.
7     Q.    Yeah.  You talked about -- you said in your
8  report that it's not related to oral contraceptives;
9  right?
10    A.    Yes.
11    Q.    So don't you think that it would have been
12 enlightening to your opinions to know that the company
13 said back in the 1990s that benign intracranial
14 hypertension was known to be related to hormonal
15 contraceptives?
16    MR. SCHMIDT: I'll object to you asking this
17 line of questions without showing him the document.
18    MR. JONES: You should have given him the
19 document.
20    MR. SCHMIDT: We don't need to fight about it.
21 BY MR. JONES:
22    Q.    You can answer.
23    MR. SCHMIDT: I don't think it's a fair
24 question, and I'll object.
25    THE WITNESS: Well, I think that there were risk

David William Feigal, Jr., M.D., M.P.H.

Page 246

1    assessments made in the 1990s based on the early
2    Norplant experience that were the state of the knowledge
3    at that time.
4            What we know now, based on much more extensive
5    use of these products, is that the evidence that was the
6    basis for those opinions in 1990 hasn't been borne out.
7        So I don't know what my opinion would have been
8    in 1990 and I'm not really offering an opinion about
9    whether the company's opinions were reasonable in 1990
10   but, as we sit here today, I don't think there is
11   reasonable evidence for a causal association for
12   levonorgestrel and benign intracranial hypertension.
13   BY MR. JONES:
14   Q.    You talk about 20 investigational trials at
15   Page 21 of your report.
16   A.    Yes.
17   Q.    Can you tell me what formulation of the product
18   was used in those 20 investigational trials?
19           MR. SCHMIDT:  Objection to formulation.
20           THE WITNESS:  Not without going back and
21   reviewing the summary data.  But I'm quoting from the
22   summary that the studies that were the basis of the
23   safety database.
24   BY MR. JONES:
25   Q.    Did you know that the marketed formulation was

Page 247

1    shown in Bayer's studies to actually have higher release
2    rates than the earlier formulations that were used in
3    the pre-approval studies?
4            MR. SCHMIDT:  Object to foundation,
5    characterization.
6            THE WITNESS:  I don't know if that's correct or
7    not.  I have not reviewed that information.
8    BY MR. JONES:
9    Q.    Did you review the NDA package in this case?
10           MR. SCHMIDT:  Asked and answered.
11           THE WITNESS:  Yes, I told you that I reviewed
12   the overall summaries that described the basis for the
13   safety information and the efficacy information.  Yes, I
14   did.
15   BY MR. JONES:
16   Q.    Did you know that the information I've been
17   questioning you about about the different formulations
18   was in the NDA package?
19           MR. SCHMIDT:  Same objection.
20           THE WITNESS:  It wouldn't surprise me.  The
21   safety information in an NDA is based on all
22   formulations and all doses that are used during the
23   investigation of the product, so most NDAs will contain
24   safety information about a variety of different doses
25   and exposures and all of that information is considered,

Page 248

1    as is the selection of the product that's going to be
2    marketed.
3    BY MR. JONES:
4    Q.    You write at Page 24 of your report that IIH
5    most often presents in young women who are overweight or
6    obese, although it is occasionally seen in children,
7    men, and older adults as well; is that correct?
8    A.    Yes.
9    Q.    Okay.  And you agree that it's seen in much
10   lesser rates in children, men, and older adults;
11   correct?
12   A.    Yes, that's correct.
13   Q.    Okay.  And you agree that PTC/IIH is less common
14   in prepubescent females; correct?
15   A.    Yes, I believe that's correct.
16   Q.    Okay.  And doesn't that suggest to you that
17   there's a hormonal component to the development of the
18   disease state?
19   A.    No, not necessarily.  There are many
20   differences.  There are many diseases which have a
21   predilection for men or for women that are not based on
22   hormonal differences between men and women and
23   differences then in age groups that don't relate to the
24   hormonal changes in ages.  So no, I don't think that's
25   direct evidence that it's related to hormonal changes.

Page 249

1    Q.    You talk about signs and symptoms of IIH/PTC
2    include papilledema, headache, pulsatile noises, and
3    visual disturbances; is that correct?
4    A.    Yes.
5    Q.    And did you review all Bayer Adverse Event
6    Reports that included these terms?
7    A.    No, I did not.
8    Q.    You mentioned earlier in your experience at one
9    of your pharmaceutical companies that you were familiar
10   with a software system called Argus?
11   A.    Yes.
12   Q.    Were you given access to Bayer's Argus system to
13   perform searches for this case?
14   A.    No, I didn't feel that was necessary for me to
15   develop my opinions.
16   Q.    You don't contend that obesity causes
17   pseudotumor cerebri, do you?
18   A.    I would describe that as a causal association.
19   It's -- it -- there could be something about obesity and
20   about the changes in the body associated with obesity
21   that is the underlying cause but I don't think the
22   mechanism is actually well understood.
23   Q.    Is that something that happens in the body, is
24   it hormonal?
25   A.    No, there's things that happen in the body that

David William Feigal, Jr., M.D., M.P.H.

---

Page 250

1  aren't hormonal.
2  Q.    What percentage of obese or overweight women
3  develop PTC?
4  A.    Well, I think the rates that -- you know, the
5  rates in the general population are thought to be one to
6  two per hundred thousand and the rates in obese women of
7  childbearing potential are as high as 20 per hundred
8  thousand.
9  Q.    So a very small percentage of women of
10  childbearing age who are overweight or obese ultimately
11  develop PTC; correct?
12  A.    Yes, that's correct.
13  Q.    But you believe there's a causal association
14  between obesity and overweight and PTC?
15  A.    Yes. When we say the word "association," it
16  means causation hasn't been proven, but that gives you a
17  risk factor that increases the risk, you know, 10- to
18  20-fold. That's greater than the risk of cigarettes for
19  lung cancer.
20  Q.    Let's talk about cigarettes and lung cancer.
21        Is there an established pattern of development
22  of lung cancer with cigarette smokers?
23  A.    Well, I think the epidemiology is well stood, if
24  that -- understood, if that's what you mean by pattern,
25  yes.

---

Page 251

1  Q.    No. I'm talking about a temporal pattern.
2  A.    Well, the temporal relationship is that smokers'
3  risk increases steadily with duration of use, which is
4  temporal, and also amount of use.
5  Q.    Some cigarette smokers never develop lung
6  cancer; right?
7  A.    That's correct.
8  Q.    Okay. I'm a cigarette smoker. Can you tell me
9  as we sit here today, based upon current scientific
10  knowledge, when or if I will develop lung cancer?
11  A.    No. It's -- the smoker's risk of lung cancer --
12  the average smoker's risk of lung cancer is
13  approximately ten times greater than the risk of a
14  non-smoker.
15  Q.    But the inability to determine a time period in
16  which someone will develop lung cancer does not negate
17  the fact that there is a causal association between
18  smoking cigarettes and lung cancer; correct?
19  A.    Well, that's correct. For any given individual
20  you can't predict what will happen.
21        Risk changes over time, risk changes with dose.
22  There's many different sources of evidence that suggest
23  that cigarettes and lung cancer is a causal association.
24  But not every lung -- not every smoker gets lung cancer,
25  it's just that the risk is much higher if you're a

---

Page 252

1  smoker.
2  Q.    And if I get lung cancer, stopping smoking is
3  not going to make the lung cancer go away, is it?
4  A.    In the case of lung cancer, stopping smoking
5  will not make it go away. That's correct.
6  Q.    You say that at Page 24, due to increases in
7  obesity, since those data were generated several decades
8  ago and because obesity has dramatic -- because obesity
9  dramatically increases the risk for IIH, the incidence
10  rate is likely higher today.
11        Did I read that correctly?
12  A.    Yes.
13  Q.    Okay. And can you point me to any scientific
14  studies anywhere that show that the incidence rate of
15  PTC is higher today because of increases in obesity?
16  A.    No. It's an indirect conclusion. We know the
17  obesity -- proportion of the population that's obese is
18  higher than it's been in the past and we know that
19  obesity, the prevalence in obesity is higher; therefore,
20  the prevalence in the population which has more obesity
21  will have a higher prevalence.
22  Q.    What percentage of the U.S. population is obese
23  or overweight?
24  A.    Obese or overweight, overweight is usually
25  defined with a BMI of 25 and obese at 30 and more

---

Page 253

1  serious obesity at a BMI of 35.
2        Actually, I don't remember the exact number. I
3  know the number that is overweight or obese is more than
4  half the population.
5  Q.    And I've seen it referred to as about
6  two-thirds.
7  A.    Yes, that probably is correct.
8  Q.    Okay. And do you know what percentage of Mirena
9  users would be considered overweight or obese?
10  A.    No, I do not.
11  Q.    You've never seen any data on that point?
12  A.    I don't know if it's available, but I don't
13  recall seeing estimates of obesity in Mirena users.
14  Q.    Have you ever asked Bayer's lawyers for that
15  data, the obesity and overweight percentage of its
16  users?
17  A.    No. I think that the thing I was trying to
18  determine was the obesity in the cases that are reported
19  with PTC, but I didn't ask for it for the Mirena users.
20  Q.    At Page 25 you say, with many patients, IIH
21  either resolves spontaneously or resolves after the
22  patient receives a lumbar puncture.
23        Did I read that correctly?
24  A.    Yes.
25  Q.    And do you know what percentage of patients have

---

David William Feigal, Jr., M.D., M.P.H.

Page 254

1  spontaneous resolution of their IIH?
2  A.   No, I don't.
3  Q.   Do you know scientifically the reason why one
4  would experience spontaneous resolution of IIH?
5  A.   No.  I know it's a situation -- it's a -- it's
6  one of the conditions that waxes and wanes and sometimes
7  recurs but I don't know if we know the reasons for why
8  it can spontaneously resolve without treatment.
9  Q.   And it resolves sometimes after a patient
10  receives a lumbar puncture, which is a diagnostic tool
11  for determining whether one has PTC; correct?
12  A.   That's correct.
13  Q.   Does it completely resolve in those patients or
14  does it sometimes just provide temporary relief?
15  A.   I think it's variable.
16  Q.   And you would agree with me, wouldn't you, that
17  there are patients who have developed PTC that will have
18  it permanently, regardless of whether their -- they lose
19  weight or not?
20  MR. SCHMIDT:  Objection.  Vague.
21  THE WITNESS:  I'm not sure what you mean by
22  permanently.  There are neurologic complications in some
23  patients that are permanent, that persist, so in that
24  sense, the condition can have permanent effects, yes.
25

Page 255

1  BY MR. JONES:
2  Q.   Are you aware of any cure for PTC?
3  A.   Well, I guess I don't think of it as a disease
4  that has a cure or not a cure.  It has treatments that
5  resolve, resolve the episode, which, you know, include
6  lumbar puncture and acetazolamide, which is a diuretic,
7  and, as I mentioned, some -- you know, some patients
8  will spontaneously improve, others will have
9  recurrences.
10  Q.   The treatments resolve the symptoms; correct?
11  A.   Yes.
12  Q.   There's no pill that you can take that just
13  cures you of the disease.
14  A.   Well, I'm not sure I understand the distinction.
15  I guess I don't think of this as necessarily a
16  chronic, persistent condition of -- I think there are
17  many patients where the episode resolves and does not
18  recur.
19  Q.   And, alternatively, there are many patients
20  where the condition does not resolve; correct?
21  A.   There are some.  I don't know the breakdown.
22  Q.   Because you're not -- you said earlier --
23  A.   I'm --
24  Q.   -- you're not an expert on PTC/IIH; correct?
25  A.   No, I'm not offering -- I'm not offering an

Page 256

1  opinion about that.
2  I can recall in the case-controlled studies, in
3  one case-controlled study where they identified
4  patients, approximately half of them were patients with
5  recurrences and the other half had never had a
6  recurrence after the resolution.  But I don't know if
7  that's representative.
8  Q.   You mentioned that -- oh, strike that.
9  At Page 25 you talk about the IIH warning was
10  added to Norplant based on a small number of case
11  reports?
12  A.   Yes.
13  Q.   Okay.  How many is a small number?
14  A.   Well, I think I walk through in Section 1, which
15  begins on the bottom of 26, the evidence, beginning with
16  two reports and then in 1995 two additional reports and
17  then reports by Alder, who identified 56 cases, although
18  it's not clear that they're all IIH because he included
19  disk edema alone, which may or may not have been -- may
20  not have been pseudotumor cerebri.  But these were the
21  cases that resulted in the Norplant warning.
22  Q.   Do you know when the Norplant warning was added
23  to the label?
24  A.   1992, I believe.
25  Q.   Okay.  And you were just talking about, I asked

Page 257

1  you about the small number of case reports and you were
2  citing to 1995 articles; right?
3  A.   Well, that's right.  I think there were much
4  fewer than that.  So initially, it was based on a very
5  small number.
6  Q.   Well, you say "much fewer than that."
7  Can you point me to any evidence anywhere that
8  tells me exactly how many number of case reports were in
9  Wyeth's possession at the time that it proposed the
10  labeling change to add idiopathic intracranial
11  hypertension to the Norplant System?
12  A.   I don't have any data that actually indicates
13  the number of reports.
14  We know that by the time of the Alder report in
15  '95, that Wyeth-Ayerst commented that they had 70
16  reports by 1995.  And, of course, by that time, it's in
17  the labeling and attention is being called to it.  But I
18  actually don't have the historical data of how many
19  cases were initially reported.
20  Q.   And so when you say small, that it was based on
21  a small number of case reports, where are you getting
22  that information that it was a small number versus a
23  large number?
24  A.   Well, the fact that even by '95, we're still
25  dealing with -- you know, after the condition has been

David William Feigal, Jr., M.D., M.P.H.

Page 258

1    publicized, we're still dealing with, at most, the 70
2    cases and the cases at the time of the labeling had to
3    be some smaller set of that 70.
4    Q.    Okay.  Because it was changed three years
5    earlier.
6    A.    Yes, that's right.
7    Q.    So you're concluding that it was something
8    substantially less than 70 when Wyeth proposed this
9    labeling change; right?
10   A.    Yes.
11        MR. SCHMIDT:  Object to characterization.
12        THE WITNESS:  Well, and there's nothing in the
13   literature that describes a larger number of cases.
14   BY MR. JONES:
15   Q.    And today you're aware that there are well over
16   100 cases of PTC/IIH reported in association with
17   Mirena; right?
18   A.    Yes, that's correct.
19   Q.    Okay.  And you're not aware of any efforts by
20   Bayer to go to the FDA and propose a labeling change to
21   add IIH/PTC; correct?
22   A.    Well, that's correct.
23        I think those are the number of cases that have
24   been acquired over all of the use since the product has
25   been on the market and reflects a very different

Page 259

1    situation than the labeling decisions that were made
2    when Norplant was relatively new to the market.
3    Q.    Okay.  Let's look at, you cite the label change
4    starting at Page 25 and going to Page 26.  Okay?
5    A.    Yes.
6    Q.    And it says, "Idiopathic Intracranial
7    Hypertension," and then beginning with the first
8    sentence, idiopathic intracranial hypertension
9    (pseudotumor cerebri, benign intracranial hypertension)
10   is a disorder of unknown etiology which is seen most
11   commonly in obese females of reproductive age.
12        Do you agree with that?
13   A.    Yes, you read that correctly.
14   Q.    Okay.  Do you agree with that statement, though?
15   A.    Yes.
16   Q.    Okay.  There have been reports of intracranial
17   hypertension -- there have been reports of idiopathic
18   intracranial hypertension in Norplant System users.
19        Do you agree with that?
20   A.    Yes, there were reports.
21   Q.    Okay.  And do you agree that, as we sit here
22   today, there have been reports of idiopathic
23   intracranial hypertension in Mirena users?
24   A.    Yes, that's also correct.
25   Q.    Okay.  And you would agree that going all the

Page 260

1    way back to 2002, there had been reports of idiopathic
2    intracranial hypertension in Norplant System users.
3    A.    Yes, that's correct.
4    Q.    A cardinal sign of idiopathic intracranial
5    hypertension is papilledema.  Early symptoms may include
6    headache associated with a change in frequency, pattern,
7    severity or persistence.  Of particular importance are
8    those headaches that are unremitting in nature and
9    visual disturbances.
10        Do you agree with that?
11   A.    Yes, I think that's correct.
12   Q.    Okay.  Patients with these symptoms,
13   particularly obese patients or those with recent weight
14   gain, should be screened for papilledema and, if
15   present, the patient should be referred to a neurologist
16   for further diagnosis and care.
17        Do you agree with that?
18   A.    Yes, generally.
19   Q.    What do you not agree with in that sentence?
20   A.    I think it's just a matter of medical judgment
21   when you screen a patient for papilledema.  Many of
22   these symptoms are nonspecific and so it would really
23   depend on the patient's history.  But, generally
24   speaking, I think that's reasonable advice.
25   Q.    Yeah.  It's not wrong to tell doctors that if

Page 261

1    you see these symptoms in your patients, particularly
2    obese patients or those with recent weight gain, to
3    screen them for a serious condition.  That's not
4    unreasonable, is it?
5    A.    No, it's not unreasonable.
6    Q.    And then the final part of the Norplant label
7    says, Norplant System should be removed from patients
8    experiencing this disorder.
9        Do you agree with that?
10   A.    Well, that's what the statement says.  I -- in
11   hindsight, looking back at that, we know now that the
12   IIH resolves in patients when you leave it in and
13   there's other patients when you take it out and they're
14   given other treatments, it resolves in them as well.
15   It's not clear to me, sitting here today, that that is
16   still a well-founded recommendation.
17   Q.    If you had a patient come to you that had
18   PTC/IIH that had the Norplant System in there, would you
19   recommend removal?
20        MR. SCHMIDT:  Objection.  Foundation, incomplete
21   hypothetical.
22        THE WITNESS:  I think it would -- this was
23   information that was written almost 25 years ago.
24        I think with what we know now, I think it would
25   be an individual discussion with the patient and it

66 (Pages 258 to 261)

David William Feigal, Jr., M.D., M.P.H.

| Page 262 |
| --- |

1  might be very reasonable to treat the patient and see if
2  the symptoms resolve.
3  BY MR. JONES:
4  Q.    What do we know now that makes it safe to leave
5  a Norplant System in a patient who's experiencing PTC?
6  MR. SCHMIDT: Object to characterization.
7  THE WITNESS: Well, what we know now is that the
8  sparsity of reports, despite 30 years of use and
9  millions and millions of patients of use, is that, you
10  know, based on this initial prediction, had it been
11  correct, this should have been an ongoing and, you know,
12  management problem with patients taking levonorgestrel
13  and yet for the products that come out further -- I
14  mean, you see this if you just even look at the U.S.
15  reports in the OpenVigil database system. We have 24
16  reports in ten years of experience and we have reports
17  of patients whose symptoms resolve when the Mirena is
18  not removed.
19  So I think that's a little categorical and I
20  think it's an individual decision that should be made
21  between the patient and the physician.
22  BY MR. JONES:
23  Q.    You read the literature that you cited about
24  Norplant, the Norplant experience; correct?
25  A.    Yes.

| Page 263 |
| --- |

1  Q.    And you agree with me that in that, in that
2  literature, the Wysowski article, the Oliver letter,
3  those cite to patients that the symptoms went away when
4  the Norplant was removed; right?
5  A.    Yes. But we know now that when Mirena is left
6  in place, which is, you know, another source of
7  levonorgestrel, that the patients will often improve
8  even when it's left in place.
9  Q.    More often -- if you've looked at the documents,
10  more often, isn't it true that patients actually have a
11  resolution of symptoms after the Mirena is removed?
12  MR. SCHMIDT: Object to foundation.
13  THE WITNESS: Well, again, there are very few
14  patients you can interpret that that's due to the Mirena
15  removal because that's not all that's done. They're
16  also treated with lumbar punctures and with diuretics.
17  So my interpretation of the evidence is that the
18  symptoms resolve whether you remove the Mirena or not.
19  MR. JONES: Okay. We have to take a break.
20  We'll pick back up there when we come back.
21  VIDEO OPERATOR: This is the end of Media Number
22  3.
23  We are going off the record at 4:54 p.m.
24  (Recess, 4:54-5:05 p.m.)
25  VIDEO OPERATOR: This is the beginning of Media

| Page 264 |
| --- |

1  Number 4.
2  We are back on the record at 5:05 p.m.
3  BY MR. JONES:
4  Q.    Dr. Ellman (sic), we're back on the record.
5  Can you go to Page 41 of your report?
6  A.    Okay.
7  Q.    Okay. The first full paragraph, third sentence,
8  you say, Bayer reasonably and appropriately decided that
9  the Norplant label should be used only on a case-by-case
10  basis when scientific evidence demonstrated its
11  applicability to Mirena, and then there's a Footnote 69.
12  Do you see that?
13  A.    Yes.
14  Q.    Okay. And then if you go down to Footnote 69,
15  the label on the document is MIR_JR_00186491.
16  Did I read that correctly?
17  A.    Yes.
18  Q.    Okay.
19  MR. JONES: I'm going to hand this to the court
20  reporter to be marked as Deposition Exhibit 7.
21  (Exhibit Feigal-7 was marked for
22  identification.)
23  BY MR. JONES:
24  Q.    Is the document that I handed you, on the front
25  page does that say MIR_JR_00186491?

| Page 265 |
| --- |

1  A.    Yes, it does.
2  Q.    Okay. And is that the document cited in
3  Footnote 69 of your report?
4  A.    Yes.
5  Q.    Okay. And can you point me to where in this
6  document it mentions Norplant?
7  MR. SCHMIDT: I'll object to the premise of this
8  question.
9  MR. JONES: Can you be more specific? Maybe I
10  can fix it.
11  MR. SCHMIDT: Yeah. I think you're citing the
12  wrong document from his report.
13  MR. JONES: And why do you say that?
14  MR. SCHMIDT: Because I think what he's using
15  for the Norplant proposition is 70.
16  MR. JONES: It cites Footnote 69 for the
17  sentence that I read.
18  THE WITNESS: Well, I think this is the document
19  that lays out the labeling strategy and then 70 I think
20  is a quote from a Bayer document where it's discussing a
21  risk factor that is in Norplant.
22  BY MR. JONES:
23  Q.    Well, let's read your sentence again: Bayer
24  reasonably and appropriately decided that the Norplant
25  label should be used only on a case-by-case basis when

Golkow Technologies, Inc877.370.3377

David William Feigal, Jr., M.D., M.P.H.

| Page 266 |
| --- |

1  scientific evidence demonstrated its applicability to
2  Mirena, Footnote 69; correct?
3      A.   Yes.
4      Q.   Okay.  So tell me where in this document it
5  mentions the word "Mirena."
6          MR. SCHMIDT:  Same objection.
7          THE WITNESS:  Oh.  Well, I think you meant
8  Norplant.
9          MR. JONES:  Or Norplant.
10         THE WITNESS:  Yes.
11         It does not.  These two sentences go together
12  and the two footnotes and the two documents go together.
13         So the first document lays out the labeling team
14  and the strategy and shows the deliberate way in which
15  they were approaching the labeling and then Document 70
16  is actually a specific reference to a Norplant warning
17  that they're considering for Mirena.
18  BY MR. JONES:
19     Q.   Well, isn't conventional use of a citation
20  something to support the proposition that you've just
21  laid out in the sentence that you're citing to?
22     A.   Yes.
23         MR. SCHMIDT:  Objection.
24  BY MR. JONES:
25     Q.   Can you -- do you see -- can you flip to

| Page 267 |
| --- |

1  MIR_JR_00186492.
2          MR. SCHMIDT:  Can you give me that number again?
3          MR. JONES:  MIR_JR_00186492.
4          MR. SCHMIDT:  Thank you.
5          MR. JONES:  The second page of the document, on
6  the back side.
7          THE WITNESS:  Oh, okay.
8          MR. JONES:  Okay.
9  BY MR. JONES:
10     Q.   Do you see down towards the bottom where it
11  says, it was proposed to follow the, redacted other
12  Bayer, label with respect to, and then it lists some
13  items?
14     A.   Yes.
15     Q.   Okay.  Were you ever provided with a copy of a
16  document that did not have that redacted other Bayer box
17  over whatever the text is underneath that?
18     A.   Not that I recall.
19     Q.   Were you -- see on the next page it says,
20  "Redacted:  Manufacturing/CM&C"?
21     A.   Yes.
22     Q.   Okay.  And were you ever provided a copy of this
23  document without the redactions for Manufacturing/CM&C
24  redaction?
25     A.   No; although I don't think the chemistry,

| Page 268 |
| --- |

1  manufacturing and controls are relevant to what I was
2  reviewing.
3          But I think the document does show that they're
4  taking labeling from other labeling, and then when you
5  look at the other document where I have a direct quote,
6  you can see that it does relate to Norplant.
7      Q.   I just wanted to make sure you were -- you're
8  not using this document to say that Bayer reasonably and
9  appropriately decided that the Norplant label should be
10  used only on a case-by-case basis when scientific
11  evidence demonstrated its applicability to Mirena.
12         MR. SCHMIDT:  Object to characterization.
13         THE WITNESS:  Well, I think the document does
14  show.  I mean, the product is redacted, but if you look
15  at the other document and we trace it back to Norplant,
16  they are basing it on another label, and that's what
17  this document shows and that's what I've said in that
18  sentence.
19  BY MR. JONES:
20     Q.   So are you concluding that this redaction and
21  the it was proposed to follow the redacted label with
22  respect to, are you concluding that it says Norplant
23  under that redaction box?
24     A.   As I recall -- I don't have the other document
25  in front of me, but the other document is a specific

| Page 269 |
| --- |

1  example of a Norplant issue that they are looking at and
2  it's an example of their case-by-case examination of the
3  Norplant warnings and not just -- and issues in Norplant
4  and not just accepting or rejecting all of them.
5  They're making their decisions on a scientific basis.
6      Q.   Let's switch gears a little bit.
7          Back when you were at FDA, did you feel as
8  though FDA had adequate resources to do its job and
9  satisfy its mission?
10     A.   For the most part.  There were some areas,
11  particularly foreign inspections, where FDA could have
12  used additional resources and, to an extent, even for
13  some domestic, domestic inspections.  But at the review
14  divisions I felt, that I was responsible for, that I had
15  adequate resources.
16     Q.   Do you feel as though, is it your belief that
17  FDA has adequate resources today to meet its mission?
18     A.   I think if the word is "adequate," yes.  I think
19  actually there are areas still where there are needs
20  to -- needs -- where there's a need to add specific
21  types of scientists and reviewers.  So it's an ongoing
22  process of building and improving the FDA but I think
23  that from a -- the issues that are relevant to this
24  case, the FDA resources are adequate, and it's actually
25  where FDA places in the drug center a large percentage

68 (Pages 266 to 269)

David William Feigal, Jr., M.D., M.P.H.

Page 270

1  of its resources is in the review process.
2  Q.    Based upon your experience at FDA, did you ever
3  feel as though there was a lack of adequate resources
4  that rose to the level of being a crisis for the FDA?
5  A.    No.
6  Q.    Do you remember being involved in an American
7  course on drug development and regulatory sciences at
8  the Mission Bay Conference Center at UCSF?
9  A.    Yes.
10  Q.    Okay. And your wife also -- you were a faculty
11  member at that conference; correct?
12  A.    That's right. My wife was the course director,
13  and I still teach in that -- that course is still
14  ongoing. It's jointly taught by FDA and UC-San
15  Francisco. And actually, there's a session next week
16  where I'm giving two lectures.
17  Q.    Okay. And you were involved in a section called
18  "The Global Registration and Approval Process"; correct?
19  A.    I don't recognize that title but --
20  Q.    Okay. Well, let me try to refresh your
21  recollection.
22  A.    Okay.
23  Q.    Some of the lectures given as part of that were
24  the history of regulation of drugs and biologics, U.S.,
25  U.K., Germany, and Japan, FDA regulatory pathways, INDs,

Page 271

1  EINDs, NDAs, BLAs, 505 B1, 505 B2, and ANDAs, EMA and EU
2  registration procedures, centralized procedure, mutual
3  recognition procedure, and decentralized procedure.
4  There were also presentations on FDA's critical path
5  initiative.
6     Have you ever heard of that before?
7  A.    Yes, I was there when that program was
8  implemented and designed.
9  Q.    Okay. There were also presentations on the IOM
10  report on drug safety and FDA Science Board Subcommittee
11  on Science and Technology Report, "FDA Science and
12  Mission At Risk. Where Are We Now?"
13     Do you remember that?
14  A.    Yes, I know that report. Yes.
15  Q.    And do you know the report, the FDA Science and
16  Mission At Risk report?
17  A.    Yes, I know that report.
18  Q.    And can you tell me what the FDA Science
19  and Mission, FDA Science and Mission At Risk report is?
20  A.    This was a report prepared by the FDA Science
21  Board. I was actually a member of that board while I
22  was the center director because the center directors sit
23  on that board with some external advisors.
24     It was a report prepared at the request of the
25  FDA as part of a budget justification for increasing

Page 272

1  staffing in some areas, for improving computer systems.
2  There's other areas. Those are just a couple that I
3  recall that were identified in the report.
4     MR. JONES: Can we mark that as Deposition
5  Exhibit 8.
6     (Exhibit Feigal-8 was marked for
7  identification.)
8  BY MR. JONES:
9  Q.    What's been handed to you is the FDA Science and
10  Mission at Risk report of the Subcommittee on Science
11  and Technology prepared for the FDA Science Board dated
12  November 2007; is that correct?
13  A.    Yes.
14  Q.    And you've seen this report before; right?
15  A.    I have.
16  Q.    Okay. And let's go, can we flip over to the --
17  it's the fourth page in that set but it's labeled little
18  I, little I, little I.
19  A.    Oh, okay.
20  Q.    See where it says "FDA Mission Statement"?
21  A.    Yes.
22  Q.    Okay. It reads, the FDA is responsible for
23  protecting the public health by assuring the safety,
24  efficacy, and security of human and veterinary drugs,
25  biological products, medical devices, our nation's food

Page 273

1  supply, cosmetics, and products that emit radiation.
2  The FDA is also responsible for advancing the public
3  health by helping to speed innovations that make
4  medicines and foods more effective, safer, and more
5  affordable and helping the public get the accurate,
6  science-based information they need to use medicines and
7  foods to improve their health.
8     Did I read that correctly?
9  A.    Yes, you did.
10  Q.    And did you understand that to be FDA's mission?
11  A.    That is FDA's mission statement, yes.
12  Q.    Okay. And let's flip over to the next page
13  where it says "Executive Summary."
14  A.    Yes.
15  Q.    Second paragraph, a strong -- or first
16  paragraph, a strong Food and Drug Administration is
17  crucial for the health of our country.
18     Do you agree with that?
19  A.    Yes.
20  Q.    Second paragraph, the FDA constitutes a critical
21  component of our nation's healthcare delivery and public
22  health system.
23     Do you agree with that?
24  A.    Yes.
25  Q.    The FDA, as much as any public or private sector

David William Feigal, Jr., M.D., M.P.H.

Page 274

1 institution in this country, touches the lives, health,
2 and well-being of all Americans and is integral to the
3 nation's economy and its security.
4      Do you agree with that?
5 A.   Yes, I do.
6 Q.   Okay.  Going down to the fourth paragraph, the
7 FDA is also central to the economic health of the
8 nation, regulating approximately $1 trillion in consumer
9 products or 25 cents of every consumer dollar expended
10 in this country annually.
11      Do you agree with that?
12 A.   Yes.
13 Q.   Go to the next page.  It begins, thus, the
14 nation is at risk if FDA science is at risk.
15      Do you agree that the nation is at risk if FDA
16 science is at risk?
17 A.   Generally speaking, that's true.  I think you
18 have to get much more specific.
19      And, in fact, when you look at the risks they're
20 talking about, they lead off with the need to improve
21 the science in the food science area and food safety
22 because there's approximately 50,000 deaths a year from
23 food poisoning and food contamination.
24      So there very specific examples that are
25 given in the report.  I think you need to look at the

Page 275

1 report examples rather than to --
2 Q.   But --
3 A.   -- accept the broad premise that the nation is
4 at -- that all parts of things that FDA regulate are at
5 risk because some things need resources and other things
6 are in pretty good shape.
7 Q.   Well, and that's what we're doing.  We're going
8 to look at the report.
9 A.   Okay.
10 Q.   But you agree with me that this report is not
11 limited to food safety, is it?
12 A.   Oh, no, it's not.
13 Q.   And --
14 A.   It's all FDA products.
15 Q.   It relates to drugs that are regulated by the
16 FDA; correct?
17 A.   Yes.
18 Q.   And combination products that are regulated by
19 the FDA; correct?
20 A.   Yes, that's correct.
21 Q.   Okay.  Let's go over to or let's go down.  It
22 says, the Subcommittee concluded that science at the FDA
23 is in a precarious position.  The agency suffers from
24 serious scientific deficiencies and is not positioned to
25 meet current or emerging regulatory responsibilities.

Page 276

1      Did I read that correctly?
2 A.   You did read it correctly.
3 Q.   Okay.  The Subcommittee found that the
4 deficiency has two sources:  The demands on the FDA have
5 soared due to the extraordinary advance of scientific
6 discoveries, the complexity of the new products, and
7 claims submitted to FDA for premarket review and
8 approval, the emergence of challenging safety problems,
9 and the globalization of the industries that FDA
10 regulates.
11      Did I read that correctly?
12 A.   Yes, you did.
13 Q.   And next it reads, the resources have not
14 increased in proportion to the demands.  The result is
15 that the scientific demands on the agency far exceed its
16 capacity to respond.  The imbalance is imposing a
17 significant risk to the integrity of the food, drug,
18 cosmetic, and device regulatory system and, hence, the
19 safety of the public.
20      Did I read that correctly?
21 A.   Yes, you did.
22 Q.   Okay.  Let's go to the next page, "1.2 Major
23 Findings."
24      Do you read -- see that?
25 A.   Yes.

Page 277

1 Q.   Okay.  Below that, the Subcommittee found
2 substantial weaknesses across the agency, with the
3 possible exception of some drug and medical device
4 review functions funded by our industry fees.  There are
5 several areas of greatest concern, however, which form
6 the basis for this report's most significant findings.
7      Did I read that correctly?
8 A.   Yes.
9 Q.   Okay.  And below that, the FDA cannot fulfill
10 its mission because its scientific base has eroded and
11 its scientific organizational structure is weak.
12      Did I read that correctly?
13 A.   Yes, you did.
14 Q.   Going down into the box, it says, FDA's
15 inability to keep up with scientific advances means that
16 American lives are at risk.
17      Did I read that correctly?
18 A.   Yes, you did.
19 Q.   Going to the last sentence, likewise, evaluation
20 methods have not kept pace with major advances in
21 medical devices and uses of products in combination.
22      Did I read that correctly?
23 A.   Yes.  And on the next page they give an example
24 of the products they're talking about.
25 Q.   And we talked earlier, Mirena is a combination

70 (Pages 274 to 277)

David William Feigal, Jr., M.D., M.P.H.

Page 278

1  product, isn't it?
2  A.   Yes, it's --
3       MR. SCHMIDT:  Asked and answered.
4       THE WITNESS:  Yes, it's a medical, it's a
5  medical device that's a drug delivery device so it's a
6  combination device and drug.
7       MR. JONES:  Okay.
8  BY MR. JONES:
9  Q.   And then down below that it says, the world
10 looks to FDA as a leader to integrate emerging
11 understanding of the biology of medicine, technology,
12 and computational mathematics in ways that will lead to
13 successful disease therapies.  Today, not only can the
14 agency not lead, it cannot even keep up with the
15 advances in science.
16      Did I read that correctly?
17 A.   You did.
18      I don't think I agree with that conclusion by
19 the Committee, but they're entitled to their opinion.
20 Q.   Sure.
21      Let's go to the next page.  Due to constrained
22 resources and lack of adequate staff, FDA is engaged in
23 reactive regulatory priority setting or a fire-fighting
24 regulatory posture instead of pursuing a culture of
25 proactive regulatory science.

Page 279

1       Did I read that correctly?
2  A.   Yes.  And they point out they're talking about
3  the Center for Food and the Center for Veterinary
4  Medicine.
5  Q.   Actually, what they say is that is particularly
6  true for those two entities; correct?
7  A.   Yes.
8  Q.   Okay.  The FDA cannot adequately monitor the --
9  monitor development of food and medical products because
10 it is unable to keep up with scientific advances.
11      Did I read that correctly?
12 A.   Yes.  And then they list the advances, and you
13 can see that none of those really apply to Mirena.
14 Q.   The next sentence then -- we'll see what the
15 document says.
16      The Subcommittee identified the following
17 emerging -- eight emerging science and technologies that
18 are most challenging the FDA:  Systems biology,
19 including genomics and other -omics, wireless
20 health-care devices, nanotechnology, medical imaging,
21 robotics, cell- and tissue-based products, regenerative
22 medicine, and combination products.
23      Did I read that correctly?
24 A.   You did.
25 Q.   Each of these emerging areas is developing at an

Page 280

1  exponential rate and each generates novel scientific,
2  analytic, laboratory, and/or information requirements.
3       Did I read that correctly?
4  A.   Yes, you read that.
5  Q.   Next sentence, the FDA cannot fulfill its
6  surveillance mission because of inadequate staff and IT
7  resources to implement cutting-edge approaches to
8  modeling, risk assessment, and data analysis.
9       Did I read that correctly?
10 A.   Yes.
11 Q.   The FDA lacks a coherent scientific structure
12 and vision as a result of weak organizational
13 infrastructure.
14      Did I read that correctly?
15 A.   You did.
16 Q.   Last sentence, consistent and rigorous peer
17 reviews of programs and processes which are currently
18 lacking are critical for wise utilization of resources
19 and for rebuilding the agency's ability to implement its
20 science-based regulatory responsibilities effectively.
21      Did I read that correctly?
22 A.   Yes, you did.
23 Q.   Next, the FDA cannot fulfill its mission because
24 its scientific workforce does not have sufficient
25 capacity and capability.

Page 281

1       Did I read that correctly?
2  A.   Yes, you did.
3  Q.   The Subcommittee found that, despite the
4  significant increase in workload during the past two
5  decades, in 2007 the number of appropriate -- number of
6  appropriated personnel remained essentially the same,
7  resulting in major gaps of scientific expertise in key
8  areas.
9       Did I read that correctly?
10 A.   Yes.
11      And the word "appropriated" is very important
12 because the size of the FDA by 2007 had nearly doubled,
13 its budget now has quadrupled because of the user fees.
14 So while the congressional appropriated, funded staff or
15 funds for staff remains constant -- and this is a
16 document prepared with Congress in mind -- the FDA has
17 actually been adding the staff in these areas based on
18 user fees.
19 Q.   But as of 2007, this was the Committee's report;
20 correct?
21 A.   Well, it's about the appropriated rather than --
22 it's not talking about the total FDA workforce, they're
23 talking about the congressional appropriation, which had
24 remained relatively flat at right around 10,000, you
25 know, 10,000 employees, but -- and the budget, the

David William Feigal, Jr., M.D., M.P.H.

Page 282

1    appropriated budget, had remained relatively flat, right
2    around a billion dollars, but by 2007, as I recall, it
3    was almost an additional billion dollars from user fees
4    that provided staff.  In fact, more than half the staff
5    in the review divisions are funded by other sources than
6    appropriated dollars.
7    Q.    Okay.  More importantly, despite the critical
8    need for a highly trained workforce to fulfill its
9    mission, the FDA faces substantial recruitment and
10   retention challenges.
11        Did I read that correctly?
12   A.    Yes.  That's true of some parts of FDA.
13   Q.    But it doesn't say some parts of FDA in the
14   document, does it?
15   A.    No.  But I know -- I mean, I know what parts of
16   FDA that have problems and other areas -- you know, in
17   the device center the average tenure of my thousand
18   staff was 17 years, so we had a 3 percent turnover rate.
19        So the document is very -- speaks in the
20   introduction in very broad terms.  You actually have to
21   sort of drill down and see the specific areas they're
22   talking about.
23   Q.    There's insufficient investment in professional
24   development, which means that the workforce does not
25   keep up with scientific advances.

Page 283

1         Did I read that correctly?
2    A.    You did.
3    Q.    Okay.
4    A.    And, again, it's very -- it varies from
5    organizational unit to organizational unit.
6    Q.    FDA's failure to retain and motivate its
7    workforce puts FDA's mission at risk.  Inadequately
8    trained scientists are generally risk-averse and tend to
9    give no decision, a slow decision or, even worse, the
10   wrong decision on regulatory approval or disapproval.
11        During our encounters with staff and center
12   leadership, we were struck by the near unanimity at the
13   shortage of science staff due to the lack of resources
14   to hire and the inability to recruit and retain needed
15   expertise are serious, long-standing challenges.
16   Internal expertise and experience to provide the science
17   capability and capacity needed in highly specialized and
18   fast-evolving areas is disturbingly limited.
19        The lack of a trained workforce means that the
20   FDA is ineffective in responding to emerging fields that
21   require individuals and work teams with
22   multi-disciplinary skills built on very complex, highly
23   specialized, and often esoteric bodies of knowledge.
24        Did I read that correctly?
25   A.    Yes, you did.

Page 284

1    Q.    Going down, the FDA was extremely disturbed at
2    the state of the FDA IT infrastructure.
3         Did I read that correctly?
4    A.    Yes, you did.
5    Q.    It also pointed out that the FDA has insufficient
6    access to data and cannot effectively regulate products
7    based on new science due to lack of supportive IT
8    infrastructure.
9         Did I read that correctly?
10   A.    Yes, you did.
11   Q.    Okay.  The IT situation at FDA is problematic,
12   at best, and, at worst, it is dangerous.  Many of the
13   FDA's systems reside on technology that has been in
14   service beyond the useful life cycle.  Systems fail
15   frequently, and even E-mail systems are unstable, most
16   recently, during an E-Coli food contamination
17   investigation.  More importantly, reports of product
18   dangers are not rapidly compared and analyzed.
19        Did I read that correctly?
20   A.    Yes.  This is a good description of the Food
21   Center.
22   Q.    It doesn't say the Food Center there, does it,
23   sir?
24   A.    Well, the E-Coli --
25        MR. SCHMIDT:  Object to characterization.

Page 285

1         THE WITNESS:  The E-Coli food contamination,
2    their one example that they give, is a Food Center
3    issue.
4    BY MR. JONES:
5    Q.    But, sir, this paragraph does not refer to the
6    Food Center, does it?
7         MR. SCHMIDT:  Objection.  Asked and answered,
8    argumentative.
9         THE WITNESS:  This is an overall statement, but
10   the examples that they're citing are -- throughout most
11   of this report are in the Center for Food and the Center
12   for Veterinary Medicine, two of the centers that in 2007
13   had no user fee resources compared to the Drug Center,
14   which by this time had more than doubled in size over
15   the last decade.
16        MR. JONES:  Move to strike as nonresponsive.
17        MR. SCHMIDT:  I'll object to that motion.
18   BY MR. JONES:
19   Q.    Reading, critical data reside in large
20   warehouses sequestered in piles and piles of paper
21   documents.  There's no backup of these records, which
22   include valuable clinical trial data.
23        Did I read that correctly?
24   A.    You did, yes.
25   Q.    The FDA has inadequate extramural funding

Golkow Technologies, Inc877.370.3377

David William Feigal, Jr., M.D., M.P.H.

Page 286

1      programs and collaborations to accelerate the
2      development of critical health information exchanges in
3      order to support clinical trials and pharmacovigilance
4      activities.
5            Did I read that correctly?
6      A.   Yes, you did.
7      Q.   And there are no pharmacovigilance activities
8      associated with food, is there?
9      A.   Well, they're not pharmacovigilance but there's
10     food safety vigilance programs, yes.
11     Q.   That's right. And that's in that paragraph that
12     you were trying to say related to food safety; correct?
13           MR. SCHMIDT: Objection. Argumentative.
14           THE WITNESS: No. They give examples, they do
15     give examples from drugs, although not very many.
16           MR. JONES: Okay.
17     BY MR. JONES:
18     Q.   The next, 1.3, at the bottom, in contrast to
19     previous reviews that warned crises would arise -- would
20     arise if funding issues were not addressed, recent
21     events in our findings indicate that some of those
22     crises are now realities and American lives are at risk.
23           Did I read that correctly?
24     A.   Yes, you did.
25     Q.   Going to the next page, we found that FDA's

Page 287

1      resource shortfalls have resulted in a plethora of
2      inadequacies that threaten our society, including, but
3      not limited to, inadequate inspections of manufacturers,
4      a dearth of scientists who understand emerging new
5      technologies, inability to speed the development of new
6      therapies, an import system that is badly broken, a food
7      supply that grows riskier each year, and an information
8      infrastructure that was identified as a source of risk
9      in every center and program reviewed by the
10     Subcommittee. We conclude that FDA can no longer
11     fulfill its mission without substantial and sustained
12     additional appropriations.
13           Did I read that correctly?
14     A.   Yes, you did.
15     Q.   Although there is indeed great urgency to stem
16     the tide of continued deterioration and the science that
17     supports the regulatory decisions of the FDA, the
18     magnitude of changes that are needed will require a
19     phased approach based on a well-thought-out plan.
20           Did I read that correctly?
21     A.   Yes.
22     Q.   For example, during the time of our review, the
23     directorship of two of the largest FDA centers, CFSAN
24     and the Center for Drug Evaluation and Research, became
25     vacant. It will be difficult, if not impossible, to

Page 288

1      recruit the best leaders unless there is assurance that
2      adequate resources and staff will be available to
3      address the challenges.
4            Did I read that correctly?
5      A.   Yes, you did.
6            And the Center for Drug position was filled
7      immediately. That person remains in that job and she's
8      held that job since 1993, with a brief time when she
9      worked in the commissioner's office. So they predicted
10     that it would be a problem but, in fact, it was not.
11     Q.   Not according to this report.
12           The magnitude of the resources --
13           MR. SCHMIDT: Object to -- objection.
14           Just a second.
15           Objection. Argumentative.
16     BY MR. JONES:
17     Q.   The magnitude of the resources required to
18     restore scientific capability and capacity is
19     substantial.
20           Did I read that correctly?
21     A.   Yes.
22     Q.   We recognize -- next page. We recognize that
23     adequate resources, human and financial, alone will not
24     be sufficient to repair the deteriorating state of
25     science at FDA, which is why we also recommend

Page 289

1      significant restructuring. But without a substantial
2      increase in resources, the agency is powerless to
3      improve its performance and will fall further behind and
4      will be unable to meet either the mandates of Congress
5      or the expectations of the American public.
6            Did I read that correctly?
7      A.   Yes, you did.
8      Q.   Okay. Let's go down to, it's Page 11, and you
9      see a chart there. Let's go to the section that talks
10     about the Center for Drug Evaluation and Research, the
11     CDER.
12           Are you with me?
13     A.   Yes.
14     Q.   Okay. CDER regulates the safety, efficacy,
15     quality, and advertising of all drug products marketed
16     in the U.S., including brand-name and generic
17     pharmaceuticals, over-the-counter medicines, therapeutic
18     proteins --
19           And can you help me out with that word? Mono?
20     A.   Monoclonal antibodies.
21     Q.   Oh.
22           -- monoclonal antibodies, 2,500 U.S. and 2,500
23     foreign non-gas manufacturers, 5,000 active commercial
24     Investigational New Drug Applications, 12,000 drug
25     products, 3.3 billion prescriptions per year, 61,000

Golkow Technologies,  Inc877.370.3377

David William Feigal, Jr., M.D., M.P.H.

Page 290

1   pieces of promotional material received for review, 290
2   billion in pharmaceutical sales, brand prescription
3   sales 221 billion, generic prescription sales 54
4   billion, and over-the-counter sales 15 billion.
5          Did I read that correctly?
6   A.   Yes.
7   Q.   Okay.  Let's go to Page 12.
8          Science forms the basis of all regulatory
9   decisions.  Those --
10          MR. SCHMIDT:  Where are you reading from?
11          MR. JONES:  The last sentence.
12  BY MR. JONES:
13  Q.     Science forms the basis of all regulatory
14  decisions.  Those that do not have adequate scientific
15  support are thus subject to delays or, worse, poor
16  decisions.  Therefore, effective regulation requires
17  that the scientific competency within FDA matches or
18  exceeds an applicant's knowledge.
19          Did I read that correctly?
20  A.   Yes.
21  Q.   Next page, first paragraph, last sentence, the
22  bulk of the agency's activities involve reviewing new
23  drugs, biologics, medical devices, and additives.  It is
24  clear from this list that the FDA must master science at
25  the molecular and nanoscale and be able to detect,

Page 291

1   assess, and respond to the growing risks resulting from
2   globalization.
3          Did I read that correctly?
4   A.   Yes.
5          It's referring back to the description of
6   genomics and nanotechnology, which in 2007 -- genomics
7   has actually come -- has actually become important,
8   nanotechnology not so much.
9   Q.   Okay.
10  A.     So they're anticipating these would be new areas
11  that the center would need to -- the centers would need
12  to deal with.
13  Q.   Next paragraph towards the bottom, an even
14  broader range of activities related to surveillance of
15  adverse events is needed with marketed products:
16  Surveillance and efficacy and safety assessments need
17  support.  These iterative and complex activities consist
18  of multiple sublevels of activity, such as science-based
19  interactions with third parties.  Surveillance also
20  requires an array of analytic activities as well as
21  extensive risk communications activities.
22          FDA must have the scientific staff and resources
23  to undertake the regulatory research that will provide a
24  basis to, one, improve capacity for safety and efficacy
25  evaluations and monitoring of candidate and licensed

Page 292

1   products; two, modernize current regulatory pathways;
2   and, three, develop new regulatory pathways where there
3   are currently none.  Much of this research must be
4   undertaken by FDA because it is mission critical and
5   because it either cannot or will not be done by other
6   government agencies or industry.
7          Did I read that correctly?
8   A.   Yes, you did.
9   Q.   Okay.  Next page, second paragraph, in summary,
10  getting the science right is critical to FDA's ability
11  to fulfill its mission.  Decisions made in regulation
12  development, premarket approvals, legal actions, and
13  related public health emergencies must be based on
14  understanding of contemporary and emerging science
15  within the context of the risk analysis paradigm.
16          Did I read that correctly?
17  A.   I lost where you were.  Oh, I see where you are.
18          Yeah, what you did is you just skipped over
19  several paragraphs where they cited examples where FDA
20  had actually done a good job.
21  Q.   Well, I'll let your counsel go into that because
22  I only have so much time with you.
23          Next page, Center for -- the chart, Center for
24  Drug Evaluation and Research, CDER, premarket reviewed
25  and approved 101 prescription drugs and biologics, 14

Page 293

1   OTC medications, 371 generic drugs, and conducted 648
2   clinical research inspections.
3          That was for 2000 -- fiscal year 2006; correct?
4   A.   Yes, that's right.
5   Q.   Okay.  And then post-market, fiscal year 2006,
6   received 471,000 AERS reports.
7          Those are Adverse Event Reports; correct?
8   A.   Yes, that's right.
9   Q.   Issued 16 public health advisories, reviewed
10  13,000 medication error reports, issued 70 drug
11  promotion violation letters and 530 advisory letters.
12          Product quality, reviewed 184 pre-approval
13  inspections in support of 81 new drugs and 109 generic
14  applications, reviewed 1,329 cGMP inspections, received
15  2,670 Drug Quality Reports, and coordinated 361 drug
16  recalls.
17          Did I read that correctly?
18  A.   Yes.
19          Those are activities that the field does, staff
20  of about 1,500 people.  Yeah, this is the work that was
21  actually completed.  Yes.
22  Q.   Okay.  Let's go down to -- let's go down to Page
23  20, second paragraph, middle of the paragraph, but
24  despite this commendable commitment of staff, we found
25  that scientific capabilities and capacity at the FDA

74 (Pages 290 to 293)

David William Feigal, Jr., M.D., M.P.H.

Page 294

1    overall are unevenly meeting current requirements, have
2    areas of serious deficiencies, and are not positioned to
3    meet future needs.  Most of these deficiencies are the
4    result of the dramatic increase in responsibilities of
5    the FDA on the one hand and the lack of increasing
6    personnel and scientific expertise to fulfill these
7    responsibilities on the other.
8           Did I read that correctly?
9    A.    Yes.
10   Q.    Okay.  Next page.
11          Let's go down to Page 26, second-to-last
12   paragraph, second-to-last sentence, the mission of
13   getting safe and effective drugs to patients in a timely
14   manner is currently threatened by inadequate expertise
15   and capabilities.
16   A.    Yes.
17   Q.    Did I read that correctly?
18   A.    Yes.
19          This is a paragraph describing the use of
20   genetics and genome-wide association, which isn't really
21   relevant to this product, but that's what this paragraph
22   is about.
23   Q.    Isn't it also referring to combination products?
24   A.    Not products like Mirena.  There are
25   combinations of companion diagnostics where genomics is

Page 295

1    used to predict which cancers will respond to which
2    drugs.  So that's largely what they're referring to
3    here.
4    Q.    Let's go down to the bottom of that page.  The
5    area of drug safety now has several examples that
6    favorably affect the benefit-risk ratio.  Safety
7    pharmacogenetics using genetic technologies can and have
8    defined diagnostic profiles that can predict which
9    patients should not risk an adverse event before they
10   take the drug.  The Subcommittee stressed the importance
11   of safety science.
12          Did I read that correctly?
13   A.    Yes.
14          They're giving an example of where the agency
15   actually did this and resulted in a much safer use of a
16   drug for HIV infection.  There's another --
17   Q.    Page 30, Section 3.1.3, there is insufficient
18   capacity in modeling, risk assessment, and analysis.
19   Recommendation:  The FDA should immediately implement
20   the IOM recommendations for improving drug safety as
21   well as those made by the Subcommittee working group on
22   bio -- on surveillance/biostatistics.
23          Did I read that correctly?
24   A.    You did.
25   Q.    Okay.  Let's go to the next page, Page 31, first

Page 296

1    full sentence, we concur with the IOM's findings of
2    scientific gaps in surveillance and biostatistics and
3    are in substantial agreement with the IOM
4    recommendations directed to the agency and with FDA's
5    proposed response.
6           Did I read that correctly?
7    A.    Yes.
8           This report is endorsing a request for agency to
9    fund a program known as the Sentinel, the Sentinel
10   System, which has been funded and is in place.
11   Q.    Okay.  Next paragraph, our findings and
12   recommendations of the highest priority are summarized
13   below.  Although there are many needs, e.g., external
14   collaborations and IT support, in all centers and
15   programs, none of it -- none is as time sensitive and
16   critical as surveillance and risk management.
17          Did I read that correctly?
18   A.    Yes, you did.
19   Q.    The Subcommittee found that there's an urgent
20   need for developing and evaluating new statistical
21   methods that are most appropriate for the data generated
22   by new areas of science.  The Subcommittee notes that
23   new challenges are posed by the wealth of new types of
24   data arising from animal studies, early clinical work,
25   and new approaches to safety surveillance.

Page 297

1           Did I read that correctly?
2    A.    Yes.
3    Q.    Okay.  Next paragraph down, second-to-the-last
4    sentence, statistical and epidemiological expertise will
5    need to be brought to bear on the most efficient and
6    productive analytical approaches to identifying and
7    evaluating signals arising from such databases.
8    A.    Yes.
9    Q.    Did I read that correctly?
10   A.    Yes.
11          They're talking about microarray and system
12   biology and genetic information databases.
13   Q.    Yeah.  I don't see that.  It's actually --
14   A.    Well, it's at the top.
15   Q.    It's talking about the Center for Medicare and
16   Medicaid and Veterans Administration databases, isn't
17   it, sir?
18   A.    Well, that relates to the Sentinel initiative.
19   Yes, that's -- but it begins with methods to evaluate
20   and appropriate data from microarray and systems biology
21   experiments but then it does talk about the availability
22   of -- this is the time period when we're starting to see
23   electronic medical records and starting to utilize
24   those, so this document was to help justify a request
25   for FDA to set up a 100-million-patient database that

David William Feigal, Jr., M.D., M.P.H.

Page 298

1    FDA could do -- could access to actually use to help
2    evaluate safety.
3    Q.    The Subcommittee found that the FDA lacked
4    sufficient expertise in quantitative methods, such as
5    statistics and biomathematics, to effectively assess
6    products and guide sponsors to design valid and
7    informative studies.
8          Did I read that correctly?
9    A.    You did.
10         I think it's referring back to the systems
11   biology.
12   Q.    Let's go to the next page.  The Subcommittee
13   found that the FDA also has a lack of expertise in
14   risk/benefit assessment.  The Subcommittee notes that
15   another important area for quantitative methods
16   development is risk/benefit assessment.  Such
17   assessments have traditionally been made informally but
18   as the public's concern about the value and safety of
19   new drugs continues to grow and as the complexity and
20   volume of data informative about potential benefits and
21   risks increases, more formal methods will be important
22   for optimal decision-making.
23         Did I read that correctly?
24   A.    Yes, you did.
25   Q.    Okay.  Going down, skipping that next

Page 299

1    recommendation in the interest of time, the Subcommittee
2    recommends that the FDA strengthen the information tools
3    for supporting effective risk management.  This would
4    provide the FDA with improved capacity to identify
5    safety risks in advance and to conduct effective risk
6    management, analysis, and communications.  Key areas of
7    focus would include providing improved database access
8    and analysis and support of safety assessment, including
9    access to health and public health databases for adverse
10   event identification and the surveillance for risk
11   identification and evaluation.  It would also include
12   the development of advanced data mining and analytical
13   methodologies for signal detection in large health care
14   databases.
15         Did I read that correctly?
16   A.    Yes.
17         MR. SCHMIDT:  Objection.  You misread one word.
18         MR. JONES:  That's okay.
19         THE WITNESS:  But that does again refer to the
20   FDA proposal to fund the Sentinel initiative.
21         MR. JONES:  Okay.
22   BY MR. JONES:
23   Q.    Let's go down to the bottom of Page 32.  The FDA
24   should also expand the drug safety framework to apply
25   active surveillance to medical devices, animal drugs,

Page 300

1    and possibly foods as well as human drugs and biologics.
2    This was at a minimum include providing access to
3    existing databases with relevant medical information to
4    FDA reviewers.  It should increase the level of staff
5    expertise in scientifically based risk communication
6    strategies and increase the involvement of external
7    stakeholders in the evaluation of FDA approaches and
8    processes.  The Subcommittee also urges the FDA to
9    develop enhanced reviewer tools, such as data standards,
10   electronic submissions, data mining and analysis as well
11   as tools for electronic facilities, establishment, and
12   product listing and tracking.
13         Did I read that correctly?
14   A.    Yes.
15         And a lot of that has been done and even some of
16   the methodologic work done by FDA statisticians on data
17   mining are techniques that weren't used by either Dr.
18   Ross or Dr. Etminan but which I've cited in my report.
19         MR. JONES:  Okay.  Strike as nonresponsive.
20         MR. SCHMIDT:  Object to that motion.
21   BY MR. JONES:
22   Q.    Page 34.  Actually, let's go down to Page 42,
23   Finding 3.2.2, Finding:  The FDA has an inadequate and
24   ineffective program for scientist performance.
25   Recommendation:  The FDA should enhance the program to

Page 301

1    monitor performance metrics and put the appropriate IT
2    infrastructure in place to track the evolution of those
3    metrics.
4          Did I read that correctly?
5    A.    You did.
6    Q.    Okay.  Going down, the Subcommittee found that
7    there needs to be more meaningful measures of scientific
8    performance on the part of staff.
9          Then going to the last sentence, if performance
10   is based on a noisy proxy, such as time to review a new
11   product application, the pressure to perform can lead to
12   unintended consequences, such as worse drug safety.
13         Did I read that correctly?
14   A.    Yes.
15         That isn't what has happened but that -- you did
16   read that.
17   Q.    Okay.  Finding 3.2.3.  That's okay.  We'll skip
18   that in the interest of time.
19         MR. SCHMIDT:  Because I think you are down to a
20   few minutes.  Ten minutes.
21         MR. JONES:  Ten?  Yeah, that's what I was
22   thinking.
23   BY MR. JONES:
24   Q.    Go to Page 47, Finding 3.3.2.  Finding:  The FDA
25   lacks the information science capability and information

David William Feigal, Jr., M.D., M.P.H.

Page 302

1  infrastructure to fulfill its regulatory mandate.
2       Going down, the Subcommittee found that the
3  FDA's current critical information supply chains are, at
4  best, inefficient, cost intensive and prone to promote
5  errors in regulatory science due to the inability to
6  access, integrate, and analyze data.  Incredibly,
7  critical data resides in large warehouses sequestered in
8  piles and piles of paper documents.
9       Did I read that correctly?
10 A.   Yes.
11      I mean, it reflects the situation a decade ago
12 but -- and not uniformly for FDA, but that certainly was
13 true in 2007 for some parts of FDA.
14      MR. JONES:  Move to strike as nonresponsive.
15      MR. SCHMIDT:  Object to the motion.
16 BY MR. JONES:
17 Q.   There are no effective mechanisms to protect
18 these paper records, which include very valuable
19 clinical trial data.  Furthermore, processes for data
20 and information exchange, both internally as well as
21 among external partners, lack clear business processes,
22 information technology standards, sufficient workforce
23 expertise, a robust technology platform, such that FDA
24 cannot credibly process, manage, protect, access,
25 analyze, and leverage the vast amounts of data that it

Page 303

1  encounters.  Consequently, the FDA's ability to support
2  industry innovation and regulatory activities is
3  compromised.
4       Did I read that correctly?
5  A.   You did.
6  Q.   Let's go to Page 48, second-to-last
7  recommendation.  The Subcommittee recommends that the
8  FDA develop the capacity to do advanced data mining and
9  use analytical methodologies and tool development for
10 large databases as well as the development of new
11 statistical methods and trial designs.  This includes
12 adverse event and signal detection, rapid portable
13 diagnostic analytic testing, the development of
14 risk-based models for selection of manufacturing
15 inspections, risk communications science, and enhanced
16 reviewer tools, such as data standards, electronic
17 submissions, data mining analysis, and electronic
18 product listing and tracking.
19      Did I read that correctly?
20 A.   Yes.  These are all things which are -- have
21 been done since this report has been written.
22 Q.   Let's go to Page 50, middle of the page.  The
23 Subcommittee found that in addition to deficiencies --
24      MR. SCHMIDT:  Let him catch up.
25      THE WITNESS:  Okay.

Page 304

1  BY MR. JONES:
2  Q.   The Subcommittee found that in addition to
3  deficiencies in its technology and communications
4  platform, the FDA lacks many basic tools to support
5  science and regulatory services.  Specifically, the
6  agency lacks the ability to adequately store data from
7  clinical trials or adverse event reporting.  The vast
8  majority of these data are still paper based and sit in
9  large warehouses, where it is not possible to
10 efficiently access the data.  The agency lacks adequate
11 tools to search data, model the data, and analyze the
12 data.  FDA staff repeatedly emphasized the incredible
13 missed opportunities that exist due to the inability to
14 conduct safety and efficacy studies as a consequence of
15 these deficiencies in storage, search, and core
16 scientific tools.
17      Did I read that correctly?
18 A.   You did.
19      I don't think the paragraph actually accurately
20 describes the adverse reporting system, but you did read
21 that correctly.
22 Q.   Okay.  When did you leave FDA?
23 A.   In 2004.
24 Q.   Okay.  So that was three years before this
25 report?

Page 305

1  A.   Yes.  And some of the things that they're
2  describing in 2007 weren't accurate in 2004.
3  Q.   Okay.  So you disagree with the Committee.
4  A.   I'm --
5       MR. SCHMIDT:  Object to characterization.
6       THE WITNESS:  Yes, I disagree with some of their
7  conclusions and I think that some of their
8  characterizations are overbroad and superficial.
9       This is a document that was prepared to support
10 requests for funds in some of these areas and it was
11 successful at doing this.
12      But, for example, with the adverse event
13 reporting, I mean, you know since you've taken a look at
14 AERS downloadable databases that those databases are
15 updated quarterly, there's usually a few-month lag, and
16 they've been provided and they were provided
17 continuously all throughout this period and it existed
18 in FDA databases, so they're -- this is a time when FDA
19 is transitioning from paper to electronic records, and I
20 think this report strongly supports that activity, which
21 is now largely complete.
22      VIDEO OPERATOR:  Source.  Top right.  Hit it
23 twice, I think.  One more time.  Make sure the light is
24 on the right.
25      MR. JONES:  Yeah, here it is.  Okay.

77 (Pages 302 to 305)

David William Feigal, Jr., M.D., M.P.H.

Page 306

1    BY MR. JONES:
2    Q.    Dr. Feigal, do you remember participating in a
3    discussion at -- with -- do you know what Eucomed is?
4    A.    Yes. It's the medical device trade association
5    in Europe.
6    Q.    Okay. And do you remember giving an interview
7    during your -- one of your interactions with that
8    organization?
9    A.    Yes. I don't remember the content, but I think
10   you're going to help me remember what it was about.
11   Q.    Okay.
12         MR. SCHMIDT: Can you just tell me what source
13   you're about to play? Is this on the Internet? What is
14   this?
15         MR. JONES: It's something that we got off of
16   YouTube.
17         THE WITNESS: Oh.
18         MR. JONES: I'll cite the -- yeah. And you're
19   famous.
20         THE WITNESS: Well, I've got a lecture I gave in
21   San Diego that's on YouTube that --
22         MR. JONES: I've got that one too.
23         THE WITNESS: Yeah. Every time I see that, I
24   conclude I needed a haircut before I gave that lecture.
25         MR. JONES: Okay. Let's watch this.

Page 307

1          MR. SCHMIDT: Can you just for the record cite
2    the URL? I think that's what you were about to say.
3          MR. JONES: The sound is not working.
4          MR. SCHMIDT: While he's doing that, do you mind
5    just telling us what the URL is?
6          MR. JONES: Christina, can you pull it?
7          MS. NATALE: Yeah.
8          VIDEO OPERATOR: I think it's because --
9          MS. NATALE: Because it's HDMI?
10         VIDEO OPERATOR: Yeah. If it's going to HDMI,
11   we don't get the sound through here.
12         MR. JONES: You don't get the sound through the
13   HDMI?
14         MS. NATALE: I'm trying. I'm sorry.
15         VIDEO OPERATOR: Do you want to go off the
16   record real quick?
17         MR. JONES: Yeah, let's go off the record.
18         MR. SCHMIDT: I'm not going to agree to go off
19   the record. We're almost done.
20         MR. JONES: Yeah, going -- we're going off the
21   record.
22         MR. SCHMIDT: All right. Over my objection.
23   We're counting this towards the time.
24         MS. NATALE: You have six minutes.
25         THE WITNESS: Off the record?

Page 308

1          MR. JONES: Yeah.
2          MR. SCHMIDT: I'm going to object to going off
3    the record and request that we finish the deposition.
4    There's five minutes left.
5          MR. JONES: It's my deposition. We're going off
6    the record.
7          MR. SCHMIDT: Over my objection.
8          MR. JONES: That's okay.
9          VIDEO OPERATOR: Okay? Okay.
10         We're going off the record. The time is 6:01
11   p.m.
12         MR. SCHMIDT: Could we just go back on the
13   record for five seconds so I can say on the record -- we
14   can just do it on the stenography record.
15         From our perspective, the deposition is done in
16   five minutes.
17         MR. JONES: We're off the record.
18         (Discussion off the record.)
19         VIDEO OPERATOR: We are back on the record.
20         The time is 6:03 p.m.
21   BY MR. JONES:
22   Q.    Dr. Feigal, so do you believe that FDA has
23   adequate resources such that FDA always performs its job
24   in accordance with its mission?
25         MR. SCHMIDT: Objection. Asked and answered.

Page 309

1          THE WITNESS: No. I think I have stated in,
2    including in other testimony, that there are times that
3    FDA needs to improve its resources and, in fact, I
4    have -- when I was center director for Devices, I was an
5    advocate for user fees to increase the resources of the
6    Center and particularly pointed out resources needed for
7    inspections. So there are areas where FDA resources are
8    needed.
9          I think my points before may have related to the
10   fact that the resources that are relevant for this trial
11   or the resources in the review division and the
12   reviewers have considered this product and I don't see
13   anything in the record that suggests they didn't have
14   the resources to their job.
15         MR. JONES: Okay. Let's watch this video.
16         (Video played as follows:
17         "DR. FEIGAL: Well, I think they're becoming
18   more similar but the biggest difference between the
19   European and the U.S. is the utilization of third
20   parties. In the U.S., the Food and Drug Administration
21   has a tradition of doing its own inspection, its own
22   reviews, and even to the extent that if they don't have
23   enough resources to do all the inspections or to do all
24   of the reviews, they leave them undone.")
25

78 (Pages 306 to 309)

David William Feigal, Jr., M.D., M.P.H.

|  | Page 310 |
|---|---|
| 1 | BY MR. JONES: |
| 2 | Q.    Is that you in the video? |
| 3 | A.    It is. |
| 4 | Q.    Do you remember saying that in that interview? |
| 5 | A.    Yes.  It's similar to something I said many |
| 6 | times.  We had a program in the Center for Devices where |
| 7 | companies could opt to use third-party reviews and the |
| 8 | program was underutilized.  I was also an advocate for |
| 9 | using third-party inspectors, the way that the Europeans |
| 10 | do.  So that's what this interview was about. |
| 11 | Q.    Okay. |
| 12 | A.    FDA doesn't have very many staff located outside |
| 13 | the United States and so it's difficult for them to do |
| 14 | the biannual manufacturing inspections outside the |
| 15 | United States. |
| 16 |       MR. JONES:  I have no further questions for you, |
| 17 | Dr. Feigal. |
| 18 |       MR. SCHMIDT:  Okay.  Do you mind just reading |
| 19 | into the record the URL? |
| 20 |       MS. NATALE:  I don't have it. |
| 21 |       MR. JONES:  Oh, here.  I'll get it for you, |
| 22 | Paul. |
| 23 |       MR. SCHMIDT:  Thank you.  I appreciate it. |
| 24 |       MR. JONES:  The URL is HTTPS, hyphen, forward |
| 25 | slash, forward slash, WWW dot YouTube dot-com, forward |

|  | Page 312 |
|---|---|
| 1 | STATE OF CALIFORNIA          ) |
| 2 | COUNTY OF LOS ANGELES        ) |
| 3 |       I, ROSEMARY LOCKLEAR, a Certified Shorthand |
| 4 | Reporter of the State of California, duly authorized to |
| 5 | administer oaths pursuant to Section 2025 of the |
| 6 | California Code of Civil Procedure, do hereby certify |
| 7 | that |
| 8 |       DAVID WILLIAM FEIGAL, JR., M.D., M.P.H., the |
| 9 | witness in the foregoing deposition, was by me duly |
| 10 | sworn to testify the truth, the whole truth and nothing |
| 11 | but the truth in the within-entitled cause; that said |
| 12 | testimony of said witness was reported by me, a |
| 13 | disinterested person, and was thereafter transcribed |
| 14 | under my direction into typewriting and is a true and |
| 15 | correct transcription of said proceedings. |
| 16 |       I further certify that I am not of counsel or |
| 17 | attorney for either or any of the parties in the |
| 18 | foregoing deposition and caption named, nor in any |
| 19 | way interested in the outcome of the cause named in |
| 20 | said deposition dated the_____ day of |
| 21 | _____, 2016. |
| 22 |  |
| 23 |  |
| 24 |  |
| 25 | ROSEMARY LOCKLEAR, RPR, CRR, CSR 13969 |

|  | Page 311 |
|---|---|
| 1 | slash, watch, question mark, V equals X, as in Xerox, L |
| 2 | as in Larry, F as in Frank, 4, lower case A, H as in |
| 3 | Harry, D as in David, L as in Larry, lower case TZY. |
| 4 |       And just to clarify -- |
| 5 |       THE WITNESS:  Of course. |
| 6 |       MR. JONES:  -- so everybody has it, the V is |
| 7 | lower case V equals upper case XLF4, lower case A, upper |
| 8 | case HDL, lower case TZ, upper case Y. |
| 9 | They don't make it easy. |
| 10 |       MR. SCHMIDT:  Here it is.  Thank you. |
| 11 |       THE WITNESS:  You got it, huh?  I'm impressed at |
| 12 | your typing skills. |
| 13 |       MR. SCHMIDT:  That concludes the deposition. |
| 14 |       MR. JONES:  All right. |
| 15 | Thank you, Dr. Feigal. |
| 16 |       THE WITNESS:  You're welcome. |
| 17 |       VIDEO OPERATOR:  This concludes the deposition |
| 18 | of David Feigal, consisting of four DVDs. |
| 19 |       The time is 6:08 p.m. |
| 20 |       We're off the record. |
| 21 |       (Whereupon the deposition concluded at 6:08 |
| 22 | p.m.) |
| 23 |       TESTIMONY CLOSED |
| 24 |  |
| 25 |  |

|  | Page 313 |
|---|---|
| 1 | INSTRUCTIONS TO WITNESS |
| 2 |  |
| 3 |  |
| 4 |       Please read your deposition over carefully and |
| 5 | make any necessary corrections.  You should state the |
| 6 | reason in the appropriate space on the Errata Sheet for |
| 7 | any corrections that are made. |
| 8 |       After doing so, please sign the Errata Sheet |
| 9 | and date it. |
| 10 |       You are signing same subject to the changes |
| 11 | you have noted on the Errata Sheet, which will be |
| 12 | attached to your deposition. |
| 13 |       It is imperative that you return the original |
| 14 | Errata Sheet to the deposing attorney within thirty (30) |
| 15 | days of receipt of the deposition transcript by you.  If |
| 16 | you fail to do so, the deposition transcript may be |
| 17 | deemed to be accurate and may be used in court. |
| 18 |  |
| 19 |  |
| 20 |  |
| 21 |  |
| 22 |  |
| 23 |  |
| 24 |  |
| 25 |  |

79 (Pages 310 to 313)

David William Feigal, Jr., M.D., M.P.H.

Page 314

```
1              E R R A T A
2              - - - - - -
3
4    PAGE  LINE  CHANGE
5    ____  ____ _____
6    REASON:_____
7
8    PAGE  LINE  CHANGE
9    ____  ____ _____
10   REASON:_____
11
12   PAGE  LINE  CHANGE
13   ____  ____ _____
14   REASON:_____
15
16   PAGE  LINE  CHANGE
17   ____  ____ _____
18   REASON:_____
19
20   PAGE  LINE  CHANGE
21   ____  ____ _____
22   REASON:_____
23
24
25
```

Page 316

```
1              LAWYER'S NOTES
2    PAGE LINE
3    ____  ____ _____
4    ____  ____ _____
5    ____  ____ _____
6    ____  ____ _____
7    ____  ____ _____
8    ____  ____ _____
9    ____  ____ _____
10   ____  ____ _____
11   ____  ____ _____
12   ____  ____ _____
13   ____  ____ _____
14   ____  ____ _____
15   ____  ____ _____
16   ____  ____ _____
17   ____  ____ _____
18   ____  ____ _____
19   ____  ____ _____
20   ____  ____ _____
21   ____  ____ _____
22   ____  ____ _____
23   ____  ____ _____
24   ____  ____ _____
25   ____  ____ _____
```

Page 315

```
1           ACKNOWLEDGEMENT OF DEPONENT
2
3
4         I, _____, do hereby certify
5    that I have read the foregoing pages, and that the same
6    is a correct transcription of the answers given by me to
7    the questions therein propounded, except for the
8    corrections or changes in form or substance, if any,
9    noted in the attached Errata Sheet.
10
11
12
13   _____
14   DAVID WILLIAM FEIGAL, JR., M.D., M.P.H.   DATE
15
16   Subscribed and sworn
     to before me this
17   _____ day of _____, 20____.
18
     My commission expires:_____
19
20   _____
     Notary Public
21
22
23
24
25
```